# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

Ako K. Burrell

　　　　　　　　Plaintiff,

　　v.　　　　　　　　　　　　　　　　　9:23-CV-0098
　　　　　　　　　　　　　　　　　　　　(MJK)

Bishop, *et. al.*

　　　　　　　　Defendants.

---

Ako K. Burrell, Plaintiff, *pro se*
Jennifer J. Corcoran Esq., Asst. Attorney General for Defendants

Mitchell J. Katz, United States Magistrate Judge

## MEMORANDUM-DECSION AND ORDER

In this *pro se* civil rights action, Burrell alleges that Defendants violated his constitutional rights in December 2022 while incarcerated at Upstate C.F. *See* (*generally* Complaint ("Compl.")," Dkt. 1). Currently before the Court is Defendants' motion for summary judgment under Fed. R. Civ. P. 56. (Dkts. 122, 133). Burell opposes the motion. (Dkt. 130). Burrell consented to the jurisdiction of a Magistrate Judge. (Dkt. 32). For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part.

1

## I.    BACKGROUND

### A. Facts

The parties are fully familiar with the facts underlying Burrell's claims which the Court will refer to as necessary in its analysis of Defendants' motion.

### B. Procedural History

Burrell commenced this action on January 25, 2023 by filing a Complaint and moving for leave to proceed *in forma pauperis*. (Dkts. 1, 2).

By Decision and Order dated March 7, 2023, Senior United States District Court Judge David N. Hurd granted Burrell's request to proceed *in forma pauperis*, reviewed the Complaint under 28 U.S.C. §1915 and dismissed the following claims without prejudice: (i) Eighth Amendment condition-of-confinement claims against Defendants Nurse Doe 2, Taylor, and Lebarge; (ii) Eighth Amendment condition-of-confinement claims related to deprivation orders; (iii) Fourteenth Amendment due process claims; (iv) First Amendment access-to-court claims; and (v) First Amendment retaliation claims against Defendants Locke, Conto, Burroughs, Bruemelle, and Taylor. (Dkt. 5, at 29).

Senior Judge Hurd ruled that the following claims survived the Court's initial review and required a response: (i) Eighth Amendment excessive force and failure-to-intervene claims against Defendants Bishop, Locke, Gary, Plonka, Ditullio, Durant, Menard, Martindale, Bonesteel, Bugavey, Marshton, Chontosh, and Hart; (ii) Eighth Amendment deliberate medical indifference claims against Defendants Dumas, Nurse Doe, Hart, Holcombe, Dr. Doe, and Surgeon Doe; (iii) Eighth Amendment condition-of-confinement claims against Defendants Mitchell, Durant, and Hastings; and (iv) First Amendment retaliation claims against Defendants Menard, Durant, Ditullio, Hart, Mitchell, Nurse Doe, Bonesteel, Martindale, Gary, Bugavey, Conto, Richter, Plonka, Marshton, Chontosh, Dumas, Cook, Martin, Bishop, Hastings, Bullock, Taylor. (Dkt. 5, at 29-30).

Defendants filed their Answer on September 22, 2023. (Dkt. 26).

On April 12, 2024, the Court issued a text order (Dkt. 65) denying, as untimely, Burrell's letter request (Dkt. 64) to amend the Complaint.

Defendants now move for summary judgment, arguing that: (i) Burrell did not exhaust the administrative remedies available to him prior to commencing this action; and (ii) even if Burrell did exhaust his

administrative remedies, the Complaint should nevertheless be dismissed because Burrell's constitutional claims do not raise any issues of fact. (Dkt. 122-2).

The Court heard oral argument on January 28, 2026.

## II.   <u>STANDARD OF REVIEW</u>

### A. Summary Judgment

"Summary Judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (cleaned up). When deciding if there is a genuine issue of material fact, courts "must view the evidence in the light most favorable" to the non-moving party. *Id.* at 656 (cleaned up). Likewise, courts must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Kessler v. Westchester County Dep't of Social Services,* 461 F.3d 199, 206 (2d Cir. 2006). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v.*

4

*Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586. "The nonmoving party may not rely on mere conclusory allegations nor speculation but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145,149 (2d Cir. 1998) (cleaned up).

"If the defendant in a run-of-the-mill civil case moves for summary judgment," judges "must ask" themselves "not whether" they "think the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook,* 691 F.3d 226, 230 (2d Cir. 2012).

## III. GENERALLY APPLICABLE LAW

Section 1983 establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (cleaned up). "Section 1983 itself creates no substantive rights, it only creates "a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). "To establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (cleaned up).

## IV.   DISCUSSION

The Court: (i) grants in part and denies in part Defendants' motion for summary judgment; (ii) adopts Defendants' Statement of Material Fact ("SOMF") as true because it is supported by the record; (iii) finds that there is a question of fact as to whether Burrell exhausted his administrative remedies regarding his December 10, 2022 First Amendment retaliation claim against Defendants Menard, Durant, Ditullio and Hart; (iv) finds even though there is a question of

6

fact as to whether Burrell exhausted his administrative remedies regarding his December 10, 2022 First Amendment retaliation claim, there are no issues of fact precluding granting Defendants summary judgment on the substantive claim; (v) finds that Burrell exhausted his administrative remedies regarding his Eighth Amendment excessive force claim against Defendants Ditullio and Locke for allegedly inserting a pen in his anus; and (vi) finds that there is an issue of fact as to who inserted the pen in Burrell's anus.

### A. The Court adopts Defendants' SOMF as true because Burrell failed to comply with Local Rule 56.1(b) and it is well supported by the record.

The Court adopts Defendants' SOMF as true. *Pro se* litigants are notified that the failure to comply with the Northern District's local rules can result in the adoption of their opposition's SOMF if the SOMF is well supported. Here, Burrell did not comply with Local Rule 56.1(b) and Defendants' SOMF is well supported.

"While courts are required to give due deference to a plaintiff's *pro se* status, that status 'does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Jackson v. Moore*, No. 9:21-CV-1001 (GTS/ATB), 2023 WL 4710869, at

*2 (N.D.N.Y. Apr. 14, 2023) (quoting *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir. 2003)), *report and recommendation adopted,* 2023 WL 4711091 (N.D.N.Y. July 24, 2023). "Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the non-movant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion." *Id.* (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996)).

Accordingly, when a party moves for summary judgment against a *pro se* litigant, either the movant or the district court must provide the *pro se* litigant with notice of the consequences of failing to respond to the motion. *See Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620 (2d Cir. 1999). Courts in this district have routinely held that when such notice is provided and a *pro se* plaintiff fails to respond to a motion for summary judgment, the court may accept the defendant's factual assertions as true to the extent they are supported by the evidence in the record. *See, Jackson,* 2023 WL 4710869 at *2; *see also Price v.*

8

*Oropallo,* 9:13-CV-563 (GTS/TWD), 2014 WL 4146276, at \*5 (N.D.N.Y. Aug. 2014) ("An unopposed summary judgment motion may properly be granted only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law.") (cleaned up).[1]

Burrell failed to comply with Local Rule 56.1(b). On May 29, 2025, Defendants served Burrell with their motion for summary judgment and a Notification of Consequences of Failing to Respond to a Summary Judgment Motion. (Dkts. 122, 124). Although Burrell responded to the motion, his response to Defendants' SOMF fails to comply with Local Rule 56.1(b) because he did not cite to the record to support his denials of Defendants' factual assertions. *See* (Dkt. 130); *see also Lee v. City of Troy*, 520 F. Supp. 3d 191, 198 (N.D.N.Y. 2021) ("Because a naked denial of a fact the movant claims to be undisputed would do little to help the Court, the opposing party must support every denial with a citation to record evidence supporting a genuine dispute of material

---

[1] In *Burrell v. Global Tel Link, et al.*, No. 9:24-cv-1377 (BKS/TWD) (N.D.N.Y. Dec. 23, 2024), Chief United States District Judge Brenda K. Sannes revoked Burrell's special status as a *pro se* civil rights litigant.

fact."). The Court therefore deems Defendants' SOMF admitted because it is properly supported by the record. *See* Local Rule 56.1(b).

## B. Defendants are entitled to summary judgment on the issue of exhaustion as to some of Burrell's remaining claims.

Based on the record before it, the Court grants Defendants summary judgment on the issue of exhaustion on all remaining claims except as follows - the Court finds that: (i) there are questions of fact as to whether Burell exhausted his administrative remedies regarding his December 10, 2022 First Amendment retaliation claim against Defendants Menard, Durant, Ditullio and Hart, and (ii) Burrell exhausted his administrative remedies regarding his Eighth Amendment excessive force claim as to a pen having been inserted in his anus.

The Prison Litigation Reform Act (PLRA) governs federal civil rights litigation by inmates. Under the PLRA, "no action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (cleaned up). "The PLRA's exhaustion requirement applies to all inmate suits about prison

10

life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (cleaned up). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (citations omitted). To exhaust administrative remedies, an incarcerated individual must complete all the administrative review procedures according to the rules applicable to the institution in which they are confined. *See Jones v. Bock*, 549 U.S. 199, 218 (2007). "Untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (cleaned up).

The PLRA's exhaustion requirement does not apply if the remedy is functionally unavailable to the incarcerated individual. *See Ross v. Blake*, 578 U.S. 632, 642 (2016). There are three "circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643.

*First,* "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a

simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* (citation omitted).

*Second*, "an administrative scheme" is unavailable, when it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* at 643-644. "When an administrative process is susceptible of multiple reasonable interpretations" the incarcerated individual "should err on the side of exhaustion." *Id.* at 644. "But when a remedy is . . . essentially 'unknowable' —so that no ordinary prisoner can make sense of what it demands—then it is also unavailable." *Id.* (citation omitted).

*Third*, an administrative procedure is unavailable when "prison administrators thwart" incarcerated persons "from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

DOCCS has a three-step-grievance process. Step one requires an incarcerated individual to file a complaint with the facility's incarcerated grievance program clerk within 21 days of the alleged event. 7 N.Y.C.R.R § 701.5(a). The Incarcerated Grievance Review Committee reviews the complaint, investigates the allegations, and then issues a written determination. 7 N.Y.C.R.R § 701.5(b)(1). At step

12

two of the grievance process, the incarcerated person may appeal the Committee's determination to the facility's superintendent. 7 N.Y.C.R.R § 701.5(c). On appeal, the superintendent reviews the Committee's decision and issues their own decision. *Id.* At the third step, an incarcerated individual may appeal the superintendent's decision to the Central Office Review Committee ("CORC") for a final administrative determination. 7 N.Y.C.R.R § 701.5(d).

### 1. Burrell's Claims and Corresponding Grievances

Below is a listing of Burrell's surviving claims as determined by Senior Judge Hurd and the corresponding grievance history regarding those claims reflected in the documentary evidence submitted by Defendants in support of their summary judgment motion.[2]

### A. First Amendment Retaliation Claims

i. On December 10, 2022, Defendants Menard, Durant, Ditullio and Hart removed Burrell's mattress, sheets, blankets, towels, washcloths and paper because he would not withdraw his claims against Defendant Ditullio in a separate lawsuit. (Dkt. 122-2, Def. Mem. of Law, pg. 3, at ¶ 1).

---

[2] Burell's response includes four of the five grievances included in Defendants' moving papers: USR-2541-22; UST-2545-22, UST-2538-22; and UST-2537-22. Significantly, the fifth grievance that Burrell includes, UST-2409-22, is for a time period prior to the dates at issue in this case. (Dkt. 130, pg. 17).

The Court finds that there is an issue of fact as to whether Burrell exhausted his administrative remedies regarding this claim. The record is ambiguous as to which, if any of Burrell's five grievances offered by Defendants in their motion papers, is applicable to this First Amendment claim. During oral argument on January 28, 2026, Defendants' counsel confirmed the ambiguity, conceding that either grievance **UST-2537-22** or grievance **UST-2545-22** could be applicable to this particular claim. The Court therefore denies Defendants' motion for summary judgment with respect to the issue of exhaustion of this First Amendment claim. *See Kessler*, 461 F.3d at 206.

However, the presence of an issue of fact whether Burrell exhausted this First Amendment claim is not necessarily fatal to Defendants' motion for summary judgment on this claim. If the Court determines that there are no genuine issues of material fact as to the underlying First Amendment claim, Defendants will be granted summary judgment and the claim will be dismissed.

14

ii.    Between December 10, 2022 and December 12, 2022, Burrell claims that Defendants Mitchell and Durant denied him nine (9) meals because he refused to withdraw claims against Defendants Locke and Ditullio. (Dkt. 122-2, Def. Mem. of Law, pg. 4, at ¶ 2).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

iii.    On December 13, 2022, Defendant Bonesteel assaulted Burrell when Burrell confirmed that Defendant Bonesteel was the John Doe Defendant in a separate lawsuit. (Dkt. 122-2, Def. Mem. of Law, pg. 4, at ¶ 3).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

iv.    On December 13, 2022, Defendants Martindale, Gary and Bugavey assaulted Burrell during transport to/from the hospital because Burrell would not drop a separate lawsuit. (Dkt. 122-2, Def. Mem. of Law, pg. 3, at ¶ 4).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

15

v.  On December 15, 2022, Defendants Conto and Richter issued a contraband watch against Burrell because Burrell refused to withdraw a separate lawsuit. (Dkt. 122-2, Def. Mem. of Law, pg. 4, at ¶ 5).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

vi.  On December 15, 2022, Defendants Plonka, Marston and Chontosh assaulted Burrell because Burrell would not withdraw a separate lawsuit. (Dkt. 122, Def. Mem. of Law, pg. 4, at ¶ 6).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

vii.  On December 15, 2022, Defendants Dumas and Hart refused to provide medical attention to Burrell because Burrell sued Defendant Dumas and non-party Blackburn in a separate lawsuit. (Dkt. 122-2, Def. Mem. of Law, pg. 4, at ¶ 7).

Burrell did not file a grievance specific to these allegations.

However, on December 21, 2022, Burrell authored grievance **UST-2544-22** regarding medical care which named Defendant Hart. Grievance **UST-2544-22** was filed on December 27, 2022 and denied on

16

January 12, 2023. The denial was affirmed by the Superintendent on February 3, 2023 and Burrell appealed to CORC on February 8, 2023. Burrell's appeal to CORC was filed **after** the Complaint in this action was filed. (Dkt. 122-1, Def. SOMF, ¶ 24(C). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

Burrell did not file a grievance or an appeal of a grievance as to Defendant Dumas. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

viii.  On December 15, 2022, Defendants Cook, Martin, Plonka and Bishop placed Burrell on a suicide watch because Burrell tried to sue Defendant Cook and would not withdraw a separate lawsuit. (Dkt. 122-2, Def. Mem. of Law, pg. 4, at ¶ 8).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

ix.   Between December 15, 2022 and December 19, 2022, Defendant Hastings refused to provide Burrell with meals, a mattress and a blanket because Burrell tried to sue Defendant Hastings. (Dkt. 122-2, Def. Mem. of Law, pg. 4, at ¶ 9).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

x.    On December 21, 2022, Defendants Bullock and Taylor issued Burrell a false misbehavior report because of a prior lawsuit Burrell filed. (Dkt. 122-2, Def. Mem. of Law, pg. 4, at ¶ 10).

On December 26, 2022, Burrell authored grievance **#2538-22** which was received on December 27, 2022. (Dkt. 122-4, pg. 135). The grievance was denied by the Superintendent on January 10, 2023 (Dkt. 122-4, pg. 136) which Burrell appealed to CORC on January 19, 2023 (*Id.*). CORC received Burrell's appeal <u>after</u> the Complaint was filed. (Dkt. 122-1, Def. SOMF, ¶ 24(B); Dkt. 122-5, pg. 170).

18

xi.    On December 22, 2022, Bishop directed Defendants Marston and Menard to assault Burrell because Burrell would not withdraw a prior lawsuit. (Dkt. 122-2, Def. Mem. of Law, pg. 5, at ¶ 11).

On December 26, 2022, Burrell authored grievance **#2541-22** which was received on December 27, 2022. (Dkt. 122-4, pg. 143). The Superintendent's affirmance of the denial was issued <u>after</u> the Complaint was filed. (Dkt. 122-1, Def. SOMF, ¶ 24(C); Dkt. 122-4, pg. 144). Burrell never appealed to CORC. (Dkt. 122-1, Def. SOMF, ¶ 24(C); Dkt. 122-5, pgs. 169-176 ). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

xii.    On December 23, 2022, Defendant Bishop directed Defendants Marston and Durant to assault Burrell because Burrell would not withdraw a prior lawsuit. (Dkt. 122-2, Def. Mem. of Law, pg. 16, ¶ 12).

On December 26, 2022, Burrell authored grievance **#2541-22** which was received on December 27, 2022. (Dkt. 122-4, pg. 143). The Superintendent's affirmance of the denial was issued <u>after</u> the Complaint was filed. (Dkt. 122-1, Def. SOMF, ¶ 24(C); Dkt. 122-4, pg. 144). Burrell never appealed to CORC. (Dkt. 122-1, Def. SOMF, ¶ 24(C); Dkt. 122-5, pgs. 169-176 ). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

## B. Eighth Amendment Conditions of Confinement

i. Between December 10, 2022 and December 12, 2022, Defendants Mitchell and Durant denied Burrell nine (9) meals. (Dkt, 122-2, Def. Mem. of Law, pg. 18).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

ii. Between December 15, 2022 and December 19, 2022, Defendant Hastings denied Burrell meals. (Dkt, 122-2, Def. Mem. of Law, pg. 18).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

## C. Eighth Amendment Deliberate Medical Indifference

i. On December 15, 2022, Defendant Dumas refused Burrell's request for medical treatment after he was assaulted by staff. (Dkt, 122-2, Def. Mem. of Law, pg. 18).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

20

ii.    On December 13, 2022 Defendant Hart denied Burrell medical treatment when Burrell complained that he had a pen in his anus and again denied Burrell medical treatment on December 15, 2022 after he was assaulted by staff. Dkt, 122-2, Def. Mem. of Law, pg. 18).

Burrell did not file a grievance specific to these allegations. However, on December 21, 2022, Burrell authored grievance **UST-2544-22** regarding medical care which named Defendant Hart. Grievance **UST-2544-22** was filed on December 27, 2022 and denied on January 12, 2023. The denial was affirmed by the Superintendent on February 3, 2023 and Burrell appealed to CORC on February 8, 2023. Burrell's appeal to CORC was **filed <u>after</u>** the Complaint in this action was filed. (Dkt. 122-1, Def. SOMF, ¶ 24(D); Dkt. 122-4, pgs. 151-54). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

iii.    On December 12, 2022, Defendant Holcombe refused to process Burrell's sick call request. (Dkt, 122-2, Def. Mem. of Law, pg. 18).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

21

### D. Eighth Amendment Excessive Force and Failure to Intervene

    i. On December 22, 2022 and December 23, 2022, Bishop directs officers to assault Burrell. (Dkt, 122-2, Def. Mem. of Law, pgs. 18-19),

On December 26, 2022, Burrell authored grievance **#2541-22** which was received on December 27, 2022. (Dkt. 122-4, pg. 143). The Superintendent's affirmance of the denial was issued <u>after</u> the Complaint was filed. (Dkt. 122-1, Def. SOMF, ¶ 24(C); Dkt. 122-4, pg. 144). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

    ii. On December 10, 2022 Defendants Locke and Ditullio inserted a pen in Burrell's anus. (Dkt, 122-2, Def. Mem. of Law, pg. 19).

Defendants maintain that Burrell failed to exhaust his administrative remedies relative to this claim. They argue that "[Burrell] filed no grievance(s) with regard to the alleged assault, *with the exception of a PREA complaint relative to the alleged placement of a pen in his anus*." (Dkt. 122-2, Defs. Mem. of Law, pg. 34)(emphasis added). Defendants' argument is misguided because Burrell's filing of a PREA claim was his avenue for exhausting his administrative remedies. Directive 4040, § 701.3(i) provides in relevant part:

22

(i) Sexual abuse and sexual harassment complaints. The department has zero tolerance for sexual abuse and sexual harassment. Consistent with this policy and the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52(a)), an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the Prison Litigation Reform Act (PLRA) exhaustion requirement (42 U.S.C. § 1997e(a)) before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported as set forth below. For purposes of the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52) and the exhaustion requirement, any allegation concerning an incident of sexual abuse or sexual harassment …  shall be deemed exhausted if official documentation confirms that:

(1) an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards (28 C.F.R. § 115.51(b)); or to the department's Office of the Inspector General; or

(2) a third party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation …

Defendants concede that Burrell filed a PREA claim (Dkt. 122-1, Def. SOMF, ¶ 4) and a copy of the February 6, 2024 final report issued by the DOCCS Office of Special Investigations regarding Burrell's PREA claim is attached as Exhibit "B" to the Corcoran Declaration (Dkt. 122-6).

23

Because Burrell exhausted his administrative remedies by filing a PREA claim, Defendants' motion for summary judgment regarding exhaustion on this issue is denied. The Court will, however, substantively analyze Burrell's Eighth Amendment excessive force claim below to determine whether Defendants are nevertheless entitled to summary judgment on this claim.

   iii.  On December 13, 2022, Defendant Gary assaulted Burrell at the hospital and watched Defendants Bonesteel and Martindale assault Burrell in the transport van and watches Defendant Martindale assault Plaintiff in the transport van. (Dkt, 122-2, Def. Mem. of Law, pg. 19).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

   iv.  On December 15, 2022, Defendant Plonka assaulted Burrell by pushing his face into a wall. (Dkt, 122-2, Def. Mem. of Law, pg. 19).
       Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

24

     v.  On December 10, 2022, Defendant Ditullio placed a stick around Burrell's neck and lifted him off the ground and, together with Defendant Locke, inserted a pen into his anus. (Dkt, 122-2, Def. Mem. of Law, pg. 19).

Burrell did not file a grievance or an appeal to CORC regarding the allegation that Ditullio placed a stick around Burrell's neck and lifted him off the ground. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). See Section D(ii) above regarding Burrell's claim that Defendants Locke and Ditullio inserted a pen into his anus.

     vi.  On December 10, 2022, Defendant Durant physically assaulted Burrell and watched Defendants Locke and Ditullio insert a pen into Burrell's anus. On December 23, 2022, Durant punched, kicked and slapped Burrell over twenty (20) times. (Dkt, 122-2, Def. Mem. of Law, pg. 19).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

vii. On December 10, 2022, Defendant Menard physically assaulted Burrell and watched Defendants Locke and Ditullio insert a pen in his anus. On December 22, 2022, Defendant Menard choked, punched and slapped Burrell in his head/face and rammed his face into wall. (Dkt, 122-2, Def. Mem. of Law, pgs. 19-20).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

viii. On December 13, 2022, Defendant Martindale choked Burrell with a seatbelt and punched him in the face during transport from Albany Medical Center back to Upstate C.F. (Dkt, 122-2, Def. Mem. of Law, pg. 20).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

ix. On December 13, 2022, Defendant Bonesteel choked, punched and slapped Burrell in the transport van on the way from Upstate C.F. to the hospital. (Dkt, 122-2, Def. Mem. of Law, pg. 20).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part

"1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

    x.  On December 13, 2022, Defendant Bugavey watched Defendant Bonesteel assault Burrell in the transport van, and punched Burrell in the head and face and threatened to "mace him" while at Alice Hyde Medical Center. (Dkt, 122-2, Def. Mem. of Law, pg. 20).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

    xi.  On December 15, 2022 Defendant Marston slammed Burrell's face into a wall. On December 22, 2022, Defendant Marston choked, punched and slapped Burrell in head and face and rammed his face into wall. On December 23, 2022, Defendant Marston punched, kicked and slapped Burrell more than twenty (20) times. (Dkt, 122-2, Def. Mem. of Law, pg. 20).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

Regarding the December 22, 2022 and 23, 2022 allegations, Burrell authored grievance **#2541-22** on December 26, 2022 which was received on December 27, 2022. (Dkt. 122-4, pg. 143). The

Superintendent's affirmance of the denial was issued <u>after</u> the Complaint was filed. (Dkt. 122-4, pg. 144). Because the denial was issued after the Complaint was filed, and because Burrell did not properly respond to Defendants' SOMF, the fact that he failed to exhaust is deemed admitted.

> xii. On December 15, 2022, Defendant Chontosh slammed Burrell's face into a wall. (Dkt, 122-2, Def. Mem. of Law, pg. 20).

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

> xiii. On December 10, 2022, Defendant Hart  physically assaulted Burrell.

Burrell did not file a grievance related to this claim or an appeal of a grievance to CORC. (Dkt. 122-4, Corcoran Decl., Exhibit "A", Part "1," pg. 115, Part "2," pgs. 169-176). Because Burrell did not properly respond to Defendants' SOMF, this fact is deemed admitted.

***

Other than as specifically noted above, the documentary evidence offered by Defendants establishes that Burrell did not exhaust his

28

administrative claims prior to commencing this action for one of the

following reasons:

(i)  Burrell <u>never</u> filed a grievance in the first instance. *See Phipps v. Gillani,* No. 9:10-CV-1588 (TJM/DEP), 2013 U.S. Dist.LEXIS 132088, at \*8 (N.D.N.Y. Jul. 23, 2013) (summary judgment granted and complaint dismissed where plaintiff did not file a grievance "addressing the issues not raised in this action before commencing suit"); or

(ii)  Burrell <u>never</u> appealed the Superintendent's affirmance to CORC. *See Shabazz v. Bailey*, No. 9:20-CV-0057 (LEK/TWD), 2023 WL 5779533, at \*5 (N.D.N.Y. June 28, 2023) ("Plaintiff's failure to appeal [his] grievance … to CORC means Plaintiff failed to properly exhaust his administrative remedies before filing this action."), *report and recommendation adopted*, 2023 WL 5622049 (N.D.N.Y. Aug. 31, 2023); *see also Arias v. Rice,* No. 23-CV-6230, 2025 WL 1249556 (W.D.N.Y. Apr. 30, 2025) (Plaintiff failed to exhaust where he did not seek review with CORC "for any grievance related to this incident"); or

(iii)  Burell commenced this action <u>before</u> receiving a response from CORC regarding an appeal. *See Animashaun v. Afify,* 470 F. Supp. 3d 294, 296 (W.D.N.Y. 2020) ("a prisoner may not file suit . . . before the time in which CORC is supposed to issue a decision has expired."); *see also Bowie v. Woodruff,* No. 9:18-CV-0266 (BKS/ML), 2019 WL 7606078, at \*5 (N.D.N.Y. Sept. 20, 2019) (holding that *pro se* inmate failed to "fully exhaust his administrative remedies prior to filing [his] lawsuit," where CORC did not decide the plaintiff's administrative appeal until "approximately eight months after [he] commenced [his federal] action."), *report and recommendation adopted*, 2019 WL 5445519 (N.D.N.Y. Oct. 23, 2019); *Feliz v. Johnson,* No. 9:17-CV-1294 (DNH/ATB), 2019 WL 3491232, at \*2 (N.D.N.Y. Aug. 1, 2019) (holding that the *pro se* inmate "did not fully exhaust his

29

administrative remedies prior to commencing [his federal] action because he filed his federal complaint before completing the DOCCS grievance process," where the "plaintiff had not yet even appealed the relevant grievance to CORC at the time of filing this action."); *White v. Drake,* No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit." (citations omitted), *report and recommendation adopted*, 2011 WL 4478921 (N.D.N.Y. Sept. 26, 2011).

Defendants, having satisfied their burden of establishing that a grievance procedure existed at Upstate C.F. at the time of the events at issue in this lawsuit, the burden shifts to Burrell to demonstrate that the grievance procedure was unavailable to him. *See Hubbs v. Suffolk County Sheriff's Dept.,* 788 F.3d 54, 59 (2d Cir. 2015).

### E.  Burrell's reasons for not exhausting his administrative remedies.

In opposition to Defendants' motion, Burrell argues that he could not exhaust his administrative remedies because he:

(i)     was placed on a "paper deprivation, denying him grievance forms [and] paper" (Dkt. 130-1, Pl. Mem. of Law, at 11);

(ii)    was transferred from Upstate C.F. to Five Points C.F. and "had his appeals denied, even after requesting and extension" (*Id.);*

(iii)   was "never interviewed by Defendants, Co-workers, pertaining to grievances" (*Id.*);

(iv)   "was transferred from Five Points, the same day the alleged grievance interview took place, by the Five Points Superintendent" and his "grievances were denied [and] not process[ed] by Five Points Sgt. McIntyre" (*Id.*); and

(v)   "there are no IGRC lockboxes in the SHH/RRU in Upstate or Five Points, as required by Dir. 4040" (*Id.*).

For the reasons discussed below, Burrell's arguments are unavailing and do not raise any genuine issues of material fact.

### i.   Paper Deprivation

On December 10, 2022, at approximately 11:11 a.m., Burrell's cell was searched because he "had obstructed the light in his cell and visibility of the cell with papers." (Dkt. 122-1, Def. SOMF, ¶ 1, Dkt. 122-5, Corcoran Decl., Exhibit "A", part 2, at p. 41). In addition to covering his light with paper, the search also revealed that Burrell damaged his sheets and mattress. (Dkt. 122-1, Def. SOMF, ¶ 1). As a result, Burrell was placed on a paper, sheet, and mattress deprivation. (Dkt. 122-1, Def. SOMF, ¶ 3, Dkt. 122-4, Corcoran Decl., Exhibit "A", part 1, at 161-65).

Burrell argues that because of the December 10, 2022 paper deprivation, the administrative process was a "dead end" to him from

"12/10/25 – 01/09/23." (Dkt. 130, Burrell's SOMF, ¶ 45).[3] However, Burrell's allegations are belied by the documentary evidence submitted by Burrell and Defendants. First, Burrell admits that he "smuggled paper from other [incarcerated individuals] and used them as [a] conduit to file grievances with their names on envelopes to prevent detection from 12/10/25- 01/09/23." (*Id.*). Second, there is no indication that the paper deprivation extended beyond December 21, 2022. (Corcoran Decl., Dkt. 122-4, Exhibit "A", part 1, pg. 162). Third, and most notably, is the unrefuted fact that Burrell filed <u>nine</u> grievances on December 27, 2022, within the 21 day window from the alleged unconstitutional deprivation on December 10, 2022 to file a grievance. (Corcoran Decl., Dkt. 122-4, Exhibit "A", part 1, pg. 115).[4] [5] The Court therefore finds that the December 10, 2022 paper deprivation did not cause the grievance process to be  a "dead end" and deny Burrell the ability to exhaust his administrative remedies.

---

[3] The Court notes the error in the "12/10/25" date in Burrell's submission.

[4] UST-22537-22, UST-22538-22, UST-22539-22, UST-22540-22, UST-22541-22, UST-22542-22, UST-22543-22, UST-22544-22, and UST-22545-22.

[5] Burrell authored three of the grievances more fully discussed above on December 21, 2022 and the other two on December 26, 2022.

### ii.    Facility Transfer – Request for Extension of Time

Burrell asserts that he was transferred from "Upstate to Five Points" and that he "ha[d] his grievance appeals denied, even after requesting an extension, [and] grieving the appeal denials." (Dkt. 130-1, Pl. Br., at 11). Burrell's argument does not raise any genuine issues of material fact.

The Court construes Burrell's argument as follow – Burrell's request for an extension of time to file appeals of his grievance denials was denied and because his request for more time was denied, he also appealed the denials of his "appeals." Burrell's allegations that he requested an "extension" of time implicates 7 NYCRR § 701.6(g)(1)(i) which states that:

> (a) An inmate may request an exception to the time limit for filing a grievance, or for filing an appeal to the superintendent or to CORC. Such a request shall be in writing and shall be submitted to the grievance clerk with the grievance or appeal the inmate wishes to file.
>
> (b) The IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances (e.g., timely attempts to resolve a complaint informally by the inmate, etc.). An exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence.

33

(c) The IGP supervisor may grant an exception to the time limit for filing an appeal of an IGRC or superintendent's decision based on mitigating circumstances (e.g. failure to implement action required by the IGRC or superintendent's decision within 45 days, etc.). An exception to the time limit may not be granted if the request was made more than 45 days after the date of the decision unless the late appeal asserts a failure to implement the decision.

Burrell's argument fails because he:

(i)    provides no proof that he requested an extension of time to file a grievance in the first instance;

(ii)   provides no proof that he requested an extension of time to file an appeal for a grievance denial;

(iii)  does not provide copies of any written request(s) for any extension of time to submit a grievance to the clerk (7 NYCRR § 701.6(g)(1)(i));

(iv)   does not indicate the date(s) he submitted the request(s) for an extension;

(v)    does not provide any description of the content of his request(s) for an extension of time; and

(vi)   does not provide any evidence that the "mitigating circumstances" set forth in 7 NYCRR § 701.6(g)(1)(i)(a) or (b) apply even though he references the same. (Dkt. 130, pg. 5, ¶ 30).

Burrell's failure to provide the Court with any details beyond his conclusory allegations to substantiate his claims are fatal and

34

insufficient to raise a genuine issue of fact sufficient to defeat Defendants' motion for summary judgment. *See Simpson v. Price*, No. 9:19-CV-1413 (MAD/ATB), 2021 WL 7367083, at *9 (N.D.N.Y. Dec. 29, 2021) ("granting summary judgment on exhaustion grounds where plaintiff 'provided no specifics regarding when the grievances were written, their content, or the steps he took to provide them to an officer to send to the grievance office' and there was no documentary evidence to corroborate the fact plaintiff attempted to file a grievance, such as follow-up correspondences.").

### iii./iv.    Failure to Interview

To prove that the exhaustion process was unavailable to him, Burrell alleges that he "was never interviewed by Defendants, Co-workers, pertaining to grievances" and that he "was transferred from Five Points the same day the alleged grievance interview took place." (Dkt. 130-1, Pl. Mem. of Law, p. 11). However, like many of his other allegations in opposition to Defendants' motion, Burrell again offers no details about these conclusory assertions which, without more, are insufficient to raise an issue of fact. Further, the documents offered by Defendants belie Burrell's contention that he was not interviewed

35

and/or that the exhaustion process was a "dead end" to him. (Dkt. 122-4, pgs. 127, 129, 136, 137, 144, 145). Burrell is a prolific grievance filer, and for him to suggest that grievance process at Upstate C.F. was unavailable to him is disingenuous. Between May 19, 2022 and December 27, 2022, Burrell filed 69 grievances while housed at Upstate C.F. (Dkt. 122-5, Corcoran Decl., Exhibit "A", part 2, pgs. 170-72).

### v.   SHU

Next, Burrell claims that "there are no I.G.R.C. lock boxes in the Upstate SHU/RRU, nor in the Five Pointes SHU/RRU where Plaintiff was housed" [] "[g]iving Sg. Mcintyre [and] Defendants the access to thwart grievances Plaintiff file[d] and destroy them." (Dkt. 130, Burrell's SOMF, ¶ 35). Burrell's assertion is insufficient to defeat Defendants' motion for summary judgment. (Dkt. 130, Burrell's SOMF, ¶ 35).

"[C]ourts in this Circuit have granted summary judgment for failure to exhaust administrative remedies, even for a prisoner confined to a SHU whose ability to directly file a grievance or make a copy may be limited, when the plaintiff provided no documentation or minimal corroborative details." *See Jackson v. Moore*, No. 9:21-CV-1001

(GTS/ATB), 2023 WL 4710869, *6 (N.D.N.Y. April 2023); *see also Sankara v. Montgomery*, No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances . . . the officers named in the grievance(s) . . .; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office[.]"), *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018); *Simpson v. Price*, No. 9:19-CV-1413 (MAD/ATB), 2021 WL 7367083, at *9 (N.D.N.Y. Dec. 29, 2021) (in the absence of any documentary evidence to corroborate plaintiff's alleged attempt to file a grievance from the SHU, the court concludes that plaintiff's completely unsupported, unclear, and vague implication that the grievance was not properly processed does not suffice to avoid summary judgment), *report and recommendation adopted*, 2022 WL 336540 (N.D.N.Y. Feb. 4, 2022).

Here, Burrell alleges in conclusory fashion that there were no

"I.G.R.C. lock boxes in the Upstate SHU/RRU, nor in the Five Points

SHU/RRU." However, Burrell offers no proof:

> (i)   that he prepared any grievances while housed in the Upstate C.F./Five Points C.F. SHU/RUU;
>
> (ii)  what the content of those grievances were;
>
> (iii) that there were no lock boxes in the Upstate C.F./Five Points C.F. SHU/RUU to deposit his grievances;[6] or
>
> (iv)  that Sgt. McIntyre and Defendants thwarted and/or destroyed any grievance that he filed or attempted to file.

Burrell's bare bone allegations are insufficient to prove that

exhaustion was a "dead end" to him. *See Sankara v. Montgomery*, No.

9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25,

2018).

---

[6] Directive 4040 does not require the presence of a lock box in RRU or SHU. While Directive 4040 is silent as to incarcerated individuals in the RRU, it does address those individuals in the SHU. Directive 4040, Section 701.7(b) (Procedures for incarcerated individuals in Special Housing Unites (SHU's)) states in relevant part that, "Where available, SHU incarcerated individuals shall use centrally located deposit boxes to send grievance forms and IGP correspondence to the IGP office …" 7 N.Y.C.R.R. § 701(b).

***

The Court finds that Burrell has not sustained his burden of proving that the grievance process at Upstate C.F. was unavailable to him. *See Jenkins v. Cordero,* No. 17-CV-1592, 2019 WL 2121655 at *3 (S.D.N.Y. May 15, 2019). His efforts to do so are belied by documentary evidence and the unsubstantiated and fanciful nature of his allegations.

**F. Defendants are entitled to summary judgment regarding Burrell's December 10, 2022 First Amendment claim that Defendants Menard, Durant, Ditullio and Hart removed his mattress, sheets, blankets, towels, washcloths and paper because he would not withdraw his claims against Defendant Ditullio in a separate lawsuit.**

The Court grants Defendants summary judgment as to Burrell's December 10, 2022 First Amendment claim. Regardless of whether Burrell exhausted his administrative remedies prior to commencing this action, the documentary evidence establishes that the deprivation orders were issued to Burrell because of his own actions and not in retaliation for him having filed a prior lawsuit against Defendant Ditullio.

**i. Legal Standard**

To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (i) the

39

speech or conduct at issue was "protected;" (ii) the Defendants took "adverse action" against the plaintiff - namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (iii) there was a causal connection between the protected speech and the adverse action - in other words, that the protected conduct was a "substantial or motivating factor" in the Defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489,491 (2d Cir. 2001), *overruled on other grounds* by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

Indeed, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." *Rucano v.*

40

*Annucci*, 9:18-CV-218 (GTS/CFH), 2021 WL 3293504 (N.D.N.Y. May 19, 2021) (citing *Green v. Phillips*, No. 04-CV-10202, 2006 WL 846272, at \*3 (S.D.N.Y. Mar. 31, 2006)). "Consequently, a plaintiff must set forth non-conclusory allegations to sustain a retaliation claim." *Id.* (citing *Green*, 2006 WL 846272, at \*3); *see also Williams v. Goord*, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial.") (internal quotation marks and citations omitted)).

"Allegations, although specific, 'may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Smith v. Woods,* No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at \*3 (N.D.N.Y. Apr. 24, 2006) (internal quotation marks and citations omitted).

It is undisputed that filing a lawsuit is a protected activity. *See Livingston v. Hoffnagle,* No. 9:19-CV-353 (GLS/CFH), 2019 WL

7500501, at *13 (N.D.N.Y. Nov. 8, 2019), *report and recommendation adopted,* 2020 WL 95431 (N.D.N.Y. Jan. 8, 2020). With respect to the second element of a First Amendment retaliation claim, an action is adverse if it "would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Lewis v. Hanson,* No. 9:18-CV-12 (LEK/DJS) 2022 WL 991729, at *11 (citing *Tafari v. McCarthy,* 714 F.Supp.2d 317, 348 (N.D.N.Y. May 24, 2010)).

### ii.    Analysis

Even if Burrell exhausted his administrative remedies with respect to his December 10, 2022 First Amendment retaliation claim against Defendants Menard, Durant, Ditullio and Hart, Defendants are nevertheless entitled to summary judgment dismissing this claim.

As an initial matter, Burrell's filing of a separate lawsuit against Defendant Ditullio is a protected activity. *See Livingston,* 2019 WL 7500501.

To establish the second prong of a retaliation claim, i.e., an adverse action, a plaintiff must show that a defendant's retaliatory conduct would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights. *Doyle,* 429 U.S. at 287.

Burrell cannot make this showing. Despite his allegations, the documentary evidence establishes that Burrell's paper, sheets and mattress were removed from his cell because he was placed on deprivation orders for covering the light in his cell with paper and damaging his sheets and mattress. *See* (Dkt. 122-3, Corcoran Decl., Exhibit "A," part 1, pgs. 161-65). The deprivation orders were issued because of Burrell's own behavior and not because he filed a prior action against Defendant Ditullio. Therefore, no trier of fact could reasonably find that Defendants' alleged retaliatory conduct would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.

As to the third prong, the allegations in the Complaint and in Burrell's response to Defendants' motion simply do not establish the requisite causal connection between the issuance of the December 10, 2022 deprivation orders and his prior action against Defendant Ditullio. *See Bouknight v. Shaw*, No. 08-CV-5187, 2009 WL 969932, at *6 (S.D.N.Y. Apr. 6, 2009) (stating that inmate's conclusory assertion that correction officer "wrote me up for revenge" was insufficient to state plausible retaliation claim, and that plaintiff had "failed to allege the

43

requisite causal connection between his filing of a grievance and Officer

Rivera's writing him up for an infraction"); *see also Cusamano v. Sobek*,

604 F.Supp.2d 416, 477-78 (N.D.N.Y. 2009) (dismissing, *sua sponte*,

prisoner's retaliation claim against correction officer stemming from

officer's issuance of misbehavior report against plaintiff, where

plaintiff's allegations that he was convicted of the disciplinary charge,

and that the conviction was affirmed on appeal, 'plausibly suggest[ed]

that what caused him to receive the referenced misbehavior report was

his own misconduct'). As noted, Burrell was issued a deprivation order

on December 10, 2022 for conduct that occurred on that day, not

because he previously filed a lawsuit against Defendant Ditullio.

Because Burrell does not raise any issues of fact regarding his

December 10, 2022 First Amendment retaliation claim, the Court

grants Defendants summary judgment on this claim.

### G. There is an issue of fact regarding Burrell's December 10, 2022 Eighth Amendment excessive force claim against Defendants Locke and Ditullio.

Although there is no issue of fact as to whether Burrell exhausted

his administrative remedies regarding the alleged insertion of a pen in

Burrell's anus, one does exist as to who is responsible for doing so. The

Court therefore denies Defendants' motion for summary judgment regarding Burrell's December 10, 2022 Eighth Amendment excessive force claim against Defendants Locke and Ditullio.

### i. Legal Standard

Incarcerated individuals enjoy Eighth Amendment protection against the use of excessive force and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *See Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). To sustain an Eighth Amendment excessive-force claim, a plaintiff must establish both an objective and subjective element. *See Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999); *see also Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

To satisfy the objective element, a plaintiff must prove that a defendant's conduct was "inconsistent with the contemporary standards of decency." *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "Not every

45

push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted). Claims "of excessive force may be established even if the victim does not suffer serious . . . or significant injury, . . . provided that the amount of force used is more than *de minimis* or involves force that is repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 7-10 (cleaned up).

To prove the subjective element, a plaintiff must show that the Defendant's actions were wanton. *Simms*, 230 F.3d. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). When determining whether defendants acted in a malicious or wanton manner, courts consider five factors: (i) the extent of the injury and the mental state of the defendant; (ii) the need for the application of force; (iii) the correlation between that need and the amount of force used; (iv) the threat reasonably perceived by the defendants; and (v) any efforts made by the defendants to temper the severity of a forceful response. *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

It is undisputed that Burrell had a pen in his anus. (Dkt. 123, pgs. 1-3). It is also undisputed that the pen was "discharged" on December 15, 2022. (Dkt. 123, pg. 15). There are, however, issues of fact as to who inserted the pen in Burrell's anus. Paragraphs "47" and "48" of the Complaint allege Defendant Ditullio informed Burrell that "[Defendant] Locke has a present for [Burrell]" and that Defendant Ditullio "began lowering [Burrell's] pants & boxers, & where his anus area was entered with a pen-like shape object. (Compl., Dkt. 1, ¶¶ 47-48). In contrast, and in response to Burrell's allegations, Defendant Ditullio declares that "[a]t no time did I use excessive force against [Burrell], nor did I witness any other correction staff use excessive force against [Burrell]." (Dkt. 122-13, Ditullio Decl., ¶ 7). Notably, Defendant Locke states in general terms that "[a]t no time did I violate [Burrell's] constitutional rights," but is otherwise silent regarding the specific behavior Burrell complains of. (Dkt. 122-19, Locke Decl., ¶ 6). Because Defendants are unable to demonstrate the absence of a genuine issue of material fact, their motion for summary judgment regarding Burrell's claim of a pen being inserted in his anus is denied. *See* Fed. R. Civ. P. 56; *see also Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 220 (2d Cir.

47

2023) ("a dispute about a genuine issue of material fact occurs if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.") (cleaned up). The Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656. And because this issue of fact exists, the Court denies Defendants' motion for summary judgment on Burrell's Eighth Amendment excessive force claim.

## H.    Qualified Immunity

As discussed above, there remains disputed issues of fact that preclude a summary disposition as to whether Defendants Locke and Ditullio violated Burrell's Eighth Amendment. These questions of fact defeat an application of qualified immunity at this stage. *See Robinson v. Taylor*, No. 9:16-CV-0285 (BKS/DJS), 2017 WL 4174795, at *6 (N.D.N.Y. 2017) (denying summary judgment on qualified immunity grounds where "resolution of the objective reasonableness of Defendants' actions 'depends on the determination of certain factual questions that cannot be answered at this stage of the litigation.'") (citation omitted); *see also Lloyd v. City of New York*, 246 F. Supp. 3d 704, 725 (S.D.N.Y. 2017) (denying summary judgment where "there are

unresolved facts that are material to a determination of the reasonableness of the officers' conduct").

## V. CONCLUSION

**WHEREFORE**, based on the findings above, it is

**ORDERED,** that Defendants' motion for summary judgment (Dkt. 122) is **GRANTED IN PART AND DENIED IN PART**, and it is further

**ORDERED**, that Defendants' motion for summary judgment (Dkt. 122) as to whether Burrell exhausted his administrative remedies regarding his December 10, 2022 First Amendment retaliation claim against Defendants Menard, Durant, Ditullio and Hart is **DENIED**, and it is further

**ORDERED**, that even though there is an issue of fact as to whether Burrell exhausted his administrative remedies regarding his December 10, 2022 First Amendment retaliation claim against Defendants Menard, Durant, Ditullio and Hart, the Court nevertheless **GRANTS** Defendants' motion for summary judgment because there are no issues of fact on the substantive claim, and it is further

**ORDERED**, that Defendants' motion for summary judgment (Dkt. 122) on the issue of whether Burrell exhausted his administrative remedies regarding his Eighth Amendment Claim against Defendants Ditullio and Locke for allegedly inserting a pen in his anus is **DENIED**, and it is further

**ORDERED**, that Defendants' motion for summary judgment (Dkt. 122) regarding Burrell's Eighth Amendment claim that Defendants Locke and Ditullio inserted a pen in his anus is **DENIED**, and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (*per curiam*), and it is further

**ORDERED**, that this case is deemed trial-ready and will proceed to trial on Burrell's Eighth Amendment claim for excessive force against Defendants Ditullio and Locke. Considering Burrell's previous motion for the appointment of counsel (Dkt. 137), the Court *sua sponte* instructs the Clerk that *Pro Bono* Counsel be appointed for Burrell for trial purposes.

Dated: March 4th, 2026

_____
Hon. Mitchell J. Katz
U.S. Magistrate Judge

2023 WL 4710869
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dumar JACKSON, Plaintiff,
v.
N. MOORE, Defendant.

9:21-CV-1001 (GTS/ATB)
|
Signed April 14, 2023

**Attorneys and Law Firms**

DUMAR JACKSON, Plaintiff, pro se.

RACHAEL S. OUIMET, Assistant Attorney General, for Defendant.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** In this pro se civil rights action, plaintiff alleges that the defendant violated his Eighth Amendment rights when he failed to protect plaintiff from another inmate. Presently before the court is defendant Correctional Officer ("C.O.") Moore's motion for summary judgment. (Dkt. No. 16). This matter has been referred to me for Report and Recommendation by United States District Judge Glenn T. Suddaby, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). For the reasons set forth below, this court will recommend granting defendant's motion and dismissing the complaint in its entirety.

### I. Background

#### A. Procedural History
In this civil rights action, plaintiff alleges a constitutional violation occurred while he was incarcerated at Clinton Correctional Facility ("Clinton C.F."), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff filed the original complaint on September 10, 2021. (Dkt. No. 1). On October 25, 2021, the court issued a Decision and Order granting plaintiff's application to proceed in the action in forma pauperis ("IFP"), and conditionally dismissing the original complaint because it failed to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915 and 28 U.S.C. § 1915A. (Dkt. No. 4). The court granted plaintiff leave to amend his complaint to "correct[ ] the pleading defects" identified with his original complaint. (*Id.* at 10). Plaintiff availed himself of the opportunity to amend, and the court received plaintiff's amended pleading on or about November 18, 2021. (Dkt. No. 6, "Am. Compl.").

On February 9, 2022, I determined, pursuant to my initial review of the complaint, that plaintiff's amended complaint was accepted for filing and that the only active defendant was C.O. Moore. (Dkt. No. 7 at 3). C.O. Moore filed an answer to the amended complaint on April 14, 2022. (Dkt. No. 12). On December 15, 2022, defendant filed this instant motion for summary judgment (Dkt. No. 16), to which plaintiff responded on February 16, 2023 (Dkt. No. 20).

#### B. Summary of Complaint
The complaint alleges that on September 6, 2018, while plaintiff was confined in Clinton C.F., he was attacked by another inmate when they were released from their keep-lock cells at the same time. (Am. Comp. at 4). Although facility policies and procedures prohibited C.O. Moore from releasing the other inmate "until [plaintiff] was ... back in general population," C.O. Moore nevertheless released both inmates simultaneously, knowing that plaintiff did not have an escort at the time. *Id.* C.O. Moore also "knew there was a race war going on in [Clinton C.F.] with the bloods and the Spanish gangs and let [plaintiff] out of [his] cell with a known gang member posed [sic] a substantial risk of serious harm to [him]." *Id.* Although C.O. Moore observed the inmate run into plaintiff's cell and attack him, C.O. Moore "did nothing to prevent it from happening." Plaintiff was returned to keep-lock after the incident and remained there for an additional 70 days, until November 15, 2018. (Dkt. No. 16-3, Pl.'s Dep. at 18, 27, 79, 88, 95; Internal Movement History, Dkt. No. 20-1 at 31).

### II. Summary Judgment
**\*2** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir. 2006). Rule 56(b) provides that a party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). Thus, a party may move for summary judgment in lieu of an answer. *See, e.g., Anderson v. Rochester-Genesee Reg'l*

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 52 of 306
Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

*Transp. Auth.*, 337 F.3d 201, 202 (2d Cir. 2003); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010); *Riehl v. Martin*, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *1-2 (N.D.N.Y. Mar. 31, 2014).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272. "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

While courts are required to give due deference to a plaintiff's pro se status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the non-movant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Although plaintiff received proper notice of his obligation to respond to defendant's summary judgment motion in accordance with Local Rules, the plaintiff did not file a Statement of Material Facts that addressed many of the factual allegations in defendant's Statement, as required by Local Rule 7.1(a)(3).[1] Consequently, the court may accept the properly supported facts contained in the defendants' Rule 7.1 statement (Dkt. No. 16-2) as true for purposes of this motion. *See Govan v. Campbell*, 289 F. Supp. 2d 289, 295-96 (N.D.N.Y. 2003).

[1]   Defense counsel specifically advised plaintiff of the consequences of failing to respond to the summary judgment motion. (Dkt. No. 16). Counsel forwarded, to plaintiff, a copy of the court's form Notification of the Consequences of Failing to Respond to a Summary Judgment Motion, which provided in pertinent part:

> If you do not file a proper response to this motion, the Court may grant the motion and dismiss some or all of your claims. Under Local Rules 7.1(b) and 56.1(b), to file a proper response to this motion, you must submit the following papers:
>
> > (1) A response to the defendants' statement of material facts that admits and/or denies each of the defendants' assertions in matching numbered paragraphs, 1 and that supports each denial with citations to record evidence.
>
> * * *
>
> WARNING: If you do not submit a proper response to the defendants' statement of material facts, the Court may deem you to have admitted the defendants' factual statements.

(Dkt. No. 16 at 4).

## III. Exhaustion of Administrative Remedies

### A. Legal Standards

**\*3** The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), *abrogated on other grounds, Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the court

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford,* 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Incarcerated [2] Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Incarcerated [3] Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) and (I), 701.5.

[2] This committee was formerly known as the "Inmate Grievance Resolution Committee," but has recently been renamed.

[3] The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

Prior to *Ross v. Blake*, *supra*, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of

"special circumstances." *Ross v. Blake,* 578 U.S. 632, 640 (2016). "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross,* 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at 642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must also consider whether those remedies were "available" to the inmate. *Id.*; *see also Riles*, 2016 WL 4572321 at *2.

**B. Analysis**

**\*4** Defendant C.O. Moore argues that plaintiff's failure-to-protect claim is subject to dismissal, for failure to exhaust administrative remedies, because plaintiff did not file an initial grievance prior to bringing suit, nor did he appeal the denial of any grievance concerning this claim to CORC. (Dkt. No. 16-1, Defendant's Memorandum of Law at 14). In support of his position, defendant has attached to his motion papers the sworn declarations of Rachael Seguin ("Seguin Decl.") (Dkt. No. 16-7), the Director of the IGP for DOCCS, and Christine Gregory, the IGP Supervisor at Clinton C.F. ("Gregory Decl.") (Dkt. No. 16-6). These declarations, and the evidence attached as exhibits thereto, indicate that plaintiff neither filed an initial grievance related to his claim that C.O. Moore failed to protect him from another inmate on September 6, 2018, nor did plaintiff submit an appeal to CORC. (*See* Gregory Decl. ¶¶ 16-20; Seguin Decl. ¶¶ 12-14, Ex. A).

In opposition to defendant's motion, plaintiff alleges that, while confined in his keep-lock cell, he attempted to file a grievance relating to the incident with C.O. Moore by putting a sealed letter on the gate for mail pickup. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89). Plaintiff testified that he remembered the grievance being picked up by an unnamed officer, but does not remember the exact day he mailed the grievance. [4] (Dkt. No. 16-3, Pl.'s Dep. at 87-89, 93). Plaintiff speculates that an unnamed officer on duty threw his grievance away. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89)

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 54 of 306

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

4    Plaintiff testified that he filed the grievance "it was in like the same – I want to say around like the 22 nd or so." (Pl.'s Dep. at 87-88).

Plaintiff acknowledged that he never followed up with respect to his grievance for the 70 days after the incident when he was confined on keeplock; but he alleges that he asked sergeants, officers, and counselors about the status of his grievance and they told plaintiff "they'll get back to you." (Pl.'s Dep. at 93-94). Plaintiff admitted that he did not retain any copies of the purported grievances relative to his complaints against C.O. Moore. (*Id.* at 88). [5]

5    Plaintiff alleges that he was told "it was a code 49 and that it had to go to the superintendent office." (Dkt. No. 20 at 3).

Plaintiff further testified that he not only understood the grievance process, but also that he participated in an orientation program at Clinton C.F. about how the grievance process works at the facility. (*Id.* at 85-86). He admitted that he filed "a couple" of grievances after the incident concerning other matters, while still residing at Clinton C.F. (*Id.* at 90).

The record before this court clearly established that the defendant did not exhaust administrative remedies with respect to the failure-to-protect claim against C.O. Moore. Given that an initial grievance was never filed, nor was the claim ever appealed to CORC, the question becomes whether plaintiff's failure to exhaust should be excused.

The defendant has satisfied his initial burden of "establishing ... that a grievance process exist[ed] and applie[d] to the underlying dispute." *Hubbs v. Suffolk County Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted). [6] Thus, plaintiff assumes the burden of producing evidence that one of the exceptions to the administrative exhaustion requirement applies, excusing his failure to exhaust and permitting his claim to survive summary judgment. *Id.* ("If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors ... rendered a nominally available procedure unavailable as a matter of fact.") [7]

6    IGP Supervisors Gregory and Seguin stated Clinton C.F. had a fully functioning IGP program at all times relevant to the complaint. (Gregory Decl. ¶ 16; Seguin Decl. ¶ 11). Plaintiff also testified that he filed a grievance for an unrelated matter after the incident and received an unfavorable decision and appealed that decision. (Pl.'s Dep. 90-91).

7    I agree with Magistrate Judge Peebles' cogent analysis that, while the burden of production may shift to a plaintiff with respect to certain aspects of the exhaustion issue, "the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant." *See, e.g.*, *Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *5-6 (N.D.N.Y. Oct. 4, 2012), *report and recommendation adopted*, 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); *Nelson v. Plumley*, No. 9:12-CV-422 (TJM/DEP), 2015 WL 4326762, at *7-8 (N.D.N.Y. July 14, 2015), *report and recommendation adopted*, 2013 WL 1305338 (N.D.N.Y. Mar. 18, 2013).

**\*5** Liberally construed, plaintiff appears to argue that administrative remedies were unavailable to him as a result of C.O. Moore trying "to cover his mistakes up". (Dkt. No. 20 at 2-3). Plaintiff does not offer any support for his claim other than his statement "officers talk like inmates talk. So knowing the incident, knowing I put in a grievance, they wanted to be nosey [sic], and they opened it and never let it get to where it was supposed to go once it was read." (Pl.'s Dep. at 89). During his deposition, plaintiff specifically stated that C.O. Moore was not the person who picked up the grievance. (Pl.'s Dep. at 88-89). Furthermore, plaintiff testified the alleged grievance was sealed, so the unnamed C.O. would have no way of knowing what conduct the grievance was referring to unless (s)he opened the envelope. (Pl.'s Dep. at 92).

As noted above, plaintiff was on keep-lock status when he allegedly attempted to submit a grievance relating to the claim in this action by leaving a sealed envelope for C.O.s to deliver. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6. While "[k]eep-lock is similar to serving time in a Special Housing Unit ... [with the inmate] remain[ing] in their assigned cell" (Dkt. No. 16-5, Terry Allen Declaration ¶ 7), plaintiff acknowledged that keep-lock status is "not like if you were in the SHU" (Pl.'s Dep. at 35).

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative

remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in a SHU, he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126.[8] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

[8] My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), *report and recommendation adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

Some district court cases in the Second Circuit suggest that *Williams* should be limited to its particular facts, *e.g.*, by not applying its holding to plaintiffs who are not confined in a SHU.[9] *See, e.g., Shaw v. Ortiz*, No. 15-CV-8964, 2016 WL 7410722, at *6 (S.D.N.Y. Dec. 21, 2016) ("the factual scenario here is different from that in *Williams* where the Second Circuit found that part of the IGP's regulatory scheme was 'so opaque and so confusing that ... no reasonable prisoner c[ould] use' it.") (citing *Mena v. City of New York*, No. 13-CV-2430, 2016 WL 3948100, at *5 (S.D.N.Y.

July 19, 2016) (finding that the Second Circuit's decision in *Williams* "hinged on the 'extraordinary circumstances' specific to the case before it")); *Blake v. Porlier*, No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *6 (N.D.N.Y. Oct. 4, 2019) ("Courts have taken an inmate's housing and level of segregation from the general population into account when determining the availability of grievance procedures.") (citing *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (holding that a plaintiff in keeplock was not entitled to an exhaustion exception when he alleged that his grievance had not been filed due to mail tampering, and subsequently never inquired about it), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017)).

[9] In *Medina v. Napoli*, 725 F. App'x at 53-54, the Second Circuit followed *Williams* in a case involving a SHU inmate, but absent the additional circumstance of a transfer to a different facility, which might have further complicated the inmate's ability to file a grievance.

**\*6** In any event, unsupported assertions that a plaintiff "filed a grievance but that it was somehow lost or destroyed" have generally been found "insufficient to establish a genuine issue of fact." *Blake v. Porlier*, 2019 WL 7484052, at *5 ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' ") (quoting *Rodriguez v. Cross*, 2017 WL 2791063, at *5); *Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report and recommendation adopted*, 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2017); *Engles v. Jones*, No. 6:13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

Moreover, courts in this Circuit have granted summary judgment for failure to exhaust administrative remedies, even for a prisoner confined to a SHU whose ability to directly file a grievance or make a copy may be limited, when the plaintiff

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 56 of 306

Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

provided no documentation or minimal corroborative details. *See, e.g., Sankara v. Montgomery*, No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at \*8 (N.D.N.Y. June 25, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office[.]"), *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018); *Simpson v. Price*, No. 9:19-CV-1413 (MAD/ATB), 2021 WL 7367083, at \*9 (N.D.N.Y. Dec. 29, 2021) (in the absence of any documentary evidence to corroborate plaintiff's alleged attempt to file a grievance from the SHU, the court concludes that plaintiff's completely unsupported, unclear, and vague implication that the grievance was not properly processed does not suffice to avoid summary judgment), *report and recommendation adopted*, 2022 WL 336540 (N.D.N.Y. Feb. 4, 2022); *Ozzborn v. Cornell*, No. 9:17-CV-1039 (MAD/ATB), 2021 WL 2227829, at \*5 (N.D.N.Y. June 2, 2021) (Plaintiff claimed that he filed a grievance from the SHU by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect; but, because he never received a response, he presumed that the grievance was never submitted. Because plaintiff never followed up on his grievance and successfully filed numerous other grievances in the recent past, he has failed to demonstrate that his administrative remedies were unavailable to him).[10]

[10]    District Judge D'Agostino distinguished *Williams v. Priatno* by noting the various ways in which the plaintiff in *Williams* specified how he followed up with respect to the grievance that he left for delivery from the SHU, which was never filed with the IGP. *Id.* at \*4.

Here, the court does not merely rely on plaintiff's lack of direct evidence, such as copies of the relevant grievances, in finding that he has failed to establish a genuine issue of material fact as to unavailability. Plaintiff in this case has done nothing more than allege in conclusory fashion that he attempted to file a grievance concerning the September 6, 2018 incident. Plaintiff's testimony about when he attempted to submit the grievance was vague and he did not identify the officer who allegedly collected it. Likewise, he has not supported his claim that unnamed sergeants, officers, and counselors told

him "not to worry" with any documentary evidence. *See, e.g., Belile v. Griffin*, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at \*8 (N.D.N.Y. Feb. 12, 2013) ("Plaintiff's mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances, are insufficient to excuse his failure to comply with the IGP [process]"), *report and recommendation adopted*, 2013 WL 1291720 (N.D.N.Y. Mar. 27, 2013).

**\*7** For the above reasons, the court concludes that plaintiff's completely unsupported and vague claim that a grievance he attempted to file against C.O. Moore relative to the September 6, 2018 incident was not properly processed does not suffice to avoid summary judgment. Accordingly, the court recommends that C.O. Moore be granted summary judgment and the second amended complaint be dismissed against him, on the ground that plaintiff failed to exhaust his administrative remedies.

Dismissal with prejudice is appropriate where the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust. *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004). Here, plaintiff's time to file the relevant grievance to CORC in accordance with the rules and regulations has already passed,[11] rendering his failure to exhaust his administrative remedies incurable at this time. As a result, I recommend that plaintiff's complaint be dismissed with prejudice as to these claims. *See Livingston v. Hoffnagle*, No. 17-CV-1158 (MAD/DEP), 2019 WL 409366, at \*7 (N.D.N.Y. Feb. 1, 2019) (dismissing without leave to amend, where the exhaustion error would not be cured by permitting the plaintiff leave to amend).

[11]    "Ordinarily, an inmate must first submit 'a complaint,' or grievance, to the facility's IGP clerk within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a). Relief from the twenty-one day time limit may be granted by the IGP supervisor based upon mitigating circumstances, provided, however, that '[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence.' " *Nelson v. Plumley*, 2015 WL 4326762, at \*2 (citing N.Y.C.R.R. § 701.6(g)(1)(i) (a)).

### IV. Eighth Amendment Failure to Protect Claim

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

Defendant also seeks summary judgment on the merits of plaintiff's failure to protect claim, arguing, among other things, that plaintiff has failed to establish C.O. Moore was acting with deliberate indifference to conditions that posed a substantial risk of serious harm to plaintiff. For the following reasons, the court agrees that summary judgment is warranted, in the alternative, on the merits of plaintiff's Eighth Amendment claim.

### A. Legal Standards

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970 (1994). The plaintiff must show that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. *Id.* at 837, 114 S. Ct. 1970. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

The failure of corrections officers to employ reasonable measures to protect an inmate from violence by other inmates may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) (citing *United States v. Bailey*, 444 U.S. 394, 423 (1980)). "Reckless disregard" of plaintiff's right to be free from attacks by other inmates may be shown by the existence of a "pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221-22 (S.D.N.Y. 1995) (citing *Rucco v. Howard*, No. 91 Civ. 6762, 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993); *Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984)).

**\*8** An isolated omission by corrections officers generally does not support a claim for deliberate indifference absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord*, No. 99 Civ. 1674, 2000 WL 1372834, at *4 (S.D.N.Y. Sept. 25, 2000) (citing *Ayers v. Coughlin*, 780 F.2d at 209). Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer*, 511 U.S. at 842-43).

### B. Analysis

With due regard for plaintiff's status as a pro se litigant, plaintiff has failed to establish that C.O. Moore knew of a particular risk to plaintiff's safety or that C.O. Moore was deliberately indifferent for failing to protect plaintiff. Plaintiff merely offers conclusory, general allegations that C.O. Moore knew about an alleged gang and/or race war happening at Clinton C.F. (Dkt. No. 20 at 2). However, C.O. Moore has, in his sworn declaration, denied having any knowledge about a race war at Clinton C.F. or having any access to information regarding an inmate's gang status. (Moore Decl. ¶¶ 21, 23). Even if C.O. Moore did have access to such records, plaintiff testified that he is not a member of a gang. (Jackson Dep. at 19). Thus, there is nothing in the record other than plaintiff's conclusory allegations establishing that C.O. Moore knew plaintiff was at a substantial risk of harm because of an alleged gang war.

Plaintiff's claim is further undermined by his sworn testimony admitting that he had not had any prior interactions with the inmate who attacked him before the underlying incident. (Jackson Dep. at 19-20); *Gillard v. Jarvis*, No. 9:11-CV-1021 (LEK/ATB), 2012 WL 7037734, at *7 (N.D.N.Y. Nov. 6, 2012), *report and recommendation adopted*, 2013 WL 474384 (N.D.N.Y. Feb. 7, 2013) ("If plaintiff did not know the inmate who assaulted him, he cannot claim that defendants "knew" and disregarded the serious risk that plaintiff would be assaulted at Clinton by this unknown individual."). Plaintiff has not alleged that he was threatened by the other inmate, or any member of the other inmate's race or gang, prior to this incident. Additionally, neither inmate was in protective custody when they were released form their cells. (Moore Decl. ¶ 14). Plaintiff also testified he never asked for protective custody before or after the incident. (Jackson Dep. at 73).

"Courts routinely deny deliberate indifference claims based upon surprise attacks." *Zimmerman v. Macomber*, No. 95 Civ. 0882, 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21, 2001) (granting summary judgment in favor of the defendants where the plaintiff failed to carry his burden to establish that the defendant had knowledge of a substantial risk to plaintiff's health or safety from an inmate attacker). Here, plaintiff has failed to allege defendants knew of a prior altercation between the plaintiff and his attacker, or of any threats that had been made against the plaintiff. *Fernandez v. N.Y.C. Dep't of Corr.*, No. 08 Civ. 4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010); *Clark v. Gardner*, 256 F. Supp.3d

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 58 of 306

**Jackson v. Moore, Not Reported in Fed. Supp. (2023)**
2023 WL 4710869

154, 168 (N.D.N.Y. 2017). Because plaintiff has alleged no facts suggesting that C.O. Moore knew of a particular risk to the plaintiff's safety, he has failed to raise a material question of fact as to whether C.O. Moore was deliberately indifferent, and summary judgment is warranted. *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp.2d 354, 363 (S.D.N.Y. 2013).

**\*9**  **WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that Defendant's motion for summary judgment (Dkt. No. 16) be **GRANTED,** and the complaint be **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4710869

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 9:21-CV-01001**<br>Jackson v. New York State Department of Corrections et al | — | N.D.N.Y. | Sep. 10, 2021 | Docket |

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (3)**

**Direct History (2)**

1.  Jackson v. Moore 🐂
    2023 WL 4710869 , N.D.N.Y. , Apr. 14, 2023

*Report and Recommendation Adopted by*

2.  Jackson v. Moore
    2023 WL 4711091 , N.D.N.Y. , July 24, 2023

**Related References (1)**

3.  Jackson v. Moore
    2022 WL 22888891 , N.D.N.Y. , Feb. 09, 2022

**WESTLAW**   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag

Distinguished by Sheffer v. Fleury, N.D.N.Y., September 18, 2019

2014 WL 4146276
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Chris PRICE, Plaintiff,

v.

J. OROPALLO, Sergeant, Upstate Corr. Facility;
Norman H. Bezio, Dir. of Shu, Inmate Disciplinary
Program, Nys Docs; and Phillip Battiste, Dir.
of Security Staff, Nys Docs, Defendants.

No. 9:13–CV–0563 (GTS/TWD).
|
Signed Aug. 19, 2014.

**Attorneys and Law Firms**

Chris Price, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Keith J. Starlin, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

 **\*1**  Currently before the Court, in this *pro se* prisoner civil
rights action filed by Chris Price ("Plaintiff") against the three
above-captioned New York State correctional employees
("Defendants"), are Defendants' motion for summary
judgment, and United States Magistrate Judge Therese
Wiley Dancks' Report–Recommendation recommending that
Defendants' motion be granted. (Dkt.Nos.25, 28.) Plaintiff has
not filed an Objection to the ReportRecommendation, and
the deadline by which to do so has expired. (*See generally*
Docket Sheet.) After carefully reviewing the relevant filings
in this action, the Court can find no clear error in the Report–
Recommendation: Magistrate Judge Dancks employed the
proper standards, accurately recited the facts, and reasonably
applied the law to those facts. (Dkt. No. 28.) To that analysis,
the Court would add only two points.

First, with regard to Plaintiff's claims against Defendants
Battiste and Bezio, the Court notes that the verified Complaint
does not allege facts plausibly suggesting, or adduce
admissible evidence establishing, that Plaintiff sent letters to
Battiste or Bezio at an appropriate address *and* by appropriate
means. (Dkt. No. 1, at ¶ 6.) In any event, even if he had
done so, the Complaint alleges facts plausibly suggesting, or
adduces admissible evidence establishing, that a response by
officials at his correctional facility followed the sending of
the letters. (*Id.*)

Second, as an alternative ground for the dismissal of the
Complaint, the Court accepts Defendants' failure-to-exhaust
argument because, even assuming Plaintiff was in fact told
that his complaint was not grievable, he filed the grievance
and knew he was "suppose[d] to ... receive[ ]" a response to it.
(Dkt. No. 1, at 4.) More important, he could have, and should
have, filed an appeal from his non-response (which he did not
do). 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within
the time limits may be appealed to the next step."); *see also
Smith v. Kelly,* 985 F.Supp.2d 275, 281–82 (N.D.N.Y.2013)
(collecting cases). Such an appeal could have proved fruitful,
given that the issue was indeed grievable. (Dkt. No. 25,
Attach. 5. at ¶ 3 [Hale Decl.].)

For all of these reasons, Defendants' motion is granted, and
Plaintiff's Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–
Recommendation (Dkt. No. 28) is ***ACCEPTED*** and
***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment
(Dkt. No. 25) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is
***DISMISSED*** in its entirety.

### *ORDER and REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

*Pro se* Plaintiff Chris Price, an inmate currently confined
in the Auburn Correctional Facility, has commenced this
action pursuant to 42 U.S.C. § 1983 alleging Defendants

Price v. Oropallo, Not Reported in F.Supp.3d (2014)

2014 WL 4146276

failed to protect him in violation of his Eighth Amendment rights by placing a member of a rival gang in his cell. (Dkt. No. 1.) Plaintiff has sued Corrections Sergeant Jon Oropallo ("Oropallo"); Phillip Battiste ("Battiste"), New York State Department of Corrections and Community Supervision ("DOCCS") Director of Security Staff; and Norman R. Bezio ("Bezio"), DOCCS Director of Special Housing/Inmate Disciplinary Program *Id.* at 1.

 **\*2** Defendants filed an Answer to Plaintiff's Complaint (Dkt. No. 12) and have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 25.) Plaintiff has not opposed the motion or sought additional time within which to do so. For the reasons set forth below, the Court recommends that Defendants' motion for summary judgment be granted.

## I. BACKGROUND

While Plaintiff was confined at the Upstate Correctional Facility ("Upstate"), his membership in the Crips gang was known to prison officials. (Dkt. No. 1 at ¶ 7.) Plaintiff expressed concerns for his safety to officials at Upstate, at least in part because according to Plaintiff, Defendant Oropallo had previously forced him to fight with members of the Bloods, a rival gang. *Id.* at 6. In a Declaration submitted in support of Defendants' motion for summary judgment, Oropallo denies ever having forced Plaintiff to fight with another inmate. (Dkt. No. 25–4 at ¶ 4.)

The evidence shows that Oropallo did issue a misbehavior report on Plaintiff on December 8, 2011, after observing Plaintiff and his cell mate Williams fighting. (Dkt. No. 25–4 at ¶ 8 and p. 23.) [1] The fight investigation form reveals that Plaintiff did not want protection and neither he nor Williams wanted to press charges in connection with the fight. *Id.* at p. 24. Donald Uhler ("Uhler"), Deputy Superintendent of Security at Upstate, reviewed Plaintiff's security file and found no request by him for protective custody. (Dkt. No. 25–3 at ¶ 10.)

[1]     Page numbers cited herein are those assigned by the Case Management/Electronic Case File (CM/ECF) system.

Plaintiff claims that as a result of being forced to fight members of the Bloods gang, he filed a grievance and began speaking with officials at Upstate regarding his safety in the fall of 2011. (Dkt. No. 1 at ¶ 6.) Plaintiff's file from Upstate contains a December 12, 2011, "To Whom it May Concern"

letter in which Plaintiff disclosed that he had been forced to fight on December 8, 2011, and had been threatened with a scalpel by members of the Bloods. (Dkt. No. 25–3 at ¶ 4 and p. 6.) In his December 12, 2011, letter Plaintiff indicated that he was writing to create a paper trail regarding safety issues he had raised with corrections officers and sergeants. (Dkt. No. 25–3 at p. 6.) Plaintiff wrote:

> I used to be a well known crip gang member. The bloods still label me as being a crip gang member. So to back myself up, I'm [writing] to all people that I think should be notified of my situation of safety. On the 8th of this month for this particular reasons I stated above, I was [threatened] and forced to fight. I fear for my life while I'm here [incarcerated]. I just wanna do the time that I have and hopeful[ly] get a reversal on my appeals. Are there any ways that, I can be bunked up with someone who isn't labeled a bloods gang member, because I was threatened with a scalpel. I notified the proper personnel and I wasn't taken serious [ly] until I started kicking the cell door I was in, I was taken out to be forced to fight in another cell. I fear I'm a get hurt or I'm a hurt someone. Can you help me? Thank you for your time and [patience].

 **\*3** *Id.*

According to Uhler, Lt. Lumbard ("Lumbard") investigated the letter on December 21, 2011. *Id.* at ¶ 5. Lumbard reported that Plaintiff told him that he was a member of the Crips gang and had been having trouble with members of the Bloods gang. *Id.* at p. 5. When asked about being threatened with a scalpel, Plaintiff refused to provide any information. *Id.* Plaintiff did tell Lumbard that he was getting along well with his current cell mate, and that they had no issues. *Id.* Lumbard indicated that the cell block staff had been notified about the situation and advised to leave Plaintiff with his cell mate and, if possible, to move the cell mate with him when he was moved upstairs. *Id.*

Plaintiff was dissatisfied with the resolution of his grievance and claims to have written to Defendants Battiste and Bezio about his safety concerns. *Id.* Plaintiff was subsequently told by Upstate officials that the safety issues of which he had complained would be handled, and he would not have to worry about being placed in the same cell with known members of the Bloods. *Id.* Nonetheless, on August 9, 2012, inmate Adams, a member of the Bloods, was brought in to bunk with Plaintiff. (Dkt. No. 1 at ¶ 6 .) Plaintiff and Adams got into what both described as a gang related fight in the cell within minutes after the officer placing Adams in the cell left, and Plaintiff sustained a non-displaced fracture of his nose and a laceration on his nose which required stitches. *Id .;* Dkt. Nos. 25–3 at 12; 25–4 at 8–9; 26 at 8–12.

Prior to Adams being placed in the cell with Plaintiff, Oropallo had no personal knowledge or information that would have led him to believe that Adams was gang related or would pose a threat to Plaintiff. (Dkt. No. 25–4 at ¶ 7.) Adams had never told Oropallo he was in a gang, and nothing about the December 8, 2011, fight between Plaintiff and Williams led Oropallo to believe Adams would be a threat to Plaintiff. *Id.* at ¶ 10. Furthermore, the assignment of inmates for double cell housing was not within the scope of Oropallo's authority. *Id.* at ¶ 9.

DOCCS maintains an "enemies" list for inmates based upon information provided by the inmate and from his disciplinary record. *Id.* at ¶ 6. Uhler has explained in his Declaration that DOCCS does not recognize street gangs, and inmates frequently do not disclose gang affiliations to prison officials, although if there is information of gang affiliation, a notation might appear on the inmate's personal characteristics screen, his security file, or be made by a counselor during intake. *Id.* at ¶ 7. Uhler reviewed the DOCCS files on Adams and found no notations indicating that he was gang affiliated. *Id.* at ¶ 8; *see also* Adams' Personal Characteristics Form and Inmate Security Classification Form, neither of which identifies him as a member of the Bloods gang. *Id.* at pp. 9–10.

A misbehavior report was filed against Plaintiff as a result of the August 9, 2012, fight. (Dkt. No. 25–4 at 8.) Plaintiff was found guilty of violent conduct and assault and was given four months in the Special Housing Unit, loss of packages, commissary, ear phones, recreation, and good time, with two months suspended as an incentive for Plaintiff to improve his behavior. *Id.* at 5–6.

## II. APPLICABLE LEGAL STANDARDS

### A. General Legal Standards for Summary Judgment Motions

**\*4** Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [2] *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

[2]    Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable

inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at *3, 1999 U .S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). [3]

3      Copies of unpublished decisions cited herein will be provided to Plaintiff in accordance with *Lebron v. Sanders,* 557 F.3d 76, 79 (2009) (*per curiam* ). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**B. Summary Judgment When a *Pro Se* Plaintiff Fails to Oppose the Motion**

Plaintiff has not opposed Defendants' summary judgment motion. N .D.N.Y. L.R. 56.2 requires the moving party to notify a *pro se* litigant of the consequences of failing to respond to the summary judgment motion. [4] Where a party has been given satisfactory notice of the consequences of failing to respond to a motion for summary judgment, the nonmovant's failure to respond to the movant's statement of material facts will result in the facts set forth in the statement being accepted as true to the extent they are supported by the evidence in the record. [5] *See* L.R. 7.1(a) (3) (*"The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* ) (emphasis in original).

4      A Notice of the Consequences of Failing to Respond to a Summary Judgment Motion was served with Defendants' motion papers in this case. (Dkt. No. 25 at 3.)

5      *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to

evidence in the record supports the assertion.") (citation omitted).

**\*5**  A *pro se* plaintiff's failure to oppose a summary judgment motion does not mean that the defendant's motion is to be granted automatically. An unopposed summary judgment motion may properly be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (internal quotes and citations omitted).

A district court has no duty to perform an independent review of the record to find proof of a factual dispute where the nonmovant fails to respond to a summary judgment motion. *See Amnesty America. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2000). This is so even where a plaintiff is appearing *pro se* because even *pro se* plaintiffs must obey the Court's procedural rules. *See McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). Although not obligated to do so, the Court has elected to conduct a review of the entire record in this case. *See Monahan v. New York City Dept. of Corrections,* 214 F.3d 275, 292 (2d Cir.2000) (a court may, in its discretion, "choose to conduct an assiduous review of the record" even when a party has failed to file a statement of material facts). Because Plaintiff's Complaint is verified, the Court will treat it as an affidavit in opposition to Defendants' motion. *See Colon,* 58 F.3d at 872.

**III. ANALYSIS**

**A. Administrative Exhaustion**

Defendants argue that they are entitled to summary judgment based upon Plaintiff's failure to exhaust his administrative remedies with regard to Defendants' alleged failure to protect him from a Bloods gang member in violation of his Eighth Amendment rights. (Dkt. No. 25–6 at 5–6.)

1. *Exhaustion Under The Prison Litigation Reform Act*

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997(e). The PLRA requires "proper exhaustion" of prison administrative remedies, which includes compliance with agency deadlines and procedural rules. *See Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378,

165 L.Ed.2d 368 (2006). "[P]roper exhaustion ... means using all steps that the agency holds out and doing so properly (so that the agency addresses the issues on the merits)." *Id.* Exhaustion is mandatory, and an inmate cannot satisfy the PLRA's exhaustion requirement by filing an untimely or administratively defective grievance or appeal. *Id.* at 84–85.

The DOCCS Inmate Grievance Procedure ("IGP") has three stages which prison inmates must complete. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5; *see also Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir.2009). First a grievance complaint must be submitted to the Inmate Grievance Resolution Committee ("IGRC") for an initial determination within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a). Next, if the IGRC decision is adverse to the inmate, he has seven calendar days to appeal to the prison superintendent. *Id.* at § 701.5(c). If dissatisfied with the superintendent's decision, the inmate has another seven calendar days to appeal the superintendent's decision to the Central Office Review Committee ("CORC"). *Id.* at § 701.5(d).

**\*6** An inmate must follow through on all three steps to complete the exhaustion process. *See Morrison v. Stefaniak,* 523 F. App'x 51 (2d Cir.2013) (summary order) (upholding dismissal of complaint because plaintiff failed to appeal IGRC's decision); *Belile v. Griffin,* No. 9:11–CV0092 (TJM/DEP), 2013 WL 1776086, at *3–4, 7, 2013 U.S. Dist. LEXIS 47137, at *10, 22–23 (N.D.N.Y. Feb.12, 2013) (plaintiff failed to exhaust his administrative remedies because he had not followed through on all of the steps, *i.e.,* he did not appeal to the superintendent of the facility or appeal any unfavorable decision of the superintendent to CORC).

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar.31, 2010). If a defendant meets that burden, however, a plaintiff's failure to exhaust does not end the review. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray,* 2010 WL 1235591, at *4. *Hemphill* sets forth a three-part

inquiry for district courts. [6] First, courts must determine if administrative remedies were in fact available to plaintiff. In *Hemphill,* the Second Circuit stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill,* 380 F.3d at 688.

[6]    Subsequent to *Hemphill,* the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the negative, explaining that PLRA requires "proper exhaustion"—"using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford,* the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense) (internal quotation marks omitted).

Second, courts must determine if the defendants are estopped from presenting nonexhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by conduct such as " 'beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility.' " *Hemphill,* 380 F.3d at 688 (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray,* 2010 WL 1235591, at *5 & n. 26 (collecting cases); *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at *12, 2008 U.S. Dist. LEXIS 124388, at *44 (N.D.N.Y. Apr. 15, 2008) (Lowe, M.J.) ("None of those documents allege facts plausibly

suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question."). Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a nonexhaustion defense, the inmate's failure to exhaust may be justified. *Hemphill,* 380 F.3d at 686.

#### 2. *Exhaustion Analysis*

**\*7** In his Complaint, Plaintiff has alleged that he asked to file a grievance with regard to the placement of a known Bloods gang member in his cell. (Dkt. No. 1 at ¶ 4.) According to Plaintiff, he was told by the grievance officer that the issue was not grievable and, as a result, never received a response to his grievance. *Id.* Jeffrey Hale ("Hale"), Assistant Director for the DOCCS IGP, has stated in his Declaration that the IGP is the appropriate vehicle for inmates to use to address issues regarding the person with whom they are housed and complaints against staff. (Dkt. No. 25–5 at ¶ 3.) Defendants have not, however, submitted evidence disputing Plaintiff's claim that he was told his complaint was not grievable.

Instead, Defendants have focused on a grievance filed by Plaintiff with regard to the medical care he received for the injuries he sustained in the fight with Adams and have relied upon Plaintiff's failure to appeal from the denial of that grievance as evidence of failure to exhaust the claim asserted in this lawsuit. (Dkt. Nos. 25–3 at ¶ 9 and pp. 11–13; 25–6 at 6.) In Grievance No. UST–50552, Plaintiff referenced the fight in his cell but only in the context of the fight as the cause of his broken nose. *Id.* at p. 11. Plaintiff's complaint was that it took five days for the medical staff at Upstate to send him out for x-rays. *Id.* The investigative report on the grievance references only the medical care given Plaintiff, and the grievance was denied solely on the grounds that there was no urgent need for an x-ray. *Id.* at p. 13. In short, the grievance has no direct relevance to Plaintiff's exhaustion of the failure to protect claim asserted in this lawsuit.

The relevant exhaustion issue on this motion is whether the allegation in Plaintiff's Complaint regarding his unsuccessful attempt to grieve the failure to protect issue is sufficient by itself to raise an issue of fact under any of the *Hemphill* considerations. A number of district courts in the Second Circuit have found either that the IGP is unavailable to an inmate who has been told by a prison official that his complaint was not grievable, or that the misinformation constitutes a special circumstance excusing exhaustion under

*Hemphill.* [7] *See, e.g., Partee v. Goord,,* No. 06–15528, 2007 WL 2164529(SAS), at \*4, 2007 U.S. Dist. LEXIS, at \*14 (S.D.N.Y. July 25, 2007) (excusing exhaustion requirement because plaintiff was told in reply to his grievance that his claim was outside the purview of the IGRC, and he reasonably understood this to mean his dispute was not grievable); *Lewis v. Cunningham,* No. 05–9243(GBD), 2007 WL 2412258, at \*2, 2007 U.S. Dist. LEXIS 62346, at \*5 (S.D.N.Y. Aug.23, 2007) (finding special circumstances justifying failure to exhaust remedies because a supervisor told plaintiff that filing a grievance was not the proper way to address a complaint, and to instead write a letter to the Chief Medical Officer at the Department of Health, which he did); *Jeffers v. Goord,* No. 9:99–CV–0335 (FJS/GHL), 2005 WL 928628, at \*6, 2005 U.S. Dist. LEXIS 39309, at \*16–17 (N.D.N.Y. Apr.4, 2005) ("[p]rison official may prevent a prisoner from utilizing a remedy by incorrectly representing to the prisoner that his complaint is not grievable, or that it is grievable only through another avenue.").

[7]     Courts have noted that there is significant overlap in the three *Hemphill* considerations. *See, e.g., Barksdale v. Frenya,* No. 9:10–CV–00831 (MAD/DEP), 2012 WL 4107805, at \*6 n. 11, 2012 U.S. Dist. LEXIS 134738, at \*21 n. 11 (N.D.N.Y. Sept.19, 2012) ("In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap."). A failure to exhaust as a result of being given false information on whether a complaint was grievable by a non-defendant could arguably fit within either the first or third consideration.

**\*8** Defendants' failure to submit evidence refuting or explaining Plaintiff's claim that he was told his complaint was not grievable leaves material issues of fact regarding the applicability of one or more of the *Hemphill* considerations. Therefore, the Court recommends that Defendants' request for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies be denied without prejudice.

### B. Battiste and Bezio

The Eighth Amendment to the United States Constitution "requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996). Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate

indifference to the inmate's safety. *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988) ("[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983."); *see also Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991) ("[A]n inmate's claim that prison officials failed, as a result of their deliberate indifference, to protect [the inmate] from the violent actions of other inmates may state a viable § 1983 cause of action."); *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) ("The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment"); *Wassmann v. County of Ulster,* 528 F. App'x 105, 106 (2d Cir.2013) ("Officers at correctional facilities have a duty to protect inmates from violence at the hands of other inmates.") (citing *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

To prevail on a failure to protect claim, an inmate must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm; and (2) prison officials exhibited deliberate indifference. *Farmer,* 511 U.S. at 837. In order to establish deliberate indifference where a prison official has failed to protect an inmate from violence by another inmate, a plaintiff must prove that the defendant official actually knew of and disregarded an excessive risk of harm to the plaintiff's safety. *Hayes,* 84 F.3d at 620. Even assuming that the allegations in Plaintiff's Complaint are sufficient to satisfy, or at least raise a question of fact on the issue of substantial risk of harm, the summary judgment record is devoid of evidence that Battiste and Bezio exhibited deliberate indifference to Plaintiff's safety in placing Adams in his cell.

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919,

at \*6, 2012 U.S. Dist. LEXIS 25367, at \*22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (citing *Ayers,* 780 F.2d at 210). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered ." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*9** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. [8]

[8]     The Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law.

Plaintiff claims that he wrote to Defendants Battiste and Bezio with respect to his safety concerns with regard to sharing a cell with a Bloods gang member after he was dissatisfied with the response of Upstate officials to his complaints in the fall or winter of 2011. (Dkt. No. 1 at ¶ 6.) According to Plaintiff after he sent the letters to Battiste and Bezio he was told by Upstate officials that his safety issue had been addressed. *Id.*

Battiste and Bezio did not submit evidence regarding whether they received letters from Plaintiff and, if so, took any action in response. Instead, they rely upon an attorney's declaration stating upon information and belief that a search was made of records in the DOCCS Central Office and no correspondence to or from Plaintiff was found. (Dkt. No. 25–2 at ¶ 3.) The

source of counsel's information and belief appears to be the July 25, 2013, unsworn letter from a DOCCS senior attorney annexed as an exhibit. *Id.* at p. 4.

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997); *see also Salahuddin,* 467 F.3d at 272–73 (movant bears the initial burden of showing through the production of admissible evidence that he is entitled to judgment as a matter of law). An attorney's affidavit that is not based upon personal knowledge and relies upon an attached letter not sworn as required by Rule 56(e) is not admissible evidence and not properly considered on a summary judgment motion.[9] *See Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986); *see also Sepanski v. Jani–King, Inc.,* No. 10–CV–518S, 2013 WL 4455412, at *2–3, *8, 2013 U.S. Dist. LEXIS 116437, at *8 (W.D.N.Y. Aug.16, 2013) (holding that three unsworn letters submitted by plaintiff could not be considered in connection with a motion for summary judgment).

| 9 | Statements in Defendants' Statement Pursuant to Rule 7.1(a)(3) are deemed admitted on an unopposed summary judgment motion only to the extent they are supported by admissible evidence. *See Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001) ("court may not rely solely upon statement of undisputed facts in determining whether movant has met this burden of showing the absence of a genuine issue for trial; court must be satisfied that the citation to evidence in the record supports the assertion). Paragraph 13 of Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 25–1), stating that "[t]here is no evidence to demonstrate that Defendants Bezio or Battiste received correspondence from Plaintiff," relies upon an attorney's declaration that is not based upon personal knowledge and an unsworn letter, neither of which constitutes admissible evidence. *See Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986). |

A movant's burden of demonstrating the absence of a question of material fact remains the same where the motion is unopposed. *See Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.") (citation and internal quotation marks omitted). Defendants have not satisfied their burden of production with respect to Plaintiff's claim that he wrote to Battiste and Bezio regarding his concerns about Bloods.

**\*10** Nonetheless, because Plaintiff has not alleged facts in his Complaint showing that Battiste or Bezio had knowledge of, or personal involvement in, Adams being placed in a cell with him, or that they were aware of Adams' Bloods affiliation, he has failed to state an Eighth Amendment claim against the two supervisory officials for failure to protect him from the injuries he sustained in the fight with Adams. *See McKinnon,* 568 F.2d at 934 (personal involvement in constitutional deprivation is a prerequisite to an award of damages under § 1983); *Hayes,* 84 F.3d at 620 (defendant official must actually have known of and disregarded an excessive risk of harm to the plaintiff's safety to establish deliberate indifference).

Therefore, the Court recommends that Battiste and Bezio be granted summary judgment dismissing the Complaint as against them.

### C. Oropallo

Even assuming, *arguendo,* that the allegations in Plaintiff's Complaint are sufficient to satisfy, or at least raise a question of fact, on the issue of substantial risk of harm, the evidence in the summary judgment record establishes that Defendant Oropallo did not know of and disregard an excessive risk of harm to Plaintiff's safety in connection with Adams being placed in Plaintiff's cell. *See Hayes,* 84 F.3d at 620. The prison files on inmate Adams contained no notations indicating that he was gang related. (Dkt. No. 25–3 at ¶ 8.) The DOCCS "enemies" list did not identify Plaintiff and Adams as enemies. *Id.* at ¶ 6. Moreover, Plaintiff's security file contained no requirements for protective custody. *Id.* at ¶ 10.

According to Oropallo, prior to the altercation between Plaintiff and Adams, he had no personal knowledge or information that would have led him to believe that Adams was gang affiliated or would pose a threat to Plaintiff. (Dkt. No. 25–4 at ¶ 7.) Adams had not told Oropallo he was in a gang before being placed in Plaintiff's cell. *Id.* at ¶ 10. Moreover, the assignment of inmates in double cell housing was not within Oropallo's authority. *Id.* at ¶ 9.

Since Plaintiff has failed to submit opposition to Defendants' motion, the Court can look only to his verified Complaint for evidence demonstrating that a genuine issue of material

**Price v. Oropallo, Not Reported in F.Supp.3d (2014)**
Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 69 of 306
2014 WL 4146276

fact exists as to whether Oropallo knew of and disregarded an excessive risk of harm to the plaintiff's safety. *Id.* Mere allegations in Plaintiff's Complaint, especially conclusory allegations or conjecture and speculation, are insufficient to create a genuine issue of fact. *See Matsushita,* 475 U.S. at 585–86; *Kerzer,* 156 F.3d at 400.

None of the allegations in Plaintiff's verified Complaint contradicts Defendants' evidence that prison records did not identify Adams as a member of the Bloods gang, that Oropallo had no knowledge that Adams was a member of the Bloods gang at the time he was placed in Plaintiff's cell, and that Oropallo had no authority with regard to the assignment of inmates in double cells. Therefore, Plaintiff has failed to raise a question of fact as to whether Oropallo was deliberately indifferent to his safety, a necessary element of proof on an Eighth Amendment claim for cruel and inhuman punishment based upon a failure to protect. *See Farmer,* 511 U.S. at 837. Therefore, the Court recommends that Oropallo's motion for summary judgment be granted.

**\*11 ACCORDINGLY,** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892F.2d 15 (2d Cir.1989) (per curiam); 28 U.S.C. § 636(b) (1); Federal Rules of Civil Procedure 72, 6(a).

Filed June 18, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4146276

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| 1. **Docket 9:13cv00563**<br>PRICE v. OROPALLO ET AL | — | N.D.N.Y. | May 15, 2013 | Docket |

**History**

There are no History results for this citation.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Shabazz v. Bailey, Not Reported in Fed. Supp. (2023)

2023 WL 5779533

2023 WL 5779533
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael Aziz Zarif SHABAZZ, Plaintiff,
v.
BAILEY, Defendant.

9:20-cv-00057 (LEK/TWD)
|
Signed June 28, 2023

**Attorneys and Law Firms**

MICHAEL AZIZ ZARIF SHABAZZ, Plaintiff, pro se, P.O. Box 1312, Mount Vernon, NY 10551.

LETITIA JAMES, New York State Attorney General, JOHN F. MOORE, ESQ., Ass't Attorney General, Counsel for Defendant, The Capitol, Albany, NY 12224.

## REPORT-RECOMMENDATION AND ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** This matter has been referred for a report and recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Before the Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 101.) For the reasons set forth below, the Court recommends granting Defendant's motion.

## I. BACKGROUND

### A. Procedural History

On December 19, 2019, Michael Aziz Zarif Shabazz, a/k/a Michael Hurley (DIN 72-B-0089), commenced this action pursuant to 42 U.S.C. § 1983 in the Southern District of New York ("SDNY") alleging wrongdoings while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Upstate Correctional Facility ("Upstate"). (Dkt. No. 2.) On January 9, 2020, SDNY Chief District Judge Colleen McMahon issued an Order transferring this action to this District. (Dkt. No. 3.) Upon receipt of the action in this District, Judge Kahn

granted Plaintiff's application to proceed *in forma pauperis*, accepted the complaint for filing, and ordered only Plaintiff's Eighth Amendment conditions of confinement and deliberate medical indifference claims asserted against Corrections Officer ("CO") Bailey survived *sua sponte* review. (Dkt. No. 5 at 15.[1]) Defendant filed an answer. (Dkt. No. 14.)

[1]     Page citations herein are those assigned by the Court's electronic filing system, CM/ECF. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

Following discovery, Defendant filed the instant summary judgment motion on January 6, 2023. (Dkt. No. 101.[2]) Defendant argues he should be granted summary judgment because Plaintiff did not exhaust his available administrative remedies prior to the filing of this action. (Dkt. No. 101-4 at 11-17.) Defendant further argues summary judgment is warranted on the merits. *Id.* at 17-24. Plaintiff has filed a response. (Dkt. No. 107.[3]) Defendant filed a reply. (Dkt. No. 109.)

[2]     Defendant's submission includes a Notice of Motion (Dkt. No. 101); Declaration of John F Moore, AAG, with exhibits (Dkt. Nos. 101-1, 101-2); Statement of Material Facts (Dkt. No. 101-3); Memorandum of Law (Dkt. No. 101-4); Appendix of Unreported Cases (Dkt. No. 101-5); Declaration of Defendant Mark Bailey with exhibits (Dkt. No. 101-6); Declaration of Cassie Bayne with exhibits (Dkt. No. 101-7); and Declaration of Rachael Seguin with an exhibit (Dkt. No. 101-8).

[3]     Plaintiff's submission includes a Response (Dkt. No. 107); Memorandum of Law (Dkt. No. 107-1); Exhibits (Dkt. No. 107-2); and Responding Declaration (Dkt. No. 107-3).

### B. Facts

The verified complaint alleges CO Bailey "contaminated and poisoned" Plaintiff's food during the afternoon shift on October 26, 2016, at Upstate. (Dkt. No. 2 at 6.) As a result, Plaintiff "experienced and suffered unbearable [physical] and extreme stomach pain." *Id.* at 7. During subsequent rounds on October 26, 2016, CO Bailey ignored Plaintiff's requests for emergency medical attention. *Id.* at 8-9. Approximately seven hours later—during the "late night shift"—Plaintiff was

Case 9:23-cv-00098-MJK Document 144 Filed 03/04/26 Page 74 of 306

Shabazz v. Bailey, Not Reported in Fed. Supp. (2023)

2023 WL 5779533

provided medical attention. *Id.* at 9-10. He stayed overnight in the prison hospital and was transferred to an outside hospital the next morning. *Id.* at 9-10. "Tubes were ... used to ... drain and to remove some of the poison from [Plaintiff's] body," and Plaintiff later underwent surgery, where "at least a foot of [his] intestines [were] ... removed." *Id.* As a result of the surgery, Plaintiff continues to experience physical pain, as well as psychological and emotional trauma. *Id.* at 11.

**\*2** In his declaration, CO Bailey states that on October 26, 2016, he worked at Upstate in the 11 Building ("Unit 11") from 2:00 p.m. to 10:00 p.m. (Dkt. No. 101-6 at ¶ 4.) CO Bailey categorically denies the material allegations of the complaint. To that end, CO Bailey states:

> I did not poison, contaminate or otherwise tamper with Plaintiff's food on October 26, 2016, or at any time.
>
> I have no hand in preparing food for incarcerated individuals. I have no knowledge of anyone else, including any nurse on duty on October 26, 2016, or at any other time, poisoning, contaminating or otherwise tampering with Plaintiff's food.
>
> On October 26, 2016, I would have been involved in passing out either meals or juice to the incarcerated individuals on Unit 11. The log annexed as Exhibit A indicates that this occurred at 4:30 p.m. on October 26, 2016 ("Rounds in progress/chow being served"). Rounds would have occurred every half-hour during the shift I worked on October 26, 2016.
>
> At no time during the remainder of my shift on October 26, 2016[,] did Plaintiff advise me that he needed emergency medical attention, or wished to see the nurse. If he had, I would have radioed the request for medical attention to the block nurse, and that would have been reflected in the log annexed as Exhibit A, which it is not.

(Dkt. No. 101-5 at ¶ 5. [4] )

[4]     Internal citations and emphasis omitted; spacing added for ease of reading.

CO Bailey also points out:

> If Plaintiff had needed medical care in the hours following the distribution of chow on October 26, 2016, he could have also advised the nurse. According to the Unit 11 log book for October 26, 2016, at 7:30 p.m. the nurse walked the unit to distribute meds and pick up any sick call,

and the Plaintiff could have requested medical attention or submitted a sick call at that point. There is no indication in the log that he did so at that time.

> The log book does indicate that at 10:00 p.m. on October 26, 2016, Plaintiff was given medical attention from the nurse on duty. ("2200 Rounds/Nurse on block checked on Inmate Hurley 72B008 who complained about food poisoning. After talking to nurse appears OK"). Plaintiff saw the nurse again at 11:10 (2310 entry), and was taken to the infirmary at 11:37 (2337 entry).

*Id.* at ¶¶ 6-7. [5]

[5]     Internal citations and emphasis omitted; spacing added for ease of reading.

During his deposition, Plaintiff admitted it was possible a nurse gave him antacids at 10:05 p.m. "after the shift change" and that he saw the nurse again after 11:00 p.m. and was brought to the infirmary. (Dkt. No. 101-2 at 92-95.) There, he was seen by medical personnel. *Id.* at 96-97. The next morning, on October 27, 2016, he was taken to an outside emergency room. *Id.* at 97-98. Plaintiff was diagnosed with an intestinal/bowel obstruction at Alice Hyde Medical Center, and was ultimately treated with surgery. *Id.* at 98-99, 104-06. Plaintiff agreed he was diagnosed with an intestinal obstruction and that the doctors never used the word "poisoned." *Id.* at 106-07. Plaintiff was discharged from Alice Hyde Medical Center on November 5, 2016. *Id.* at 107-08.

Defendant also submits detailed affidavits of the process for exhausting inmate grievance complaints. (Dkt. Nos. 101-7, 101-8.) Those affidavits, and the records attached thereto, show there is a grievance procedure available to inmates at Upstate known as the Incarcerated Grievance Program ("IGP") which involves three steps: (1) complain to the Incarcerated Grievance Resolution Committee ("IGRC") at the individual facility; (2) appeal to the Superintendent of the facility; and (3) appeal to the Central Office Review Committee ("CORC"). (Dkt No. 101-3 at ¶¶ 2-10.) Plaintiff was aware of the grievance procedure and as of May 6, 2020, had appealed 256 grievances to CORC. *Id.* at ¶ 11.

**\*3** Plaintiff's grievance records at Upstate indicate he filed grievance number UST-59727-16, alleging that, amongst other things not at issue in this lawsuit, on October 26, 2016, CO Bailey contaminated Plaintiff's food, after which Plaintiff allegedly became sick, and CO Bailey ignored Plaintiff's requests for medical attention. *Id.* at ¶ 18. That grievance was

2023 WL 5779533

denied by the Superintendent based on a finding of no staff misconduct. *Id.* at ¶¶ 19-20. There is no record of Plaintiff appealing the grievance to CORC. *Id.* at ¶¶ 21-24.

## II. DISCUSSION

### A. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The movant may meet this burden by showing the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys*, 426 F.3d at 554 (emphasis in original). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to

defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

**\*4** In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

### B. Local Rule 56.1

Local Rule 56.1(a) requires a party moving for summary judgment to file and serve a Statement of Material Facts. L.R. 56.1(a). In turn, Local Rule 56.1(b) mandates that the party opposing a motion for summary judgment "file a separate Response to the Statement of Material Facts. The opposing party response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs." L.R. 56.1(b). "Each denial shall set forth a specific citation to the record where the factual issue arises." *Id.*; *see Lee v. City of Troy*, 520 F. Supp. 3d 191, 198 (N.D.N.Y. 2021) ("Because a naked denial of a fact the movant claims to be undisputed would do little to help the Court, the opposing party must support every denial with a citation to record evidence supporting a genuine dispute of material fact."). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." L.R. 56.1(b) (emphasis omitted).

Here, Defendant filed and served a 47-paragraph Rule 56.1 Statement of Material Facts. (Dkt. No. 101-3.) In opposing Defendant's motion, Plaintiff failed to respond to Defendant's Rule 56 Statement of Material Facts. (*See generally* Dkt. No.

Case 9:23-cv-00098-MJK   Document 144   Filed 03/04/26   Page 76 of 306

Shabazz v. Bailey, Not Reported in Fed. Supp. (2023)
2023 WL 5779533

107.[6]) Plaintiff's failure to provide a response in accordance with Local Rule 56.1(b) permits this Court to deem admitted Defendant's properly supported facts that Plaintiff does not specifically controvert. *See* L.R. 56.1(b); *see also T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."). The Court "may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation omitted).

[6]    As pointed out by Defendant, Plaintiff filed a document titled "Responding Declaration" (Dkt. No. 107-3), which on its face appears to be a 13-pargarph declaration in response to the Attorney Declaration of John F. Moore, AAG (Dkt. No. 101-1), not the 47-paragraph Rule 56 Statement (Dkt. No. 101-3). (Dkt. No. 109 at 6.)

Because Plaintiff did not comply with Local Rule 56.1(b), the facts set forth in Defendant's Rule 56.1 Statement of Material Facts that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's verified complaint and sworn opposition submission will be accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts on motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement of Facts ... supplemented by Plaintiff's verified complaint ... as true."). As to any facts not contained in Defendant's Statement of Material Facts, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

### C. Exhaustion of Administrative Remedies

**\*5** The Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)), *abrogated on other grounds by Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). The PLRA requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Exhaustion is an affirmative defense, and the burden of proof, at all times, remains on the defendant. *Coley v. Garland*, No. 9:19-CV-00382 (LEK/ATB), 2023 WL 346242, at *4 (N.D.N.Y. Jan. 20, 2023).

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the IGRC. N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to CORC. *Id.* § 701.5(d). Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (I), 701.5.

"CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the inmate does not receive such confirmation within forty-five days, he 'should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC.' " *Ruiz v. Link*, No. 20-CV-0235, 2022 WL 3020254, at *4 (S.D.N.Y. July 29, 2022) (quoting 7 N.Y.C.R.R. § 701.5(d)(3)(i)). The IGP requires CORC to respond to an appeal within thirty days of receipt. 7 N.Y.C.R.R. § 701.5(d)(3)(ii). If CORC has received an appeal and fails to rule within those thirty days, the inmate is considered to have exhausted his administrative remedies and may file suit. *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

Here, the Court concludes Defendant has satisfied his burden of proof that Plaintiff did not exhaust his available administrative remedies. (*See* Dkt. Nos. 101-4 at 11-17; 109

at 6-10.) As detailed above, the record establishes Plaintiff filed a grievance at Upstate following the alleged incidents at issue, which was assigned grievance number UST-59727-16. (Dkt. No. 101-3 at ¶ 18.) Given the nature of the grievance, alleging employee misconduct, it was forwarded directly to the facility Superintendent. *Id.* at ¶ 19. On January 18, 2017, the Superintendent denied grievance UST-59727-16. *Id.* at ¶ 20. The Upstate IGP has no record of Plaintiff filing an appeal to CORC from the Superintendent's decision denying grievance UST-59727-16. *Id.* at ¶ 21. Plaintiff has no records of any appeal of his grievance to CORC and, according to CORC records, Plaintiff did not appeal any grievance to CORC related to any incident occurring on or about October 26, 2016. *Id.* at ¶ 22-23. Plaintiff's failure to appeal grievance UST-59727-16 to CORC means Plaintiff failed to properly exhaust his administrative remedies before filing this action.

**\*6** A prisoner's failure to exhaust administrative remedies may be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 578 U.S. at 642. As the Supreme Court stated in *Ross*, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end - with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44.

The record establishes none of the *Ross* exceptions are applicable here. Plaintiff, who is well versed in the IGP, has fully exhausted administrative grievances to CORC on 256 other occasions. (Dkt. No. 101-3 at ¶ 11.) "This shows that Plaintiff did not view the filing of grievances as a dead end. It also demonstrates that he clearly understood DOCCS' inmate grievance policy and could navigate it when he wished to pursue a grievance. As such, the first two exceptions identified under *Ross* are not applicable here." *Smith v. Jaynes*, No. 9:18-CV-1107 (DNH/DJS), 2022 WL 686627, at \*3 (N.D.N.Y. Feb. 18, 2022), *report and recommendation adopted*, 2022 WL 685488 (N.D.N.Y. Mar. 8, 2022) (citing *Walker v. Ball*, 2018 WL 1415212, at \*5 (N.D.N.Y. Feb. 16, 2018), *report and recommendation adopted*, 2018 WL 1406632 (N.D.N.Y. Mar. 20, 2018)); *see also Coley*, 2023 WL 346242, at \*5 (plaintiff's testimony he

had successfully filed and appealed grievances in the past at Upstate suggested DOCCS grievance process was not a "dead end" or "incapable of use") (citing *Lurch v. Bui*, No. 19-CV-895 (DNH/DJS), 2020 WL 8450543, at \*5 (N.D.N.Y. Dec. 8, 2020), *report and recommendation adopted*, 2021 WL 392486 (N.D.N.Y. Feb. 4, 2021)).

Nor has Plaintiff raised any triable question of fact as to the applicability of the third *Ross* exception. Plaintiff implies that he attempted to appeal his grievance to CORC but that it was not properly forwarded. (*See, e.g.*, Dkt. No. 107 at 8 ("I appealed all adverse grievances and/or prison authorities never received same."); Dkt. No. 101-2 at 124 (testifying he "obviously appealed" the grievance to CORC and "this civil complaint is a result of them ignoring and not addressing the issue").) His conclusory allegations in this regard are, however, insufficient to raise a question of fact. *Lurch*, 2020 WL 8450543, at \*5; *see Blake v. Porlier*, No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at \*5 (N.D.N.Y. Oct. 4, 2019) ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' ") (quoting *Rodriguez v. Cross*, No. 9:15-CV-1079 (GTS/CFH), 2017 WL 2791063, at \*5 (N.D.N.Y. May 9, 2017)); *Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at \*7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report and recommendation adopted*, 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2019); *see also Haywood v. Palmer*, No. 21-cv-7277 (NSR), 2023 WL 2711555, at \*5 (S.D.N.Y. Mar. 30, 2023) ("[A]lthough Plaintiff alleges that 'the grievance process is broken' and that it is [the facility's] 'usual practice' not to respond to grievances, these claims are too vague and conclusory to excuse Plaintiff's failure to exhaust.").

**\*7** Further, the record is devoid of any indication that Plaintiff followed up with the Upstate IGP supervisor "to confirm that the appeal was filed and transmitted to CORC" when he did not receive written confirmation within forty-five days that his appeal was received. 7 N.Y.C.R.R. § 701.5(d)(3)(i); *see, e.g.*, *Simpson v. Price*, No. 9:19-CV-1413 (MAD/ATB), 2021 WL 7367083, at \*9 (N.D.N.Y. Dec. 29, 2021) (granting summary judgment on exhaustion grounds where plaintiff "provided no specifics regarding when the

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 78 of 306

Shabazz v. Bailey, Not Reported in Fed. Supp. (2023)
2023 WL 5779533

grievances were written, their content, or the steps he took to provide them to an officer to send to the grievance office" and there was no documentary evidence to corroborate the fact plaintiff attempted to file a grievance, such as follow-up correspondences).

There is no allegation, nor is there any showing, that Defendant or prison officials affirmatively or misleadingly prevented Plaintiff from filing the appeal to CORC. *See, e.g., Smith,* 2022 WL 686627, at *4 ("For an inmate with Plaintiff's experience with the grievance process, this failure to address the allegedly missing grievance belies any claim that prison administrators' "machination, misrepresentation, or intimidation" denied Plaintiff the ability to file a grievance against Jaynes.").

In short, "[g]iven the lack of evidence that Plaintiff's appeal to CORC was ever filed, or ever followed up on, it is not that the full scope of administrative remedies was not available to Plaintiff – rather, Plaintiff failed to fully exhaust the administrative remedies available to him." *Houston v. Coveny,* No. 14-CV-6609, 2020 WL 2494439, at *3 (W.D.N.Y. May 14, 2020); *see Litchmore v. Williams,* No. 11-CV-7546, 2013 WL 3975956, at *6 (S.D.N.Y. Aug. 5, 2013) (no "sufficient basis in the record to find that administrative remedies were unavailable" where, among other things, there was "no evidence here that the plaintiff's appeal was actually mailed, intercepted, or ignored" and "DOCCS has no record of any appeal filed with CORC").

As a final matter, to the extent Plaintiff appears to argue "special circumstances" justify his failure to comply with the exhaustion, (*see* Dkt. No. 107 at 5-11), the Supreme Court made it clear in *Ross* that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross,* 578 U.S. at 640. " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan,* 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross,* 578 U.S. at 639).

Accordingly, for the foregoing reasons, the Court finds Plaintiff has not raised an issue of material fact as to the availability of administrative remedies. As a result, the Court recommends granting Defendant's motion for summary judgment because Plaintiff has failed to exhaust his available administrative remedies under the PLRA. As such, the Court does not reach Defendant's alternative arguments. *See, e.g., Coley,* 2023 WL 346242, at *6 (declining to address alternative arguments where summary judgment

was warranted on exhaustion grounds); *White v. Dishaw,* No. 9:14-CV-0002 (GLS/DJS), 2017 WL 4325770, at *4 (N.D.N.Y. June 20, 2017) (same), *report and recommendation adopted,* 2017 WL 4326074 (N.D.N.Y. Sept. 27, 2017).

### III. CONCLUSION
After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 101) be **GRANTED** because of Plaintiff's failure to exhaust available administrative remedies; and it is further

**ORDERED** that the Clerk serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009).

**\*8** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. [7] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[7]     If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date of the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2023 WL 5779533

**Shabazz v. Bailey, Not Reported in Fed. Supp. (2023)**

2023 WL 5779533

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (2)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 23-7252**<br>Shabazz v. Bailey | — | C.A.2 | Oct. 04, 2023 | Docket |
| **2.  Docket 9:20-CV-00057**<br>Shabazz v. Bailey | — | N.D.N.Y. | Jan. 16, 2020 | Docket |

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (5)**

**Direct History (3)**

1. Shabazz v. Bailey
2023 WL 5779533 , N.D.N.Y. , June 28, 2023

*Report and Recommendation Adopted by*

2. Shabazz v. Bailey
2023 WL 5622049 , N.D.N.Y. , Aug. 31, 2023

*Affirmed by*

3. Shabazz v. Bailey
2025 WL 272602 , 2nd Cir.(N.Y.) , Jan. 23, 2025

**Related References (2)**

4. Shabazz v. Annucci
2020 WL 13801095 , S.D.N.Y. , Jan. 09, 2020

*Transferred to*

5. Shabazz v. Annucci
2020 WL 13801106 , N.D.N.Y. , Apr. 07, 2020

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 5622049

2023 WL 5622049
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael Aziz Zarif SHABAZZ, Plaintiff,
v.
BAILEY, Defendant.

9:20-CV-57 (LEK/TWD)
|
Signed August 30, 2023
|
Filed August 31, 2023

**Attorneys and Law Firms**

Michael Aziz Zarif Shabazz, Mount Vernon, NY, Pro Se.

John F. Moore, Office of Attorney General - Albany State of New York, Albany, NY, for Defendant.

### MEMORANDUM-DECISION AND ORDER

LAWRENCE E. KAHN, United States District Judge

## I. INTRODUCTION

 **\*1** Plaintiff Michael Aziz Zarif Shabazz brings this pro se action against Defendant Corrections Officer ("CO") Bailey pursuant to 42 U.S.C. § 1983, alleging that Defendant violated his Eighth Amendment rights. See Dkt. No. 2 ("Complaint") at 4–15.

The Honorable Thérèse Wiley Dancks, United States Magistrate Judge, issued a report and recommendation on June 28, 2023, Dkt. No. 112 ("Report and Recommendation"), recommending that Defendant's motion for summary judgment, Dkt. No. 101 ("Motion"), be granted because Plaintiff failed to exhaust his available administrative remedies under the Prison Litigation Reform Act ("PLRA"), R. & R. at 14–15. Plaintiff has filed objections, Dkt. No. 113 ("Objections"), and Defendant has responded, Dkt. No. 114. For the reasons that follow, the Court approves and adopts Judge Dancks's Report and Recommendation in its entirety.

## II. BACKGROUND

### A. Factual Allegations

The Court assumes familiarity with Judge Dancks's Report and Recommendation, as well as with Plaintiff's factual allegations detailed therein. See R. & R. at 2–5.

### B. The Report and Recommendation

Judge Dancks comprehensively reviewed Plaintiff's Complaint and Defendant's Motion, R. & R. at 2–5, and recommended that Defendant's Motion be granted, id. at 15. Judge Dancks reached this conclusion after finding that Plaintiff failed to exhaust his available administrative remedies under the PLRA. Id. at 14–15.

Pursuant to 42 U.S.C. § 1997e(a) of the PLRA, incarcerated individuals must exhaust all available administrative remedies prior to bringing a federal civil rights action. Id. at 9. "The PLRA requires 'proper exhaustion,' which means using all steps of the administrative process and complying with 'deadlines and other critical procedural rules.' " Id. at 9 (quoting Woodford v. Ngo, 548 U.S. 81, 93 (2006)). Exhaustion is an affirmative defense, and the burden of proof remains on the defendant at all times. Id. at 10.

To prevail on his 42 U.S.C. § 1983 claim, Plaintiff, who alleged wrongdoings while he was in the custody of New York State Department of Corrections and Community Supervision ("DOCCS") at Upstate Correctional Facility ("Upstate"), id. at 2, was required to follow New York's grievance procedure, which is known as the Incarcerated Grievance Program ("IGP"), id. at 5. The IGP is a three-tiered process, requiring inmates to: (1) file a grievance with the Incarcerated Grievance Resolution Committee ("IGRC") at the individual facility; (2) appeal adverse IGRC decisions to the superintendent of the facility ("Superintendent"); and (3) appeal adverse Superintendent decisions to the Central Office Review Committee ("CORC"). Id. at 5, 10. However, complaints of harassment are expedited and are forwarded directly to the Superintendent. Id. at 10. The incarcerated individual must then, similarly, appeal an adverse Superintendent decision to CORC. Id. "CORC is required to provide, through IGP staff, written confirmation that an appeal has been received." Id. (internal citations omitted). Therefore, if an incarcerated individual does not receive confirmation of appeal receipt within forty-five days, the individual is instructed to write the IGP supervisor to confirm that the appeal was filed and transmitted to CORC. Id.

 **\*2** Here, given that Plaintiff alleged employee misconduct, Plaintiff's grievance was forwarded directly to the facility

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 84 of 306

Shabazz v. Bailey, Not Reported in Fed. Supp. (2023)
2023 WL 5622049

Superintendent. Id. at 10–11. The Superintendent denied Plaintiff's grievance, but neither Upstate's IGP nor Plaintiff had any record of Plaintiff filing an appeal to CORC. Id. at 11. CORC's records also did not indicate that Plaintiff had appealed to CORC. Id. Accordingly, Judge Dancks found that Plaintiff's failure to appeal to CORC meant Plaintiff "failed to properly exhaust his administrative remedies before filing this action." Id.

Judge Dancks next evaluated if the record established that Plaintiff's failure to exhaust administrative remedies may be excused due to unavailability of the remedy to Plaintiff. Id. at 11–14. Judge Dancks noted that the Supreme Court has outlined three types of circumstances where administrative remedies are not available:

> (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved [incarcerated individuals]"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

Id. at 11 (quoting Ross v. Blake, 578 U.S. 632, 643–44 (2016)).

Judge Dancks concluded that none of the three Ross exceptions were applicable here. Id. Furthermore, Judge Dancks noted that courts in this Circuit have held that a plaintiff's past filing of grievances demonstrates both that (1) the plaintiff does not view the filing as a dead end, and that (2) the plaintiff understands DOCCS' IGP. Id. (citing Smith v. Jaynes, No. 18-CV-1107, 2022 WL 686627, at *3 (N.D.N.Y. Feb. 18, 2022)). Judge Dancks specifically stated that Plaintiff has "fully exhausted administrative grievances to CORC on 256 other occasions," and, as such, "the first two exceptions identified under Ross are not applicable here." Id.

Further, Judge Dancks found that Plaintiff's conclusory allegation that his grievance appeal to CORC was not property forwarded did not raise any triable question of fact as to the applicability of the third Ross exception. Id. at 12 (citing Lurch v. Bui, No. 19-CV-895, 2020 WL 8450543, at *5 (N.D.N.Y. Dec. 8, 2020)). Judge Dancks noted that courts in this Circuit "have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact

when there is no evidence to support the allegations." Id. (internal citations omitted) (quoting Blake v. Porlier, No. 18-CV-1008, 2019 WL 7484052, at *5 (N.D.N.Y. Oct. 4, 2019)). Judge Dancks stated that there is not only a lack of evidence that Plaintiff's appeal to CORC was ever filed, but there is also no "indication that Plaintiff ever followed up with the Upstate IGP Supervisor 'to confirm that the appeal was filed and transmitted to CORC' when he did not receive written confirmation within forty-five days that his appeal was received." Id. at 13 (internal citations omitted). Accordingly, Judge Dancks found that "it is not that the full scope of administrative remedies was not available to Plaintiff—rather, Plaintiff failed to fully exhaust the administrative remedies available to him." Id. (internal citations omitted).

Finally, Judge Dancks concluded that, while "Plaintiff appears to argue 'special circumstances' to justify his failure to comply with the exhaustion, the Supreme Court made it clear in Ross that courts may not excuse a prisoner's failure to exhaust because of 'special circumstances.' " Id. at 14 (quoting Ross, 578 U.S. at 640). Thus, Judge Dancks found that Plaintiff did not raise an issue of material fact as to the availability of administrative remedies, and recommended granting of Defendant's motion for summary judgment because Plaintiff failed to exhaust his available administrative remedies under the PLRA. Id. Accordingly, Judge Dancks did not reach Defendant's alternative arguments. Id. (citing Coley v. Garland, No. 19-CV-00382, 2023 WL 346242, at *6 (N.D.N.Y. Jan. 20, 2023) (declining to address alternative arguments where summary judgment was warranted on exhaustion grounds)).

### III. STANDARD OF REVIEW

**\*3** "Rule 72 of the Federal Rules of Civil Procedure and Title 28 United States Code Section 636 govern the review of decisions rendered by Magistrate Judges." A.V. by Versace, Inc. v. Gianni Versace, S.p.A., 191 F. Supp. 2d 404, 405 (S.D.N.Y. 2002); see also 28 U.S.C. § 636; Fed. R. Civ. P. 72. Review of decisions rendered by Magistrate Judges are also governed by the Local Rules. See L.R. 72.1. As 28 U.S.C. § 636 states:

> Within fourteen days after being served with a copy [of the Magistrate Judge's report and recommendation], any party may serve and file written objections to such proposed findings

2023 WL 5622049

and recommendations as provided by rules of the court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings of recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1). When written objections are filed and the district court conducts a de novo review, that "*de novo* determination does not require the Court to conduct a new hearing; rather, it mandates that the Court give fresh consideration to those issues to which specific objections have been made." A.V. by Versace, 191 F. Supp. 2d at 406 (emphasis in original); see also 12 Wright & Miller, Fed. Prac. & Proc. Civ. § 3070.2 (3rd ed.) (2022) ("[T]he judge to whom the objection is made must review the record and magistrate's recommendations, and must make a de novo determination of the facts and legal conclusions, receiving additional evidence and rehearing witnesses at his or her discretion. The district judge must not be a rubber stamp." (footnote omitted)).

"The district court may adopt those portions of a report and recommendation to which no timely objections have been made, provided no clear error is apparent from the face of the record." DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009). "When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the [report and recommendation] strictly for clear error." N.Y.C. Dist. Couns. of Carpenters Pension Fund v. Forde, 341 F. Supp. 3d 334, 336 (S.D.N.Y. 2018) (quoting Molefe v. KLM Royal Dutch Airlines, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009)).

"The objections of parties appearing *pro se* are 'generally accorded leniency' and should be construed 'to raise the strongest arguments that they suggest.' " DiPilato, 662 F. Supp. 2d at 340 (emphasis in original) (quoting Milano v. Astrue, No. 05-CV-6527, 2008 WL 4410131, at *2 (S.D.N.Y. Sept. 26, 2008)). "Nonetheless, even a *pro se* party's objections to a report-recommendation must be specific

and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." DiPilato, 662 F. Supp. 2d at 340 (emphasis in original) (quoting Pinkney v. Progressive Home Health Servs., No. 06-CV-5023, 2008 WL 2811816, at *1 (S.D.N.Y. July 21, 2008)).

## IV. DISCUSSION

### A. Plaintiff's Objections

**\*4** Plaintiff objects to the Report and Recommendation on nine grounds. Objs. at 1–4. Plaintiff's objections appear to either address matters wholly unrelated to the Report and Recommendation, or reiterate the same arguments that he presented in earlier filings. Id.; see also Dkt. No 87 ("2022 Appeal") (appealing a magistrate decision and objecting on identical grounds). Further, Plaintiff's Objection does not specifically challenge any portion of Judge Dancks's Report and Recommendation. See generally Objs.

The Court first addresses those arguments that Plaintiff repeats from previous filings. Regarding Plaintiff's first objection, Plaintiff states that he "reiterate[s] and repeat[s] all of the issues raised in my responding papers to the defendants' [Motion]." Id. at 1. However, Plaintiff does not provide any specific basis for rejecting or changing the Report and Recommendation, and thus is "simply relitigating a prior argument." DiPilato, 662 F. Supp. 2d at 340. Accordingly, the Court reviews this portion of the Report and Recommendation for clear error and finds none.

Next, Plaintiff's fourth argument objects to venue in the Northern District of New York. Objs. at 2. Plaintiff seeks venue in the Southern District of New York, id., which Plaintiff also previously raised, see 2022 Appeal at 4. [1] Thus, because Plaintiff reiterates a prior argument, the Court finds no clear error here.

[1]    The Court notes that Judge McMahon ruled that transfer from the Southern District of New York was appropriate and that venue was proper in the Northern District of New York. See Dkt. No. 3 at 3–4.

Plaintiff's seventh objection alleges that "Magistrate Judge and John Moore repeatedly lied about providing me with my discovery requests," Objs. at 3, and Plaintiff's Ninth objection states that Judge Dancks "unconstitutionally and wantonly denied my Rule 37 motion," id. at 4. Plaintiff has previously

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 86 of 306

Shabazz v. Bailey, Not Reported in Fed. Supp. (2023)
2023 WL 5622049

raised the allegation that Defendants adequately respond to his discovery demands. See Dkt. No. 85 at 2; see also Dkt. No. 87 at 1–2. Because Plaintiff restates a prior argument, the Court finds no clear error here.

The Court next turns to Plaintiff's arguments that are plainly meritless; namely, Plaintiff's second, third, fifth, sixth, and eighth objections. Plaintiff's second objection argues that Judge Dancks "misrepresented my papers and lied on the record." Id. at 2. Plaintiff's third objection states that Judge Dancks was "bias[ed] and prejudice[d] against me." Id. Plaintiff's fifth objection posits that Judge Dancks "usurped the authority of Judge Kahn and unconstitutionally denied my motion request." Id. at 3. Plaintiff's sixth objection states that Judge Dancks and defense counsel "*may* have a personal relationship." Id. Plaintiff's eighth objection states that his grievances were "robbed out of my assigned cell." Id. at 4. Plaintiff provides no supporting evidence for these assertions, and these objections appear to be sheer speculation. The Court therefore finds these objections meritless. See Belgrave v. Graham, No. 10-CV-5168, 2017 WL 4736731, at *3 (E.D.N.Y. Oct. 19, 2017) (denying an objection to a magistrate's report and recommendation because the "objection is mere speculation and is without support in the record"); Lilakos v. New York City, No. 14-CV-05288, 2016 WL 5928674, at *3 (E.D.N.Y. Sept. 30, 2016) (rejecting a report and recommendation objection on the ground that the objection "is based on pure speculation"), aff'd, 808 F. App'x 4 (2d Cir. 2020).

**\*5** Based upon a careful review, the Court denies Plaintiff's Objections and accepts the Report and Recommendation in its entirety. See 28 U.S.C. § 636(b)(1). The Court therefore grants Defendant's Motion and dismisses this action. Furthermore, given that Plaintiff failed to exhaust administrative remedies, and given that the time period to exhaust those remedies has expired,[2] any further attempt

to prosecute this case would be futile. The Court therefore dismisses the Complaint against Defendants with prejudice. See Nwaokocha v. Sadowski, 369 F. Supp. 2d 362, 372 (E.D.N.Y. 2005) ("A court [ ] has discretion to dismiss with prejudice if it believes that amendment would be futile or would unnecessarily expend judicial resources.").

[2]    N.Y. Comp. Codes R. & Regs., tit, 7 §§ 701.5(d)(1)(i) outlines that an appeal must be made to CORC "within seven calendar days after receipt of the superintendent's written response to the grievance."

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report and Recommendation (Dkt. No. 112) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendant's motion for summary judgment (Dkt. No. 101) is **GRANTED** because of Plaintiff's failure to exhaust available administrative remedies; and it is further

**ORDERED**, that Plaintiff's Complaint (Dkt. No. 2) is **DISMISSED with prejudice**; and it is further

**ORDERED**, that the Clerk close this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 5622049

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (2)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 23-7252**<br>Shabazz v. Bailey | — | C.A.2 | Oct. 04, 2023 | Docket |
| **2. Docket 9:20-CV-00057**<br>Shabazz v. Bailey | — | N.D.N.Y. | Jan. 16, 2020 | Docket |

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (5)**

**Direct History (3)**

1.  Shabazz v. Bailey
2023 WL 5779533 , N.D.N.Y. , June 28, 2023

*Report and Recommendation Adopted by*

2.  Shabazz v. Bailey
2023 WL 5622049 , N.D.N.Y. , Aug. 31, 2023

*Affirmed by*

3.  Shabazz v. Bailey
2025 WL 272602 , 2nd Cir.(N.Y.) , Jan. 23, 2025

**Related References (2)**

4.  Shabazz v. Annucci
2020 WL 13801095 , S.D.N.Y. , Jan. 09, 2020

*Transferred to*

5.  Shabazz v. Annucci
2020 WL 13801106 , N.D.N.Y. , Apr. 07, 2020

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1249556
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Francis M. ARIAS, Plaintiff,
v.
C.O.S. RICE, Defendant.

Case # 23-CV-6340-FPG
|
Signed April 30, 2025

**Attorneys and Law Firms**

Francis M. Arias, Bronx, NY, Pro Se.

Hillel David Deutsch, NYS Attorney General's Office, Rochester, NY, for Defendant.

DECISION AND ORDER

FRANK P. GERACI, JR., United States District Judge

**\*1** *Pro se* Plaintiff Francis M. Arias brings this civil rights action against Defendant C.O.S. Rice, alleging that Defendant used excessive force against him while he was incarcerated at Lakeview Shock Incarceration Correctional Facility. ECF No. 1. Presently before the Court is Defendant's motion for summary judgment. ECF No. 19. Defendant argues that judgment as a matter of law is warranted because Plaintiff failed to exhaust his administrative remedies. Plaintiff has not filed a response.[1] *See* ECF Nos. 20, 23, 25. For the reasons that follow, Defendant's motion is GRANTED.

[1]    Plaintiff's response was originally due on January 9, 2025. ECF No. 20. Plaintiff received two extensions of time, such that his most recent deadline was April 10, 2025. ECF No. 25. Plaintiff was warned that no further extensions would be granted without good cause. *See id.* Plaintiff did not file a response by that deadline.
       On April 23, 2025—nearly two weeks after the deadline—Plaintiff contacted the Clerk's Office by phone in order to notify the Court that he intended to submit another letter request for an extension of time. Nevertheless, a week has passed, and the Court has not received any letter. No further delay is warranted.

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

Under the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."[2] The administrative exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). If an inmate fails to exhaust his administrative remedies, he is barred from commencing a federal lawsuit. *Martin v. Niagara Cty. Jail*, No. 05-CV-00868, 2012 WL 3230435, at *6 (W.D.N.Y. Aug. 6, 2012). In other words, to commence a lawsuit "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012). Exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011). To be "[p]roper," exhaustion must comply with all of the agency's "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

[2]    Although Plaintiff has been released from custody, ECF No. 24 at 1, he is subject to the exhaustion requirement because he "initiated suit while still in custody." *Richardson v. City of New York*, No. 21-

CV-5080, 2023 WL 1777323, at *3 (S.D.N.Y. Feb. 6, 2023) (collecting cases).

**\*2** To satisfy the PLRA's exhaustion requirement, an inmate in New York is generally required to follow the prescribed grievance procedure, which is set forth at 7 N.Y.C.R.R. § 701.5. The inmate's administrative remedies consist of a three-step grievance and appeal procedure: (1) investigation and review of the grievance by the Inmate Grievance Resolution Committee ("IGRC"); (2) if appealed, review of the IGRC's determination by the superintendent of the facility; and (3) if the superintendent's decision is appealed, review and final administrative determination by CORC. *See id.* All three steps of this procedure must ordinarily be exhausted before an inmate may commence suit in federal court. *See Morrison v. Parmele*, 892 F. Supp. 2d 485, 488 (W.D.N.Y. 2012).

In this case, Defendant provides evidence establishing that Plaintiff never sought review with CORC for any grievance related to this incident—a necessary step to exhaust. *See* ECF No. 19-4 at 5-6. 7 N.Y.C.R.R. § 701.5(d); *Omaro v. Annucci*, 68 F. Supp. 3d 359, 364 (W.D.N.Y. 2014) ("It is well-established that an inmate who does not appeal to CORC has failed to exhaust his administrative remedies."). Moreover, in his Rule 56 Statement of Facts, Defendant asserts that "Plaintiff did not exhaust a grievance pertaining to the incident alleged prior to filing the instant suit." ECF

No. 19-1 at 1. Despite being warned of the consequences of his failure to respond with opposing facts, *see* ECF No. 19-2 at 2-5; ECF No. 20 at 1-2, Plaintiff did not contest this factual assertion. Accordingly, Plaintiff's failure to exhaust is "deemed admitted" insofar as he fails to "specifically controvert[ ] [it]" in accordance with the Local Rules. Loc. R. Civ. P. 56(a)(2).

Because Plaintiff failed to exhaust his administrative remedies with respect to the excessive-force claim against Defendant, Defendant is entitled to summary judgment. Dismissal with prejudice is appropriate because Plaintiff can no longer cure this defect in exhaustion. *See generally* 7 N.Y.C.R.R. § 701.5.

### CONCLUSION

For these reasons, Defendant C.O.S. Rice's motion for summary judgment (ECF No. 19) is GRANTED. Plaintiff's complaint is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 1249556

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 6:23-CV-06340**<br>Arias v. Lakeview Correctional Facility et al | — | W.D.N.Y. | June 20, 2023 | Docket |

**WESTLAW**  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 7606078

2019 WL 7606078
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Edmund BOWIE, Plaintiff,
v.
Sergeant Gary WOODRUFF and Correctional
Officer Kyle Brooks, Defendants.

9:18-CV-0266 (BKS/ML)
|
Signed 09/20/2019

**Attorneys and Law Firms**

EDMUND BOWIE, 14-B-0838, Plaintiff, pro se, Auburn
Correctional Facility, P.O. Box 618, Auburn, NY 13021.

HON. LETITIA JAMES, Attorney General for the State of
New York, MATTHEW P. REED, ESQ., Assistant Attorney
General, Attorney for Defendants, The Capitol, Albany, New
York 12224-0341.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for
        report and recommendation pursuant to 28 U.S.C.
        § 636(b) and N.D.N.Y.L.R. 72.3(c).

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** Plaintiff *pro se* Edmund Bowie ("Bowie" or "Plaintiff"),
an inmate who was, at all relevant times, in the custody of
the New York Department of Corrections and Community
Supervision ("DOCCS"), brings this action pursuant to 42
U.S.C. § 1983 against Defendants Sergeant Gary Woodruff
("Sgt. Woodruff") and Correctional Officer Kyle Brooks
("C.O. Brooks") for violations of his rights under the Eighth
Amendment. Dkt. No. 1 ("Compl."). Presently before the
Court is Defendants' motion for summary judgment and
dismissal of Bowie's complaint pursuant to Rule 56(a) of
the Federal Rules of Civil Procedure. Dkt. No. 29. Bowie
did not oppose the motion. For the following reasons,
it is recommended that Defendants' motion for summary
judgment be granted.

## I. BACKGROUND

### A. Plaintiff's Failure to Respond

Before discussing the background of this case, the Court
addresses Bowie's failure to respond or oppose the motion.
The Second Circuit requires that a pro se litigant defending
against a summary judgment motion be notified as to the
nature and consequences of summary judgment. *Vital v.
Interfaith Med. Ctr.*, 168 F.3d 615, 620–21 (2d Cir. 1999);
*see also* Local Rule 56.2 (Notice to Pro Se Litigants of the
Consequences of Failing to Respond to a Summary Judgment
Motion). Here, Bowie was notified of the consequences
of failing to respond to a summary judgment motion by
Defendants and the Court. Dkt. No. 29 at 3; Dkt. No. 30.
Given this notice, Bowie was adequately apprised of the
pendency of Defendants' motion and the consequences of
failing to respond. On May 21, 2019, Bowie filed a Notice
of Change of Address and requested an extension of time to
file his response to the motion. Dkt. Nos. 31 and 32. The
Court granted the extension and directed Bowie to provide a
response on or before June 21, 2019. Dkt. No. 33. Despite the
extension, Bowie has not submitted opposition to Defendants'
motion for summary judgment.

"The fact that there has been no response to a summary
judgment motion does not ... mean that the motion is to be
granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486
(2d Cir. 1996). The Court has broad discretion to decide
whether to overlook the parties' failures and perform an
independent review of the record. *Holtz v. Rockefeller & Co.*,
258 F.3d 62, 73 (2d Cir. 2001); *see also Jackson v. Fed.
Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (noting that "the court
may rely on other evidence in the record even if uncited" in
determining the undisputed material facts). If the district court
chooses to conduct such an independent review of the record,
any verified complaint filed by the plaintiff should be treated
as an affidavit in opposing a motion for summary judgment.
*Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir.
2004).

Here, because the Complaint is verified, [2] the Court will
accept the pleading as an affidavit to the extent that the
statements are based on Bowie's personal knowledge or are
supported by the record. *See Berry v. Marchinkowski*, 137
F.Supp.3d 495, 530 (S.D.N.Y. 2005) (collecting cases to
support the proposition that a court may consider unsworn

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 94 of 306

Bowie v. Woodruff, Not Reported in Fed. Supp. (2019)
2019 WL 7606078

assertions on a motion for summary judgment where they are based on the plaintiff's personal knowledge and in light of special solicitude).

2    The Complaint was properly verified by declaration under 28 U.S.C. § 1746. Compl. at 5; *LeBeouf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (holding that use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

**\*2** Due to Bowie's pro se status, the Court has opted to review the entire summary judgment record to ascertain the undisputed material facts. Consequently, the facts set forth in Defendants' Rule 7.1 Statement of Material Facts[3] are accepted as true as to those facts that are not disputed by the facts set forth in the Complaint. N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

3    Local Rule 7.1(a)(3) states:
     Summary Judgment Motions
     Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorneys' affidavits. The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. The non-movant's response may also set forth any additional material facts that the non-movant

contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.
Local Rule 7.1(a)(3).

## B. Facts[4]

4    Defendants annexed exhibits to the motion. Dkt. No. 29-3. Plaintiff does not object or challenge the authenticity of the documents. Therefore, the Court will consider the exhibits in the context of the within motion. *See U.S. v. Painting known as Hannibal*, No. 07-CV-1511, 2010 WL 2102484, at \*1, n.2 (S.D.N.Y. May 18, 2010) (citing *Daniel v. Unum Provident Corp.*, 261 F. App'x 316, 319 (2d Cir. 2008) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party")). In light of the procedural posture of the case, the following recitation is derived from the record now before the Court, with all inferences drawn and ambiguities resolved in non-moving party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

At the time of the incidents described in the Complaint, Bowie was an inmate in the custody of DOCCS and confined at Great Meadow Correctional Facility ("Great Meadow C.F."). *See generally*, Dkt. No. 1.

Bowie claims that he was involved in a physical altercation with Sgt. Woodruff and C.O. Brooks on June 10, 2017. Dkt. No. 1 at 2-3. Bowie alleges that Sgt. Woodruff and C.O. Brooks used excessive force and failed to intervene to protect him from the use of force, in violation of his Eighth Amendment rights. *Id.* at 4.

On June 23, 2017, Bowie filed an Inmate Grievance Complaint (Grievance No. 62268-17) related to the June 10, 2017 incident. Dkt. No. 29-3 at 3, 6. Bowie alleged:

> I was involved in a altercation in the big yard on (6-10-17) at which time I was handcuffed and taken to the facility infirmary. While in the infirmary check up room, Sergeant John Doe asked me questions which

Bowie v. Woodruff, Not Reported in Fed. Supp. (2019)

2019 WL 7606078

I answered. He said I was not trueful [sic] and proceed[ed] to slap me in the back of the head. He asked me some more questions[,] again I answered. He once again told me I was a liar [and] told Officer John Doe to hold me against the wall while another officer punched me in the ribs 4 or 5 times breaking 2 of my ribs which resulted in me going to Albany Med.

**\*3** Dkt. No. 29-3 at 6.

On July 10, 2017, the Grievance Clerk received the grievance. Dkt. No. 29-3 at 3. Due to the nature of the grievance, the Inmate Grievance Resolution Committee ("IGRC") forwarded the grievance directly to the facility Superintendent for review. *Id.*

On August 9, 2017, the Superintendent issued a decision stating that the grievance was investigated and denied. Dkt. No. 29-3 at 7. On August 21, 2017, Bowie signed the Appeal Statement indicating that he wished to appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). *Id.* On August 23, 2017, the Grievance Clerk received and signed the Appeal Statement. *Id.* On August 29, 2017, CORC received the appeal. *Id.* at 8.

On February 26, 2018, Bowie signed his civil rights Complaint and commenced the within action. Dkt. No. 1 at 5.

On October 17, 2018, CORC issued a decision affirming the Superintendent's determination. Dkt. No. 29-3 at 9.

### C. Procedural History

On March 3, 2018, the Court received the Complaint in the within action. Dkt. No. 1. Upon review of the Complaint, the Court directed Defendants to respond to the Eighth Amendment excessive force and failure-to-intervene claims. Dkt. No. 7. On June 25, 2018, Defendants filed an Answer to the Complaint. [5] Dkt. No. 13. On April 26, 2019, Defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to Bowie's claims. Dkt. No. 29.

5      In the Answer, Defendants pleaded, *inter alia*, the affirmative defense that Bowie failed to exhaust his administrative remedies. Dkt. No. 13 at ¶ 15.

### II. LEGAL STANDARD

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 317, 248 (1986).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. Fed. R. Civ. P. 56; *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

**\*4** All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir. 1997). Furthermore, where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our

**Bowie v. Woodruff, Not Reported in Fed. Supp. (2019)**

2019 WL 7606078

cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191–92 (2d Cir. 2008). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION [6]

[6] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to Plaintiff.

Defendants move for summary judgment arguing that Bowie failed to exhaust his administrative remedies through available grievance procedures prior to the commencement of this action. *See generally*, Dkt. No. 29.

### A. Exhaustion

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *see also Woodford v. Ngo*, 548 U.S. 81, 82 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. *Id.* at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal citation omitted).

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program ("IGP"). N.Y. Comp. Codes R. & Regs. title 7, § 701.5 (2015). First, the inmate must file a complaint with IGP clerk within twenty-one days of the alleged action. *Id.* at § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. *Id.* at § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. *Id.* §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. *Id.* § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. *Id.* §§ 701.5(d)(1)(i)-(ii). If a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC. *Id.* at § 701.5(d)(3)(i). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." *Id.* § 701.5(d)(3)(ii). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F.Supp.2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia, Porter*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter*, 534 U.S. 516.

**\*5** Where the grievance involves allegations of employee excessive force, as alleged by Bowie, there is an expedited administrative process. *See N.Y.C.R.R. title 7, § 701.8*; *see Torres v. Carry*, 691 F.Supp.2d 366, 369–70 (S.D.N.Y. 2009). Complaints and grievances of this nature are forwarded directly to the superintendent of the facility. *Bell v. Napoli*, No. 9:17-CV-850 (ATB), 2018 WL 6506072, at *2 (N.D.N.Y. Dec. 11, 2018). In such cases the superintendent is required to order an investigation and render a decision within twenty-five (25) days. *See N.Y.C.R.R., title 7, § 701(a)-(f)*. If the superintendent fails to respond within the required twenty-five (25) day time limit the inmate may appeal his grievance to the CORC. Disagreement with the superintendent's decision in the expedited review process also requires an appeal to the CORC. *Id.* § 701.8-(g)-(h); *see also Espinal v. Goord*, 588 F.3d 119,125 (2d Cir. 2009) (explaining IGP and the expedited

procedure for harassment claims and its appeal mechanism through the CORC). The Second Circuit has long recognized this procedure as an "available remedy" for purposes of the PLRA. *See Hall v. County of Saratoga*, No. 10–CV–1120 (NAM/CFH), 2013 WL 838284, at *1–2 (N.D.N.Y. Mar. 6, 2013).

Defendants bear the burden of establishing that a prisoner failed to satisfy the exhaustion requirement. *See Jones*, 549 U.S. at 216.

### 1. Did Plaintiff Exhaust his Administrative Remedies?

The record is clear that Bowie filed this action on February 26, 2018, and, at that time, CORC had yet to issue a decision on his grievance. *See* Dkt. No. 1; Dkt. No. 29-3 at 9. DOCCS IGP Assistant Director Rachael Seguin ("Seguin") declared that she is the custodian of records maintained by CORC. Dkt. No. 29-3 at 1. Based upon Seguin's review of DOCCS' records, Bowie filed a grievance on June 23, 2017 claiming he was assaulted at Great Meadow on June 10, 2017. *Id.* at 3. Bowie's grievance was received by the IGRC Clerk on July 17, 2017 and denied by the Superintendent on August 9, 2017. *Id.* at 3-4. Seguin also reviewed CORC records for appeals received from Plaintiff relating to his allegations in this action. *Id.* at 3. Based upon Sequin's review, CORC received Bowie's appeal of the Superintendent's determination on August 29, 2017 and decided the appeal on October 17, 2018 – approximately eight months <u>after</u> Bowie commenced this action. Dkt. No. 29-3 at 4. A copy of Bowie's grievance, the Superintendent's response, documentation of CORC's receipt of Bowie's appeal, and CORC's response are attached to Seguin's Declaration as Exhibit A. *Id.* at 6-9.

Thus, Bowie did not fully exhaust his administrative remedies prior to filing this lawsuit as CORC's decision was outstanding. *White v. Drake*, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted). The fact that Bowie subsequently exhausted his administrative remedies is irrelevant as he was required to properly exhaust before he sued. *See Burgos v. Craig*, 307 Fed. App'x 469, 471 (2d Cir. 2008).

### 2. Availability of Administrative Remedies

Having determined that Bowie failed to exhaust his administrative remedies, the Court examines whether he should be excused from the exhaustion requirement because administrative remedies were unavailable.

A prisoner's failure to exhaust administrative remedies may be excused if remedies were unavailable to the inmate. *Ross*, 136 S.Ct. at 1858 ("An inmate [...] must exhaust available remedies, but need not exhaust unavailable ones."). There are three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Williams v. Priatno*, 829 F.3d 118, 123-24 (2d Cir. 2016) (quoting *Ross*, 136 S.Ct. at 1858-1861).

**\*6** Courts within this Circuit are split as to whether a delay by CORC constitutes unavailability that would excuse a plaintiff's failure to exhaust his administrative remedies. *See Hayes v. Dahlke*, No. 9:16-CV-1368 (TJM/CFH), 2018 WL 7356343, at *9 (N.D.N.Y. Dec. 11, 2018) (collecting cases); *but cf. Henderson v. Annucci*, No. 14-CV-445A, 2016 WL 3039687, at *9 (W.D.N.Y. March 14, 2016) (excusing the prisoner's failure to exhaust because, after two years, CORC's decision was still outstanding); *see also High v. Switz*, No. 9:17-CV-1067 (LEK/DJS), 2018 WL 3736794, at *5 (N.D.N.Y. July 9, 2018), *report and recommendation adopted sub nom.*, 2018 WL 3730175 (N.D.N.Y. Aug. 6, 2018) (noting that the Second Circuit has not decided the precise issue set forth herein) (citing *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, 692 Fed. App'x 668 (2d Cir. 2017)). In some instances, Courts in this District have found that a delay by CORC does not excuse a prisoner's failure to exhaust. *See Feliz v. Johnson*, No. 9:17-CV-1294 (DNH/ATB), 2019 WL 3491232, at *1 (N.D.N.Y. Aug. 1, 2019) (citing, *inter alia, Casey v. Brockley*, No. 9:13-CV-01271, 2015 WL 8008728, at *6 (N.D.N.Y. Nov. 9, 2015), *report-recommendation and order adopted by*, 2015 WL 7864161 (N.D.N.Y. Dec. 3, 2015) (finding five month delay by CORC in rendering decision on appeal did not excuse the plaintiff from exhaustion requirement)); *see also Staples v. Patane*,

No. 9:17-CV-0703 (TJM/TWD), 2018 WL 7361009, at \*9 (N.D.N.Y. Dec. 7, 2018) (concluding that more than ten month delay was insufficient for finding unavailability).

In this case, CORC's records reveal that Bowie's appeal was received on August 29, 2017. Dkt. No. 29-3 at 8. "[P]ursuant to N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(3)(i), '[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal [to CORC], the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC.' " *Fox v. Lee*, No. 9:15-CV-0390 (TJM/CFH), 2018 WL 8576600, at \*7 (N.D.N.Y. Dec. 18, 2018) (citing N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(3)(i)). The record herein lacks evidence that Bowie received confirmation or notice of the receipt of his appeal.

In *High*, the plaintiff filed an appeal with CORC on February 6, 2017. *High*, 2018 WL 3736794, at \*3. "[A]fter not hearing from CORC, [the] [p]laintiff sent CORC a letter asserting that CORC had exceeded the timeline and that he had therefore exhausted his administrative remedies, and would be filing a claim in Court." *Id*. On September 12, 2017, the plaintiff filed his federal complaint. *Id*. In February 2018, CORC issued a decision, one year after the plaintiff filed his appeal to CORC. *High*, 2018 WL 3736794, at \*3. The Court noted that "[t]here is no instruction [in the IGP] on what a grievant is to do if he or she has appealed to CORC, the final step, and has not received a response." *High*, 2018 WL 3736794, at \*5. In that case, the Court noted that, "under the hopefully unique facts of this case," the failure to exhaust was excused. *Id.* at \*5.

Here, CORC should have responded by September 29, 2017. *See* 7 NYCRR §§ 701.5(d)(3)(ii), 701.8(i). A decision however, was not issued until October 17, 2018, more than one year beyond the thirty days required by the IGP. While the Court is troubled by the excessive delay and lack of explanation for said delay by counsel or Seguin, the facts herein are distinguishable from *High* because Bowie has not offered any evidence suggesting that he received written notice that the appeal was filed or that he attempted to contact CORC or the IGRC at Great Meadow C.F. regarding the status of his appeal before commencing this action. Indeed, the Complaint is devoid of any reference to the grievance, the IGP, or Bowie's attempts to exhaust. *See generally*, Dkt. No. 1. Because the facts of this case are similar to those presented in *Staples* and *Fox*, on the record before the Court, the undersigned concludes that CORC's delay in rendering a decision did not excuse Bowie from

the exhaustion requirement. *Staples*, 2018 WL 7361009 at \*9; *see also Hayes*, 2018 WL 7356343, at \*10 ("[...] there is no indication in the record that plaintiff wrote to CORC regarding the status of his appeal and CORC further neglected to respond."); *Fox*, 2018 WL 8576600, at \*7 (granting summary judgment because the plaintiff did not proffer evidence that he wrote to the IGRC or CORC inquiring as to the status of his appeals and "never contacted Eastern's [IGP supervisor] in writing ... to confirm that any of his appeals were filed and transmitted to CORC.")*; see also Ulmer v. Bedore*, No. 9:15-CV-00497 (DNH/TWD), 2018 WL 7291499, at \*7 (N.D.N.Y. Nov. 13, 2018) (finding no excuse for failure to fully exhaust without evidence in the record that Plaintiff contacted the IGRC or CORC inquiring as to the status of his appeal before filing his lawsuit); *see also Berkley v. Ware*, No. 9:16-CV-1326 (LEK/CFH), 2018 WL 3736791, at \*6 (N.D.N.Y. July 6, 2018) ("Plaintiff has not proffered evidence that he wrote to the Franklin IGRC or CORC inquiring as to the status of his appeal.").

**\*7** Accordingly, it is recommended that Defendants' motion for summary judgment be granted based on Bowie's failure to exhaust his claims. Because "[f]ailure to exhaust administrative remedies is often a temporary, curable procedural flaw," and "[i]f the time permitted for pursuing administrative remedies has not expired, a prisoner ... can cure the defect by exhausting [the available remedies] and reinstating his suit." *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2003) (amended 2004) (quoting *Snider v. Melindez*, 199 F.3d 108, 111–12 (2d Cir. 1999)). In this case, the alleged incidents in the underlying action occurred in 2017 and thus, are still within the applicable statute of limitations.

## IV. CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 29) be **GRANTED without prejudice**; and it is further

**RECOMMENDED** that the Complaint be **DISMISSED without prejudice**; and it is further

**ORDERED** that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 99 of 306

**Bowie v. Woodruff, Not Reported in Fed. Supp. (2019)**
2019 WL 7606078

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [7] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

[7]     If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(c).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7606078

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:18-CV-00266**<br>Bowie v. Woodruff et al | — | N.D.N.Y. | Mar. 01, 2018 | Docket |

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

1.  Bowie v. Woodruff
    2019 WL 7606078 , N.D.N.Y. , Sep. 20, 2019

*Report and Recommendation Adopted by*

2.  Bowie v. Woodruff
    2019 WL 5445519 , N.D.N.Y. , Oct. 23, 2019

WESTLAW     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 5445519

2019 WL 5445519
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Edmund BOWIE, Plaintiff,
v.
Sergeant Gary WOODRUFF and Correctional
Officer Kyle Brooks, Defendants.

9:18-cv-00266 (BKS/ML)
|
Signed 10/23/2019

**Attorneys and Law Firms**

Plaintiff pro se: Edmund Bowie, 14-B-0838, Auburn Correctional Facility, P.O. Box 618, Auburn, New York 13021.

For Defendants: Letitia James, Attorney General for the State of New York, Richard C. White, The Capitol, Albany, New York 12224.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

 **\*1** Plaintiff Edmund Bowie, a New York State inmate proceeding pro se, brought this action under 42 U.S.C. § 1983, alleging that Defendants subjected him to excessive force in violation of the Eighth Amendment. (Dkt. No. 1, at 2–3). On April 26, 2019, Defendants moved for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 29). Plaintiff did not respond to the motion, although he requested and was granted an extension of time to do so. (Dkt. No. 33). This matter was assigned to United States Magistrate Judge Miroslav Lovric who, on September 20, 2019, issued a Report-Recommendation and Order recommending that Defendants' motion for summary judgment be granted and that Plaintiff's complaint be dismissed without prejudice. (Dkt. No. 35). Magistrate Judge Lovric advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review. (Dkt. No. 35, at 15–16). No objections were filed.

For the following reasons, Magistrate Judge Lovric's Report-Recommendation is adopted.

**II. STANDARD OF REVIEW**

As no objections to the Report-Recommendation have been filed and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment.

**III. DISCUSSION**

Magistrate Judge Lovric recommended granting Defendants' motion for summary judgment because Plaintiff commenced this action before receiving a decision from the Central Office Review Committee ("CORC") on his appeal. Plaintiff sent his appeal to the CORC on August 21, 2017. (Dkt. No. 29-3, at 7). The CORC received the appeal on August 29, 2017. (*Id.* at 8). The CORC did not, however, decide the appeal within the applicable thirty-day time period. *See* 7 N.Y.C.R.R. § 701.5(d)(3)(ii). Plaintiff commenced this action on March 1, 2018, almost six months after the CORC had received his appeal. (Dkt. No. 1). The CORC denied Plaintiff's appeal on October 17, 2018, almost 14 months after the CORC had received it. (Dkt. No. 29-3, at 9). Magistrate Judge Lovric determined that the CORC's delay in rendering a decision did not excuse Plaintiff from the exhaustion requirement. (Dkt. No. 35, at 14) (citing *Staples v. Patane*, No. 17-cv-0703, 2018 WL 7361009, 2018 U.S. Dist. LEXIS 207971 (N.D.N.Y. Dec. 7, 2018), *report and recommendation adopted*, No. 17-cv-0703, 2019 WL 757937, 2019 U.S. Dist. LEXIS 26563 (N.D.N.Y. Feb. 20, 2019); *Fox v. Lee*, No. 15-cv-0390, 2018 WL 8576600, 2018 U.S. Dist. LEXIS 213705 (N.D.N.Y. Dec. 18, 2018), *report and recommendation adopted*, No. 15-cv-0390, 2019 WL 1323845, 2019 U.S. Dist. LEXIS 48967 (N.D.N.Y. Mar. 25, 2019)).

There is a split of authority in this Circuit as to whether, under the Supreme Court's decision in *Ross v. Blake*, ––– U.S. ––––, 136 S. Ct. 1850, 195 L.Ed.2d 117 (2016) and the Second Circuit's decision *Williams v. Priatano*, 829 F.3d 118 (2d Cir. 2016), this kind of delay by the CORC in issuing a timely decision to a prisoner's grievance renders exhaustion unavailable. *Compare, e.g.*, *Sherwood v. Senecal*, No. 17-cv-00899, 2019 WL 4564881, at \*2–4, 2019 U.S. Dist. LEXIS 160295, at \*4–8 (N.D.N.Y. Sept. 20, 2019); *Mayandeunas v. Bigelow*, No. 18-cv-1161,

2019 WL 3955484, at *4, 2019 U.S. Dist. LEXIS 142452, at *10 (N.D.N.Y. Aug. 22, 2019) (Suddaby, C.J.); *Lovell v. McAuliffe*, No. 18-cv-0685, 2019 WL 4143361, 2019 U.S. Dist. LEXIS 74402 (N.D.N.Y. May 1, 2019), *report and recommendation adopted*, No. 18-cv-0685, 2019 WL 4142593, 2019 U.S. Dist. LEXIS 147890 (N.D.N.Y. Aug. 30, 2019); *Bell v. Napoli*, No. 17-cv-850, 2018 WL 6506072, 2018 U.S. Dist. LEXIS 208503 (N.D.N.Y. Dec. 11, 2018); *Yates v. Smith*, No. 17-cv-1227, 2018 WL 4635715, 2018 U.S. Dist. LEXIS 116276 (N.D.N.Y. July 11, 2018), *report and recommendation adopted*, No. 17-cv-1227, 2018 WL 3727357, 2018 U.S. Dist. LEXIS 131450 (N.D.N.Y. Aug. 6, 2018); *High v. Switz*, No. 17-cv-1067, 2018 WL 3736794, 2018 U.S. Dist. LEXIS 114403 (N.D.N.Y. July 9, 2018), *report and recommendation adopted sub nom. High v. PA Switz*, No. 17-cv-1067, 2018 WL 3730175, 2018 U.S. Dist. LEXIS 131446 (N.D.N.Y. Aug. 6, 2018) *with Staples*, 2018 WL 7361009, 2018 U.S. Dist. LEXIS 207971; *Berkley v. Ware*, No. 16-cv-1326, 2018 WL 3736791, 2018 U.S. Dist. LEXIS 113521 (N.D.N.Y. July 6, 2018), *report and recommendation adopted*, No. 16-cv-1326, 2018 WL 3730173, 2018 U.S. Dist. LEXIS 131445 (N.D.N.Y. Aug. 6, 2018). Although this Court has concluded that this kind of delay by the CORC in responding to a prisoner's appeal renders administrative remedies unavailable under *Ross,* considering the intra-Circuit split on this issue, the Court cannot say that the magistrate judge's determination here rises to the level of clear error. *See Warr v. Liberatore*, No. 13-cv-6508, 2018 WL 3237733, at *5, 2018 U.S. Dist. LEXIS 111126, *13–14 (W.D.N.Y. July 3, 2018) (explaining, in the context of a motion for reconsideration, that "considering the split in authority ... defendants have not demonstrated that [district court's decision was] clearly erroneous").

**\*2** Finally, the Court notes that, because the CORC has now rendered a decision on Plaintiff's grievance, (Dkt No. 29-3, at 9), his administrative remedies are now exhausted. Plaintiff is therefore free to reinstitute his lawsuit, which is dismissed without prejudice. (Dkt. No. 35, at 15). *See Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004) (noting that where a plaintiff fails to exhaust administrative remedies, and the defect can be cured, dismissal without prejudice is proper)[1]

[1] The Court notes that Plaintiff has ample time to do so because the statute of limitations on Plaintiff's claim tolled for the duration of the mandatory administrative exhaustion process— that is, his limitations period tolled from the time Plaintiff initiated his grievance process on June 23, 2017 until the CORC issued its final decision on October 17, 2018. (Dkt. No 29-3, at 3, 9). *Gonzalez v. Hasty*, 651 F.3d 318, 323–24 (2d Cir. 2011) ("[W]e join our sister circuits and hold 'that the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process.' " (quoting *Brown v. Valoff*, 422 F.3d 926, 943 (9th Cir. 2005))).

IV. CONCLUSION

For these reasons, it is

ORDERED that the Report-Recommendation (Dkt. No. 35) is **ADOPTED**; and it is further

ORDERED that Defendants' motion for summary judgment (Dkt. No. 29) is **GRANTED**; and it is further

ORDERED that the complaint is **DISMISSED WITHOUT PREJUDICE**; and it is further

ORDERED that the Clerk is directed to close this case; and it is further

ORDERED that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5445519

---

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:18-CV-00266**<br>Bowie v. Woodruff et al | — | N.D.N.Y. | Mar. 01, 2018 | Docket |

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

1. Bowie v. Woodruff
2019 WL 7606078 , N.D.N.Y. , Sep. 20, 2019

*Report and Recommendation Adopted by*

2. Bowie v. Woodruff
2019 WL 5445519 , N.D.N.Y. , Oct. 23, 2019

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 3491232

2019 WL 3491232
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Juan FELIZ, Plaintiff,
v.
Vonda JOHNSON, MD, Clinton Annex Correctional Facility; Amber Lashway, Nurse Practitioner, Clinton Annex Correctional Facility; and Paul Harriman, Nurse Assistant, Clinton Annex Correctional Facility, Defendants.

9:17-CV-1294 (DNH/ATB)
|
Signed 08/01/2019

**Attorneys and Law Firms**

JUAN FELIZ, Plaintiff pro se, 16-A-4711, Greene Correctional Facility, P.O. Box 975, Coxsackie, NY 12051.

HON. LETITIA JAMES, Attorney General for the State of New York, OF COUNSEL: KEITH J. STARLIN, ESQ., Ass't Attorney General, The Capitol, Albany, NY 12224, Attorney for Defendants.

**<u>DECISION and ORDER</u>**

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Juan Feliz brought this civil rights action pursuant to 42 U.S.C. § 1983. On June 6, 2019, Magistrate Judge Andrew T. Baxter advised by Report-Recommendation that defendants' motion for summary judgment be granted and that the action be dismissed in its entirety without prejudice for failure to exhaust administrative remedies. Plaintiff timely filed objections to the Report-Recommendation along with a motion to amend his complaint.

In his objections, plaintiff advises that on February 13, 2019, "**after over fourteen (14) months**," the Central Office Review Committee ("CORC") finally issued its decision on grievance FKN-13836-17 pertaining to unaddressed medical needs and the alleged falsification of his medical records by staff at Clinton Correctional Facility. Pl.'s Obj. ¶ 8, ECF No. 35 (emphasis in original). In his motion to amend, he "concedes that he submitted the Complaint in this case at bar, prior to receiving the CORC decision." Feliz Decl., ¶

3, ECF No. 36–1. Thus, he admits that he failed to exhaust administrative remedies prior to commencing suit in federal court. He nonetheless argues he may proceed because the grievance process was unavailable to him and he is therefore excused from exhausting. Plaintiff contends the grievance process was unavailable due to the fact that it " 'operates as a simple dead end' because DOCCS CORC consistently fails to timely issue its decision in conformity with 7 NYCRR § 701.5(d)(3)(ii)." Pl.'s Obj. ¶ 11.

The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. Ross v. Blake, 136 S. Ct. 1850, 1858 (2016). First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

In the Report-Recommendation, Magistrate Judge Baxter addressed the unavailability of the grievance process and concluded "there is no indication on the record that the grievance process was unavailable to the plaintiff." Report-Rec. 10. Magistrate Judge Baxter detailed and rejected plaintiff's allegations that the process was unavailable due to lack of a translator and also rejected plaintiff's argument that the grievance process does not apply to the instant matter. Id. 11.

The Report-Recommendation did not (nor at first glance the summary judgment briefing) address CORC's fourteen month delay in rendering a decision on FKN-13836-17. Courts within this Circuit are split as to whether a delay by CORC constitutes unavailability that would excuse a plaintiff's failure to exhaust his administrative remedies. See Hayes v. Dahkle, No. 9:16-CV-1368, 2018 WL 7356343, at *9 (N.D.N.Y. Dec. 11, 2018), report-recommendation and order adopted by, 2019 WL 689234 (N.D.N.Y. Feb. 19, 2019) (McAvoy, S.J.) (analyzing Second Circuit split). Courts within this District have found that a delay by CORC does not constitute a basis on which to excuse a plaintiff's failure to exhaust. See, e.g., Casey v. Brockley, No. 9:13-CV-01271, 2015 WL 8008728, at *6 (N.D.N.Y. Nov. 9, 2015), report-recommendation and order adopted by, 2015 WL 7864161

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 108 of 306

Feliz v. Johnson, Not Reported in Fed. Supp. (2019)
2019 WL 3491232

(N.D.N.Y. Dec. 3, 2015) ("CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust."); Ford v. Smith, No. 9:12-CV-1109, 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (McAvoy, S.J.) (concluding that CORC's six month delay in responding to his appeal did not render the grievance process unavailable).

**\*2** There is no need to decide whether CORC's fourteen month delay in this case rendered the grievance process unavailable to plaintiff. This is not a case where the plaintiff " 'appealed every grievance in this instant matter to the CORC,' and after CORC failed to respond within the thirty-day time frame, he 'didn't know what else to do.' " Hayes, 2018 WL 7356343, at *9; see also Peoples v. Fischer, No. 11 Civ. 2694, 2012 WL 1575302, *6 (S.D.N.Y. 2012) reconsideration granted in part, 898 F. Supp. 2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative decision."). Nor is this a case

> where the plaintiff had taken all steps he could to fulfill the last step of the appeal process; where CORC had neglected to respond, not just during the thirty day time limit, but for a period of numerous months thereafter; where CORC had further neglected to respond when Plaintiff wrote to CORC regarding the status of his appeal; and where CORC had only ultimately decided the appeal a year later, after the present [motion] had been filed.

High v. Switz, No. 9:17-CV-1067, 2018 WL 3736794, at *5 (N.D.N.Y. July 9, 2018), report-recommendation and order adopted by, 2018 WL 3730175 (N.D.N.Y. Aug. 6, 2018) (Kahn, J.).

Instead, on November 13, 2017, in grievance FKN-13836-17 and subsequent addendums to that grievance, plaintiff complained of his medical care in regard to cancer treatment and for the first time made an allegation about falsified documents by staff stating he had no cancer.[1] On November

16, 2017, the Inmate Grievance Resolution Committee ("IGRC") responded in writing to grievance FKN-13836-17. Plaintiff appealed the IGRC decision to the Superintendent on November 16, 2017.[2]

[1]    At the time he filed FKN-13836-17, plaintiff was housed at Franklin Correctional Facility, though the grievance expressed plaintiff's complaints regarding his medical care at both Clinton Correctional Facility and Franklin Correctional Facility.

[2]    Plaintiff thereafter filed additional grievances regarding his medical care and treatment, which were filed as addendums to pending grievance FKN-13836-17 and which are detailed in the Report-Recommendation.

Plaintiff initiated this action on November 27, 2017. Prior to that date, the Superintendent had not yet issued a response on grievance FKN-13836-17 and therefore plaintiff could not yet have appealed the Superintendent's decision to CORC, nor obviously received any decision from CORC. On November 30, 2017, after plaintiff filed the instant Complaint, the Superintendent responded to plaintiff's appeal, finding his claims to be without merit. On December 1, 2017, plaintiff appealed the Superintendent's decision to CORC, and as discussed above, CORC issued its decision on February 13, 2019.

As Magistrate Judge Baxter explained in the Report-Recommendation, plaintiff did not fully exhaust his administrative remedies prior to commencing this action because he filed his federal complaint before completing the DOCCS grievance process. Any delay by CORC in responding to plaintiff's last level of appeal is irrelevant to whether the grievance process was unavailable to plaintiff at the time he filed this suit. This is not a situation where plaintiff filed his federal complaint while waiting months for CORC's response. To the contrary, the IGRC's and the Superintendent's responses to grievance FKN-13836-17 were timely, and plaintiff had not yet even appealed the relevant grievance to CORC at the time of filing this action.

**\*3** Plaintiff has made no other nor new arguments regarding why or how the grievance procedures were unavailable to him at the time he filed this suit. Any efforts plaintiff may have made since the filing of his Complaint, including his subsequent and timely appeal to CORC, do not cure his failure to exhaust because the PLRA requires that

**Feliz v. Johnson, Not Reported in Fed. Supp. (2019)**

2019 WL 3491232

administrative remedies be exhausted before commencing a lawsuit. Therefore, nothing in plaintiff's objections or his motion to amend change the fact that plaintiff failed to exhaust his administrative remedies at the time he brought suit. Moreover, plaintiff's motion to amend fails to comply with Northern District of New York Local Rule 7.1(a)(4) which requires a party moving to amend to attach an unsigned copy of the proposed amended pleading to its motion papers.

Therefore, based upon a de novo review of the portions of the Report-Recommendation to which plaintiff objected, the Report-Recommendation is accepted and adopted in all respects. See 28 U.S.C. § 636(b)(1). Plaintiff's motion to amend will be denied both for his failure to comply with the Local Rules and also because there are no set of facts that could cure the instant basis for dismissal.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED;

2. Plaintiff's Complaint is DISMISSED WITHOUT PREJUDICE;

3. Plaintiff's motion to amend, ECF No. 36, is DENIED; and

4. The Clerk is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3491232

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:17-CV-01294**<br>Feliz v. Annucci et al | — | N.D.N.Y. | Nov. 27, 2017 | Docket |

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (5)**

**Direct History (2)**

1. Feliz v. Johnson
2019 WL 5197216 , N.D.N.Y. , June 06, 2019

*Report and Recommendation Adopted by*

2. Feliz v. Johnson
2019 WL 3491232 , N.D.N.Y. , Aug. 01, 2019

**Related References (3)**

3. Feliz v. Annucci
2017 WL 11831941 , N.D.N.Y. , Dec. 13, 2017

4. Feliz v. Annucci
2018 WL 11611300 , N.D.N.Y. , May 30, 2018

5. Feliz v. Johnson
2019 WL 13438882 , N.D.N.Y. , May 15, 2019

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4478988
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John H. WHITE, Plaintiff,

v.

Raymond DRAKE, Correctional Officer,
Upstate Correctional Facility, Defendant.

No. 10–CV–1034 (GTS/DRH).
|
Aug. 11, 2011.

**Attorneys and Law Firms**

John H. White, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NYk, for Defendant.

## REPORT–RECOMMENDATION AND ORDER [1]

[1]     This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se John H. White ("White"), an inmate in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Raymond Drake ("Drake"), a corrections officer employed by DOCCS, violated his constitutional rights under the Eighth Amendment when Drake subjected him to excessive force. Compl. (Dkt. No. 1). Presently pending is Drake's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. Nos. 12, 21, 40. White initially opposed the motion, Dkt. Nos. 17, 25, but now appears to agree that this action should be dismissed without prejudice. Dkt. Nos. 41, 42. For the following reasons, it is recommended that Drake's motion be granted and that the complaint be dismissed without prejudice.

## I. Background

The facts are related in the light most favorable to White as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

On June 27, 2010 while incarcerated at Upstate Correctional Facility, White was notified by a corrections officer that he had a visitor. Dkt. No. 1–1 at 1. After waiting for approximately thirty minutes without being summoned for the visit, White asked the other officers why he was not being taken to his visitor. *Id.* An officer responded that White's visit was cancelled because his visitor was denied entrance. *Id.* Drake then approached White's cell door and informed him that his visitor was in possession of drugs and had been apprehended by the local police. *Id.;* Compl. ¶ 6. Drake then walked away from White's cell, as White voiced charges of "official misconduct" while lying on the floor and speaking through the open area of his cell door. Dkt. No. 1–1 at 1. Drake then returned to the cell and "deliberately kicked the [cell] door ... causing injury to [White's] mouth, nose, [and] right jaw." *Id.; see also* Compl. ¶ (6). White's nose began to bleed and he experienced immediate pain in his jaw. Dkt. No. 1–1 at 1. White then stood up and asked Drake why he would intentionally kick the cell door when he knew that White was lying next to it. Dkt. No. 1–1 at 2. Drake responded that he did so because he was aware that White was making a record of the incident and "could do it." *Id.*

That same day, White filed a grievance complaining that he had been (1) treated unfairly because he was black; (2) denied notification; (3) misled concerning the details of his visitor; and (4) subjected to excessive force. Dkt. No. 1–1 at 2–4. White's grievance was denied and he appealed administratively.[2] Compl. ¶ 4(b). However, White never received a final determination from DOCCS after his last appeal. *Id.* ¶ 4(b)(I). White "wr [ote] to the Commissioner concerning the delay ... no one ha[d] responded thus far [and White felt that he was] be[ing] denied any responses." *Id.* ¶ 4(b)(ii). On August 9, 2010, White filed the present action. Compl. at ¶ 8. On October 7 and November 3, 12, and 20, 2010, White wrote to the undersigned to apprise the court that he had still not received a final determination of his grievance. Dkt. Nos. 10, 11, 13, 22.[3]

[2]     "The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to:

2011 WL 4478988

(1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

3      On December 1, 2010, Drake filed a supplemental memorandum of law in this action seeking dismissal of White's claim for White's failure to exhaust his administrative remedies. Dkt. No. 21. On July 25, 2011, the present action was stayed to allow DOCCS or CORC to file a decision regarding White's pending administrative appeal. Dkt. No. 39. On August 1, 2011, Drake responded, providing the Court with a copy of CORC's denial of White's grievance, dated November 24, 2010. Dkt. No. 40.

## II. Discussion

**\*2** White contends that his constitutional rights were violated when Drake harassed and subjected him to excessive force. Drake moves for dismissal because (1) White has failed to exhaust his administrative remedies, (2) there are no merits to White's constitutional claim, and (3) Drake is entitled to qualified immunity. [4]

4      It is unnecessary to address the second and third grounds of Drake's motion in light of White's acknowledged failure to exhaust administrative remedies and those grounds will not be further addressed herein.

### A. Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell*

*Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

### B. Failure to Exhaust

Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *see also Woodford v. Ngo,* 548 U.S. 81, 83, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). This exhaustion requirement applies to all prison condition claims. *Porter,* 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Nussle,* 534 U.S. at 524.

**\*3** While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)).

> A plaintiff's failure to exhaust administrative remedies may be excused if: (1) administrative remedies were not actually available; (2) defendants have forfeited their affirmative defense of non-exhaustion or are estopped from raising such a defense because of their own actions; or (3) special circumstances exist, such as a reasonable misinterpretation of [DOCCS] regulations.

*Torres v. Carry,* 672 F.Supp.2d 338, 344 (S.D.N.Y.2009) (citations omitted).

Exhaustion for an inmate in DOCCS custody is generally achieved through the IGP). *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701 .1, *et seq.; see also* n. 2 *supra.* Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit. *Torres,* 672 F.Supp.2d at 344; *see also* N .Y. Comp.Codes R. & Regs. tit. 7 § 701.5(d)(2)(ii) ("The CORC shall review each appeal, render a decision on the grievance, and transmit its decision ... within 30 calendar days").

In this case, the CORC did not render its decision on the final stage of White's appeal until after White had commenced this action. Thus, exhaustion was completed during the pendency, not prior to the commencement of, this action. The facts are clear that White complied with the IGP and filed a final appeal to CORC. The facts also demonstrate that, after White commenced the present action, the final determination was rendered by CORC, thus terminating the administrative process. There are no allegations that White did not know how the grievance process worked or that it was unavailable to him. Accordingly, the question presented by this motion is whether White satisfied the exhaustion requirement in these circumstances.

"The Courts of Appeals for the First, Second, Third, Seventh, Tenth, Eleventh, and D[istrict of] C[olumia] ... have held that § 1997(e) requires exhaustion before the filing of a complaint and that a prisoner does not comply with this requirement by exhausting available remedies during the course of litigation." *McKinney v. Carey,* 311 F.3d 1198, 1199 (9th Cir.2002); *see also Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) ("Subsequent exhaustion after suit is filed therefore is insufficient.") *abrogated in part on other grounds by Porter,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12. This is because the statutory "language clearly contemplates exhaustion *prior* to the commencement of the action as an indispensable requirement [and e]xhaustion subsequent to the filing of the suit will not suffice." *Medina–Claudio v. Rodriguez–Mateo,* 292 F.3d 31, 36 (1st Cir.2002) (citations omitted); *see also* 42 U.S.C. § 1997(e) ("No action shall be brought with respect to prison conditions under section 1983 ... by a prisoner ... until such administrative remedies as are available are exhausted."); *Perez v. Wisconsin Dep't of Corr.,* 182 F.3d 532, 534–35 (7th Cir.1999) (explaining that "Congress could have written a statute making exhaustion a precondition to judgment, but it did not. The actual statute makes exhaustion a precondition to *suit."* ).

**\*4** Where the administrative process has been started, but has yet to conclude, courts have dismissed federal claims without prejudice and granting leave to reopen when the administrative process has ceased and the result is a denial of the inmate's grievance. *Torres,* 672 F.Supp.2d at 345–46; *see also Neal,* 267 F.3d at 123 (explaining that inmates' claims which are "dismissed without prejudice, ... may simply [be] re-file[d] ... after fully complying with the exhaustion requirement."); *Chalif v. Spitzer,* No. 05–CV–1355, 2008 WL 1848650, at \*13 ("The fact that a grievance is filed, or the process is completed, subsequent to commencement of suit will not salvage an otherwise premature filing.") (citations omitted). Therefore, it is clear that the case law requires White's complaint to be dismissed without prejudice to filing a new action for a failure to fully exhaust his administrative remedies prior to filing the instant complaint.

Thus, White will be required to re-commence this action and re-serve Drake even though the exhaustion requirement has now been satisfied and where the delay in completing the administrative process was apparently caused solely by DOCCS delay at the final appeal stage. This inefficiency imposes additional burdens and costs not only on White and Drake but also on the Court. This factor has already been

contemplated, and rejected, by various courts, including the Second Circuit.

> While it is true that requiring dismissal may, in some circumstances, occasion the expenditure of additional resources on the part of the parties and the court, it seems apparent that Congress has made a policy judgment that this concern is outweighed by the advantages of requiring exhaustion prior to the filing of suit ... [Therefore r]equiring dismissal without prejudice when there is no presuit exhaustion provides a strong incentive that will further these Congressional objectives; permitting exhaustion *pendente lite* will inevitably undermine attainment of them.

*McKinney,* 311 F.3d at 1200–1201; *Neal,* 267 F.3d at 123 (acknowledging that in an individual case, requiring dismissal for failure to exhaust may be judicially inefficient but ultimately concluding that exhaustion must be mandatory because a policy of generally "allowing prisoner suits to proceed, so long as the inmate eventually fulfils the

exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court."). Thus, arguments of judicial inefficiency or additional expense do not serve as compelling reasons for denying defendant's present motion.

Accordingly, Drake's motion to dismiss for failure to exhaust should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Drake's motion to dismiss (Dkt. No. 12) be **GRANTED** and the complaint **DISMISSED WITHOUT PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2011 WL 4478988

---

**End of Document**                                  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:10cv01034**<br>WHITE v. DRAKE | — | N.D.N.Y. | Aug. 26, 2010 | Docket |

**WESTLAW**  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

1.  White v. Drake
2011 WL 4478988 , N.D.N.Y. , Aug. 11, 2011

*Report and Recommendation Adopted by*

2.  White v. Drake
2011 WL 4478921 , N.D.N.Y. , Sep. 26, 2011

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4478921

2011 WL 4478921
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John H. WHITE, Plaintiff,
v.
Raymond DRAKE, Correctional Officer,
Upstate Correctional Facility, Defendant.

No. 9:10–CV–1034 (GTS/DRH).
|
Sept. 26, 2011.

**Attorneys and Law Firms**

John H. White, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Krista A. Rock, Esq., Assistant Attorney General, Albany, NY, for Defendant.

### *DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by John H. White ("Plaintiff") against Upstate Correctional Facility Correctional Officer Raymond Drake ("Defendant") pursuant to 42 U.S.C. § 1983, are the following: (1) Defendant's motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6) (Dkt. No. 12); (2) United States Magistrate Judge David R. Homer's Report–Recommendation recommending that Defendant's motion be granted and that Plaintiff's Complaint be dismissed without prejudice (Dkt. No. 44); and (3) Plaintiff's cross-motion to amend his Complaint pursuant to Fed.R.Civ.P. 15(a)(2) (Dkt. No. 45). For the reasons set forth below, the Report–Recommendation is accepted and adopted in its entirety; Defendant's motion is granted; Plaintiff's Complaint is dismissed without prejudice; and Plaintiff's cross-motion to amend his Complaint is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint

Plaintiff commenced this action on August 9, 2010. (Dkt. No. 1.) Generally, liberally construed, Plaintiff's Complaint alleges that, on June 27, 2010, Defendant wrongfully prevented him from seeing a visitor, and assaulted him during a disagreement regarding the visitor. (*Id.*)

More specifically, Plaintiff alleges as follows. After being notified that he had a visitor on June 27, 2010, and waiting more than 30 minutes for an escort, Plaintiff addressed his concerns with Defendant regarding his "visit being delayed." (*Id.*) Defendant shouted at Plaintiff that his visit would not be taking place because his visitor had been apprehended by the Franklin County Police for drug smuggling-a fact that was false. (*Id.*) When Plaintiff complained of "official misconduct," by "speaking in the open area under [his cell] door," Defendant "kicked the door" of Plaintiff's cell "several times," "causing injury to [Plaintiff's] mouth, nose & right jaw," more specifically, causing his "nose ... to bleed on the floor," and him to experience "pain in the right side of [his] jaw." (*Id.*) Aware that the events were being recorded "on VHS/Video," Plaintiff asked Defendant why he had kicked the door; and Defendant offered a response that indicated a retaliatory and/or malicious intent. (*Id.*) Finally, after Plaintiff submitted a grievance to a "Grievance Unit Investigator" regarding Defendant's conduct, Defendant "willfully, knowingly, and intelligently submitted a written statement denying the allegations," which "denied Plaintiff his right to an [sic] fair and impartial investigation ...." (*Id.*)

Construed with the utmost of special liberality, Plaintiff's Complaint attempts to assert the following five claims based on the above-described factual allegations: (1) a claim that Defendant subjected him to verbal harassment followed by a subsequent physical assault, rendering the verbal harassment actionable under the Eighth Amendment; (2) a claim that Defendant intentionally made false statements to Plaintiff regarding his visitor, in violation of the Eighth and/or Fourteenth Amendment; (3) a claim that Defendant wrongfully interfered with Plaintiff's right to visitation from and communication with the "outside world," in violation of the First, Eighth and/or Fourteenth Amendments; (4) a claim that Defendant wrongfully interfered with Plaintiff's right to the grievance process by intentionally making false statements to the Grievance Unit Investigator, in violation of the First and/or Fourteenth Amendments; and (5) a claim that Defendant subjected him to excessive force, in violation of the Eighth Amendment. (*See generally id.; see also* Dkt. No. 17 [Plf.'s Response to Def.'s Motion to Dismiss].) [1]

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

1     The Court notes that, while Plaintiff used the word "discrimination" at one point in his Complaint, the Court does not liberally construe his Complaint as attempting to assert an equal protection claim under the Fourteenth Amendment, given (1) the lack of factual allegations in his Complaint plausibly suggesting that he is a member of a protected class, and/or how he was discriminated against, and (2) the fact that he does not articulate such a claim in his response to Defendant's motion to dismiss.

**\*2** Familiarity with the remaining factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties.

### B. Defendant's Motion to Dismiss

On November 15, 2010, Defendant filed a motion to dismiss the Complaint for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 12.) Generally, in his motion, Defendant asserts the following eight arguments: (1) to the extent that Defendant is sued in his official capacity, he is protected from liability as a matter of law by the Eleventh Amendment; (2) Plaintiff's claim of verbal harassment (under the Eighth and/or Fourteenth Amendments) should be dismissed, because Plaintiff has no constitutional right to be free from verbal harassment; (3) Plaintiff's claim that Defendant intentionally made false statements to Plaintiff regarding his visitor (in violation of the Eighth and/or Fourteenth Amendments) should be dismissed, because Plaintiff has no constitutional right to be free from false statements; (4) Plaintiff's claim that Defendant wrongfully interfered with Plaintiff's right to visitation (in violation of the First, Eighth and/or Fourteenth Amendments) should be dismissed, because Plaintiff has no constitutional right to visitation; (5) Plaintiff's claim that Defendant wrongfully interfered with Plaintiff's right to the grievance process (in violation of the First and/or Fourteenth Amendments) should be dismissed, because Plaintiff has no constitutional right to the grievance process; (6) Plaintiff's claim that Defendant subjected him to excessive force (in violation of the Eighth Amendment) should be dismissed, because Plaintiff has failed to allege facts plausibly suggesting that the use of force against him was "objectively, sufficiently serious"; (7) in the alternative, all of Plaintiff's claims should be dismissed, because Defendant is protected from liability as a matter of law by the doctrine of qualified immunity; and (8) Defendant is entitled to a protective order, pursuant to

Fed.R.Civ.P. 26(c), staying discovery in this action, pending the Court's determination of Defendant's motion. (Dkt. No. 12, Attach.1.)

On November 24, 2010, Plaintiff filed a response to Defendant's motion. (Dkt. No. 17.) Generally, in his response, Plaintiff asserts the following eight arguments: (1) he is not suing Defendant in his official capacity but his individual capacity; (2) he was subjected to both verbal harassment and physical assault, which, when combined, may constitute cruel and unusual punishment under the Eighth Amendment; (3) Defendant's false statements are actionable because they were intended to annoy and harass Plaintiff in violation of 7 NYCRR 701.2(e) (and because they were accompanied by a physical assault); (4) Defendant's challenge to Plaintiff's interference-with-visitation claim is "unnecessary," because Plaintiff asserts no such claim; (5) Plaintiff does have a constitutional right to the grievance process, under the First and/or Fourteenth Amendments, and Defendant violated that right by giving false statements during that process; (6) Plaintiff has alleged facts plausibly suggesting that the use of force against him was "objectively, sufficiently serious," by alleging facts plausibly suggesting that [a] Defendant's use of force was malicious and/or sadistic, with the purpose of causing harm, [b] Defendant's use of force caused Plaintiff wanton pain, and [c] Defendant's use of force violated N.Y. Correction Law § 137(5); (7) Defendant is not entitled to qualified immunity, because Plaintiff has alleged facts plausibly suggesting that Defendant was aware of the regulations and law; and (8) while Defendant is entitled to a protective order barring discovery, the Court should direct Defendant to provide any copies of audio/video tapes relating to the alleged incident(s) giving rise to this action. (*Id.*)

**\*3** On December 1, 2010, Defendant filed (with leave of the Court) a supplemental memorandum of law in support of its motion to dismiss. (Dkt. No. 21.) Generally, in that supplemental memorandum of law, Defendant argues that, because Plaintiff has conceded (in Paragraph 4 of his Complaint as well as in Dkt. Nos. 10 and 11) that he failed to exhaust his administrative remedies before filing this action, this action should be dismissed. (*Id.*)

On December 3, 2010, Plaintiff filed (with leave of the Court) a response to Defendant's supplemental memorandum of law. (Dkt. No. 25.) Generally, liberally construed, Plaintiff's response asserts the following three arguments: (1) he should not be required to exhaust his administrative remedies because those remedies (through actions of various

2011 WL 4478921

administrative officials) have been rendered unavailable to him; (2) if the Court would allow, he would file an Amended Complaint asserting claims arising from the actions of various administrative officials in rendering his administrative remedies unavailable to him; and (3) even if the Court were inclined to dismiss this action due to his failure to exhaust his administrative remedies, it should do so only without prejudice. (*Id.*)

On January 14, 2011, Defendant filed (with leave of the Court) a reply to Plaintiff's response. (Dkt. No. 29.) Generally, in that reply, Defendant repeats his argument that this action should be dismissed based on Plaintiff's failure to exhaust his administrative remedies. (*Id.*) In addition, Defendant asserts arguments not relevant to the exhaustion issue but relevant to the arguments raised in the parties' prior exchange of briefs. (*Id.*)[2]

[2]     The Court notes that it did not, through its Text Order of November 22, 2010, grant Defendant leave to file a reply further briefing such issues.

On January 24, 2011, without prior leave of the Court, Plaintiff filed a sur-reply to Defendant's reply. (Dkt. No. 30.) Generally, in that unauthorized sur-reply, Plaintiff argues that he "stands by" his prior submissions to the Court. (*Id.*)

On July 25, 2011, the Court issued an Order staying further proceedings in this case until September 1, 2011, "to allow DOCS and CORC to render the final disposition to White's appeal in the present case." (Dkt. No. 39, at 3.)

On August 1, 2011, Defendant filed a letter advising the Court that CORC rendered a final disposition to Plaintiff's appeal on November 24, 2010. (Dkt. No. 40.)

On August 8, 2011, Plaintiff filed a response to Defendant's letter. (Dkt. No. 42.) Generally, liberally construed, that response argues as follows: (1) his original Complaint in this action should be dismissed without prejudice, with leave "to renew or amend within 45 days"; and (2) when that original Complaint is dismissed, an Order should be issued that [a] grants Plaintiff 45 days in which to file an Amended Complaint, which, *inter alia,* will assert claims arising from correctional officials' alleged intentional destruction of the audio/video tape recording of the incident giving rise to his original complaint, and [b] lifts the stay currently imposed on discovery, so that Plaintiff can obtain documents relevant to the investigation of his grievance. (Dkt. No. 42.)

**\*4** On August 10, 2011, Defendant filed a letter advising the Court that, while Defendant does not oppose Plaintiff's request to dismiss the action without prejudice, Defendant "would oppose a motion to amend the complaint as futile, based, *inter alia,* upon plaintiff's failure to exhaust administrative remedies prior to commencing suit." (Dkt. No. 43.)

**C. Magistrate Judge Homer's Report–Recommendation**

On August 11, 2011, Magistrate Judge Homer issued a Report–Recommendation recommending that Defendant's motion be granted, and that Plaintiff's Complaint be dismissed without prejudice. (Dkt. No. 44.) Generally, Magistrate Judge Homer based his Report–Recommendation not on the eight arguments asserted by Defendant in his original memorandum of law (Dkt. No. 12), but on the fact that, according to Plaintiff's own factual allegations, he had not exhausted his available administrative remedies before filing this action (on August 9, 2010). (Dkt. No. 44.) Moreover, it is worth noting that Magistrate Judge Homer specifically recommended not that Plaintiff's Complaint be *conditionally* dismissed (i.e., if he does not file of an Amended Complaint curing the deficiencies in his exhaustion allegations), but that the Complaint be dismissed without prejudice, the action be closed, and Plaintiff be required to file a new action. (*Id.*) Familiarity with the particular grounds of Magistrate Judge Homer's Report–Recommendation is assumed in this Decision and Order, which is intended primarily for the review of the parties.

Plaintiff failed to file an Objection to Magistrate Judge Homer's Report–Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.) However, on August 15, 2011, Plaintiff filed a motion to amend his Complaint pursuant to Fed.R.Civ.P. 15(a)(2).

**D. Plaintiff's Cross–Motion to Amend**

Generally, in support of his cross-motion to amend his Complaint, Plaintiff attaches an affidavit in which he asserts as follows: (1) he wishes to add as Defendants to this action New York State Department of Correctional Services Commissioner Brian Fischer, New York State Department of Correctional Services Grievance Director Karen Bellamy, Upstate Correctional Facility Superintendent David Rock, and Upstate Correctional Facility Correctional Lieutenant Lumbard; (2) his claims against those four new Defendants

are timely because they relate back to the date of his original Complaint pursuant to Fed.R.Civ.P. 15(c); and (3) "the grievance involving this claim ... is not attached but is a part of the record [and] is an essential factor of the Amended Complaint." (Dkt. No. 45.) In addition, he attaches a signed copy of his proposed Amended Complaint. (Dkt. No. 45 & Attach. 1.)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b) (1)(C).[3] When only general objections are made to a magistrate judge's report-recommendation, or where the objecting party merely reiterates the same arguments made in its original papers submitted to the magistrate judge, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[4] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

3     On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v.*

    *Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

4     *See also Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

### B. Legal Standard Governing a Motion to Dismiss for Failure to State a Claim

**\*5** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." F ed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show [ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the

White v. Drake, Not Reported in F.Supp.2d (2011)

2011 WL 4478921

above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* —— U.S. ——, —— – ——, 129 S.Ct. 1937, 1949– 52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*6** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]- that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [5] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [6] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted]. [7]

[5]   *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6    *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

7    It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed.R.Civ.P. 12(b)(6) or Fed.R.Civ.P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint (and are provided by the parties), or (4) any matter of which the court can take judicial notice for the factual background of the case. 8 Moreover, in the Second Circuit, a *pro se* plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint—to the extent those papers are consistent with the allegations in the complaint. 9

8    *See* Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted); *L–7 Designs, Inc. v. Old Navy, LLC,* No. 10–573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed.R.Civ.P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case).

9    *See Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 170 n. 1 (2d Cir.1998) (per curiam) ("[W]e deem Drake's complaint to include the facts contained in his memorandum of law filed in response to Delta's 1996 motion to dismiss."); *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) ( "In his affidavit submitted in opposition to defendants' motion to dismiss, Gill asserts that Mooney's actions amounted to deliberate and willful indifference. Liberally construed under *pro se* pleading standards, Gill's allegations against Mooney involve more than ordinary lack of due care for the prisoner's interests or safety, ... and

therefore state a colorable claim under the Eighth and Fourteenth Amendments.") (internal quotation marks and citation omitted); *Donhauser v.Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.) (Sharpe, M.J.) ("[I]n cases where *a pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they "are consistent with the allegations in the complaint.") (collecting district court cases), *vacated on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004) (Hurd, J.).

### C. Legal Standard Governing a Motion to Amend a Complaint

**\*7** Rule 15(a) (2) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave [to] amend when justice so requires." Fed. R. Civ. Proc. 15(a)(2); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Manson v. Stacescu,* 11 F.3rd 1127, 1133 (2d Cir.1993). Elaborating on this standard, the Supreme Court has explained:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should ... be 'freely given.'

*Foman,* 371 U.S. at 182, *accord, Milanese v. Rust–Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001) ("[Leave to amend] should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.").

For example, with regard to the "undue delay" factor, the Second Circuit has held that "despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir.2000).

In addition, with regard to the "undue prejudice" factor, while as a general rule permission to amend a complaint should be freely given, " 'the trial court [is] required to take into account any prejudice' that might result to the party opposing the amendment." *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir.1985) (leave to amend denied where new claim concerned different period of time and different theory of recovery from original claim) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330–31 [1971] ). For example, in *Ansam Associates,* the Second Circuit held that permitting Plaintiff to allege a "new set of operative facts" would have been "especially prejudicial [to the defendant] given the fact that discovery had already been completed and [defendant] had already filed a motion for summary judgment." *Ansam Associates,* 760 F.2d at 446.

Finally, with regard to the "futility" factor, a court measures futility under the same standard as a motion to dismiss under Fed.R.Civ.P. 12(b)(6). *Nettis v. Levitt,* 241 F.2d 186, 194 n. 4 (2d Cir2001); *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

## III. ANALYSIS

### A. Defendant's Motion to Dismiss

As an initial matter, neither party has filed an Objection to Magistrate Judge Homer's Report–Recommendation. As a result, the Court need review the Report–Recommendation for only clear error. After carefully reviewing all of the papers in this action, including Magistrate Judge Homer's Report–Recommendation, the Court concludes that the Report–Recommendation is correct in all respects. (Dkt. No. 44.) Magistrate Judge Homer employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (*Id.*) As a result, the Court adopts the Report–Recommendation in its entirety for the reasons stated therein.

**\*8** The Court would add only three points. First, Magistrate Judge Homer's thorough and correct Report–Recommendation would survive even *de novo* review.

Second, the Court bases its conclusion that Plaintiff's Complaint should be dismissed on the alternative ground that the claims asserted in that Complaint fail to state a claim upon which relief can be granted *for the reasons stated in the eight arguments asserted by Defendant in his original memorandum of law.* (Dkt. No. 12.)

White v. Drake, Not Reported in F.Supp.2d (2011)
2011 WL 4478921

Third, the Court bases its conclusion that Plaintiff should be required to file a new action rather than be permitted to simply file an Amended Complaint in this action on the following additional grounds: (1) Plaintiff will not be unfairly prejudiced by the Court's current Decision and Order, because the three-year limitations period governing his claims [10] (which appear to have arisen between June 27, 2010, and November 24, 2010) [11] does not yet appear to have expired, and because no reason exists to believe that Plaintiff's *in forma pauperis* status has changed since it was granted on September 8, 2010 (Dkt. No. 4); [12] and (2) if the Court were to simply accept for filing the proposed Amended Complaint that Plaintiff has submitted, the Court would actually be prejudicing Plaintiff because the pleading deficiencies in that Amended Complaint (described below in Part III.B. of this Decision and Order) would cause the Court to dismiss this entire action *with prejudice*.

[10]    "The applicable statute of limitations for § 1983 actions arising in New York requires claims to be brought within three years ." *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995); *see also Connolly v. McCall,* 254 F.3d 36, 40–41 (2d Cir.2001) ("[Plaintiff's] federal constitutional claims, brought pursuant to 42 U.S.C. § 1983, are governed by New York's three-year statute of limitations for personal injury actions ...."). A claim arising under Section 1983 accrues "when the plaintiff knows or has reason to know of the harm that he seeks to redress." *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001) [internal quotation marks omitted], *accord, Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002) [internal quotation marks omitted].

[11]    (*Compare* Dkt. No. 1, Attach. 1 [attaching grievance reflecting date of incident as June 27, 2010] *with* Dkt. No. 40 [attaching final decision on grievance, dated November 24, 2010].)

[12]    The Court notes that it appears that Plaintiff has acquired only one "strike" for purposes of 28 U.S.C. § 1915(g), as of the date of this decision. *See White v. Brettschneider,* 10–CV–4957, Order (E.D.N.Y. filed Dec. 23, 2010).

For all of these reasons, Defendant's motion to dismiss is granted, and Plaintiff's Complaint is dismissed without prejudice.

**B. Plaintiff's Cross–Motion to Amend**

As an initial matter, the Court denies Plaintiff's cross-motion to amend on three procedural grounds. First, Plaintiff's cross-motion is untimely in that it had to be filed with his opposition to Defendant's motion. N.D.N.Y. L.R. 7.1(c). [13] Ignoring this rule in this circumstance, and permitting Plaintiff to change the landscape of his claims after Magistrate Judge Homer has reviewed them, would frustrate the purpose of the Magistrate Act . [14]

[13]    The Court notes that, during the time in question, a copy of the District's Local Rules of Practice and *Pro Se* Handbook were on file at Plaintiff's correctional facility. The Court notes also that proceeding *pro se* does not excuse Plaintiff of his obligation to comply with the procedural requirements set forth in the Federal Rules of Civil Procedure and the Local Rules of Practice for this District. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*"[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks

and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted]; *Krug v. Cnty. of Rennselaer,* 559 F.Supp.2d 223, 234 (N.D.N.Y.2008) (McAvoy, J.) (noting that *pro se* plaintiffs "must follow the procedural formalities of Local Rules"); *Carmona v. Wright,* 233 F.R.D. 270, 275 (N.D.N.Y.2006) (Sharpe, J.) (*"Pro se* litigants must comply with local rules, and the failure to do so is sanctionable.").

14      *See also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection[ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson–Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990– 91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to *de novo* review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted]; *cf. Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no

justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88–CV–5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted].

Second, Plaintiff's motion fails to "set forth specifically the proposed amendments and identify the amendments in the proposed pleading, either through the submission of a red-lined version of the original pleading or other equivalent means." N.D.N.Y. L.R. 7.1(a)(3). Neither Defendant nor the Court should be required, at its own peril (i.e., if it happens to be mistaken), to compare Plaintiff's two pleadings on a line-by-line basis, in an attempt to discern Plaintiff's proposed amendments.

Third, in attempting to state a claim in his Amended Complaint, Plaintiff appears to rely heavily on the incorporation by reference of a document attached to only his original Complaint, in violation of Local Rule 7.1(a)(3). (Dkt. No. 45, at ¶ 5 [stating that "the grievance involving this claim ... is not attached but is a part of the record [and] is an essential factor of the Amended Complaint"].) *See also* N.D.N.Y. L.R. 7.1(a)(3) ("A party shall not incorporate any portion of its prior pleading into the proposed amended pleading by reference."). This proscription against piecemeal pleadings is not just a formality, but is supported by several practical justifications.

**\*9** In any event, even setting aside these three procedural violations, the Court would deny Plaintiff's cross-motion on five substantive grounds. First, Plaintiff has failed to even attempt to show cause for his motion, for example, by attempting to persuade the Court that his delay in filing the motion was not "undue," and that the prejudice to Defendants caused by the granting of his motion would not be "undue." (Dkt. No. 45.)

Second, Plaintiff's proposed claims against Defendant Drake in his Amended Complaint are more vague, and less factual, than are his claims against Defendant Drake in his original Complaint. [15] More important, Plaintiff's proposed claims

2011 WL 4478921

against Defendant Drake in his Amended Complaint suffer from most, if not all, of the pleading defects that plagued his claims against Defendant Drake in his original Complaint, which defects are accurately described by Defendants in their original memorandum of law. (Dkt. No. 12.) For example, Defendant's alleged false statements are not actionable, even if they were (1) intended to annoy and harass Plaintiff in violation of state law,[16] or (2) provided during the grievance process.[17] In addition, Plaintiff has failed to state a claim for excessive force because he has failed to allege facts plausibly suggesting that (1) the amount of force used against him was more than *de minimis,*[18] and (2) Defendant Drake *intended* to injure him by kicking his cell door.[19] To the contrary, Plaintiff has alleged merely that Defendant Drake kicked his cell door, "injuring [his] nose [and] right jaw." Moreover, Plaintiff's allegation that Defendant Drake's conduct violated N.Y. Correction Law § 137(5),[20] would not, even if plausible, elevate Defendant's conduct to a constitutional level.[21]

[15] (*Compare* Dkt. No. 1, at ¶¶ 6, 7 [focusing exclusively on conduct of Def. Drake] & Ex. 1 *with* Dkt. No. 45, Attach. 1, at ¶¶ 6, 7 [focusing mainly on conduct of five new proposed Defendants].)

[16] *See Robinson v. New York State Dept. of Corr. Serv.,* 08–CV–0911, 2009 WL 3246818, at * 16 (N.D.N.Y. Sept.30, 2009) (McAvoy, J., adopting Report–Recommendation by DiBianco, M.J.) ("Even if defendants had violated New York law or the DOCS Employee Manual prohibiting verbal harassment, the violation of state law, absent a constitutional violation, is not actionable under section 1983.").

[17] *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 349 (N.D.N.Y.2010) (Hurd, J. adopting Report–Recommendation by Lowe, M.J.) (noting that, because inmates do not have a constitutional right to grievance programs, "courts have consistently held that violations of th[e grievance] procedures or the state's failure to enforce them does not give rise to a claim under"); *cf. Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("A prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report.").

[18] *See Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ("The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.").

[19] *See, e.g., Rivera v. Goord,* 119 F.Supp.2d 327, 341 (S.D.N.Y.2000) (noting that the subjective prong of an excessive force claim requires the plaintiff to allege "that the prison guards acted wantonly, with the sadistic or malicious intent to harm him").

[20] N.Y. Correction Law § 137(5) ("No inmate in the care or custody of the department shall be subjected to degrading treatment, and no officer or other employee of the department shall inflict any blows whatever upon any inmate, unless in self defense, or to suppress a revolt or insurrection....").

[21] *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson v. Coughlin,* 761 F.2d 886, 891 (2d Cir.1985) ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") [citation omitted]; *Murray v. Michael,* 03–CV–1434, 2005 WL 2204985, at *10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") [citation omitted]; *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") [citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) ].

Third, to the extent Plaintiff has attempted to bring additional claims against these four individuals (as opposed to simply alleging the "special circumstances" that excused his failure to exhaust his claim against Defendant Drake),[22] at the very most, Plaintiff's proposed claims against Brian Fischer,

2011 WL 4478921

Karen Bellamy, David Rock, and Lieutenant Lumbard allege facts plausibly suggesting not criminal recklessness but mere negligence, which is not actionable under 42 U.S.C. § 1983. [23]

22    *See* Hemphill v. New York, 380 F.3d 680, 686 (2d Cir.2004) (finding that failure to exhaust administrative remedies may be excused where [1] administrative remedies were not in fact available, [2] prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion, or [3] "special circumstances ... justify the prisoner's failure to comply with administrative procedural requirements").

23    *See, e.g.,* Farmer v. Brennan, 511 U.S. 825, 827, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.... [D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Daniels v. Williams,* 474 U.S. 327, 331–33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) ("[I]njuries inflicted by governmental negligence are not addressed by the United States Constitution."); *Pena v. Deprisco,* 432 F.3d 98, 112 (2d Cir.2005) ("In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' ... [T]he Fourteenth Amendment is not a 'font of tort law.' ... It does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable.... '[N]egligently inflicted harm is categorically beneath the threshold of constitutional due process.' ") [citations omitted]; *Riddick v. Modeny,* No. 07–1645, 2007 WL 2980186, at *2 (3d Cir. Oct.9, 2007) ("The protections afforded prisoners by the Due Process Clause of the Fourteenth Amendment are not triggered by the mere negligence of prison officials.").

Fourth, Plaintiff's proposed Amended Complaint, which is barely legible, [24] fails to allege facts plausibly suggesting the personal involvement of supervisors Brian Fischer, Karen Bellamy, and David Rock: Fisher and Rock are each the subject of merely conclusory allegations by Plaintiff, and Bellamy appears to be the subject of no allegations by Plaintiff. (Dkt. No. 45, Attach.1, ¶¶ 6, 7.) Moreover, Plaintiff's proposed Amended Complaint appears to fail to allege facts plausibly suggesting the personal involvement of Lieutenant Lumbard, whom he vaguely alleges committed "abusive acts ... where allegations are of correctional officers['] official misconduct." (*Id.*)

24    *See* N.D.N.Y. L.R. 10(a),(b) (requiring, *inter alia,* that pleadings be "double-spaced" and "legibly written").

**\*10**  Fifth, and finally, Plaintiff's proposed Amended Complaint appears to allege facts plausibly suggesting that he did not exhaust (or even attempt to exhaust) his administrative remedies with regard to his new claims—i.e., his claims against Brian Fischer, Karen Bellamy, David Rock, and Lieutenant Lumbard arising from their alleged failure to preserve evidence and/or their rendering the administrative grievance process unavailable to him (by failing to render timely and correct administrative decisions on his original grievance). (Dkt. No. 45, Attach.1, ¶¶ 4, 6, 7.) Simply stated, to the extent Plaintiff has attempted to bring additional claims against these four individuals (as opposed to simply alleging the "special circumstances" that excused his failure to exhaust his claim against Defendant Drake), Plaintiff appears to have confused his exhaustion of his administrative remedies on his original grievance with his exhaustion of his administrative remedies with his new claims.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Homer's Report–Recommendation (Dkt. No. 44) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 12) is ***GRANTED*** and Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED*** **without prejudice;** and it is further

**ORDERED** that Plaintiff's cross-motion to amend his Complaint (Dkt. No. 45) is ***DENIED.***

2011 WL 4478921

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4478921

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:10cv01034**<br>WHITE v. DRAKE | — | N.D.N.Y. | Aug. 26, 2010 | Docket |

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

1.  White v. Drake
2011 WL 4478988 , N.D.N.Y. , Aug. 11, 2011

*Report and Recommendation Adopted by*

2.  White v. Drake
2011 WL 4478921 , N.D.N.Y. , Sep. 26, 2011

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Simpson v. Price, Not Reported in Fed. Supp. (2021)

2021 WL 7367083

2021 WL 7367083
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James SIMPSON, Plaintiff,
v.
R. PRICE, Defendant.

9:19-CV-1413 (MAD/ATB)
|
Signed 12/29/2021

**Attorneys and Law Firms**

JAMES SIMPSON, Plaintiff, pro se.

KONSTANDINOS D. LERIS, Asst. Attorney General for
Defendant.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and
Recommendation, by the Honorable Mae A. D'Agostino,
United States District Judge, pursuant to 28 U.S.C. § 636(b)
and Local Rules N.D.N.Y. 72.3(c). Plaintiff brought this civil
rights action asserting various allegations of constitutional
violations that occurred while he was incarcerated at Cayuga
Correctional Facility ("Cayuga C.F."), in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS").

Plaintiff filed his original complaint on November 15, 2019.
(Dkt. No. 1). By decision and order dated January 3, 2020,
Judge D'Agostino dismissed plaintiff's complaint for failure
to state a claim pursuant to 28 U.S.C. §§ 1915, 1915A. (Dkt.
No. 4). In the same order, Judge D'Agostino granted plaintiff
leave to file an amended complaint in order to cure some
of the defects identified by the court. (*Id.*). Plaintiff filed
an amended complaint on January 21, 2020. (Dkt. No. 5).
On March 17, 2020, Judge D'Agostino accepted plaintiff's
amended complaint for filing, only to the extent it asserted
an Eighth Amendment excessive force claim against C.O.
Price. (Dkt. No. 8). On August 27, 2020, plaintiff filed a
motion seeking leave to amend. (Dkt. No. 25). By decision
and order dated September 24, 2020, Judge D'Agostino
granted plaintiff's motion, in part, and accepted the second

amended complaint for filing to the extent it asserted an
Eighth Amendment excessive force claim against C.O. Price
arising from events that occurred on October 10, 2018. (Dkt.
No. 29).

There is some confusion as to what specific claims of Eighth
Amendment excessive force survived initial review by the
district court. [1] For purposes of this report-recommendation,
the court recognizes the surviving claims in plaintiff's second
amended complaint to include (1) an Eighth Amendment
excessive force claim against C.O. Price stemming from
the events that occurred on October 10, 2018, and (2) an
Eighth Amendment excessive force claim against C.O. Price
stemming from the events that occurred on August 9, 2019.

[1]     Upon initial review of plaintiff's amended
complaint, the district court acknowledged that
the pleading was "not a model of clarity," but
nevertheless liberally construed it to allege, among
other things, an Eighth Amendment excessive
force claim against C.O. Price arising out of
allegations that C.O. Price tried to place plaintiff
in leg shackles that were too small for him
on August 9, 2019. (Dkt. No. 8 at 5). In
the amended complaint, plaintiff also alleged
various constitutional violations stemming from
events which took place in October 2018. (*See
generally* Dkt. No. 5). These claims did not
survive initial review. (*See* Dkt. No. 8 at 2–8).
Plaintiff subsequently filed his second amended
complaint, which suffered from deficiencies
similar to his former pleading. (Dkt. No. 30).
Upon review, the district court construed the
second amended complaint to allege an Eighth
Amendment excessive force claim against C.O.
Price concerning the October 2018 events. (Dkt.
No. 29). The district court did not consider whether
plaintiff properly raised allegations of excessive
force against C.O. Price concerning events which
took place on August 9, 2019, presumably
because the second amended complaint did not
specifically identify this time period. However, at
his deposition plaintiff explained that his claims
against C.O. Price, as set forth in his second
amended complaint, stemmed from the events
which took place on August 9, 2019. (Plaintiff's
Deposition Transcript ("Pl.'s Dep.") at 37, 46–
47, 69). Considering plaintiff's testimony, this
court interprets the portion of the second amended

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 134 of 306

Simpson v. Price, Not Reported in Fed. Supp. (2021)

2021 WL 7367083

complaint entitled "Statement of Claim" to address the excessive force claim against C.O. Price that took place on August 9, 2019, although plaintiff has admittedly characterized this claim as one of medical deliberate indifference, as opposed to excessive force. (Dkt. No. 30 at 2–3). At the request of the moving defendant and for the sake of judicial economy, this court will assess whether the latter excessive force claim against C.O. Price survives summary judgment, assuming it was properly pleaded in the first place.

**\*2** Presently before the court is defendant C.O. Price's motion for summary judgment pursuant to Fed. R. Civ. P. 56, seeking dismissal of the action. (Dkt. No. 41). Plaintiff responded in opposition to the motion on September 9, 2021. (Dkt. No. 43). Defendant filed a reply brief on September 16, 2021. (Dkt. No. 44). For the reasons set forth below, the court recommends granting defendant C.O. Price's motion for summary judgment and dismissing the second amended complaint in its entirety.

## I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences,

against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

Local Rules of the Northern District of New York require that a motion for summary judgment be accompanied by a statement of material facts which sets forth, in numbered paragraphs, "a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." Local Rule 56.1(a). [2] The same rule requires the opposing party to file a response to the moving party's statement of material facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issues arise. Local Rule 56.1(b). The rule specifically provides that "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.*

[2]    Previously Local Rule 7.1(a)(3).

Credibility assessments and the choice between conflicting versions of a story are generally for a jury to resolve. *Rule v. Brine, Inc.* 85 F.3d 1002, 1011 (2d Cir. 1996). However, the Second Circuit recognized an exception to this rule in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). In *Jeffreys*, the court held that summary judgment may be granted in the rare case, "where there is nothing in the record to support the plaintiff's allegations, aside from his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that 'no reasonable person' could credit ... his testimony." *Quick v. Quinn*, No. 9:12-CV-1529 (DNH/DEP), 2014 WL 4627106, at \*4 (N.D.N.Y. Sept. 11, 2014) (quoting *Jeffreys*, 426 F.3d at 54-55). In order for the court to apply the *Jeffreys* exception, the defendant must satisfy each of the following: (1) "the plaintiff must rely 'almost exclusively on his own testimony,' " (2) the plaintiff's "testimony must be 'contradictory or incomplete,' " and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Id.* (quoting *Benitez v. Ham*, No. 04-CV-1159 (NAM/GHL), 2009 WL 3486379, at \*20-21 (N.D.N.Y. Oct. 21, 2009) (adopting report and recommendation) (quoting *Jeffreys*, 426 F.3d at 554)).

## II. Factual Contentions

### A. October 10, 2018

2021 WL 7367083

**\*3**  Plaintiff alleges that on October 10, 2018, he was advised that he had a medical appointment outside Cayuga C.F. (Second Amended Complaint ("SAC") at 2) (Dkt. No. 30). He informed the correctional officers responsible for his transport that "the leg irons they intended to use were to[o] small for [plaintiff's] ankles." *Id.* The officers ignored plaintiff and proceeded to place him in the small leg irons. *Id.* Fourteen hours later, plaintiff's ankles were severely bruised, "and [his] right ankle had an open wound where the shackle had grounded through [his skin]." *Id.* Approximately a week later, a nurse informed plaintiff that the injury had become a "sever[e] infection necessitating daily attention by medical staff and antibiotics." *Id.*

### B. August 9, 2019

Plaintiff was scheduled to attend a medical appointment at SUNY Upstate Medical University ("SUNY Upstate") on August 9, 2019. (Pl.'s Dep. at 47; Declaration of Richard Price ("Price Decl.") ¶ 10). C.O. Price was the officer responsible for escorting plaintiff to his medical appointment that morning. (Pl.'s Dep. at 49; Price Decl. ¶ 10). Accordingly, C.O. Price contacted plaintiff's dorm by phone at approximately 7:30 a.m., requesting that plaintiff arrive to the draft area by 8:15 a.m. in order to be strip frisked and to otherwise prepare for transport. (Price Decl. ¶ 12). Plaintiff was late, however, and did not arrive to the draft room until 8:45 a.m. (Pl.'s Dep. at 48–49, Price Decl. ¶ 13).

The parties' contentions diverge at this point. According to the plaintiff, when he got to the draft room C.O. Price was "screaming" at him for being late. (Pl.'s Dep. at 51). Plaintiff was subsequently strip frisked, without incident, per facility protocol. (*Id.* at 51–52, 55). After the strip frisk, plaintiff was under the assumption that he was going to be taken to the medical unit to have his ankle wrapped. (*Id.* at 52). Of note, plaintiff testified that he suffers from a medical condition that causes "abbreviations" and "deep imprints" in his skin when compression is applied. (*Id.* at 32–33). Plaintiff also asserted that, due to this medical condition, he had a permit for "big boy" cuffs to be used on his ankles. (*Id.* at 43). Plaintiff testified that C.O. Price knew plaintiff required larger ankle cuffs. (*Id.* At 56).

Nevertheless, after the strip frisk C.O. Price told plaintiff, "we don't have time for you to go over there to medical to get your leg wrapped." (*Id.* at 52). C.O. Price then put plaintiff in the transport van, and tried to put standard size cuffs on plaintiff's ankles. (*Id.* at 52–53). Plaintiff told C.O. Price he would not wear the smaller cuffs. (*Id.* at 53). When C.O.

Price tried forcing the cuffs onto plaintiff's ankles, plaintiff put his cane in front of his legs. (*Id.*). C.O. Price told plaintiff that he was going to "tell ... people that [plaintiff] tried to hit [him] with a cane" if plaintiff didn't allow himself to be placed in the smaller cuffs. (*Id.*). Plaintiff continued to refuse. (*Id.*). C.O. Price made another attempt to place the cuffs on plaintiff's ankles, which caused a "scab" from an old wound to "pop[ ] back open" on plaintiff's leg. (*Id.* at 53, 58–59). Plaintiff testified that C.O. Price had "no choice" then but to let plaintiff out of the van and take him to the medical unit to get his leg wrapped. (*Id.* at 53).

After plaintiff's leg was wrapped, C.O. Price attempted once more to put the smaller cuffs on plaintiff, and threatened to take plaintiff to "the box" if he did not cooperate. (*Id.* at 54). Plaintiff refused, and ultimately C.O. Price got bigger cuffs (however, apparently not the "big boy" cuffs) and placed them onto plaintiff's ankles. (*Id.*). Plaintiff was transferred to SUNY Upstate, and upon his return C.O. Price took him "straight to the box." (*Id.*).

**\*4**  C.O. Price has submitted a declaration in support of his pending motion for summary judgement, which alternatively describes the events of August 9 th . Upon plaintiff's arrival to the draft room that morning, C.O. Price maintains that he conducted a strip frisk of plaintiff, and then placed plaintiff in mechanical wrist restraints. (*Id.* ¶ 14). Plaintiff was subsequently escorted to the facility van, where C.O. Price attempted to place standard size ankle restraints on him. (*Id.* ¶¶ 14–15). Plaintiff refused and "shoved" his cane at C.O. Price, "almost striking [C.O. Price] in the nose." (*Id.* ¶ 15). Plaintiff proceeded to place his cane between his ankles. (*Id.*). The cane was taken from plaintiff and C.O. Price gave plaintiff several direct orders to allow him to apply the restraints, however plaintiff refused to comply. (*Id.* ¶ 16). C.O. Price did not threaten to take plaintiff to the Special Housing Unit ("SHU"), nor did he threaten him in any other manner. (*Id.*).

Plaintiff eventually told C.O. Price that he had a permit for "big boy" cuffs on file with Cayuga C.F. medical staff. (*Id.* ¶ 17). C.O. Price maintains that he had no knowledge of plaintiff's purported permit at the time, and had escorted plaintiff on previous medical trips where standard size leg restraints were used. (*Id.* ¶¶ 18–20). Nevertheless, C.O. Price stopped attempting to place the ankle restraints on plaintiff and contacted the area supervisor. (*Id.* ¶ 21). They escorted plaintiff from the van to the medical unit, where a nurse placed a gauze bandage around one of plaintiff's ankles. (*Id.*

¶ 22). [3] At the same time, C.O. Price looked for but could not find documentation of plaintiff's purported medical permit for larger ankle restraints, thus a determination was made to use the standard size restraints on plaintiff. (*Id.* ¶ 24). Plaintiff eventually allowed C.O. Price to place his ankles in the standard size leg restraints, and they departed for SUNY Upstate. (*Id.* ¶¶ 25–26). The remainder of the trip went without incident. When they returned, C.O. Price issued plaintiff a misbehavior report charging him with interference with an employee, lying/providing false information, and refusing a direct order. (*Id.* ¶ 28, Ex. B). C.O. Price avers that plaintiff was not injured, nor did he complain of being injured, at any time on August 9, 2019. (*Id.* ¶ 32).

[3]      C.O. Price denies that plaintiff was taken to medical because of an injury caused by him. (Id. ¶ 23).

### DISCUSSION

### III. October 10, 2018 Excessive Force Claim

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks and citations omitted); *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir. 1996). The district court interpreted plaintiff's second amended complaint to assert that C.O. Price was one of the officers who escorted plaintiff to his medical appointment. (*See* Dkt. No. 29 at 3). However, at his deposition plaintiff testified to the contrary, confirming that C.O. Price was not involved in the October 10, 2018 incident. (Pl.'s Dep. at 37). Thus, it is undisputed that C.O. Price was not present, or otherwise involved, in the events surrounding plaintiff's allegations of excessive force on October 10, 2018. [4] (*See* Pl.'s Dep. at 37; Price Decl. ¶¶ 5–6, Ex. A). Accordingly, the court recommends that the second amended complaint be dismissed against C.O. Price as it relates to this claim.

[4]      In his opposition papers, plaintiff appears to argue that this claim should not be dismissed against C.O. Price. (Plaintiff's Brief ("Pl.'s Br.") at 3–5). Plaintiff's argument is misplaced, however, as it only addresses the events which unfolded on August 9, 2019, and why C.O. Price should be held liable for his actions on that day. (*Id.*).

### IV. August 9, 2019 Excessive Force Claim

#### A. Exhaustion of Administrative Remedies

#### 1. Legal Standards

**\*5** The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint,* 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones,* 549 U.S. at 218-19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or

formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake,* 578 U.S. 632, 136 S. Ct. 1850, 1857 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross,* 578 U.S. at ——, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still relevant. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at ——, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580. An administrative procedure is "unavailable" when

> **\*6** (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, 578 U.S. at ——, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Id.* The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when

the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

## 2. Application

C.O. Price argues that plaintiff's excessive force claim stemming from the events that occurred on August 9, 2019 is subject to dismissal due to plaintiff's failure to exhaust his administrative remedies. Specifically, C.O. Price contends that plaintiff did not file an initial grievance prior to bringing suit, nor did he appeal the denial of any grievance concerning this claim to CORC. (Defendant's Memorandum of Law at 14). In support of his position, C.O. Price has attached to his motion papers the sworn declarations of Rachael Seguin, the Assistant Director of the Incarcerated Grievance Program ("IGP") for DOCCS, and Morgan Swan, the Incarcerated Grievance Program Supervisor at Cayuga C.F. (*See generally* Declaration of Rachael Seguin ("Seguin Decl."); Declaration of Morgan Swan ("Swan Decl.")) (Dkt. Nos. 41-3; 41-4). These declarations, and the evidence attached as exhibits thereto, provide compelling evidence that plaintiff neither filed an initial grievance, nor appealed to CORC, concerning his claim of excessive force by C.O. Price occurring on August 9, 2019. (*See* Swan Decl. ¶¶ 20–29, Ex. B; Seguin Decl. ¶¶ 15–16).

Plaintiff's response to this defense is equivocal, at best. In a prior pleading, plaintiff asserted that after returning from his medical trip on August 9th and being placed in the SHU, he "sent [three] letters to grievants [sic] I never got mail back or no one came to see me." (Dkt. No. 5 at 11). Plaintiff further alleged that when he got out of the SHU on August 20, 2019, he "went on a court trip so ... could not appeal to the Superintendent within 72 hours[.]" (*Id.*).

At his deposition, plaintiff testified that while in the SHU he made three attempts to file a grievance against C.O. Price. (Pl.'s Dep. at 69–71). Plaintiff initially testified that he heard back from one of the grievances, but admitted that he could not remember if C.O. Price was named in that specific grievance. (*Id.* at 72). Plaintiff then, alternatively, asserted that C.O. Price was not named in all three of the grievances he attempted to file in the SHU, and "he think[s]"

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 138 of 306

Simpson v. Price, Not Reported in Fed. Supp. (2021)

2021 WL 7367083

C.O. Price was only named in two out of the three. (*Id.*). Plaintiff could not remember if he received a response from either grievance. (*Id.*). Nor could plaintiff remember what the content of his grievances against C.O. Price actually were, with respect to the two he allegedly attempted to file. (*Id.* at 73). Plaintiff testified that he wrote to the grievance office to follow up about his grievance(s) against C.O. Price, but could not remember how many times or the content of his follow-up correspondences. (*Id.* at 73). Plaintiff admittedly did not retain any copies of the purported grievances or follow-up correspondences relative to his complaints against C.O. Price. (*Id.* at 71–73). [5]

[5]     Plaintiff testified that he was unable to make or obtain copies of his grievance paperwork while confined in the SHU. (Pl.'s Dep. at 70).

 **\*7** Plaintiff's position is further confused by the arguments contained in his opposition to the instant motion. There, plaintiff asserts that he filed a grievance in "December of 2018," then appealed the decision to CORC. (Pl.'s Br. at 6). Plaintiff takes the position that, because he did not receive a response from CORC within the 30 day deadline, his administrative remedies should be deemed exhausted. (Pl.'s Br. at 6).

Notwithstanding plaintiff's arguments, the record before this court evidences his failure to exhaust administrative remedies with respect to the latter excessive force claim against C.O. Price, to the extent that an initial grievance was never filed, nor was the claim appealed to CORC. As such, the question becomes whether plaintiff's failure to exhaust should be excused. To this end, the defendant has satisfied his initial burden of "establishing ... that a grievance process exist[ed] and applie[d] to the underlying dispute." *Hubbs v. Suffolk County Sheriff's Dept.*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted). DOCCS regulations provide that inmates in the SHU may file grievances by giving the complaint to a correction officer to forward to the grievance clerk. *See* N.Y.C.R.R. tit. 7, § 701.7. Thus, plaintiff assumes the burden of producing evidence that one of the exceptions to the administrative exhaustion requirement applies, excusing his failure to exhaust and permitting his claim to survive summary judgment. *Id.*

Liberally construed, plaintiff appears to argue that administrative remedies were unavailable to him as a result of his confinement in the SHU, and the restrictions imposed on him there. In *Williams v. Priatno,* 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate housed in the SHU, in the context of grievances allegedly submitted to facility staff, but purportedly never filed. There, the plaintiff alleged that while housed in the SHU, he drafted a grievance that he delivered to a correctional officer to forward to the grievance office on his behalf. *Id.* at 120-21. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance and alleged that it was never filed by the officer to whom he had given it. It was undisputed the plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* "Following the Second Circuits decision in *Williams*, several courts have concluded that where a grievance is both *unfiled* and *unanswered*, the process to appeal ... is prohibitively opaque, such that no inmate could actually make use of it." *Maldonado v. Mandalaywala*, No. 9:17-CV-1303 (BKS/TWD), 2020 WL 1159426, at \*15 (N.D.N.Y. Feb. 12, 2020), *report and recommendation adopted*, 2020 WL 1157643 (N.D.N.Y. Mar. 10, 2020) (internal quotation marks omitted) (listing cases).

 **\*8** For the following reasons, this court does not find *Williams* to be controlling in the instant matter. At the outset, *Williams* reversed the underlying district court's decision on the defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b). Thus, the Second Circuit was compelled to accept as true the allegations in Williams's complaint, including his assertion that a particular correctional officer never filed his grievance relevant to the subject claim. *See Williams v. Priatno,* 829 F.3d at 124. At the summary judgment stage, however, we are presented with a more complete record upon which to determine the existence of any genuine issues of material fact. *See Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir. 1998). [6]

[6]     In *Chance,* the Second Circuit noted the difference between the motion to dismiss standard of review and summary judgment standard in reversing the

2021 WL 7367083

district court's dismissal of a complaint pursuant to Rule 12(b):

> It is important to recognize the difference between disposing of a case on a 12(b)(6) motion and resolving the case later in the proceedings, for example by summary judgment. At the 12(b)(6) stage, [t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test....
>
> [Plaintiff] might not be able to prove his claims at trial. *And even at the summary judgment stage, it may well become clear that [plaintiff] cannot proffer sufficient proof to create genuine issues of material fact.* But in his complaint, he has alleged facts that are not impossible to prove and that, if demonstrated, would state a legally cognizable claim.
>
> *Id.* at 701 (internal quotation marks and citations omitted) (alterations to original and emphasis added).

Accordingly, in this instance the court need not mechanically accept plaintiff's vague allegation that he "tri[ed] [three] times to file a grievance [with] no response back." (*See* Dkt. No. 5 at 10). Further discovery on the issue of exhaustion has revealed that plaintiff did not satisfy his burden of production of evidence overcoming the defendant's proof that the defendant did not pursue the grievance process that was available to him. Specifically, given plaintiff's uncertainty, and his inability to confirm or document whether he actually attempted to file a complaint against C.O. Price regarding the August 9, 2019 incident, he has not demonstrated a genuine issue of material fact with respect to the availability of the grievance process, notwithstanding the fact that he, like Williams, was confined to the SHU. *See, e.g., Armand v. Mosko*, No. 13-CV-5, 2019 WL 2374948, at *3 (W.D.N.Y. Apr. 9, 2019), *report and recommendation adopted*, 2019 WL 2374001 (W.D.N.Y. June 4, 2019) (rejecting plaintiff's contention of unavailability based on her claim that, while housed in the SHU, she handed grievances to a corrections officer who never filed them, where plaintiff gave conflicting statements that were "unworthy of belief" that she actually filed the relevant grievance).

Notwithstanding plaintiff's allegation that he attempted to file a grievance against C.O. Price concerning the subject incident, plaintiff's contradictory assertions regarding the purported obstruction of his ability to do so undermine his efforts to document a material issue of fact. Plaintiff testified that he filed grievances during his confinement in the SHU, and "no one stopped [him] from filing a grievance." (Pl.'s Dep. at 70). He elaborated that "[i]f they answered, that was the problem.... you file one grievance then you have to be able to get it through. Especially in the hole." (*Id.*).

**\*9** Historically, unsupported assertions that a plaintiff "filed a grievance but that it was somehow lost or destroyed" have generally been found "insufficient to establish a genuine issue of fact." *Blake v. Porlier,* No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *5 (N.D.N.Y. Oct. 4, 2019) ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' ") (quoting *Rodriguez v. Cross*, No. 9:15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *5 (N.D.N.Y. May 9, 2017)); *Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report-recommendation adopted,* 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2019); *Engles v. Jones*, No. 6:13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

At least one other district court has granted summary judgment on exhaustion grounds notwithstanding *Williams*, under circumstances where the plaintiff provided no specifics related to a grievance purportedly filed during his confinement in the SHU. *See, e.g., Sankara v. Montgomery,* No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25, 2018), *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an

2021 WL 7367083

officer to send to the grievance office; and any specific follow up with the grievance office[.]"); *see also Tillman v. Phillips*, No. 9:19-CV-1597 (LEK/CFH), 2021 WL 5233308, at *7 (N.D.N.Y. Nov. 10, 2021), *report and recommendation adopted*, 2021 WL 5768393 (N.D.N.Y. Dec. 6, 2021) (distinguishing the facts in that case from circumstances outlined in *Sankara*, where plaintiff has provided no specifics related to grievance purportedly filed in SHU.).

Here, the court does not merely consider plaintiff's lack of direct evidence, such as copies of the relevant grievances, in finding that he has failed to establish a genuine issue of material fact as to unavailability. The court recognizes that an inmate-plaintiff's ability to process his grievances are curtailed to some extent while confined to the SHU. *See Rodriguez v. Cross,* No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Inmates not housed in the SHU are in a different position to SHU inmates when determining if grievance procedures are 'essentially unknowable' or unavailable.") (citation omitted).

However, plaintiff in this case has "done nothing more than allege in conclusory fashion that he attempted to file [a] ... grievance" concerning excessive force at the hands of C.O. Price in August 2019. He has provided no specifics regarding when the grievances were written, their content, or the steps he took to provide them to an officer to send to the grievance office. There is also no documentary evidence to corroborate the fact plaintiff attempted to file a grievance, such as follow-up correspondences after his release from SHU. For these reasons, the court concludes that plaintiff's completely unsupported, unclear and vague implication that a grievance he attempted to file against C.O. Price relative to the August 9, 2019 incident was not properly processed does not suffice to avoid summary judgment. *Cf. Stephanski v. Allen*, No. 9:18-CV-0076 (BKS/CFH), 2020 WL 806331, at *9 (N.D.N.Y. Jan. 22, 2020), *report and recommendation adopted*, 2020 WL 777268 (N.D.N.Y. Feb. 18, 2020) (denying summary judgment despite lack of direct evidence concerning defendant's interference with the grievance he attempted to file while in SHU where plaintiff's allegation of unavailability was supported by his proper response to defendants' statement of material facts, testimony under oath on two separate occasions, and some corroborating documentary evidence.). Accordingly, the court recommends that C.O. Price be granted summary judgment and the second amended complaint be dismissed against him as to this claim, on the ground that plaintiff failed to exhaust his administrative remedies.

**B. Excessive Force**

**\*10** Should the district court disagree with my recommendation that the second amended complaint be dismissed on exhaustion grounds, this court alternatively recommends granting summary judgment on the merits of plaintiff's Eighth Amendment excessive force claim, as further discussed below.

**1. Legal Standard**

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). To sustain a claim of excessive force, a plaintiff must still establish both the objective and subjective elements of an Eighth Amendment claim. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999); *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims*, 230 F.3d at 22 (citation omitted). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' ... or 'significant' injury, ... provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.' " *Hudson*, 503 U.S. at 7-10.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied

Case 9:23-cv-00098-MJK  Document 144  Filed 03/04/26  Page 141 of 306

Simpson v. Price, Not Reported in Fed. Supp. (2021)
2021 WL 7367083

in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; "the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

### C. Application

With respect to the events of August 9, 2019, plaintiff's second amended complaint states that C.O. Price was aware that plaintiff had a "serious medical need" by virtue of "seeing [plaintiff] with a cane and special shoes on [his] feet." (SAC at 2). Plaintiff also avers that the housing officer "called [C.O. Price], letting him know [plaintiff] could not move fast enough because of [an] abscess [on his leg]." (*Id.*). Plaintiff contends that, despite this knowledge, C.O. Price "ignored the seriousness" of plaintiff's condition and "placed a small leg iron over [his] open wound[,]" causing the "wound to reopen to the point that the medical trip was delayed[.]" (*Id.*). Plaintiff then vaguely refers to "[f]oot and ankle injuries-causing infection or disease." (*Id.* at 3). Plaintiff provided additional factual context at his deposition, the majority of which has been previously summarized. In sum, plaintiff maintains that C.O. Price knew that plaintiff had a permit for "big boy" ankle restraints, due to a medical condition. Plaintiff testified that despite this knowledge, C.O. Price attempted to force standard sized ankle restraints on plaintiff because they were running late for a medical appointment, causing an abscess on his ankle to reopen and bleed in the process. (Pl.'s Dep. at 52–56).

**\*11** For the following reasons, this court finds that plaintiff has not established a genuine issue of material fact with respect to either prong of the alleged Eighth Amendment violation. As for the subjective component of plaintiff's excessive force claim, no reasonable fact finder could conclude that C.O. Price used force against the plaintiff maliciously and sadistically to cause harm based on the record presently before this court. Even assuming the truth of plaintiff's allegations, C.O. Price was attempting to place the standard size ankle restraints onto plaintiff because plaintiff had arrived late and they had to "hurry up and go" in order to make the medical appointment. (*See* Pl.'s Dep. at 52). It is undisputed that plaintiff was running late for his medical

appointment, and that ankle restraints needed to be applied before he could be transferred out of the facility. Thus, the allegation that C.O. Price caused plaintiff's wound to reopen and bleed as he was attempting to prepare plaintiff for his medical trip, for which they were running late, does not rise to the level of an improper or wanton motive on the part of C.O. Price.

Moreover, the court finds that no reasonable fact finder would credit plaintiff's unsupported allegation that C.O. Price knew plaintiff required larger ankle restraints. C.O. Price has submitted a sworn declaration stating that he had no knowledge of plaintiff's purported medical permit for "big boy" cuffs. (Price Decl. at ¶¶ 18–20). [7] The documentary evidence submitted by C.O. Price in support of his motion, including the August 9, 2019 itinerary and the August 20, 2019 Tier II hearing disposition, support C.O. Price's further contention that plaintiff did not actually have a medical permit for larger ankle restraints in place at the time of the subject incident. (C.O. Price Decl. at ¶ 24, Exs. B, C). Plaintiff has failed to provide any evidence beyond his own conclusory statements in rebuttal. Because plaintiff has not submitted "proof that tends to show that the alleged force used against him was employed maliciously and sadistically to cause harm, he has failed to satisfy the subjective prong of his excessive force claim." *Chambliss v. Rosini*, 808 F. Supp. 2d 658, 669 (S.D.N.Y. 2011) (citing *Engles v. Dunbar*, No. 09 Civ. 2457, 2010 WL 5538517, at *7 (S.D.N.Y. Dec. 30, 2010) (concluding that the subjective component of excessive force test not satisfied where uncontroverted evidence established that force was used not maliciously or sadistically, but instead to transport the plaintiff in order to receive medical attention)).

[7] Plaintiff did not respond to the defense's Statement of Material Fact that "C.O. Price had no recollection of such a permit as he had escorted Plaintiff on previous medical trips where standard sized restraints were utilized. Price Decl. ¶ 20." (Dkt. No. 41-5 at 3, ¶ 18).

Nor is the court convinced that plaintiff could satisfy the objective component of his excessive force claim. Courts in this district "routinely dismiss claims of excessive force based on tight handcuffing where an inmate asserts only a *de minimis* injury without plausible allegations of wantonness or maliciousness." *Livingston v. Hoffnagle,* No. 9:19-CV-0353 (GLS/CFH), 2019 WL 7500501, at *4 (N.D.N.Y. Nov. 8, 2019) (listing cases); *see also Burroughs v. Mitchell,* 325

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 142 of 306

Simpson v. Price, Not Reported in Fed. Supp. (2021)
2021 WL 7367083

F. Supp.3d 249, 265 (N.D.N.Y. 2018) (dismissing pro se inmate's excessive force claim where he alleged only that the defendants "handcuffed him tightly, which caused cuts to his wrist") (internal quotation marks omitted); *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (dismissing excessive force claim based on tight handcuffing where the complaint alleged, without more, that the handcuffs caused "pain, swelling, and bruising") (internal quotation marks and brackets omitted).

Here, plaintiff merely alleges that, in attempting to place restraints on his ankles, C.O. Price "popped open a scab" on plaintiff's leg, causing it to bleed. (Pl.'s Dep. at 53–54, 65). C.O. Price disputes the fact that he caused any injury to plaintiff with the restraints (Price Decl. at ¶ 32), and there is no medical documentation before this court evidencing the contrary. In any event, the parties agree that plaintiff ultimately had his leg wrapped at the medical unit before being transferred to SUNY Upstate. (Pl.'s Dep. at 53–54; Price Decl. at ¶ 23). Assuming plaintiff's version of the facts, his leg was wrapped but "still bleeding" when he was placed in the SHU. (Pl.'s Dep. at 54). Plaintiff could not recall how long it took for his wound to stop bleeding, but concedes that he did not require stitches and that the wound healed "at some point." (*Id.* at 60–61, 65–66).

**\*12** Plaintiff testified that he did not obtain treatment for the injury, other than wrapping his leg – however, plaintiff concedes that his leg required continuous "wrapping" prior to the alleged incident. (*Id.* at 66). Notwithstanding plaintiff's self-serving assertion that his alleged injury caused him pain which he described as a "9 ½" on a scale of one to ten, given his *de minimis* injury, plaintiff has failed to document a material issue of fact with respect to the objective component of the excessive force standard. *See Warren v. Purcell*, No. 03 Civ. 8736, 2004 WL 1970642, at *8 (S.D.N.Y. Sept. 3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered de minimis injuries and no improper or wanton motive was alleged for the officers' actions).

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant C.O. Price's motion for summary judgment (Dkt. No. 41) be **GRANTED**, and the second amended complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 7367083

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:19-CV-01413**<br>Simpson v. Cayuga Correctional Facility | — | N.D.N.Y. | Nov. 15, 2019 | Docket |

**WESTLAW**   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (8)**

**Direct History (2)**

1. Simpson v. Price
2021 WL 7367083 , N.D.N.Y. , Dec. 29, 2021

*Report and Recommendation Adopted by*

2. Simpson v. Price
2022 WL 336540 , N.D.N.Y. , Feb. 04, 2022

**Related References (6)**

3. Simpson v. Cayuga Correctional Facility
2020 WL 8714804 , N.D.N.Y. , Jan. 03, 2020

4. Simpson v. Cayuga Correctional Facility
2020 WL 8714786 , N.D.N.Y. , Mar. 17, 2020

5. Simpson v. Price
2020 WL 8714784 , N.D.N.Y. , July 09, 2020

6. Simpson v. Price
2020 WL 8714783 , N.D.N.Y. , Aug. 14, 2020

7. Simpson v. Price
2020 WL 8714785 , N.D.N.Y. , Sep. 24, 2020

8. Simpson v. Price
2020 WL 8714787 , N.D.N.Y. , Oct. 22, 2020

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 145 of 306

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)
2018 WL 4610686

2018 WL 4610686
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ahmadou SANKARA, Plaintiff,
v.
MONTGOMERY, Burgess, Lopez, Defendants.

9:16-CV-00885 (FJS/TWD)
|
Signed 06/25/2018

**Attorneys and Law Firms**

AHMADOU SANKARA, 16-R-0122, Plaintiff pro se, Upstate Correctional Facility, P.O. Box 2001, Malone, New York.

HON. BARBARA D. UNDERWOOD, Attorney General for the State of New York, OF COUNSEL: MATTHEW P. REED, ESQ., The Capitol, Albany, New York 12224, Counsel for Defendants.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** The sole remaining claim in *pro se* Plaintiff Ahmadou Sankara's amended complaint (Dkt. No. 19) in this civil rights action brought under 42 U.S.C. § 1983 is his Eighth Amendment conditions of confinement claim involving the alleged denial of meals against Defendants Keith Montgomery ("Montgomery"), a Department of Corrections and Community Supervision ("DOCCS") Sergeant at Fishkill Correctional Facility ("Fishkill"); Erik Burgess ("Burgess"), a Corrections Officer ("C.O.") at Fishkill; and Jessica Lopez ("Lopez"), a former C.O. at Fishkill. (Dkt. No. 22 at 22. [1] ) Montgomery, Burgess, and Lopez now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff has failed to exhaust his administrative remedies and has failed to assert a constitutional violation. (Dkt. Nos. 81 and 81-1.) Plaintiff has filed papers in opposition to Defendants' motion. [2] (Dkt. No. 84.)

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[2] Plaintiff has filed a cross-notice of motion for summary judgment seeking denial of Defendants' summary judgment motion. (Dkt. No. 84-2). Because Plaintiff is not cross-moving for summary judgment in his favor, the Court is treating his notice of motion as opposition to Defendants' motion.

For reasons that follow, the Court recommends that Defendants' motion for summary judgment be granted.

**II. FACTUAL BACKGROUND**

Plaintiff, an inmate in the custody of DOCCS, was transferred to Fishkill on August 3, 2016. (Dkt. No. 19 at 11.) In his amended complaint, Plaintiff alleges that his Eighth Amendment conditions of confinement claim is based upon having been deprived of meals by Defendant Burgess on August 3, 2016, and August 4, 2016; by Defendants Lopez and Montgomery on October 10, 2016, and September 24, 2016; and by Montgomery on October 23, 2016, and October 24, 2016. *Id.* At his deposition, Plaintiff testified he was deprived of five meals by the Defendants, which included dinner on August 3 and 4, 2016, and lunch on September 10, 2016, September 23, 2016, and September 24, 2016. (Dkt. No. 81-3 at 19, 21, 26-27.)

**A. Service of Meals in the Fishkill SHU**

Meals are served three times a day in the Special Housing Unit ("SHU") at Fishkill. (Dkt. No. 81-4 at ¶ 7. [3] ) Before a meal is served, an announcement is made on the public address system once on each of the two floors notifying inmates of the forthcoming meal, and reminding them to be awake, with their lights on, fully clothed, and with any clothing lines in their cell taken down. *Id.* at ¶¶ 8-9. It is made before meal delivery so that inmates have time to prepare. *Id.* at ¶ 9. The rules for meals are contained in the SHU rulebook given to inmates when they are admitted to the unit. *Id.* at ¶ 10. The rules have a dual purpose: to ensure that food is not contaminated and to meet heightened security concerns in SHU. *Id.* at ¶¶ 11-13. Plaintiff denies having received the rulebook. (Dkt. No. 84 at ¶ 17.)

2018 WL 4610686

3      Paragraph numbers are used where documents identified by CM/ECF docket number contain consecutively numbered paragraphs.

**\*2** Anywhere from five to seven officers assist in delivering meals, with Defendant Montgomery either leading or following behind the officers to address any problems when he is on duty. *Id.* at ¶¶ 15-17. Inmates who do not comply with the established procedures do not receive a meal. *Id.* at ¶ 18. Failure to comply with the meal distribution procedures is noted as a refusal of chow and recorded in the SHU logbook. *Id.* at ¶ 14.

### B. August 3 and 4, 2016

Plaintiff claims that on August 3, 2016, the day he arrived at Fishkill, he was deprived of dinner by Defendant Burgess. (Dkt. No. 81-3 at 19, 27.) Plaintiff testified at his deposition that he received something like a box lunch with bread while en route to Fishkill and should have been given dinner at Fishkill but was not. *Id.* at 20. According to Plaintiff, dinner is served at 3:00 or 4:00pm. *Id.* at 22. Plaintiff claims that he and his bunk mate in SHU were denied dinner by Burgess on August 3, 2016, because his bunk mate was not properly dressed. *Id.* at 20-23, 27. Plaintiff was properly dressed and did not say anything, but his bunk mate began arguing with Burgess, which he was not supposed to do, so Burgess also deprived them of dinner the following day, August 4, 2016. *Id.* at 21, 27.

Plaintiff was very hungry and emotionally frustrated the night of August 3, 2016, because he had not made himself breakfast that morning, the lunch he was given was too small, and he did not receive dinner. *Id.* at 26. Plaintiff did receive both breakfast and lunch on August 4, 2016, missing only dinner. *Id.* at 21-22.

While Burgess recalls Plaintiff and his behavior in SHU, he does not recall the specific dates on which Plaintiff claims Burgess deprived him of a meal. (Dkt. No. 81-5 at ¶ 5.) There is an entry for August 3, 2016, in the SHU logbook in indicating that Plaintiff was not admitted to SHU until 6:48 pm, after dinner would have been served. (Dkt. No. 81-3 at 124.) The logbook appears to note two refusals for dinner on August 4, 2016, but does not list the inmates by name. *Id.* at 131.

### C. September 10, 2016

Plaintiff testified at his deposition that on September 10, 2016, he was denied a haircut by a corrections officer because Plaintiff had allegedly called him a Chinese officer, which Plaintiff denies. (Dkt. No. 81-3 at 32-33.) The officer wrote a misbehavior report on Plaintiff, and when the officer and Montgomery came around serving lunch, Plaintiff, who was standing in front of his door, was told he was not properly dressed and did not receive lunch. *Id.* at 34. Plaintiff did receive dinner on September 10, 2016. *Id.* at 36. Although Montgomery recalls Plaintiff, he does not recall his interactions with Plaintiff on the dates Plaintiff claims not to have received his meals. (Dkt. No. 81-4 at ¶ 20.)

### D. September 23, 2016

On September 23, 2016, recreation ("rec") and lunch were called at the same time. (Dkt. No. 81-3 at 39.) According to Plaintiff, a SHU inmate cannot have rec and chow at the same time. *Id.* Plaintiff was at rec with another inmate. *Id.* 39-40. When they came in, Plaintiff told the sergeant he had been at rec and needed his lunch. *Id.* at 39. At that time lunch had not yet passed by Plaintiff's door. *Id.* at 39-40. Plaintiff could see the officers and talked to them when the food was next to him, but Plaintiff was not given any. *Id.* at 40. Plaintiff has identified Montgomery as the one who did not give him lunch. *Id.* at 42.

**\*3** Plaintiff was very hungry so he started to kick the door for them to bring his food. *Id.* They did not want to bring his food so he left it alone. *Id.* Plaintiff did receive dinner on September 23, 2016. *Id.* at 41.

### E. September 24, 2016

Plaintiff testified at his deposition that on September 24, 2016, he stopped the Superintendent at Fishkill and started to speak with him about the food issue going on. (Dkt. No. 81-3 at 42.) Montgomery told Plaintiff to talk fast and Plaintiff said he knew Montgomery's name even though he hid it, and that Montgomery was the one who had denied him food September 10 and 23, 2016. *Id.* After the Superintendent left, Montgomery denied Plaintiff lunch again because he had talked to the Superintendent. *Id.* at 42-43. Defendant Lopez came to speak with Plaintiff when he began kicking his door. Plaintiff was told they had already passed and were not coming back, and they walked away. *Id.* at 43. When Plaintiff started kicking the door because he was really hungry, Lopez wrote a misbehavior report on which she stated he had been sleeping. *Id.* Plaintiff testified that of the Defendants only Montgomery was involved in depriving Plaintiff of lunch on

2018 WL 4610686

September 23, 2016, and that both Montgomery and Lopez were involved on September 24, 2016. *Id.* at 44.

## III. APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [4] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

[4] The Court finds that Plaintiff's amended complaint is properly verified under 28 U.S.C. § 1746. (Dkt. No. 19 at 16.)

**\*4** In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "To defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) [5] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ).

[5] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

## IV. PLAINTIFF'S FAILURE TO COMPLY FULLY WITH N.D.N.Y. L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3) by neglecting to set forth a specific citation to the record in a number of instances where

2018 WL 4610686

he appears to dispute a statement included in the statement of undisputed facts.[6] (See Dkt. Nos. 81-2 and 84.)

[6]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

Where a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement to which Plaintiff has not properly responded will be accepted as true (1) to the extent they are supported by evidence in the record,[7] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[8] *See Champion, v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status and the significant degree of effort he has shown in his response to Defendants' material statement of facts (Dkt. No. 84), the Court has opted to review the entire record.

[7]  L.R. 7.1(a)(3) provides that "<u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert</u>." However, *see Vermont Teddy Bear Co., Inc. v. 1 800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[8]  Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 81 at 2.)

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

### A. Legal Standard

**\*5** Montgomery, Burgess, and Lopez seek summary judgment on Plaintiff's Eighth Amendment conditions of confinement claim against them on the ground that Plaintiff failed to exhaust his administrative remedies under the DOCCS Inmate Grievance Procedure ("IGP") with regard to the claim. Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake,* ––– U.S. ––––, 136 S.Ct. 1850, 1854-55, 195 L.Ed.2d 117 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock,* 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones,* 549 U.S. at 218, 127 S.Ct. 910 (citing *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ); *see also Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* §

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 149 of 306
Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)
2018 WL 4610686

701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Special procedures are used when the grievance involves a claim of staff misconduct. *Id.* § 701.8. A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id.* § 701.8(f). If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision. *Id.* § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,' " assuming there is another step in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2) ); *see also Smith v. Kelly*, 985 F.Supp.2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can and must be appealed to the next level ... to complete the grievance process."). Exhaustion under the DOCCS IGP is not complete until the grievance has been appealed to CORC and CORC has issued a decision. *See Neal v. Goord*, 267 F.3d 116, 123 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Singh v. Goord*, 520 F.Supp.2d 487, 495 (S.D.N.Y. 2007) (complete exhaustion to CORC, the highest level, is required).

**\*6** While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S.Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S.Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted) ). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S.Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones,* 549 U.S. at 216, 127 S.Ct. 910; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S. at 94-95, 126 S.Ct. 2378. Plaintiff must then establish that the DOCCS IGP was unavailable to him. *See Jones,* 549 U.S. at 216, 127 S.Ct. 910.

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 150 of 306

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)
2018 WL 4610686

### B. Analysis

#### 1. Plaintiff's Failure to Exhaust His Administrative Remedies

Fishkill had a fully functioning inmate grievance procedure during the time Plaintiff was housed at the facility. (Dkt. No. 81-7 at ¶ 12.) Fishkill IGP supervisor, Sally Reams ("Reams"), has submitted a declaration describing the DOCCS IGP procedures followed at Fishkill. (*See generally* Dkt. No. 81-9.) According to Reams, she reviewed the records in the Fishkill grievance office where all documents or copies thereof related to a particular grievance dating back to January 1, 2013, are maintained. *Id.* at ¶¶ 9, 12. Her review revealed that Plaintiff was housed at Fishkill from August 3, 2016, to October 31, 2016, and during that time did not file any grievance related to a denial of six meals at Fishkill between August 3, 2016, and October 24, 2016.[9] *Id.* at ¶ 13.

[9]    The Court notes that Reams does not indicate in her declaration whether Plaintiff filed any grievances regarding one or more individual missed meal, or a grievance regarding a number other than six missed meals. (*See* Dkt. No. 81-9 at ¶ 13.) Moreover, Reams has used the dates in Plaintiff's amended complaint rather than the corrected dates in his deposition testimony for the time span during which the missed meals occurred used by her in her review. *Id.*

Joseph Cieslak ("Cieslak"), IGP supervisor at Mohawk Correctional Facility ("Mohawk"), to which Plaintiff was moved on October 31, 2016, has described the manner in which the DOCCS IGP is followed at Mohawk. (*See generally* Dkt. No. 81-8.) Cieslak reviewed the grievance records in the grievance office at Mohawk and determined that Plaintiff had not filed any formal grievances while at Mohawk. *Id.* at ¶¶ 9-12.

**\*7** Rachael Seguin, Assistant Director of the DOCCS IGP, has also submitted a declaration in support of Defendants' motion. (Dkt. No. 81-7.) Seguin is the custodian of records maintained by CORC. *Id.* at ¶ 2. The CORC database contains files on inmate appeals to CORC for the current year and the previous four calendar years. *Id.* at ¶ 7. Seguin reviewed the CORC database for appeals related to Plaintiff's claim in this

action and determined that he has never appealed a grievance to CORC. *Id.* at ¶¶ 10-11 and pp. 7-8.

The Court finds that the Reams declaration is deficient in showing that Plaintiff failed to file grievances with regard to any of the missed meals since it indicates only that her review of the grievance office records showed that Plaintiff did not file a grievance related to "a denial of meals on six occasions between August 3, 2016 and October 3, 2016." (Dkt. Nos. 81-3 at 38-39; 81-9 at ¶ 13.) However, inasmuch as the Seguin declaration and attached printouts from the CORC database establish that Plaintiff has never filed any appeals with CORC, the Court finds that Defendants have met their burden of establishing that Plaintiff failed to exhaust his administrative remedies with regard to his Eighth Amendment conditions of confinement claim that he was deprived of five meals by Defendants. *See [Jones, 549 U.S. at 218, 127 S.Ct. 910](...)* (proper exhaustion under the PLRA means using all steps required by the applicable administrative review process).

#### 2. Plaintiff's Failure to Sustain His Burden on Availability

The Court also finds that Plaintiff has failed to submit nonconlusory evidence of unavailability under *[Ross](...)* sufficient to raise a material issue of fact on the question of availability of the DOCCS IGP. In his amended complaint, Plaintiff alleges "... also at Fishkill my SHU appel mail was not go out and my grievance was not go out I was denied food at Fishkill five times in the SHU...." (Dkt. No. 19 at 9.) Plaintiff further alleges "[o]n August 3, 2016 I was transfer from Green facility to Fishkill facility I don't know if Green facility write note to Fishkill facility because same day on June 3, 2016 [August 3, 3016?] I was denied chow the next day I was denie on June 4, 2016 [August 4. 2016?] I write grievance I never receive my grievance respond...." *Id.* at 11.

At his deposition, Plaintiff testified he filed grievances for "any matter that's not procedure" and "for [his] right" and never received a response. (Dkt. No. 81-3 at 60.) According to Plaintiff, he filed grievances regarding missed meals at Fishkill. *[Id.](...)* at 73. Plaintiff described the procedure followed in the Fishkill SHU whereby inmates give grievances to the corrections officer who comes around and drops the grievances in a basket and claims that the officers only send out the mail they want to send out. *[Id.](...)* at 74. Plaintiff claims to have filed grievances all the time and believes that they

2018 WL 4610686

probably did not go out because he never received a response. *Id.*

Plaintiff testified he wrote to the superintendent about the food situation because he had not heard back from the I.G.R.C. *Id.* at 75. The superintendent wrote back and told him to appeal his decision. *Id.* at 78. According to Plaintiff, the superintendent told him to appeal to CORC regarding how many times he was denied food in SHU, so he wrote to CORC and retained a copy as was his practice and never received a response. *Id.* at 77-78.

In his declaration in reply to the Reams declaration, Plaintiff states that the Fishkill grievance office failed to respond to his grievance of the Eighth Amendment violation. (Dkt. No. 84-1 at 2.) In his declaration in response to the Cieslak declaration, Plaintiff states that Cieslak never filed or responded to any of Plaintiff's grievances at Mohawk. *Id.* at 4. In his declaration in response to the Seguin declaration, the only grievance referenced is a grievance dated June 21, 2017. *Id.* at 6. Although not admissible evidence, Plaintiff repeats in his response to Defendants' material statement of facts that his grievances regarding being denied meals were taken but not sent to the grievance office. (Dkt. No. 84 at ¶ 54.)

**\*8** Plaintiff has done nothing more than allege in conclusory fashion that he attempted to file one or more grievances concerning the denial of meals. He has provided no evidence that he actually did write grievances; when they were written; the content of the grievances, including the specific denial of meals involved in the grievance; the officers named in the grievance(s) as involved in the denials; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office at Fishkill regarding the grievances. Plaintiff has submitted no documentary evidence whatsoever that supports his conclusory assertion that he submitted grievances regarding the denial of meals or demonstrates any follow up on his part when he allegedly received no response.

The Court concludes that Plaintiff's conclusory accusations that the DOCCS IGP was unavailable to him because his grievances were not sent to the grievance office by the officers who picked them up and because he did not receive a response from CORC, unsupported by evidence, are insufficient to withstand summary judgment. *See Rodriguez v. Cross,* No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at \*7 (N.D.N.Y. May 9, 2017) ("Courts in this Circuit have consistently held that mere contentions or speculations

of grievances being misplaced by officers do not create a genuine issue of material fact [on the availability of the DOCCS IGP] when there is no evidence to support the allegations"); *Khudan v. Lee,* No. 12-cv-8147 (RJS), 2016 WL 4735364, at \*6 (S.D.N.Y. Sept. 8, 2016) ("Plaintiff's accusations [regarding grievances], which 'stand alone' and are 'unsupported,' are insufficient to withstand summary judgment") (quoting *Bolton v. City of New York,* No. 13-CV-5749 (RJS), 2015 WL 1822008, at \*2 (S.D.N.Y. April 20, 2015) ).

Based upon the foregoing, the Court recommends that all three Defendants be granted summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies with regard to his Eighth Amendment claim.

**VI. Eighth Amendment Claim Regarding Missed Meals**
The Court is recommending that Defendants be granted summary judgment on exhaustion grounds. However, if the Court were to consider Defendants claim for entitlement to judgment as a matter of law, it would recommend summary judgment as a matter of law on Plaintiff's Eighth Amendment conditions of confinement claim as well.

**A. Legal Standard for Eighth Amendment Conditions of Confinement Claims for Depriving an Inmate of Meals**
The Eighth Amendment "imposes the constitutional limitation upon punishments: they cannot be 'cruel and unusual.' " *Rhodes v. Chapman,* 452 U.S. 337, 345, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The Eighth Amendment prohibits punishments which "involve the unnecessary and wanton infliction of pain." *Id.* at 346, 101 S.Ct. 2392 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ). "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.' " *Id.* (quoting *Gregg,* 428 U.S. at 183, 96 S.Ct. 2909).

The Second Circuit has held that the Constitution requires that prisoners be fed nutritionally adequate food and "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir. 1983); *see also Jackson v. Marks,* 722 F. App'x 106, 107 (2d Cir. 2018) (Mem) ("[A] substantial deprivation of food can cause serious physical harm sufficient to find cruel and unusual punishment

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 152 of 306

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)
2018 WL 4610686

in violation of the Eighth Amendment.") (citation and internal quotation marks omitted).

In order to establish a claim that the denial of food constitutes an Eighth Amendment violation, a prisoner must establish that a "sufficiently serious condition" resulted from not receiving food. *Evans v. Albany County Correctional Facility*, No. 9:05-CV-1400 (GTS), 2009 WL 1401645, at *9 (N.D.N.Y. May 14, 2009) (citation and internal quotation marks omitted). To prove a conditions of confinement claim, a prisoner must also establish that defendant acted with deliberate indifference that defendant "knows of and disregards an excessive risk to inmate health or safety." *Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ). "[T]he [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that inference." *Id.* at 186 (quoting *Farmer, id.*). The "deliberate indifference" element is equivalent to standard of "recklessness" as used in criminal law. *Id.*

### B. Analysis

**\*9** Plaintiff claims to have missed a total of five meals over a period of fifty-three days as a result of the actions of the Defendants and never to have missed more than one meal on a given day. (Dkt. No. 81-3 at 19, 21, 26-27, 80.) Plaintiff contends Defendant Burgess denied him dinner on August 3 and August 4, 2016; Montgomery denied him lunch on September 10, 23, and 24, 2016; and Lopez with Montgomery denied him lunch on September 24, 2016. (Dkt. No. 81-3 at 19, 21, 27, 32-33, 42, 44, 55-56.) Neither Burgess nor Montgomery has any recollection of interactions with Plaintiff on the days he was allegedly denied meals. (Dkt. Nos. 81-4 at ¶ 20; 81-5 at ¶ 5.)

According to Lopez, she only withheld a meal from Lopez on one occasion because he was lying on his bed under a sheet either asleep or pretending to be asleep. (Dkt. No. 81-6 at ¶¶ 11, 16.) Lopez did not deliver his meal because he was not standing at his door fully dressed as required. *Id.* at ¶ 12. A review of the logbook by Lopez revealed that the denial occurred on September 24, 2016. *Id.* at ¶¶ 14-15. Lopez stated in her declaration that it was not uncommon for Plaintiff to pretend to be asleep during meals so that he could then allege he had been denied the meal and use the allegations to be disrespectful to officers and rile up the inmates. *Id.* at ¶ 13.

The Court finds that denying Plaintiff a single meal, as alleged against Lopez, does not rise to the level of a violation of Plaintiff's rights under the Eighth Amendment. *See Cabassa v. Oshier*, No. 9:11-CV-01237 (MAD/CFH), 2015 WL 5094802, at *5 (N.D.N.Y. Aug. 28, 2015) (denial of a single meal fails to plausibly state an Eighth Amendment claim); *Pagan v. Quiros,* No. 3:11-cv-1134 (DJS), 2014 WL 1057016, at *6 (D. Conn. Mar. 18, 2014) (holding that allegation of denial food and drink at one meal "does not constitute a substantial or sufficiently serious deprivation of a basic human need"); *Hankerson v. Nassau County Correctional Facility*, No. 12-CV-5282 (SJF) (WDW), 2012 WL 6055019, at *4 (E.D.N.Y. Dec. 4, 2012) (holding that denial of a single meal "falls far short of a 'substantial deprivation of food' and does not give rise to the level of a constitutional deprivation.").

The Court likewise concludes that Burgess's alleged denial of Plaintiff's dinner on August 3 and 4, 2016, and Montgomery's alleged denial of Plaintiff's lunch on September 10, 23, and 24, 2016, did not rise to the level of a violation of Plaintiff's rights under the Eighth Amendment. One missed meal a day has been found insufficient to establish an Eighth Amendment claim. *See Benitez v. Locastro*, No. 04-CV-423, 2008 WL 4767439, at *7 (N.D.N.Y. Oct. 29, 2008) (claim of one missed meal a day insufficient to establish an Eighth Amendment claim); *Johnson v. Merriman*, No. 1:13-cv-00087-MP-GRJ, 2015 WL 1409529, at *4 (N.D. Fl., Gainesville Div. March 26, 2015) (where the most each of three defendants could have personally deprived plaintiff of meals was one meal a day for a period of three days, the denial of the meals was not sufficiently severe to rise to the level of a constitutional violation).

Moreover, Plaintiff has failed to submit evidence showing that a "sufficiently serious condition" resulted from not receiving food. *See Evans*, 2009 WL 1401645, at *9. Plaintiff testified at his deposition that he was hungry and emotionally frustrated as a result of not having dinner on August 3, 2016, after having failed to make himself breakfast and traveled all day with only a small lunch en route. (Dkt. No. 81-3 at 26.) Plaintiff was hungry and emotionally frustrated after not receiving lunch on September 10, 2016, as well. *Id.* at 37.

**\*10** In sum, the evidence supports a finding by the Court that the claimed denial of meals by each of the three Defendants falls short of that required to support an Eighth Amendment violation, and the evidence does not support a finding that

**Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)**

2018 WL 4610686

Plaintiff suffered a sufficiently serious condition from any of the three Defendants' denial of a meal or meals.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 81) be **GRANTED**; and it hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam* ). Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[10]  If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4610686

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| 1. **Docket 9:16-CV-00885**<br>Sankara v. The State of New York et al | — | N.D.N.Y. | July 19, 2016 | Docket |

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

1. Sankara v. Montgomery 👓
   2018 WL 4610686 , N.D.N.Y. , June 25, 2018

*Report and Recommendation Adopted by*

2. Sankara v. Montgomery
2018 WL 3408135 , N.D.N.Y. , July 13, 2018 , appeal dismissed (2d Cir. 18-2159) ( Nov 07, 2018 )

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3408135

2018 WL 3408135
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ahmadou SANKARA, Plaintiff,
v.
MONTGOMERY, Burgess and Lopez, Defendants.

9:16-CV-885 (FJS/TWD)
|
Signed 07/13/2018

**Attorneys and Law Firms**

AHMADOU SANKARA, 16-R-122, Coxsackie Correctional Facility, P.O. Box 999, Coxsackie, New York 12051, pro se.

OFFICE OF THE NEW YORK, STATE ATTORNEY GENERAL, OF COUNSEL, MATTHEW P. REED, AAG, The Capitol, Albany, New York 12224, Attorneys for Defendants.

**ORDER**

Frederick J. Scullin, Jr., Senior United States District Judge

**\*1** The sole remaining claim in this civil rights action is Plaintiff's Eighth Amendment conditions-of-confinement claim involving the alleged denial of meals against Defendants Keith Montgomery, a Department of Corrections and Community Supervision ("DOCCS") Sergeant at Fishkill Correctional Facility; Erik Burgess, a Corrections Officer at Fishkill Correctional Facility; and Jessica Lopez, a former Corrections Officer at Fishkill Correctional Facility.

Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff had failed to exhaust his administrative remedies and had not asserted a constitutional violation. *See* Dkt. No. 81. Plaintiff filed papers in opposition to Defendants' motion. *See* Dkt. No. 84.

In a Order and Report-Recommendation dated June 25, 2018, Magistrate Judge Dancks recommended that this Court grant Defendants' motion for summary judgment. *See* Dkt. No. 88. Specifically, after thoroughly reviewing the record, she concluded that Plaintiff had failed to exhaust his administrative remedies with regard to his Eighth

Amendment claim. *See id.* at 9-17. Alternatively, she found that summary judgment was warranted because the evidence fell "short of that required to support an Eighth Amendment violation, and the evidence [did] not support a finding that Plaintiff [had] suffered a sufficiently serious condition [as a result of the] denial of a meal or meals." *See id.* at 21.

On July 2, 2018, the Court received Plaintiff's objections to Magistrate Judge Danck's recommendations. *See* Dkt. No. 89.

After reviewing a magistrate judge's recommendations, the district court may accept, reject or modify those recommendations. *See* 28 U.S.C. § 636(b)(1). The court reviews *de novo* those portions of the magistrate judge's recommendations to which a party objects. *See Pizzaro v. Bartlett,* 776 F. Supp. 815, 817 (S.D.N.Y. 1991). " 'If, however, the party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error.' " " *McAllan v. Von Essen,* 517 F. Supp. 2d 672, 679 (S.D.N.Y. 2007) (quotation and other citations omitted).

Plaintiff's objections are, for the most part, general and conclusory. In addition, some of his objections do not refer to his Eighth Amendment claim but, rather, concern claims that this Court has already dismissed. Moreover, to the extent that Plaintiff objects to Magistrate Judge Dancks' recommendations regarding the issue of whether he exhausted his administrative remedies, Plaintiff basically makes the same arguments that he made in opposition to Defendants' motion for summary judgment, which Magistrate Judge Dancks thoroughly reviewed and found no evidence to support Plaintiff's contention that he had filed grievances regarding the denial of meals.

Alternatively, the Court notes that, even if it were to find that Plaintiff had exhausted his administrative remedies with regard to denial of his meals, Defendants would still be entitled to summary judgment on Plaintiff's claim because, as Magistrate Judge Dancks thoroughly explained, the denial of five meals over the course of fifty-three days does not rise to the level of a violation of Plaintiff's Eighth Amendment rights; and, furthermore, the evidence does not support a finding that Plaintiff suffered a sufficiently serious condition as a result of Defendants' denial of those meals.

**\*2** Accordingly, having reviewed the entire file in this matter, Magistrate Judge Dancks' June 25, 2018 Order and

Report-Recommendation, and Plaintiff's objections thereto, as well as the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Dancks' June 25, 2018 Order and Report-Recommendation, *see* Dkt. No. 88, is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 81, is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3408135

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:16-CV-00885**<br>Sankara v. The State of New York et al | — | N.D.N.Y. | July 19, 2016 | Docket |

**WESTLAW** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

1.  Sankara v. Montgomery 👓
2018 WL 4610686 , N.D.N.Y. , June 25, 2018

*Report and Recommendation Adopted by*

2.  Sankara v. Montgomery
2018 WL 3408135 , N.D.N.Y. , July 13, 2018 , appeal dismissed (2d Cir. 18-2159) ( Nov 07, 2018 )

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 161 of 306

Simpson v. Price, Not Reported in Fed. Supp. (2022)
2022 WL 336540

2022 WL 336540
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James SIMPSON, Plaintiff,
v.
R. PRICE, C.O., Defendant.

9:19-CV-1413 (MAD/ATB)
|
Signed 02/04/2022

**Attorneys and Law Firms**

JAMES SIMPSON, 18-B-0295, Cayuga Correctional
Facility, P.O. Box 1186, Moravia, New York 13118, Plaintiff
pro se.

OF COUNSEL: KONSTANDINOS D. LERIS, AAG,
OFFICE OF THE NEW YORK, STATE ATTORNEY
GENERAL, The Capitol, Albany, New York 12224,
Attorneys for Defendant.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

 **\*1** On November 15, 2019, Plaintiff, an inmate in the
custody of the New York State Department of Corrections
and Community Supervision ("DOCCS"), filed his original
complaint in this matter pursuant to 42 U.S.C. § 1983.
*See* Dkt. No. 1. On January 3, 2020, the Court dismissed
the complaint on initial review and permitted Plaintiff an
opportunity to file an amended complaint. *See* Dkt. No. 4.
Plaintiff filed his amended complaint on January 21, 2020,
which the Court accepted for filing to the extent that it
asserted an Eighth Amendment excessive force claim against
Defendant Price stemming from events that occurred on
August 9, 2019. *See* Dkt. Nos. 5 & 8. Plaintiff was granted
leave to file a second amended complaint on September 24,
2020, and the second amended complaint was accepted for
filing to the extent that it asserted an additional excessive
force claim against Defendant arising from events that
occurred on October 10, 2018. *See* Dkt. No. 29.

On August 24, 2021, Defendant moved for summary
judgment. *See* Dkt. No. 41. On September 9, 2021,
Plaintiff responded to Defendant's motion. *See* Dkt. No. 43.
In a Report-Recommendation dated December 29, 2021,
Magistrate Judge Baxter recommended that the Court grant
Defendant's motion in its entirety and dismiss this case.
*See* Dkt. No. 46. In his Report-Recommendation, Magistrate
Judge Baxter first found that Defendant was not personally
involved in the October 10, 2018 incident. *See id.* at 9. As to
the August 9, 2019 excessive force claim, Magistrate Judge
Baxter initially found that dismissal is appropriate because
Plaintiff failed to exhaust his administrative remedies. *See
id.* at 13-21. Alternatively, Magistrate Judge Baxter found
that the claim should be dismissed on the merits because
Plaintiff failed to establish both the subjective and objective
components of an Eighth Amendment excessive force claim.
*See id.* at 23-26.

In objections received on January 13, 2022, Plaintiff argues,
in an entirely conclusory manner, that he has set forth a valid
Eighth Amendment excessive force claim. *See* Dkt. No. 47 at
1-4. Additionally, Plaintiff contends that he was not required
to exhaust his claim stemming from the events on August 9,
2019 because of the "futility exception." *Id.* at 2. As set forth
below, Defendant's motion for summary judgment is granted
in its entirety.

**II. BACKGROUND**

For a complete recitation of the relevant factual background,
the parties are referred to Magistrate Judge Baxter's
December 29, 2021 Report-Recommendation. *See* Dkt. No.
46.

**III. DISCUSSION**

**A. Standard of Review**
When a party files specific objections to a magistrate judge's
report-recommendation, the district court "make[s] a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." 28 U.S.C. § 636(b)(1)(C). However, when a party
files "[g]eneral or conclusory objections, or objections which
merely recite the same arguments [that he] presented to the
magistrate judge," the court reviews those recommendations
for clear error only. *O'Diah v. Mawhir*, No. 9:08-CV-322,
2011 WL 933846, \*2 (N.D.N.Y. Mar. 16, 2011) (citations

2022 WL 336540

and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**\*2** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* (quoting *Anderson*, 477 U.S. at 252 (emphasis and alterations in original)). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' ... and they 'may not rely on conclusory

allegations or unsubstantiated speculation.' " *Id.* (quotations omitted).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment." *Kotler v. Fischer*, No. 9:09-CV-01443, 2012 WL 929823, \*12 (N.D.N.Y. Mar. 19, 2012) (citations omitted). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### B. October 10, 2018 Incident

In his second amended complaint, Plaintiff alleges that on October 10, 2018, he had a medical appointment outside of Cayuga Correctional Facility ("Cayuga C.F."). *See* Dkt. No. 30 at 2. Plaintiff informed the correctional officers responsible for his transport that the leg irons that he was placed in were too small for his ankles. *See id.* The officers ignored Plaintiff's complaints, resulting in severe bruises and aggravation of an open wound on his ankle. *See id.*

**\*3** In its initial review of Plaintiff's second amended complaint, the Court read the pleading as alleging that Defendant Price was one of the officers who transported Plaintiff to his medical appointment on October 10, 2018. *See* Dkt. No. 29 at 3. At Plaintiff's deposition, however, he confirmed that Defendant Price was not involved in the October 10, 2018 incident. *See* Dkt. No. 41-1 at 41. Since Defendant Price was not present at the time of the October 10, 2018 incident, the undisputed facts demonstrate that he was not personally involved in any constitutional violation. As such, Magistrate Judge Baxter correctly determined that this claim must be dismissed due to Defendant's lack of personal involvement. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

### C. August 9, 2019 Incident

Simpson v. Price, Not Reported in Fed. Supp. (2022)

2022 WL 336540

### 1. Exhaustion of Administrative Remedies

As Magistrate Judge Baxter correctly determined, the excessive force claim stemming from the incident on August 9, 2019 should be dismissed due to Plaintiff's failure to exhaust. The undisputed facts before the Court establish that there is no record of a grievance being filed regarding this incident and that, even if such a grievance was filed, the denial of the grievance was not appealed to the CORC. See Dkt. No. 46 at 13-15; Dkt. No. 41-3; Dkt. No. 41-4. Plaintiff attempts to argue that the grievance process was unavailable to him, but his explanations/arguments have evolved over time and are insufficient to establish his burden of demonstrating unavailability, as fully explained by Magistrate Judge Baxter. See Dkt. No. 46 at 13-20. Plaintiff has provided no specifics regarding when the alleged grievances were written, their content, or the steps that he took to provide them to an officer to send to the grievance office. Additionally, Plaintiff has failed to provide the Court with any documentary evidence to corroborate that he attempted to file a grievance, such as follow-up correspondence after his release from SHU. As such, the Court finds that Plaintiff's conclusory allegations are insufficient to defeat summary judgment. See Sankara v. Montgomery, No. 9:16-cv-885, 2018 WL 4610686, *8 (N.D.N.Y. June 25, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances; ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office"). Plaintiff's objections to Magistrate Judge Baxter's Report-Recommendation simply reiterate his belief that administrative remedies were unavailable to him in an entirely conclusory fashion. See Dkt. No. 47 at 2.

Accordingly, the Court's Defendant's motion for summary judgment as to this claim based on Plaintiff's failure to exhaust the available administrative remedies.

### 2. Merits

Magistrate Judge Baxter also correctly found, in the alternative, that Plaintiff's excessive force claim relating to the August 9, 2019 incident should be dismissed on the merits. This incident again involves the application of leg irons on Plaintiff while he was being transported that were allegedly

too small and caused a wound to reopen, resulting in an infection. See Dkt. No. 46 at 23.

According to the undisputed facts, on August 9, 2019, Plaintiff had an appointment at SUNY Upstate Medical University at 9:45 a.m. See Dkt. No. 41-2 at ¶¶ 10-11. Plaintiff was required to arrive at the departure location at Cayuga C.F. no later than 8:15 a.m. for an 8:30 a.m. departure. See id. at ¶¶ 11-12. Plaintiff arrived at the transport location at 8:45 a.m., at which point he was frisked and then placed in the transport van. See id. at ¶¶ 13-14. Once Plaintiff was placed in the van, Defendant attempted to place standard-sized ankle restraints on Plaintiff, which Plaintiff refused. See id. at ¶ 15. Plaintiff told Defendant that he would not wear the standard-sized restraints, and that he had a permit for "big boy" cuffs to ease the pressure placed on chronic wounds on his ankles and feet. See id. at ¶ 17. At this point, Defendant stopped attempting to place the standard-sized leg restraints on Plaintiff and contacted the area supervisor. See id. at ¶ 21. Defendant and the supervisor then escorted Plaintiff from the van to the infirmary, where Plaintiff spoke with Nurse Giovannetti. See id. at ¶ 22. Nurse Giovannetti placed a gauze bandage around one of Plaintiff's ankles and, at this point, Plaintiff agreed to continue on the medical trip. See id. at ¶ 23.

**\*4** Additionally, while at the infirmary, Defendant and the supervisor checked with the Deputy Superintendent's Office and Medical Office for any documentation concerning a permit approving Plaintiff for larger restraints. See id. at ¶ 24. Neither office found any documentation and, therefore, it was determined that standard-sized ankle restraints would be used. See id. Upon returning to the van, Plaintiff permitted Defendant to apply the standard-sized restraints without further complaint. See id. The delay caused by the trip to the infirmary and checking for the existence of the permit resulted in Plaintiff arriving for his medical appointment thirty-five minutes after the scheduled arrival time. See id. at ¶ 26.

As Magistrate Judge Baxter correctly determined, the undisputed facts, beyond Plaintiff's own conclusory assertions, demonstrate that the alleged force was not employed in a sadistic or malicious manner intending to cause harm. As such, he has failed to satisfy the subjective prong of his excessive force claim. See Chambliss v. Rosini, 808 F. Supp. 2d 658, 669 (S.D.N.Y. 2011) (citation omitted). Moreover, Plaintiff has failed to satisfy the objective prong of his excessive force claim since he has alleged only de minimis injury without any plausible allegations of wantonness or maliciousness. See Livingston v. Hoffnagle,

2022 WL 336540

No. 9:19-cv-353, 2019 WL 7500501, *4 (N.D.N.Y. Nov. 8, 2019) (listing cases); *see also Burroughs v. Mitchell,* 325 F. Supp. 3d 249, 265 (N.D.N.Y. 2018) (dismissing the *pro se* inmate's excessive force claim where he alleged only that the defendants "handcuffed him tightly, which caused cuts to his wrist").

Based on the foregoing, the finds that Defendant is entitled to summary judgment on this alternative ground.

### IV. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Baxter's December 29, 2021 Report-Recommendation (Dkt. No. 46) is **ADOPTED in its entirety** for the reasons set forth therein; and the Court

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 41) is **GRANTED in its entirety**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; [1] and the Court further

[1]    In a one-page letter motion dated January 18, 2022, Plaintiff asks the Court "for permission for the defendant to take a voice analysis with my question, about the event that happen [sic] at my cost." Dkt. No. 48. It is entirely unclear what Plaintiff is seeking in this letter motion. However, since the Court has granted Defendant's motion for summary judgment in its entirety, this letter motion is denied as moot.

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 336540

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 9:19-CV-01413**<br>Simpson v. Cayuga Correctional Facility | — | N.D.N.Y. | Nov. 15, 2019 | Docket |

**History (8)**

**Direct History (2)**

1. Simpson v. Price
2021 WL 7367083 , N.D.N.Y. , Dec. 29, 2021

*Report and Recommendation Adopted by*

2. Simpson v. Price
2022 WL 336540 , N.D.N.Y. , Feb. 04, 2022

**Related References (6)**

3. Simpson v. Cayuga Correctional Facility
2020 WL 8714804 , N.D.N.Y. , Jan. 03, 2020

4. Simpson v. Cayuga Correctional Facility
2020 WL 8714786 , N.D.N.Y. , Mar. 17, 2020

5. Simpson v. Price
2020 WL 8714784 , N.D.N.Y. , July 09, 2020

6. Simpson v. Price
2020 WL 8714783 , N.D.N.Y. , Aug. 14, 2020

7. Simpson v. Price
2020 WL 8714785 , N.D.N.Y. , Sep. 24, 2020

8. Simpson v. Price
2020 WL 8714787 , N.D.N.Y. , Oct. 22, 2020

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2121655

2019 WL 2121655
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Gerard JENKINS, Plaintiff,
v.
Correction Officer J. CORDERO, Correction
Officer Mayfield, Hearing Officer: Assistant Deputy
Superintendent of Programs J. Wood, Defendants.

17 Civ. 1592 (JCM)
|
Signed 05/15/2019

**Attorneys and Law Firms**

Gerard Jenkins, Otisville, NY, pro se.

Jeb Harben, Kacie Alina Lally, Office of the Attorney
General, New York, NY, for Defendants.

**OPINION AND ORDER**

JUDITH C. McCARTHY, United States Magistrate Judge

 **\*1** Plaintiff Gerard Jenkins ("Plaintiff") proceeding *pro
se* commenced this action pursuant to 42 U.S.C. § 1983
alleging violations of his Eighth Amendment and Fourteenth
Amendment rights.[1] (Docket No. 2). The Court held an
evidentiary hearing on January 30, 2019 on the issue of
whether Plaintiff exhausted his administrative remedies under
the Prison Litigation Reform Act ("PLRA"). The parties
submitted post-hearing briefs.[2] For the reasons set forth
below, after hearing the testimony and considering the post-
hearing briefs, the Court finds that Plaintiff has satisfied the
exhaustion requirements of the PLRA.

[1]    This action is before this Court for all purposes on
       the consent of the parties, pursuant to 28 U.S.C. §
       636(c). (Docket No. 47).

[2]    The parties' briefs are hereinafter referred to as
       "Pl. Br." and "Defs. Br." respectively. (Docket Nos.
       68, 72). All page number citations refer to the one
       assigned upon electronic filing.

**I. BACKGROUND**

**A. Procedural Background**
On March 2, 2017, Plaintiff filed a complaint alleging (i)
correction officers Cordero and Mayfield used excessive
force against him while he was incarcerated at Sing Sing
Correctional Facility ("Sing Sing"); and (ii) defendant Deputy
Superintendent of Programs Wood violated his due process
rights by improperly disciplining him on allegedly false
charges. (Docket No. 2). Defendants moved to dismiss
the complaint against them claiming that Plaintiff failed
to exhaust his administrative remedies with respect to his
Eighth Amendment claim and did not plausibly allege
his Fourteenth Amendment claim. (Docket No. 14). The
Honorable Vincent L. Briccetti denied the motion to dismiss
as to the Eighth Amendment excessive force claim against
defendants Cordero and Mayfield, holding that dismissal for
failure to exhaust administrative remedies was unwarranted at
the pleading stage. *Jenkins v. Cordero*, No. 17 Civ. 1592 (VB),
2018 WL 456311, at \*3 (S.D.N.Y. Jan. 17, 2018).[3] Judge
Briccetti granted the motion to dismiss as to the Fourteenth
Amendment claim against defendant Wood, finding that
Plaintiff failed to plausibly allege this claim. *Id.* at \*3-4.

[3]    In accordance with *Lebron v. Sanders*, 557 F.3d
       76 (2d Cir. 2009) and Local Rule 7.2 of the Local
       Civil Rules of the United States District Courts for
       the Southern and Eastern Districts of New York,
       a copy of this case and other cases, *infra*, that
       are unpublished or only available by electronic
       database, accompany this opinion and shall be
       simultaneously delivered to *pro se* Plaintiff.

Following the close of discovery, Defendants requested an
evidentiary hearing to determine whether Plaintiff exhausted
his administrative remedies given the dispute over whether
Plaintiff ever attempted to file a grievance within the
timeframe required by the Department of Corrections and
Community Supervision ("DOCCS"). (Docket No. 36). Judge
Briccetti granted Defendants' request for an evidentiary
hearing, and the parties subsequently consented to proceed
before the undersigned for all purposes. (Docket No. 47). This
Court held an evidentiary hearing on January 30, 2019, and
the parties submitted post-hearing briefs.

**B. Factual Background**
 **\*2** Plaintiff alleges that on August 31, 2015 he was assaulted
by CO Cordero and CO Mayfield while his wife was visiting
him at Sing Sing. (Compl.; Tr. 110:11-14). CO Cordero filed
a misbehavior report against Plaintiff, and after a disciplinary

Jenkins v. Cordero, Not Reported in Fed. Supp. (2019)
2019 WL 2121655

hearing, Plaintiff was placed in the special housing unit ("SHU"). [4] (Compl. Ex. A; Tr. 110:15-21). Plaintiff testified that on September 2, 2015, while he was in the SHU, he submitted a grievance related to the alleged assault. (Tr. 103:20-104:4, 112:2-10; Defs. Ex. 1). Plaintiff claims that after he did not receive a response or a grievance number, he submitted a second grievance on October 5, 2015. (Tr. 112:5-7; Defs. Ex. 1). Plaintiff testified that in both instances, he submitted the grievances while in the SHU by handing his grievances to the correction officer who came around with the daily mailbox. (Tr. 111:7-112:18). At the evidentiary hearing, Plaintiff did not know the identity of the correction officer he gave his September 2, 2015 grievance to, but he described her as a tall female correction officer whose name began with the letter R. (*Id.* at 119:19-20; 115:24-116:8). Plaintiff could not recall if the same correction officer picked up the grievance on October 5, 2015, but he recalled giving his grievance to a female correction officer. (*Id.* at 122:2-124:4).

[4]    Plaintiff appealed the results of his disciplinary hearing, and the director of inmate disciplinary programs reversed the disciplinary determinations on February 13, 2017. (Compl. Ex. C).

Plaintiff was released from the SHU on November 10, 2015. (Tr. 112:13-15). Upon his release, he asked inmate Vincent Warren, the prison grievance representative, about the status of his grievances. (Defs. Ex. 1). Mr. Warren told Plaintiff that he remembered filing his grievance, but later informed him that the grievance had not been filed. (*Id.*). According to Plaintiff, on November 24, 2015, he spoke with the grievance supervisor, Quandera Quick, who informed Plaintiff that his grievances had not been received and the time to file them had passed. (*Id.*). That same day Plaintiff submitted another grievance concerning the procedures used for collecting grievances and indicated that his grievances were not being filed. (*Id.*).

At the evidentiary hearing, Ms. Quick explained that there are two ways an inmate housed in the SHU can file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). (Tr. 20:18-21). First, the inmate could "hand-deliver the grievance to the Grievance Sergeant while he or she makes rounds." (*Id.*). Second, the inmate could "place [the grievance] in the mailbox that's in the housing unit." (*Id.*). With respect to the second option, Ms. Quick explained that a correction officer will bring the mailbox around to the entire facility, including the SHU, and then bring the mailbox to the mailroom, who in turn sends any grievances to the grievance

office. (*Id.* at 21:2-18). In this case, Plaintiff testified that he used the second method of filing a grievance when he handed his grievance to the correction officer assigned to general mail collection in the SHU. (*Id.* at 111:7-112:18).

Ms. Quick explained that once the grievance office receives a grievance, she processes it in accordance with Directive 4040. (Tr. 15:6-9). Specifically, Ms. Quick reviews the grievance, codes it based on the nature of the allegations, and then gives it to the grievance clerk to assign a grievance number that is entered into a computer database. (*Id.* at 15:9-16:7). Once a grievance is given a number and entered into the database, it is considered filed. (*Id.* at 16:6-8).

Ms. Quick testified that she had no recollection of receiving or filing the subject grievances from Plaintiff. (Tr. 26:11-18). She also reviewed the grievance office's database and confirmed that Plaintiff's alleged grievances from September 2, 2015 and October 5, 2015 had not been filed. (Tr. 33:2-5; Defs. Ex. 3). Ms. Quick did, however, receive Plaintiff's November 24, 2015 grievance, in which he stated that his grievances were not being filed. (Tr. 26:22-25; Defs. Ex. 1). Upon receiving Plaintiff's November 24, 2015 grievance, Ms. Quick consulted with Mr. Warren about whether the grievance office had received Plaintiff's prior grievances. (Tr. 29:14-30:2). On December 1, 2015, Mr. Warren wrote a letter to Ms. Quick stating that he had never seen the grievances Plaintiff was asking about. (Defs. Ex. 2). However, Mr. Warren recanted the statement in his letter at the evidentiary hearing and testified that he wrote that he had never seen Plaintiff's grievance because he was afraid of being fired from his position at the grievance office if he admitted that he saw the grievance. (Tr. 67:18-68:3, 76:22-77:20).

**\*3** Inmate John Hale, who served as a grievance file clerk at the time, also testified that he remembered seeing a grievance concerning an assault that took place on the visit floor with CO Cordero, but he could not remember if the grievance was the November 24 grievance or the September 2 or October 5 grievances. (Tr. 100:7-102:8).

## II. LEGAL STANDARDS
The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," therefore "foreclosing judicial discretion."

2019 WL 2121655

*Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). "[P]roper exhaustion ... means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Hernandez v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (citing *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)). "The exhaustion inquiry thus requires that we look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009).

In New York State, a prisoner must comply with the rules of New York's Inmate Grievance Program ("IGP"). To exhaust a claim, a prisoner must complete the following three steps: (1) submit a complaint to the clerk of the facility's IGRC within twenty-one days of the alleged incident; (2) appeal an adverse decision to the superintendent of the facility within seven days of receipt of the IGRC's written response; and (3) appeal an unfavorable decision by the superintendent to the Central Office Review Committee within seven days of receipt of the superintendent's written response. 7 N.Y.C.R.R. § 701.5. A prisoner who has not received a response within the prescribed timeframe may appeal to the next level. *Id.* § 701.6(g)(2).

Because Plaintiff's failure to exhaust administrative remedies is an affirmative defense, Defendants bear the initial burden of establishing that a grievance process existed and applied to the alleged dispute. *See Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015). Defendants can meet their burden by "pointing to 'legally sufficient source[s]' such as statutes, regulations or grievance procedures." *Id.* (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003)). If Defendants satisfy their initial burden, the burden shifts to Plaintiff to demonstrate "that other factors ... rendered a nominally available procedure unavailable as a matter of fact." *Id.*

In *Ross*, the United States Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, an administrative procedure is unavailable when "prison administrators thwart

inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

**\*4** Shortly after the Supreme Court's decision in *Ross*, the Second Circuit elaborated upon the "opaqueness" exception in *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016). In *Williams*, an inmate housed in the SHU satisfied the PLRA's exhaustion requirement when he handed a grievance to a correction officer who then failed to file it. The Second Circuit explained that "[o]n their face, the regulations only contemplate appeals of grievances that were actually filed." *Id.* at 124. Because the plaintiff's grievance was not filed, it was "practically impossible for him to ascertain whether and how he could pursue his grievance." *Id.* Therefore, the Second Circuit concluded that "the regulatory scheme ... [was] 'so opaque' and 'so confusing' that ... no reasonable prisoner can use [it].' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859). Since *Williams*, numerous courts in this Circuit have followed its reasoning when assessing the "inescapable quandary that inmates find themselves in when their grievances are not filed." *McRae v. Cordero*, No. 15 Civ. 4334 (NSR)(PED), 2018 WL 3611964, at *6 (S.D.N.Y. July 26, 2018); *see also Ortiz v. Annucci*, No. 17 Civ. 3620 (RJS), 2019 WL 1438006, at *8 (S.D.N.Y. Mar. 29, 2019) ("If, in fact, Plaintiff timely attempted to file his grievance by handing it to an officer while in SHU and that officer failed to file the grievance, Plaintiff's avenues for pursuing the grievance would be unavailable under *Williams*, excusing him from any further exhaustion requirements."); *Terry v. Hulse*, No. 16 Civ. 252 (KMK), 2018 WL 4682784, at *9-10 (S.D.N.Y. Sept. 28, 2018); *Jackson v. Downstate Corr. Facility*, No. 16 Civ. 267 (NSR), 2018 WL 3650136, at *8 (S.D.N.Y. July 31, 2018).

## III. DISCUSSION

Defendants have met their initial burden of demonstrating that a grievance process existed and applied to the instant dispute. *See* 7 N.Y.C.R.R. § 701.5. The Court next addresses whether that grievance process was unavailable to Plaintiff within the meaning of the framework established by *Ross*.

Plaintiff argues that he has demonstrated the second *Ross* unavailability exception, the "opaqueness" exception. (Pl. Br. at 4). Plaintiff likens this case to *Williams*. He argues that he attempted to timely file his grievance regarding the August 31, 2015 incident while in the SHU by submitting his grievance through Sing Sing's mail system, which entails placing his grievance in the mailbox brought around by one of the correction officers on duty. (*Id.*). Plaintiff maintains that once he filed his grievance through Sing Sing's mailing

system it was "out of [his] hands" and the regulations do not describe a mechanism for appealing an unfiled grievance. (*Id.*).

The regulations analyzed by the Second Circuit in *Williams* are the same regulations as the ones here. 829 F.3d at 125-26 (citing 7 N.Y.C.R.R. §§ 701.5, 701.6, 701.8). Defendants do not contest the applicability of the *Williams* analysis to the instant case. Instead, they maintain that Plaintiff failed to complete any step of the grievance process and challenge his claim that he timely attempted to file a grievance while housed in the SHU. (Defs. Br. at 8-11). Defendants question Plaintiff's credibility, noting (1) Plaintiff had no issue filing other grievances while in the SHU; (2) Plaintiff did not explain why he inquired about the status of a separate grievance while failing to mention the September 2 and October 5 grievances; and (3) Plaintiff failed to adequately explain why he did not have copies of the grievances in question. (Defs. Br. at 10-11).

The pertinent factual issues that this Court must decide under *Williams* are whether Plaintiff attempted to file his grievance in the prescribed time and manner, and whether his grievances nonetheless remained unfiled.

### A. Plaintiff Attempted to File His Grievance Using the Proper Administrative Procedures

Plaintiff was initially required to submit a grievance to IGRC within twenty-one days of the August 31, 2015 incident. The Court credits Plaintiff's testimony that he attempted to file a grievance while in the SHU within the twenty-one-day period for several reasons. Plaintiff gave specific details about how on September 2, 2015, he handed the grievance to the correction officer who came around with the mailbox and did so again on October 5, 2015 when he did not receive a grievance number. Plaintiff's account was consistent with Ms. Quick's description of the procedure for filing a grievance from within the SHU. The Court bases its credibility determination in part on Plaintiff's demeanor, body language and tone of voice during his testimony. Other facts in the record further support a finding that Plaintiff attempted to file his grievance within the mandated timeframe. For example, once Plaintiff was released from the SHU, he immediately followed up with the inmate grievance representative about the status of his grievances, and he then raised his prior grievances with the civilian grievance supervisor to see if they were ever filed. Furthermore, Plaintiff's testimony that he handed his grievance to the correction officer on mail duty remained unrebutted. For example, CO Maribel Lopez, the correction officer Defendants called to testify that Plaintiff

did not attempt to mail a grievance while in the SHU, could not recall if she was the correction officer assigned to mail collection on the dates in question. (Tr. 57:1-11; 58:3-4).

**\*5** The evidence cited by Defendants that Plaintiff failed to exhaust his administrative remedies does not undermine Plaintiff's testimony. First, the evidence that Plaintiff filed other grievances while in the SHU shows that Plaintiff knew how to competently follow the correct grievance procedures available to him. *See Ortiz*, 2019 WL 1438006, at \*9 ("If anything, Plaintiff's understanding of how the IGP process functions in the ordinary course bolsters the inference that the usual process did not unfold in this circumstance by suggesting that the filing failure did not result from Plaintiff's own ineptitude.").

Second, Defendants argue that Plaintiff's credibility is undermined by the fact that he filed a written complaint when he did not receive a grievance number in connection with a separate grievance regarding the Family Reunion Program ("FRP"), (Defs. Ex. 6), but he did not file a similar complaint with respect to the September 2 and October 5 grievances. (Defs. Br. at 10). The Court showed Plaintiff Defendants' Exhibit 6 and asked him why he requested a number for the FRP grievance but did not include the September 2 grievance in his request. (Tr. 108:9-109:17). Plaintiff testified that he specifically requested a number for the FRP grievance because he was preparing for a hearing regarding the FRP incident. (*Id.*). However, he did not think of requesting a number for the September 2 grievance at that time. (*Id.*). In any event, Plaintiff submitted written complaints regarding his September 2 grievance once he learned it had not been filed, and he promptly spoke with members of the grievance office in person once he was released from the SHU. (*See* Defs. Exs. 1, 4).

Third, Defendants maintain that Plaintiff does not offer a sufficient explanation for why he does not have copies of the September 2 and October 5 grievances. (Defs. Br. at 11). However, the Court credits Plaintiff's explanation that he typically keeps copies of his grievances, but his property bag was lost during transit and he no longer has any of his paperwork. (Tr. 10:4-7; 125:8-12).

Accordingly, based on Plaintiff's credible testimony, the Court finds that Plaintiff attempted to timely file his grievance relating to the August 31, 2015 incident in accordance with proper administrative procedures.

Case 9:23-cv-00098-MJK   Document 144   Filed 03/04/26   Page 171 of 306

Jenkins v. Cordero, Not Reported in Fed. Supp. (2019)
2019 WL 2121655

**B. Plaintiff's Grievance Was Never Filed**

The evidence demonstrates that Plaintiff's grievances were not filed, even though he mailed his grievances in accordance with the IGP. Plaintiff did not know why his grievances were not filed, but once he mailed them, they were within DOCCS' possession and out of Plaintiff's control. [5] In such circumstances, the grievance process became unavailable to Plaintiff, thereby excusing him from pursuing further exhaustion requirements. *See Curtis v. Bola*, No. 15 Civ. 718 (GLS)(TWD), 2017 WL 6767392, at *13 (N.D.N.Y. Nov. 28, 2017), *report and recommendation adopted by*, No. 15 Civ. 718 (GLS)(TWD), 2018 WL 278673 (N.D.N.Y. Jan. 3, 2018) (the PLRA did not bar plaintiff's claims where he mailed his grievance in accordance with the IGP "and for reasons unknown to him and through no fault of his own, those [grievances] did not end up in the IGP files.").

[5]   At the evidentiary hearing, Mr. Warren testified that Ms. Quick, the civilian grievance supervisor, tampered with grievances and prevented certain grievances from being filed. (Tr. 66:24-67:17). Such actions, if they took place, would certainly render the grievance process unavailable to Plaintiff under both the second and third unavailability exceptions. Defendants spend a significant portion of their post-trial brief challenging Mr. Warren's testimony. There is insufficient evidence for the Court to make a factual finding that Plaintiff's grievances were intentionally destroyed. However, intent is not a requirement under the "opaqueness" unavailability exception enunciated by *Williams*. Thus, the absence of evidence that Plaintiff's grievances were willfully destroyed by a prison administrator does not defeat Plaintiff's claim that the grievance process was unavailable to him.

## IV. CONCLUSION

**\*6**  For the foregoing reasons, the Court finds that Plaintiff has met the PLRA's exhaustion requirement, and dismissal of his claim is not warranted. The Court schedules a Pre-Trial Conference for June 20, 2019 at 10:00 a.m. in Courtroom 421 in the United States Courthouse, 300 Quarropas Street, White Plains, New York 10601. Due to *pro se* Plaintiff's incarceration, Defendants are directed to arrange Plaintiff's telephonic participation at the aforementioned time and date. The Clerk of Court is directed to mail a copy of this order to the *pro se* Plaintiff.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2121655

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 7:17-CV-01592**<br>Jenkins v. Cordero et al | — | S.D.N.Y. | Mar. 02, 2017 | Docket |

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (1)**

1. Jenkins v. Cordero
2019 WL 2121655 , S.D.N.Y. , May 15, 2019

**Related References (1)**

2. Jenkins v. Cordero
2018 WL 456311 , S.D.N.Y. , Jan. 17, 2018

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)
2021 WL 3293504

2021 WL 3293504
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony RUCANO, Plaintiff,
v.
Anthony ANNUCCI, et al., Defendants.

No. 9:18-CV-218 (GTS/CFH)
|
Signed 05/19/2021

**Attorneys and Law Firms**

Anthony Rucano, Plaintiff pro se.

MATTHEW D. WAGONER, ESQ., The Wagoner Firm PLLC, 150 State Street, Suite 504, Albany, New York 12207, Attorneys for defendants, D. Venettozzi, A Rodriguez, Michael Kirkpatrick, D. Uhler, Lt. Durkin, R. Bishop, P. Devlin, G.T. King, J. Breyette, C.O. Tucker.

VINCENT M. MIRANDA, ESQ., JAMES PETER BLENK, ESQ., Lippes Mathias Wexler Friedman LLP, 50 Fountain Plaza, Suite 1700, Buffalo, New York 14202, Attorneys for defendant J. Kowalowski.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]   This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

**\*1**   Plaintiff <u>pro se</u> Anthony Rucano ("plaintiff"), who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants, DOCCS Director of Special Housing/Inmate Disciplinary Program, Donald Venettozzi ("Venettozzi"); DOCCS Acting Director of Special Housing/Inmate Disciplinary Program, Anthony Rodriguez ("Rodriguez"); Superintendent of Clinton Correctional Facility ("Clinton C.F."), Michael Kirkpatrick ("Supt. Kirkpatrick"); Superintendent of Upstate Correctional Facility ("Upstate C.F."), Donald Uhler ("Supt. Uhler"); Clinton C.F. correctional lieutenant ("Lt."), Charles

Durkin ("Lt. Durkin"); Clinton C.F. correction captain ("Capt."), Reginald Bishop ("Capt. Bishop"); Clinton C.F. correction captain, Patrick Devlin ("Capt. Devlin"); Clinton C.F. correction sergeant ("Sgt."), Gregory T. King ("Sgt. King"); Clinton C.F. correction officer ("C.O."), Jamie Breyette ("C.O. Breyette"); Clinton C.F. correction officer, Cory Tucker ("C.O. Tucker")—who, at all relevant times were employed by DOCCS—and Clinton C.F. Recreation Program Leader II, J. Kowalowski ("Kowalowski")—a civilian civil service employee—violated his constitutional rights under the First Amendment. See Dkt. No. 25 ("Amen. Compl."). [2]

[2]   Following initial review of plaintiff's Amended Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), Chief U.S. District Court Judge Glenn T. Suddaby, in a Decision and Order dated October 25, 2018, (1) accepted plaintiff's Amended Complaint for filing only to the extent that it asserted (a) First Amendment retaliation and conspiracy claim against Capt. Bishop, Lt. Durkin, Sgt. King, Supt. Kirkpatrick, Rodriguez, and Kowalowski; and (b) First Amendment retaliation, Fourteenth Amendment due process, and conspiracy claims against Capt. Bishop, C.O. Breyette, Capt. Devlin, Supt. Kirkpatrick, Supt. Uhler, C.O. Tucker, Rodriguez, and Venettozzi; and (2) dismissed, without prejudice, the remaining claims asserted in plaintiff's Amended Complaint. Dkt. No. 35 at 18. The Court subsequently denied plaintiff's motion for reconsideration of the October 25, 2018 Decision and Order. See Dkt. Nos. 36, 48. Further, in a Decision and Order dated September 27, 2019, as relevant here, the Court denied plaintiff's motion for leave to file a second amended complaint, see Dkt. No. 87, and Ordered that plaintiff's Amended Complaint (Dkt. No. 25) remains the operative pleading. See Dkt. No. 106.

Presently pending before the Court is (1) the motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 filed by Venettozzi, Rodriguez, Supt. Kirkpatrick, Supt. Uhler, Capt. Bishop, Capt. Devlin, Sgt. King, C.O. Breyette, C.O. Tucker (collectively, where appropriate, "defendants"), see Dkt. No. 178; and (2) the separate motion for summary judgment pursuant to Fed. R. Civ. P. 56 filed by Kowalowski, see Dkt. No. 179. Plaintiff filed a response in opposition to defendants' motion, see Dkt. No. 193, and filed a separate

2021 WL 3293504

response in opposition to Kowalowski's motion, see Dkt. No. 194. Defendants filed a reply to plaintiff's response opposition of their motion, see Dkt. No. 195, and Kowalowski filed a separate reply to plaintiff's response in opposition to his motion, see Dkt. No. 196. For the reasons that follow, it is recommended that defendants' motion for summary judgment (Dkt. No. 178) be granted in its entirety, Kowalowski's motion for summary judgment (Dkt. No. 179) be granted in its entirety, and plaintiff's Amended Complaint (Dkt. No. 25) be dismissed with prejudice in its entirety.

## I. Background

### A. Plaintiff's Factual Assertions and Claims[3]

[3]    To the extent that plaintiff's exhibits are relevant to the causes of action at issue on the present motion, the Court will consider them as part of the Amended Complaint. See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (internal quotation marks and citations omitted)).

### 1. February 2016 Disciplinary Proceeding

*2   The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II.A., infra.

In November 2015, while incarcerated at Clinton C.F., plaintiff was elected as the new Secretary of the Inmate Liaison Committee ("ILC"). See Amen. Compl. at 12 ¶ 43. In this role, plaintiff "was in charge of maintaining financial records, ILC agendas and other ILC related paperwork." Id. Plaintiff states that, at "the ILC's first meeting with ILC Staff Advisor [ ]Kowalowski in November of 2015, [Kowalowski] issued the ILC members a warning, 'You all have a target on your back, be careful!' Id. at ¶ 44.

Plaintiff alleges that his "first act" as ILC Secretary "was to address problems with the inmate population receiving showers per [DOCCS] Directive # 4009." Amen. Compl. at 13 ¶ 48. Plaintiff drafted a memorandum, dated December 9, 2015 ("the December 9, 2015 memorandum"), in which he

addressed the issues concerning Clinton C.F.'s inmate shower policy and his proposed solutions. See id. Plaintiff sent the December 9, 2015 memorandum to, among others, New York State Assemblyman Daniel O'Donnell. See id. at 13-14 at ¶ 48; Dkt. No. 25-1 at 85-88. Following the December 2015 ILC meeting, plaintiff sent a similar, but more detailed, proposal to Clinton C.F. executive staff. See id. at 14 ¶¶ 50, 51.

On December 16, 2015, plaintiff submitted a proposed ILC agenda, which outlined "five assaults on inmates by staff, violations of [DOCCS] Directive # 4803 (inappropriate removal from job), Directive # 2771 ([failure of the Clinton C.F. accountant to reconcile deposits from inmate fundraiser sales]), and the request to review and implement one of the various proposed solutions ... to address the problems concerning inmate showers." Amen. Compl. at 14 ¶ 54 (internal citations omitted); see id. 10 ¶ 33. Plaintiff alleges that, "[a]t the next weekly ILC meeting[,] Kowalowski told [him]" that " '[i]f [he] submitted this [a]genda [plaintiff] would go to Upstate Box for 270 days[.]" Id. at 15 ¶ 55. Based on the "angry tone of [Kowalowski's] voice[,]" plaintiff perceived "this as a threat, and was coerced to submit a 'watered down' ILC [a]genda ...." Id. Plaintiff submits both versions of the proposed December 2015 agenda, the first of which, dated December 16, 2015, is five pages long, and raises the above-mentioned issues. See Dkt. No. 25-1 at 115-19. The second version of the agenda, dated December 23, 2015, is a one-page document that omits the complaints of assaults by staff, but includes condensed versions of the remaining issues raised in the originally proposed agenda. See id. at 121.

At the January 6, 2016 ILC meeting, "Kowalowski violently snatched a piece of paper out of [plaintiff's] hand which listed ... new proposed TV channels," and stated, "I took it, so what. You are not as important as you think you are." Amen. Compl. at 15 ¶ 56. On January 11, 2016, plaintiff wrote a letter to New York State Assemblyman Daniel J. O'Donnell in which he explained "the ILC Agenda [he] submitted and the abusive treatment [he] was subjected to by [ ]Kowalowski since then[,]" and that he "feared retaliation because Clinton is known throughout the State, weapon thrown in your cell, imaginary assault on staff charges, etc." Id. at ¶ 57 (citing Dkt. No. 25-1 at 123). Plaintiff further states that, in his role as Facility Media Review Committee ("FMRC") co-chair, Kowalowski "made numerous disputed rulings on some [of plaintiff's] adult magazines ..., which [plaintiff] appealed to" to Central Office Media Review Committee ("COMRC").

Id. at 16 ¶ 59. On January 15, 2016, Director of Education Linda Hollmen ("Hollmen") responded to a series of three letters dated December 16, 17, and 23, 2015, relating to plaintiff's COMRC appeal. See id. at ¶ 60; Dkt. No. 25-1 at 147. Hollmen explained that the COMRC determined that the two editions of Cheri magazine at issue contained models that "may be portrayed as being under age, appealing to a prurient interest and therefore may promote the sexual performance of a minor." Dkt. No. 25-1 at 147.

**\*3** In a letter dated January 23, 2016, plaintiff responded to Hollmen's January 15, 2016 letter, and "using the same [ ]DOCCS letterhead [he] had been using for over a year (with law library Supervisor Officer Tedfords knowledge), ... asked for the ILC Supervisors [sic] name in Albany." Amen. Compl. at 16 ¶ 60. On January 29, 2016, plaintiff "sent [ ]Kowalowski a copy [of this letter] via internal mail." Id. Plaintiff alleges that, within "a few hours after mailing [a copy of his letter] to [ ]Kowalowski, [Kowalowski] went to the Captains [sic] Office with a copy of the letter that he had just received and, upon information and belief, spoke to Capt. Bishop." Id. at ¶ 61. Plaintiff contends that Kowalowski and Capt. Bishop "conspired to cover-up embezzlement of ... ILC funds and other improprieties revealed in the December [ ] 2015 Agenda." Id. Moreover, plaintiff avers, "[i]n furtherance of this conspiracy, Capt. Bishop directed Sgt. King to write [plaintiff] a false [misbehavior report] for forgery" for using DOCCS letter head on the letter he addressed to the COMRC. Id.

On January 29, 2016, Sgt. King issued plaintiff a misbehavior report ("the January 29, 2016 misbehavior report"), charging plaintiff with violations of five DOCCS rules, including that plaintiff "forged letterhead depicting a state form from [DOCCS] ... that he had created ... on a computer in the law library[,]" which he used in "a letter of personal nature ...." Dkt. No. 25-1 at 155. Plaintiff avers that "Kowalowski [i]nitiat[ed] [r]etaliation – The January 29[ ], 2016" misbehavior report. Amen. Compl. at 16. Plaintiff states that he was placed on keeplock status pending his disciplinary hearing. See id. at 17 ¶ 62.

Plaintiff's Tier III disciplinary hearing relating to the January 29, 2016 misbehavior report began on February 4, 2016 ("the February 2016 disciplinary hearing"). See Amen. Compl. at 17 ¶ 64. Plaintiff states that the "regularly assigned Tier III Hearing Officer," non-party Lt. Miller, did not preside over his case, but rather, Supt. Kirkpatrick "designated" Lt. Durkin to preside over his Tier III hearing. Id. Plaintiff

alleges that Lt. Durkin did not normally preside over such hearings and that he "was unfamiliar with the procedures and stopped frequently to read from instructions on how to hold the hearing." Id. Plaintiff contends that "[t]hese circumstances let [him] know that [he] was about to be railroaded and revealed an ongoing conspiracy now involving Supt. Kirkpatrick[,] Lt. Durkin ..., and Capt. Bishop ... to insure a finding of guilt regardless of the facts." Id. (internal quotation marks omitted). Plaintiff alleges that, "off-the-record and before the hearing, [Lt. Durkin] agree[d] the [January 29, 2016 misbehavior report wa]s problematic." Id. at 18 ¶ 65. On February 5, 2016, "[t]he day after the hearing started[,]" plaintiff states that Kowalowski visited his cell "because ... Lt. Durkin[ ] told him that [plaintiff] accused him of threatening [plaintiff] with retaliation." Id. at ¶ 66. Plaintiff avers that, during this meeting, "Kowalowski told [him that] if [he] had come to the ILC meeting at 10 AM on January 29[ ], 2016, hours before [plaintiff] received the [January 29, 2016 misbehavior report], he would have 'squashed' th[at misbehavior report]." Id.

Plaintiff alleges that, on the last day of the hearing, his "boss [at the Clinton C.F. law library], [non-party] Officer Tedford, testified that he was aware [that plaintiff] was using [DOCCS] letterhead and had no problem with [him doing] as long as it was being used for communication with [ ]DOCCS employees." Id. at 19 ¶ 70. At the conclusion of the hearing on February 11, 2016, "despite ... Tedford['s] testi['mony]" and plaintiff's "non-existent disciplinary history [for his] entire incarceration," he was found guilty and sentence to 90 days in the Clinton C.F. Special Housing Unit ("SHU"). Id. at ¶ 71. On February 15, 2016, plaintiff administratively appealed Lt. Durkin's disciplinary determination. See id. at 20 ¶ 72; Dkt. No. 25-1 at 168-70. On March 15, 2016, Rodriguez reduced plaintiff's sanction to 45 days of SHU confinement and loss of packages, commissary, and phone. See id. at 21 ¶ 77; Dkt. No. 25-1 at 176. Plaintiff submitted a letter requesting reconsideration of his administrative appeal on March 16, 2016. See Dkt. No. 25-1 at 178-79. On April 6, 2016, Rodriguez reversed Lt. Durkin's February 11, 2016 disciplinary determination. See Amen. Compl. at 21 ¶ 78; Dkt. No. 25-1 at 181.

**\*4** Liberally construed, the Amended Complaint alleges that, based on the facts relating to the February 2016 disciplinary hearing, Kowalowski, Capt. Bishop, Sgt. King, Supt. Kirkpatrick, Lt. Durkin, and Rodriguez conspired to violate plaintiff's First Amendment rights by filing a false misbehavior report that resulted in SHU confinement in

retaliation for plaintiff engaging in protected conduct relating to his service as ILC Secretary. See Amen. Compl. at 12-21, 69.

### 2. March 2016 Disciplinary Proceeding

On February 18, 2016, plaintiff filed an inmate grievance (CL-68902-16), alleging that he had been issued a false misbehavior report (the January 29, 2016 misbehavior report) in retaliation for his January 23, 2016 letter to Hollmen in which he requested the name of the ILC advisor in the Albany office. See Amen. Compl. at 20 ¶ 73; Dkt. No. 25-1 at 4-6. In particular, plaintiff requested that the Inmate Grievance Program ("IGP") "review and investigate the facts and circumstances of [his] grievance in conjunction with [the January 29, 2016] misbehavior report; reverse, dismiss and expunge ticket from [his] record, and restore [him] to [his] law library job and housing area." Dkt. No. 25-1 at 6. Plaintiff alleges that non-party IGP Supervisor Gregory filed his grievance incorrectly ...." Id. The Clinton C.F. Inmate Grievance Resolution Committee ("IGRC") denied plaintiff's grievance, explaining, as relevant here, that "[t]he grievance program can not be used as an additional substitute appeal mechanism. An individual decision or disposition resulting from a disciplinary proceeding is not grievable." Id. at 7. Plaintiff appealed the IGRC's response to the Superintendent on March 4, 2016. See id. On March 11, 2016, Supt. Kirkpatrick concurred with the IGRC's response. See id. at 8. On March 21, 2016, plaintiff appealed Supt. Kirkpatrick's decision. See id. On July 6, 2016, the Central Office Review Committee ("CORC") upheld Kirkpatrick's determination. See id. at 9.

On February 28, 2016, C.O. Breyette and C.O. Tucker came to plaintiff's cell in Clinton C.F.'s keeplock block to inform plaintiff that he was being transferred to Upstate C.F. and to pack up his belongings. See Amen. Compl. at 20 ¶ 74, 21 ¶ 79. Plaintiff "requested to see OMH when [he] was told [he] was being packed up on the draft to [Upstate C.F.]." Id. at ¶ 74. [4] Plaintiff states that, while C.O. Breyette and C.O. Tucker packed his belongings outside of his presence when he was in OMH, "an ice pick was allegedly recovered on the inside ledge of [his] cell above the bars." Id. at 21 ¶ 80. Plaintiff alleges that the ice pick was "planted in [his] cell ...." Id. at 20 ¶ 74. Capt. Bishop signed off on an unusual incident report ("UIR") concerning the weapon. See id. at 22 ¶ 84; see Dkt. No. 25-2 at 9-11 (Mar. 1, 2016 UIR, listing incident date for the discovery of the ice pick in plaintiff's

cell as Feb. 28, 2016). Plaintiff has included, as an exhibit, the photograph, of the ice pick, which is dated February 29, 2016. See Dkt. No. 25-2 at 12. "On the morning of February 29[ ], 2016, while still in an OMH [o]bservation cell," plaintiff alleges that "Capt[.] Devlin, the security captain in charge of the secure evidence locker and logbooks, banged hard on [plainitff's] cell and said 'What the [f]uck are you still doing here?" to which plaintiff replied, "Why did I get 90 days, the maximum sentence for my first non-violent Tier III [misbehavior report]?" Id. at ¶ 75. Plaintiff alleges that, "[a]s [Capt. Devlin] was walking away[,] he said 'You'll see.' " Id.

[4]   Plaintiff's use of the acronym "OMH" refers to the Office of Mental Health.

 **\*5**  On March 1, 2016, plaintiff was transferred from Clinton C.F. to Upstate C.F. and placed in SHU. See Amen. Compl. at 21 ¶ 80. On March 2, 2016, plaintiff received an inmate misbehavior report authored by C.O. Breyette, dated February 28, 2016 ("the February 2016 misbehavior report"), which charged him with possession of a weapon in violation of DOCCS Rule 113.10 based on the discovery of the ice pick in plaintiff's keeplock cell at Clinton C.F. See id. at 20 ¶ 74; Dkt. No. 25-2 at 7. Over the course of March 4, 22, and 29, 2016, a Tier III disciplinary hearing was held at Upstate C.F. relating to the February 2016 misbehavior report. See id. at 22 ¶ 82. Plaintiff alleges that Capt. Bishop "conspired with [Supt.] Ulher of [Upstate C.F.], a former [c]aptain of [s]ecurity at [Clinton C.F.] in 2008[,] to be assigned as the hearing officer at [Upstate C.F.] to hold [the] hearing, even though [Upstate C.F.] employs a full-time ... Hearing Officer whose only job is to hold hearings." Id. Plaintiff further contends that "[t]his conspiracy involved insuring [sic] that [he] was found guilty of possessing the weapon planted in [his] cell in a continuing course of retaliation for [his] protected free speech conduct as a duly elected ILC representative," including reporting alleged wrongdoing by personnel at Clinton C.F. Id. at ¶ 83.

Plaintiff alleges that, on March 22, 2016, he "requested the E-Block (Unit) log book entries from 9:00 a.m. on February 28, 2016, until 5:00 p.m., on March 1, 2016, multiple times ... and was told" by Capt. Bishop that he would be given "a copy of the ... log for the incident entry in the log book" but that the entries for "[t]he 29th ... and March 1st, [were] irrelevant ... [.]" Amen. Compl. at 23 ¶ 87 (quoting Dkt. No. 25-2 at 41-42). Plaintiff "objected" to this answer, stating that "there wasn't a weapon found in my cell that day[,]" February 28, 2016. Id. Over plaintiff's objection, Capt. Bishop instructed plaintiff that the log book entries from February 28, 2016, were "... all

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 179 of 306
Rucano v. Annucci, Not Reported in Fed. Supp. (2021)
2021 WL 3293504

you get. That's all you're getting.' " Id. at 24 ¶ 89 (quoting Dkt. No. 25-2 at 44). Plaintiff also contends that Capt. Bishop told him, "I'm going to get you when the evidence was booked into evidence. That's what you're getting. Not getting the days before or the days after of any of it." Id. at 25 ¶ 95 (quoting Dkt. No. 25-2 at 56). Plaintiff "objected, stating 'I feel this evidence wasn't logged in on February 28, 2016, and without seeing the previous ... and the forward pages, I won't be able to identify whether or not it was logged in at the time. Specially [sic] since [ ] the evidence drop box log book [ ] doesn't have a date [ ] when the evidence was entered into the drop box ....' " id. at 24 ¶ 90 (quoting Dkt. No. 25-2 at 44-45). Plaintiff states that he was "asked if [he] ha[d] the chain of custody from the evidence drop box logbooks," to which he replied, " 'No.... The log book is missing a date that's supposed to be there for weapons entered into the ... drop box log book[,]' " and contends that this missing date "explained multiple inconsistencies showing [his] request [wa]s very relevant and material." Id. at ¶ 91 (quoting Dkt. No. 25-2 at 45).

Plaintiff further alleges that C.O. Tucker testified at the hearing by phone, and stated that C.O. Breyette had shown him the weapon recovered from plaintiff's cell on February 29, 2016, "but [that] [Capt. Bishop] refused to allow [plaintiff] to question C.O. Tucker about brining [plaintiff] an I-64 form (recording property packed up) to Mental Health Unit on February 29, 2016." Amen. Compl. at 25 ¶ 94 (citing Dkt. No. 25-2 at 52-54). Plaintiff further states that non-party Sgt. Baker testified by phone that he wrote a memorandum to non-party Lt. Menard "on the day of the incident, identified on the memo as February 29, 2016, not February 28, 2016, the date of the [misbehavior report]." Amen. Compl. at 24 ¶ 92. When plaintiff "questioned" this inconsistency, "Capt. Bishop stated, 'we'll look at that to see if it's a clerical error or not,' " but plaintiff avers that "no effort [wa]s made to question Sgt. Baker while he [wa]s still on the phone." Id. (quoting Dkt. No. 25-2 at 50). However, plaintiff states that he asked Sgt. Baker, "[d]id you drop the ... weapon in the box the same date that you ... wrote the memo?" to which Sgt. Baker replied, " 'It was on the same day.' " Id. at 24-25 ¶ 93 (quoting Dkt. No. 25-2 at 51). When Sgt. Baker testified again later in the proceeding, Capt. Bishop prevented plaintiff from eliciting an answer from Sgt. Baker as to whether he had ever " 'secured evidence in the drop box in previous times[,]' " or if he " 'kn[e]w what [he was] supposed to do in the evidence drop box sign in sheet when [he] secure[d] evidence.' " Id. at 26 ¶¶ 99, 100 (quoting Dkt. No. 25-2 73-74). Capt. Bishop then asked Sgt. Baker if he had "secure[d]" the weapon "on [February 28,] 2016[,] in the evidence drop box[,]" to which

Sgt. Baker replied, "Yes I did." Id. at ¶ 101 (quoting Dkt. No. 25-2 at 75).

**\*6** Plaintiff alleges that Capt. Bishop's evidentiary rulings prevented him "from acquiring documents crucial to [his] retaliation defense," Amen. Compl. at 24 ¶ 91, and that he "was stopped from making a complete record." Id. at 23 ¶ 86 (citing Dkt. No. 25-2 at 42). In addition, plaintiff states that "[Capt.] Devlin ... failed to move the alleged weapon from ... the Evidence Drop Box to ... the Secured Evidence Locker for eight days, when the Directive requires it to be moved within 72 hours." Id. at 27 ¶ 103. Plaintiff posits that "[t]his lends further support to the fact that these log book entries, along with the [misbehavior report], were falsified and fabricated in retaliation against [him]." Id. Based on the foregoing, plaintiff contends that, on "February 29[ ], 2016, [ ]Capt[.] Devlin conspired with Capt. Bishop to fabricate the [February 28, 2016 misbehavior report], which is supported by the picture of the weapon ... recorded in the [UIR] as being photographed on February 28[ ], 2016, but was recorded by [non-party] C.O. Stiles as being photographed on February 29[,] 2016." Id. at 23 ¶ 87 (citing Dkt. No. 25-2 at 12).

On March 29, 2016, plaintiff was found guilty of possession a weapon and sanctioned to 120 days in SHU with 30 days suspended and four months loss of good time credit. See Amen. Compl. at 28; Dkt. No. 25-2 at 110. On April 11, 2016, plaintiff appealed Capt. Bishop's disciplinary determination. See id. at 32 ¶ 132; Dkt. No. 25-2 at 117-23. On June 13, 2016, Venettozzi modified Capt. Bishop's disciplinary determination, reducing plaintiff's sanctions to 90 days in SHU and expunged the four months of loss of good time credit. See id. at 34 ¶ 138; Dkt. No. 25-2 at 148. On August 15, 2016, plaintiff commenced a proceeding pursuant to N.Y. C.P.L.R. article 78 challenging the March 29, 2016 Tier III hearing determination in New York State court. See id. at 40-41 ¶¶ 164, 166; Dkt. No. 25-3 at 4-6. On July 10, 2017, after both parties had submitted briefs state court, Rodriguez [5] administratively reversed and expunged Capt. Bishop's March 29, 2016 Tier III hearing determination on the basis that "circumstances surrounding the incident raise question to inmate's culpability." Dkt. No. 25-3 at 40; see id. at 41; Amen. Compl. at 42 ¶ 173.

5    Although Venettozzi's name appears on the document reversing and expunging the March 2016 disciplinary determination, see Dkt. No. 25-3 at 40, Rodriguez is the person that actually made the determination to reverse and expunge

Case 9:23-cv-00098-MJK     Document 144     Filed 03/04/26     Page 180 of 306

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

plaintiff's disciplinary sentence and Venetozzi's name is contained on the document based on internal DOCCS policy. See Dkt. No. 195-17 at 1 (Rodriguez's affidavit in further support of motion for summary judgment, explaining that, Venettozzi's name appears on the July 10, 2017 decision "because, whenever he's in the office, all correspondence goes out in his name.").

Liberally construed, the Amended Complaint alleges that Capt. Bishop, C.O. Breyette, C.O. Tucker, Capt. Devlin, Supt. Kirkpatrick, Supt. Uhler, Rodriguez, and Venettozzi conspired to retaliate against plaintiff in violation of his First Amendment rights by filing a false misbehavior report and brining a disciplinary proceeding against him, which resulted in SHU confinement and loss of privileges, for his protected conduct relating to his service as ILC Secretary. See Amen. Compl. at 20-42, 70. Further, plaintiff alleges that Capt. Bishop violated his Fourteenth Amendment procedural due process rights by depriving him of an impartial hearing officer, and denying him documentary and testimonial evidence, which prevented plaintiff from mounting a full defense. See id. at 24-27, 70.

## II. Present Motions

### A. Arguments and Evidence in Support of Defendants' Motion for Summary Judgment (Dkt. No. 178)

#### 1. First Amendment Retaliation Claims—Both Disciplinary Hearings

Defendants aver that plaintiff's First Amendment retaliation claims must fail "because there is no direct evidence of retaliatory motive." Dkt. No. 178-2 at 17. In particular, defendants posit, no causal connection exists between defendants' actions of issuing plaintiff misbehavior reports, conducting disciplinary hearings, or the resulting sanctions and plaintiff's constitutionally protected activities relating to his service on the ILC. See id. Defendants contend that plaintiff's "conclusory allegations to the contrary cannot raise a genuine factual dispute." See id. Rather, defendants argue, the issuance of misbehavior reports and the resulting disciplinary hearings and sanctions were done in furtherance of defendants' job duties and to "ensure that DOCCS policies were followed and [to] ensure the safety of the officers and inmates." Id. at 18. To the extent that DOCCS policies were not followed, defendants state, "these errors were harmless

and did not violate the Constitution." Id. at n. 8. Moreover, defendants contend, plaintiff cannot establish that Lt. Durkin, C.O. Tucker, C.O. Breyette, and Supt. Uhler acted with retaliatory animus, because those defendants "did not even know that [plaintiff] was a member of the ILC." Id.; see Dkt. No. 178-7 at 1 ¶ 4 (Sworn affidavit of Lt. Durkin stating, that "I was not aware that [plaintiff] served on the ILC and did not know of any activities he engaged in as a part of that involvement until the hearing on February 4, 2016, .... Nor did I ever discuss [plaintiff's] involvement in the ILC with any other [d]efendant."); Dkt. No. 178-10 at 1 ¶ 3 (Sworn affidavit of C.O. Tucker, stating that, "[a]t the time of the events in question, I did not know that [plaintiff] was a member of the [ILC]. Nor did I know [plaintiff] had written letters or agendas with regard to activities on ILC, or engaged in any other constitutionally protected activities."); Dkt. No. 178-5 at 1 ¶ 3 (Sworn affidavit of C.O. Breyett, stating "I did not know that [plaintiff] was a member of Clinton's [ILC], nor did I know about any activities he undertook with respect to the ILC."); Dkt. No. 178-11 at 2 ¶ 4 (Sworn affidavit of Supt. Uhler, stating that, "[a]t the time of the events in question, I was not aware that [plaintiff] had been a member of the [ILC] at Clinton, as I did not work at that facility. I was not aware that [plaintiff] had engaged in any constitutionally protected behavior.").

**\*7** Similarly, defendants contend that, although "Capt. Devlin, Sgt. King, and Capt. Bishop" were aware that plaintiff was on the Clinton C.F. ILC, they "did not know that plaintiff authored the Dec. 9 Memo, or the Dec. 16 Agenda." See Dkt. No. 178-2 at 18; Dkt. No. 178-6 at 2 ¶ 4 (Sworn affidavit of Capt. Devlin, stating "I was aware that [plaintiff] was a member of the [ILC] at Clinton but did not know that he authored a memo on December 9, 2015, regarding the adverse effects of Clinton's shower policy. Nor did I know that on December 16, 2015, he drafted the memo outlining assaults on inmates, inappropriate removal from jobs, and a request to review and implement issues with the showers, or that he ultimately submitted a 'watered down' version of this agenda."); Dkt. No. 178-8 at 1 ¶ 2 (Sworn affidavit of Sgt. King, acknowledging that he knew of plaintiff's involvement on the Clinton ILC, but had no knowledge of the December letter or agenda); Dkt. No. 178-4 at 1, 2 ¶¶ 4, 5 (Sworn affidavit of Capt. Bishop, acknowledging that he knew of plaintiff's involvement on the Clinton ILC, but had no knowledge of the December letter or agenda).

Defendants also contend that "[n]o inference of retaliation arises from the facts in this case." Dkt. No. 178-2 at 18. First,

2021 WL 3293504

defendants aver, no inference of retaliation arises from the administrative reversal of plaintiff's March 2016 disciplinary determination during the pendency of his N.Y. C.P.L.R. article 78 proceeding. See id. In particular, defendants argue that "[t]he evidence shows that [ ]Venettozzi and [ ]Rodriguez acted because they wanted to do their jobs and ensure that no constitutional violations had occurred[,]" and that plaintiff's "speculative allegations to the contrary cannot raise a genuine issue of fact." Id. Defendants assert that plaintiff's filing of a voluminous amount of letters, some of which were only sent to Venettozzi and some of which were only sent to Rodriguez, "overwhelmed their usual review process and caused confusion about the status of his requests." Id. at 18-19. Defendants submit the sworn affidavit of Venettozzi, which explains that, "[a]t the time of the events in question, [he] was the Director of Special Housing/Inmate Disciplinary Program employed by [DOCCS,]" and that his "job duties include[d] reviewing and deciding administrative appeals from Tier III disciplinary hearings." Dkt. No. 178-12 at 1 ¶ 2. Venettozzi states that he "did not work at Clinton [C.F.] and was not personally involved with the issuance of either Inmate Misbehavior Report ... in this case. Nor was [he] involved with the hearings, other than to review [plaintiff's] appeals from their decisions." Id. at ¶ 3. Further, Venettozzi explains that, "[a]side from Acting Director Rodriguez, who works in the same office ..., [he] never spoke with any of the other defendants about this case during the relevant time period[,]" and that he has "no memory of speaking with ... Rodriguez about this case during the relevant time period." Id. at 1-2 ¶ 3. Venettozzi also denies having knowledge that plaintiff "had engaged in constitutionally protected activity at the time the [misbehavior reports] were issued, or the hearings were held." Id. Venettozzi explains that plaintiff "filed numerous letters and requests with [his] office" and that, "[a]s an administrative matter, it was difficult to keep track of them all, especially since some" letters from Venettozzi's and Rodriguez's office "crossed in the mail with some of [plaintiff's] requests, and [because plaintiff] sent multiple requests regarding the same matters." Id. at 2 ¶ 5. Venettozzi indicates that, "[u]pon information and belief, ... Rodriguez reviewed some of [plaintiff's] letters, and [he] reviewed others[,]" but that neither of he nor Rodriguez "knew about the correspondence that was reviewed by the other[,]" and denies retaliating against plaintiff or conspiring with any other defendant to do so. Id.; see id. at ¶ 4.

Venettozzi states that, on September 28, 2016, his office sent plaintiff a letter in response to a September 22, 2016 letter that plaintiff submitted requesting reconsideration of the March

2016 disciplinary determination, "informing [plaintiff] that, because the matter was currently the subject of litigation, [Venettozzi's office] would not reconsider the issue at that time." Dkt. No. 178-2 at 5 ¶ 25. However, Venettozzi further explains that, on July 10, 2017, Rodriguez issued the decision that administratively reversed and expunged plaintiff's March 2016 disciplinary determination. See id. at ¶¶ 26-27. Venettozzi states that, "[u]pon information and belief, ... Rodriguez issued [the] reversal because he was reviewing part of the correspondence from [plaintiff], without realizing that [Venettozzi] had reviewed another part[,]" and that Rodriguez "was not aware that [Venetozzi had issued the September 28, 2016 letter putting [plaintiff's] requests for reconsideration of the [March 2016 disciplinary determination] on hold." Id. at ¶ 27. Venettozzi also states that Rodriguez was not aware that plaintiff had commenced a N.Y. C.P.L.R. article 78 proceeding. See id. However, Venettozzi posits that none of the actions taken by his office were done in retaliation for plaintiff's ILC activities, and, in fact, were all favorable to plaintiff. See id. at 5-6 ¶ 28.

**\*8** Defendants also submit Rodriguez's sworn affidavit in support of their motion for summary judgment. See Dkt. No. 178-9. Rodriguez, like Venettozzi, states that he has no memory of speaking with Venettozzi about plaintiff's case, did not discuss the case with any other defendants in this action, and denies conspiring or retaliating against plaintiff. See id. at 2 ¶ 3. He further explains that he was not even aware that plaintiff engaged in constitutionally protected activity at the time DOCCS personnel issued either misbehavior report. See id. Rodriguez reiterates Venettozz's explanation that, given plaintiff's large volume of submissions, it became difficult to keep track of plaintiff's requests, especially given that plaintiff "made multiple requests regarding the same matters." Id. at ¶ 4. Like Venettozzi, Rodriguez believes that Venettozzi reviewed some of plaintiff's submissions, while he reviewed others. See id. at ¶ 6. Further, Rodriguez explains that, he "was not aware that ... Venettozzi had issued" his September 28, 2016 letter putting plaintiff's request for reconsideration of the March 2016 disciplinary determination on hold pending the article 78 proceeding. Id. at 5 ¶ 28. Rather, Rodriguez "believed, based on correspondence from [plaintiff] that [he] had reviewed, [that plaintiff] was merely considering bringing such an action. Additionally, the case was not in [Rodriguez's] list of urgent cases, as [plaintiff] had already served his sentence." Id. Rodriguez explains that, on July 10, 2017, he issued the decision administratively reversing and expunging the March 2016 disciplinary determination, because he "believed, based upon the location of where the

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

weapon was found, that it was possible that someone else had placed the weapon [where it was recovered in plaintiff's cell], not [plaintiff]." Id. at ¶ 29. However, Rodriguez submits that, "had [he] known that an Article 78 proceeding was pending, [he] would not have issued a decision until the proceeding was complete." Id. at 6 ¶ 30. Moreover, Rodriguez indicates he did not take any action concerning plaintiff's case in retaliation for plaintiff's ILC activities and, in any event, "all of the actions that [he] and [his] office took were *favorable* to [plaintiff]." Id. at ¶ 31.

Further, defendants argue that, plaintiff's assertion that an inference of retaliation arises from Captain Devlin's alleged comments, " 'What the fuck are you still doing here?' and [ ] 'You'll see,' in response to [plaintiff's] inquiry ... about his [February 2016 disciplinary determination,]" lacks force. Dkt. No. 178-2 at 19. Defendants submit Capt. Devlin's affidavit in which he acknowledges that he saw plaintiff in his cell "at some point," but "vehemently den[ies] that [he] ever said" either of those comments or "ever threaten[ed] him or otherwise imply[ied] that anyone was about to go after him." Dkt. No. 178-6 at 2 ¶ 8. "Thus," defendants aver, "the only evidence in this case illustrates that the event never happened." Dkt. No. 178-2 at 19. In any event, defendants contend that these "benign and ambiguous" comments fail to establish that Capt. Devlin acted with retaliatory animus because plaintiff does not allege having any prior interactions with Capt. Devlin, and Capt. Devlin was unaware of plaintiff's ILC activities. Id. at 20; see Dkt. No. 178-6 at 2 ¶ 4.

### 2. Section 1983 Conspiracy Claims

#### a. February 2016 Disciplinary Proceeding

Defendants aver that, contrary to plaintiff's allegation that Supt. Kirkpatrick, Lt. Durkin, and Capt. Bishop conspired to have Lt. Durkin assigned as the hearing officer at the February 2016 disciplinary proceeding, "the evidence establishes that they never discussed Lt. Durkin's appointment with one another and, thus, could not have conspired." Dkt. No. 178-2 at 21. Rather, defendants aver, Supt. Kirkpatrick independently appointed Lt. Durkin to preside over the hearing without discussing the appointment with either Lt. Durkin or Capt. Bishop. See id. Defendants point to Supt. Kirkpatrick's affidavit in which he indicates that his "decision to assign [Lt.] Durkin as the hearing officer on the first [misbehavior report] was not motivated by a desire to retaliate against [plaintiff] for his participation on the ILC," Dkt.

No. 178-13 at 4 ¶ 19, and that his "assign[ment of] Lt.[ ] Durkin as the hearing officer .... was appropriate as he had not taken part in investigating the incidents underlying the [first misbehavior report], and had served as hearing officer on 22 hearings." Id. at 2 ¶ 8.

In his sworn affidavit, Lt. Durkin states that he never discussed plaintiff's involvement on the ILC with any other defendant in this action, and that he "did not request to be appointed [as] the hearing officer" or "discuss being appointed the hearing officer with any other [d]efendant." Dkt. No. 178-7 at 2 ¶¶ 4, 9. Lt. Durkin states that he was not "unfamiliar with the hearing procedures, as [he] had previously served as a hearing officer on 22 occasions[,]" "did not state that the [February 2016 misbehavior report] was 'problematic[,]' " or "inform Kowalowski that [plaintiff] had accused him of retaliation." Id. at 3 ¶¶ 11, 12, 13. Moreover, Lt. Durkin states that his determination that plaintiff was guilty of using "DOCCS letterhead for a purpose that was unrelated to official government business," namely for "try[ing] to obtain adult magazines of a sexual nature," was based on his understanding of DOCCS regulations, and not to retaliate against plaintiff. Id. at ¶ 15. As stated above, Lt. Durkin denies having knowledge that plaintiff served on the Clinton C.F. ILC or of his specific activities as secretary of that body, and never discussed plaintiff's involvement on the ILC with any other defendant. See id. at 2 ¶ 4.

 **\*9**  In addition, defendants submit Capt. Bishop's affidavit in which he explains that, "on or around January 26, 2016, [he] believe[s] [he] read a letter that [plaintiff] had written on DOCCS letterhead[,]" which "was not regarding official government business[,]" but instead consisted of "personal correspondence regarding an adult magazine with sexual content that [plaintiff] wished to obtain." Dkt. No. 178-4 at 2 ¶ 9. Capt. Bishop states that such use of DOCCS letterhead "was ... inappropriate ...., and a clear violation of [DOCCS] Directive No. 0008." Id. He further notes that, on January 29, 2016, Sgt King issued plaintiff a misbehavior report based on plaintiff's improper use of DOCCS letterhead, but states that he "did not direct Sgt. King to write this [misbehavior report]" and states that he "did not have any personal involvement in the issuance of th[is] misbehavior report or the [February 2016 disciplinary] hearing." Id. at 2-3 ¶¶ 10, 11.

Finally, defendants contend that Rodriguez was not involved with the first misbehavior report or the February 2016 disciplinary proceeding and, therefore, did not engage in any conspiracy. See Dkt. No. 178-2 at 21; Dkt. No. 178-9 at 1-2

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 183 of 306

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)
2021 WL 3293504

¶ 3. In his sworn affidavit, Rodriguez states, "I did not work at ... Clinton [C.F.] and was not personally involved with the issuance of either Inmate Misbehavior Report ... in this case. Nor was I involved with the hearings, other than to review [plaintiff's] appeals from their decisions." Dkt. No. 178-9 at 1-2 ¶ 3. Rodriguez also denies discussing this case with any other defendant aside from Venettozzi, who worked in the same office, and posits that he has "no memory of speaking with ... Venettozzi about this case during the relevant time period." Id. at 4 ¶ 3.

### b. March 2016 Disciplinary Proceeding

Defendants argue that the evidence establishes that no conspiracy existed with respect to the February 2016 misbehavior report and March 2016 disciplinary proceeding. See Dkt. No. 178-2 at 22. Defendants argue that plaintiff's contention that, because the handwritten date on the last page of the UIR under the photograph of the weapon is February 29, 2016, rather than February 28, 2016, fails to demonstrate that Capt. Bishop and Capt. Devlin engaged in a conspiracy. See id. Defendants posit that the date contained on this document, at most, establishes a harmless ministerial error. See id. Defendants also aver that C.O. Breyette "had no contact with either Capts. Devlin or Bishop." Id. In support of this contention, defendants cite C.O. Breyette's affidavit, which states that he "did not communicate about this incident with any other defendant in this case, other than [C.O.] Tucker, who searched [plaintiff's] cell with him." See id. (citing Dkt. No. 178-5 at 2 ¶ 11). C.O. Tucker also stated in his affidavit that he "had no communications with anyone about the events underlying [C.O. Breyette's misbehavior report], other than [C.O.] Breyette ...." Dkt. No. 178-10 at 2 ¶ 10.

Defendants contend that the record evidence establishes that, contrary to plaintiff's allegations, Supt. Kirkpatrick independently assigned Capt. Bishop to preside as the H.O. at the March 2016 disciplinary hearing without ever discussing his decision with either Capt. Bishop or Supt. Uhler. See Dkt. No. 178-2 at 22. Defendants explain that, because the discovery of the weapon that gave rise to the second misbehavior report occurred at Clinton C.F., Supt. Kirkpatrick was responsible for assigning the H.O. to preside over the disciplinary hearing, and neither Capt. Bishop nor Supt. Uhler had any involvement in that decision. See id. at 22-23. In his affidavit, Supt. Uhler explains that, "[a]t the time of the events in question, [he] was employed ... as the Superintendent of Upstate [C.F.]" and that, he neither

appointed Capt. Bishop as the hearing officer for the March 2016 disciplinary proceeding, or discussed his appointment with anyone, including Supt. Kirkpatrick. Dkt. No. 178-11 at 1, 2 ¶¶ 2, 6. "In fact," Supt. Uhler states, he "did not have any other role in the [March 2016 disciplinary] hearing, other than the fact that [he] (or [his] designee) conducted a review of the hearing to ensure that all proper procedures were followed, as is done for all hearings held at Upstate [C.F.]" Id. Supt. Kirkpatrick indicates in his sworn affidavit that "[i]t is common procedure and courtesy to have a hearing officer from the facility where the incident occurred [conduct the hearing] if the inmate has been transferred from that facility before the hearing takes place." Dkt. No. 178-13 at 3 ¶ 13. Supt. Kirkpatrick states that he "did not discuss the appointment with [Capt.] Bishop or [Supt.] Uhler." Id. at 2 ¶ 11. Moreover, defendants reassert that Rodriguez and Venettozzi "never discussed this case with any of the other [d]efendants[ ]" and, therefore, did not engage in a conspiracy. Dkt. No. 178-2 at 23.

### 3. Procedural Due Process Claim Against Capt. Bishop Relating to the March 2016 Disciplinary Proceeding

**\*10** Defendants argue that plaintiff had no constitutionally protected liberty interest with respect to his due process claims relating to the March 2016 disciplinary hearing "because his sentence of 120 days in SHU does not constitute an atypical hardship since there were no other adverse conditions of confinement." Dkt. No. 178-2 at 25 (citations omitted). Indeed, defendants contend, plaintiff served only 92 days for both of his SHU sentences. See id. at 26. Defendants also posit that the imposition of loss of packages, commissary, and phone privileges does not constitute adverse conditions such that plaintiff's SHU sanction was atypical. See id.

Further, defendants submit that, contrary to plaintiff's argument, he was afforded all process due. See Dkt. No. 178-2 at 26. In this regard, defendants argue that Capt. Bishop was a fair and impartial hearing officer. See id. at 27. In particular, defendants point to Capt. Bishop's sworn affidavit in which he stated that he was properly appointed to preside over the March 2016 disciplinary hearing because he did not investigate the February 28, 2016 incident, and because his name appears on the UIR only as a matter of form. See id. Capt. Bishop explained that he "did not draft [the] UIR or investigate the claims within it" and that his "name was listed on the UIR as the 'person reporting' because, as a matter of course, the [c]aptain's name was listed on all UIRs."

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)
2021 WL 3293504

Dkt. No. 178-4 at 3 ¶ 14. Supt. Kirkpatrick corroborated Capt. Bishop's explanation, explaining that Capt. "Bishop did not investigate the incident giving rise to the March 2016 misbehavior report]." Dkt. No. 178-13 at 3 ¶ 16. Supt. Kirkpatrick stated that Capt. Bishop's "name is listed on the UIR simply because the Captain's name is listed on the UIR as a matter of course" and that his "own name is [also] listed on the UIR, not because [he] investigated the incident [or] ha[d] personal knowledge of the events described in the document, but simply because [he] was the Superintendent of the facility at the time the UIR was issued, and [his] name [wa]s listed as a matter of course." Id. Supt. Kirkpatrick further explained the procedure for how a UIR is filed:

> The UIR initial paperwork is written by the line officer, who submits the paperwork to the Sergeant for review. The Sergeant then reviews and submits it to the Watch Commander, who reviews and electronically files the UIR and submits all paperwork related to the UIR. The Watch Commander then submits it to the Captain, who reviews and makes sure the paperwork is complete and in order. The Captain then submits it to the Superintendent.

Id. at ¶ 17. Supt. Kirkpatrick corroborated Capt. Bishop's statement that he did not investigate the March 2016 incident by explaining that, "[n]one of these individuals, aside from the line officer and Sergeant, are considered to have 'investigated' the incident merely by being part of this chain of review." Id. Thus, defendants urge, plaintiff's due process claim in this regard lacks merit and must be dismissed. See Dkt. No. 178-2 at 27.

Next, defendants contend that plaintiff's due process rights were not violated when he was not provided all of the drop box logbook dates that he requested. See Dkt. No. 178-2 at 27. Defendants urge that plaintiff was afforded all process to which he was due because he was provided access to the February 28, 2016 logbook entries and allowed to question Sgt. Baker, the individual who had photographed the weapon, who confirmed that the weapon had been recovered and photographed on that date. See id. Defendants posit that the additional pages plaintiff requested (i.e. the pages spanning from February 29, 2016, to March 1, 2016), were not relevant

to the March 2016 disciplinary hearing and, therefore, Capt. Bishop did not violate his due process rights by denying plaintiff access to those log book entries. See id. at 27-28.

**\*11**  With respect to plaintiff's contention that defendants violated DOCCS evidence rules when the weapon recovered from his cell on February 28, 2016, was not purged from the evidence drop box for approximately eight days instead of within 72 hours, as required pursuant to DOCCS Directive 4910A, defendants posit that such a mistake constitutes, at most, harmless error and did not violate plaintiff's due process rights. See Dkt. No. 178-2 at 28. Capt. Bishop explained in his sworn affidavit that he determined that, although the failure to purge the evidence drop box within the time required under Directive 4910A constituted "a procedural violation," he "it was harmless because no one accessed the dropbox during those 8 days." Dkt. No. 178-4 at 5 ¶ 25. Relying on Capt. Devlin's sworn affidavit, defendants posit that, because no one accessed the evidence drop box during the eight days the weapon remained there, that evidence was "unaltered." Dkt. No. 178-2 at 28; see Dkt. No. 178-6 at 3 ¶ 10 (Capt. Devlin's affidavit stating, although the weapon was not removed from the evidence drop box within 72 hours, as contemplated under DOCCS Directive 4910A, "no one accessed the drop box during this time.").

Moreover, citing Capt. Bishop's affidavit, defendants argue that the incorrect handwritten date of February 29, 2016, contained under the photograph of the weapon, was due solely to a clerical error and is not relevant to the weapons charge that formed the basis of the second misbehavior report. See Dkt. No. 178-2 at 28; Dkt. No. 178-4 at 4 ¶ 22. Capt. Bishop explained that, on March 29, 2016, the last day of the March 2016 disciplinary hearing, he questioned Sgt. Baker, who stated that the correct date on which the weapon was recovered and photographed was February 28, 2016, and that the handwritten date contained on the photograph was a "clerical error." Id. at 5 ¶ 23. Capt. Bishop noted that, between the second and third days of the March 2016 disciplinary hearing, Sgt. Baker reviewed his attendance records, which indicated that he was not working on February 29, 2016, but was working on February 28, 2016, and that he had photographed the weapon; therefore, Capt. Bishop "concluded that the 28 th " was the correct date, "and the hand-written date was an error." See id. at ¶ 24. In any event, defendants contend, "[t]he date on the photograph did not impact the [h]earing [d]ecision." Dkt. No. 178-2 at 29.

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 185 of 306

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

#### 4. Defendants' Remaining Arguments

In addition, defendants contend that the Amended Complaint should be dismissed as to all defendants with respect to plaintiff's First Amendment retaliation and Section 1983 conspiracy claims for lack of personal involvement. See Dkt. No. 178-2 at 10-16. In this regard, defendants rely exclusively on their arguments and evidence as to the merits of plaintiff's First Amendment and Section 1983 conspiracy claims. See id. Similarly, drawing exclusively on their arguments on the merits of plaintiff's First Amendment retaliation and Section 1983 conspiracy claims, defendants aver that they are entitled to qualified immunity. See id. at 29-32.

### B. Arguments and Evidence in Support of Kowalowski's Motion for Summary Judgment (Dkt. No. 179)

#### 1. First Amendment Retaliation

Kowalowski first argues that his statements, which plaintiff alleges constituted "threats," do not constitute adverse action and are not causally related to plaintiff's constitutionally protected activities on the ILC. See Dkt. No. 179-4 at 7. First, with respect to Kowalowski's statement that ILC members "have a target on their backs" and therefore, must "be careful," Kowalowski argues that the context in which he made this statement establishes that it was not meant as a threat, but rather, as advice. See id. In particular, Kowalowski explains that he made this statement to the entire class of ILC inmates, as he did to every new class of ILC members, and "meant this as a truthful warning to the ILC members." Dkt. No. 179-3 at 2 ¶ 7. Kowalowski states, it "was clear from the context of the conversation," that he gave this advice because "inmates tend to see ILC members as the scapegoat for jail conditions that frustrate inmates" and "tensions can arise between security and staff and ILC members." Id. at 2 ¶¶ 8, 9, 10. Therefore, Kowalowski argues that, understood in the proper context and notwithstanding plaintiff's conclusory assertions to the contrary, this statement cannot constitute adverse action to support plaintiff's First Amendment retaliation claim. See Dkt. No. 179-4 at 7. In addition, Kowalowski contends that no causal connection exists between this statement and plaintiff's constitutionally protected ILC activities, as "[t]here is no indication that [p]laintiff had even made a constitutionally-protected statement in the meeting prior to Kowalowski, let

alone a statement that actually motivated Kowalowski to express this 'threat.' " Id. at 8-9. Indeed, Kowalowski argues, plaintiff did not even perceive this statement as a threat at the time it was made and only later viewed the statement in this light based on "hearing second-hand accounts of the fate of other [ILC] members ...." Id. at 8.

**\*12** Next, Kowalowski denies threatening plaintiff with SHU confinement in retaliation for the content contained in plaintiff's proposed December 2015 ILC agenda. See Dkt. No. 179-4 at 9. Kowalowski points out that, at deposition, plaintiff only recalled that Kowalowski objected to the length of the proposed agenda. See id. (citing Dkt. No. 179-2 at 63 (Deposition Transcript). Plaintiff testified at deposition that, while he could not recall "exactly why [Kowalowski] said he wasn't going to submit" the proposed December 2015 ILC agenda, Dkt. No. 179-2 at 61, plaintiff watered the agenda down to omit "issues expressed about the assaults by staff." Id. at 62. While plaintiff did not recall whether Kowalowski took issue with the inclusion of complaints of assault by staff, plaintiff stated that "there had to be some discussion about that, because it was removed. And it wouldn't be removed without there being some discussion about it not being appropriate for the agenda." Id. at 63. Plaintiff also testified that he "remember[ed] loosely, very vaguely, that there was a conversation that a lot of th[e] stuff [included in the proposed agenda] c[ould] be taken care of off the record." Id. Kowalowski also points to plaintiff's January 11, 2016 letter to New York State Assemblyman O'Donnell, noting that plaintiff stated only that Kowalowski objected to the proposed agenda's length and the highlighting of prison administrator's names. See id. In particular, plaintiff's January 11, 2016, letter to Assemblyman O'Donnell, states that Kowalowski informed him that he could not submit his proposed five-page agenda because it was "too long[ ] and [plaintiff] highlighted their (administration's) names." Dkt. No. 25-1 at 124. In his letter to Assemblyman O'Donnell, plaintiff posits that "the real reason why [Kowalowski] was upset" is because the proposed agenda "talk[ed] about misrepresentation and/ or misappropriation of $10,000 in ILC fundraiser money, violating [DOCCS] Directive 2771." Id. Further, Kowalowski states that, upon observing the length of the proposed agenda, he simply relayed a directive from Supt. Kirkpatrick to plaintiff that the Clinton C.F. administration would no longer accept ILC agendas longer than one page or containing more than four or five individual items. See Dkt. No. 179-3 at 4 ¶ 21. Kowalowski states that he did not comment on or direct plaintiff to "water down" the content of the proposed agenda. Id. at 4-5 ¶¶ 26-28. "In fact," Kowalowski states, he

"did not review the agenda in any detail before counseling [plaintiff] regarding its length." Id. at 5 ¶ 28. At most, Kowalowski states, he believed that submitting an agenda longer than one page would have resulted in Clinton C.F. cancelling the ILC meeting, but not a SHU sanction for any ILC member. See id. at 5-6 ¶ 27. Thus, Kowalowski argues, his instruction regarding the length of the proposed agenda did not constitute a threat, and no causal connection exists between the alleged threat and the constitutionally protected contents of the proposed agenda. See Dkt. No. 179-4 at 10, 11.

Further, Kowalowski contends that plaintiff's allegation that he "snatched" a piece of paper from plaintiff's hand, which contained a list of proposed television channels, and stating, "You are not as important as you think you are" does not constitute a threat sufficient to support a First Amendment retaliation claim. Dkt. No. 179-4 at 13 (quoting Amen. Compl. at 15 ¶ 56). In particular, Kowalowski contends that, even assuming that he took the piece of paper and made these comments, his actions do not rise to the level of adverse action. See id. Kowalowski avers, plaintiff's allegations amount to, at most, "generalized discourtesy," which is not actionable under Section 1983. Id. at 14.

Kowalowski also argues that plaintiff has failed to establish a First Amendment retaliation claim against him based on his alleged involvement with the January 29, 2016 misbehavior report relating to plaintiff's use of DOCCS letter head. See Dkt. No. 179-4 at 14-17. Kowalowski explains that he is the co-chair of the FMRC, which is an entirely separate role from his position as ILC Advisor. See Dkt. No. 179-3 at 5, 6 ¶¶ 35, 36. Kowalowski contends that plaintiff received a magazine that was flagged by civilian mail staff and referred to the FMRC, a member of which ultimately determined that the magazine contained prohibited pornographic content. See Dkt. No. 179-4 at 14. Kowalowski explains that, although he did not personally review plaintiff's magazine, in his role as co-chair of the FMRC he "sign[s] all determinations made by members of the FMRC." Dkt. No. 179-3 at 6 ¶ 36; see id. at ¶ 39. When plaintiff "approached [Kowalowski] about the status of his magazine, [Kowalowski] told him that he was entitled to appeal the FMRC decision to the COMRC in Albany." Id. at ¶ 42. Plaintiff testified at his deposition that "[t]here was nothing untoward about" the way Kowalowski presented this message to him and that "[t]here was no feelings on [sic] animosity about it[,]" and that plaintiff "didn't take it personally in any way. [Kowalowski] was doing his job." Dkt. No. 179-2 at 104. Plaintiff appealed the FMRC's determination and the COMRC affirmed the

FMRC's determination on appeal. See Dkt. No. 179-3 at 6 at ¶ 41. Kowalowski notes that, on January 23, 2016, plaintiff sent a memorandum, drafted on official DOCCS interdepartmental communication letterhead, to Hollmen in which he objected to the terminology and reasoning the COMRC used in its decision affirming the FMRC's determination. See Dkt. No. 25-1 at 149-52.

Kowalski states that, "[i]n January of 2016, [Capt.] Bishop summoned [him] to his office[,]" where they met with non-party Deputy Superintendent Bell ("Deputy Supt. Bell"). Dkt. No. 179-3 at 6 ¶ 43. Capt. Bishop informed Kowalowski that he and Deputy Supt. Bell "had learned that [plaintiff] had been using certain letterhead in his correspondence." Id. at ¶ 44. Capt. Bishop and Deputy Supt. Bell showed Kowalowski the letterhead, which Kowalowski "recognized ... from other correspondence that [he] had seen from [plaintiff]." Id. However, Kowalowski "do[es] not know the substance of the correspondence that [Capt.] Bishop showed [him]." Id. at ¶ 45. "Capt. Bishop asked [Kowalowski] if [he] would be willing to write a misbehavior report against [plaintiff] for his use of the letterhead." Id. at 7 ¶ 47. Although Kowalowski "understood [Capt.] Bishop's objection, [he] refused his request." Id. at ¶ 48. Kowalowski explains that, although he "understood the letterhead to be an issue for the security administration[, i]t did not relate to [his] role as Resident Coordinator or ILC Advisor[ ]" and Kowalowski "had no special knowledge or awareness of the relevant facts" concerning plaintiff's letter. Id. Kowalowski further states that, "[a]t the time of [his] meeting with [Capt.] Bishop and [Deputy Supt.] Bell, [he] was not aware of any connection between the review of [plaintiff's] magazine and the letterhead." Id. at ¶ 50. Moreover, Kowalowski states that, although he "subsequently learned that [Sgt.] King wrote a misbehavior report against [plaintiff] relating to the letterhead[,]" he did not encourage Sgt. King or any other DOCCS personnel to write a misbehavior report, did not participate in any way in the February 2016 Tier III disciplinary hearing, id. at ¶ 53, and was not referenced in the January 2016 misbehavior report. See Dkt. No. 179-4 at 17. Thus, Kowalowski contends, the record evidence does not establish a claim of retaliation against him with respect to the issuance of the January 29, 2016 misbehavior report, because he did not issue the misbehavior report or otherwise have any involvement in the issuance of that misbehavior report, and no causal connection exists between plaintiff's ILC activities and Kowalowski's "tangential involvement" with the FMRC review of plaintiff's magazine and the January 29,

2021 WL 3293504

2016 misbehavior report and subsequent sanction. See id. at 17-19.

### Section 1983 Conspiracy

**\*13** Kowalowski first argues that, for the reasons set forth above, plaintiff's Section 1983 conspiracy claim lacks merit. See Dkt. No. 179-4 at 22. Alternatively, Kowalowski contends that plaintiff's conspiracy claim should be dismissed because all of the alleged conduct complained of occurred while defendants were acting within the scope of their employment. See id. at 22-23.

### C. Plaintiff's Responses in Opposition

#### 1. Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 193)

Plaintiff first controverts defendants' contention that he failed to establish their personal involvement, arguing that, "when the defendants retaliated against [him] for [his] constitutionally conduct as an ILC member submitting an [a]genda in accordance with DOCCS Directive #4002 ..., setting forth grievances on behalf of the inmate population, they became personally involved in the constitutional violations against [him]." Dkt. No. 193-2 at 10-11. He also posits that "[n]umerous [i]nferences of [r]etaliation are [a]pparent from the [f]acts of [t]his [c]ase." Id. at 20. He also avers that Lt. Durkin's "retaliation and conspiracy against [him] was apparent when he violated [his] Due Process rights in the [February 2016 disciplinary] hearing." Id. Plaintiff argues that "[t]he fact that Sgt. King conspired and retaliated against [him] is not defeated because Sgt. King did not know about the Dec. 9th letter or the Dec. 16th Agenda, as his lack of knowledge of this memo and agenda did not prevent him from conspiring and retaliating ...." Id. (internal citation omitted).

Plaintiff contends that "Kowalowski's statement that he was summoned to Capt. Bishop's office, ... and was asked by Capt. Bishop if he would be willing to write a misbehavior report ..., provides a strong causal connection/inference that once Capt. Bishop was unable to have Kowalowski write the [January 2016 misbehavior report, he instead directed Sgt. King to write it." Id. Plaintiff avers that C.O. Breyette's and C.O. Tucker's lack of knowledge of plaintiff's ILC

activities "did not prevent them from conspiring with other defendants ... to retaliate against [him]." Id. at 15. Plaintiff also asserts that contrary to Capt. Devlin's assertion, he did make the statements, "What the fuck are you still doing here" and "You'll see[,]" and that Capt. Devlin was aware of the December 9 letter and December 16 Agenda. Id. at 16. Further, plaintiff avers that the wrong date contained on the photograph of the weapon, along with Capt. Devlin's statements "shows the big picture," and raises an inference that Capt. Devlin retaliated against him. Dkt. No. 193-2 at 21. Moreover, plaintiff avers that Supt. Kirkpatrick "conspired with [Capt.] Bishop and [Supt.] Uhler when he assigned [Capt.] Bishop to be [the] hearing officer ...." Id. at 16. Plaintiff urges that this assignment was "irregular" and, along with the fact that he signed the UIR, evidences that Supt. Kirkpatrick conspired with Capt. Bishop and Supt. Uhler to retaliate against him. Id. In addition, plaintiff contends that the "multiple failures of ... Rodriguez and ... Venettozzi in the processing, handling and decision making of [his second administrative] appeal is indicative of the IDP Directors [sic] inability to promulgate the Policies, Procedures and Practices properly for all inmates in the ... custody ... of [ ]DOCCS." Id. at 20. Plaintiff posits that Venettozzi's and Rodriguez's contentions that plaintiff's submission of an "exorbitant number of letters" confused the review process and that they reviewed his requests without each other's knowledge are "weak excuse[s]." Id.

**\*14** Plaintiff further argues that he "can provide a factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end result of retaliation against [him] for [his] activities on the ILC." Dkt. No. 193-2 at 22. Plaintiff posits that defendants' affidavits constitute "unsupported allegations that they did not discuss [his] claims," which "lack[ ] substance and merit." Id. For instance, plaintiff contends, "Capt. Bishop clearly directed Sgt. King to write the first [misbehavior report] after he tried, and failed, to have Kowalowski do so." Id. at 23. He states that Capt. "Bishop's sworn affidavit that he had nothing to do with the [first misbehavior report] is highly doubtful, being that he tried to have Kowalowski do so and failed." Id. "In furtherance of this conspiracy," plaintiff states, Supt. "Kirkpatrick assigned Lt. Durkin ... to be [his] hearing officer," rather than non-party "Lt. Miller, who was the person regularly assigned to handle such hearings, left for the day." Id. Plaintiff states that defendant have failed to provide him proof that Lt. Miller was "overwhelmed" to justify Lt. Durkin's appointment, therefore strongly implying "that Lt. Durkin was assigned with the

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

specific purpose of finding [him] guilty[.]" Id. at 12. Thus, plaintiff avers, the February 2016 disciplinary hearing was the result of a conspiracy. See id. at 23.

Plaintiff contends that the March 2016 disciplinary hearing was also the result of a conspiracy because "it is disputed that [C.O.] Breyette, as author of the misbehavior report, did not discuss this case with anyone else, with said discussions ... in tacit agreement to achieve the unlawful end of retaliation against [him] for [his] protected conduct ... as a member of the ILC." Dkt. No. 193-2 at 23 (internal citations omitted). Plaintiff contends that Supt. Kirkpatrick's act of assigning Capt. Bishop as the hearing officer at the March 2016 disciplinary hearing is "taken outside the scope of his employment duties," and that Capt. Bishop's and Supt. Uhler's "tacit agreement" to allow Capt. Bishop to preside over the hearing "resulted in their participation in retaliation against [him]." Id. at 24. Plaintiff also opposes Venettozzi's and Rodriguez's assertions that they did not collaborate in reviewing plaintiff's requests, and states that their statements, "together with the facts asserted in [his] Verified Complaint[,] provides admissible proof ... that they tacitly agreed to conspire and obstruct justice by delaying the timely reversal of [his] administrative appeal during it's [sic] initial review, as opposed to one year later." Id. (internal citations omitted).

In addition, plaintiff opposes defendants' arguments concerning his Fourteenth Amendment due process claims. See Dkt. No. 193-2 at 24. He contends that his SHU constituted "atypical and significant hardship" because he "was left in [his] cell for 4 days without [his] high blood pressure medication and without no [sic] clothing but what [he] was wearing." Id. at 25. Plaintiff contends that Capt. Bishop violated his procedural due process rights by preventing him from eliciting testimony about the chain of custody of the weapon from non-party Sgt. Baker. See id. at 27-28. He also contends that the date contained on the photograph of the weapon was "not a clerical error by Sgt. Baker, but just another fantasy of the defendants that finds absolutely zero support in the record[,] a far cry from harmless error." Id. at 28 (emphasis omitted). Further, plaintiff reasserts that he was denied due process because Capt. Bishop was a partial hearing officer based on his involvement with the UIR and his alleged involvement in a conspiracy with Supt. Kirkpatrick and Supt. Uhler. Id. at 27-29. Finally, plaintiff contends that defendants are not entitled to qualified immunity, because "there is no objectively reasonable view of the facts that show that defendants believed that their actions were not intentional and did not violate [his] clearly established constitutional rights." Id. at 29.

### 2. Plaintiff's Response in Opposition to Kowalowski's Motion for Summary Judgment (Dkt. No. 194)

In opposition to Kowalowski's motion for summary judgment, plaintiff first argues that "there is overwhelming evidence that Kowalowski engaged in adverse actions which were ... causally ... related to [his] constitutionally protected conduct as a member of the ILC[.]" Dkt. No. 194-1 at 11. Plaintiff premises this argument on the fact that he has established "that Kowalowski and the defendants he conspired with have previously engaged in this same retaliatory conduct with ILC members serving before [him]." Id. He further contends that "it is not a coincidence that [Kowalowski] threatened [him] with 270 days in SHU" because Emerenciano, another inmate at Clinton C.F., "received 270 days in SHU for a misbehavior report written by Kowalowski." Id. at 13. Plaintiff avers that Kowalowski's statement that ILC inmates have " 'a target on [their] backs,' considered together with [Capt.] Bishop requesting that [Kowalowski] (once again, like he did to Emerenciano) write the [misbehavior report] against [plaintiff], show a causal connection between [plaintiff's] protected conduct ... and the adverse action [of the] false [misbehavior report] and confinement." Id. at 14. Plaintiff avers that "[i]t is of no moment that Kowalowski chose not to write the [misbehavior report] against [him]," because "it only reveals his attempt to shield himself from being identified as part of the conspiracy against the ILC." Id. Moreover, plaintiff argues that, because the revised agenda did not contain "items about assaults by staff, and other serious issues," Kowalowski's statement that he did not read the contents of the proposed agenda is false. Id. at 15. In addition, plaintiff contends that Kowalowski's act of "violently snatch[ing]" a piece of paper out of his hand "represented the 'final straw' that compelled [him], through fear, to ... document this violent act[,]" which he suggests establishes that Kowalowski's threats did, in fact, "dissuade" his First Amendment activities. Id. In this regard, plaintiff contends that his letter to Assemblyman O'Donnell provides documentary support for his claims against Kowalowski. See id. at 16. As a final matter, plaintiff reiterates his argument that he has "provided a factual basis supporting a meeting of the minds of Kowalowski with [Supt.] Kirkpatrick and [C.O.] Bishop showing that they entered into an agreement, whether expressly or tacitly, to achieve the unlawful end of retaliation against [him] for [his] constitutionally protected conduct as a

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

member of the ILC reporting the atrocities [at Clinton C.F.]." Id. at 19.

### D. Defendants' Reply to Plaintiff's Opposition (Dkt. No. 195)

**\*15** Defendants aver that they have met their burden of proving that no genuine issue of fact exists as to plaintiff's claims, in opposition to which, plaintiff has failed to "produce evidence" demonstrating otherwise, as required pursuant to Rule 56.1(b) of the Federal Rules of Civil Procedure. Dkt. No. 195 at 6. Further, defendants posit, to the extent that plaintiff has failed to "cite hard evidence" in opposition, "the [C]ourt should deem [his] unsupported 'disputed' facts admitted." Id. With respect to plaintiff's retaliation and conspiracy claims relating to the February 2016 disciplinary hearing, defendants contend that plaintiff offers no evidence to controvert their entitlement to summary judgment, and instead relies solely an unsupported "multi-step inferential chain" to show that defendants conspired to retaliate against him for his activities on the ILC. Id. at 9. Further, defendants contend, even assuming arguendo that plaintiff could establish retaliatory motive, he would have received the same punishment because "there is no dispute that ... plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." Id. at 8 (internal quotation marks and citations omitted)). Defendants contend that plaintiff "admitted on multiple occasions that he used DOCCS letterhead to obtain a magazine that" included prohibited sexual content. Id. Defendants also oppose, as belated, plaintiff's argument, contained in his declaration in opposition, that the January 6, 2016 letter did not contain DOCCS letterhead because it did not contain a certain logo. See Dkt. No. 193 at 3 ¶ 12; Dkt. No. 195 at 9.

### E. Kowalowski's Reply to Plaintiff's Opposition (Dkt. No. 196)

In reply to plaintiff's opposition, Kowalowski asserts that, even if the Court accepts plaintiff's allegations against Kowalowski as true, the alleged "threats" do not constitute adverse action. See Dkt. No. 196 at 3. Kowalowski further argues that plaintiff has failed to proffer evidence to establish that he "ever commented on, let alone, veto[ed]," any specific "topic" contained in the December 2016 ILC agenda. Id. Moreover, Kowalowski contends plaintiff's assertions pertaining to inmate Emerenciano are irrelevant, fail to

establish any causal connection between any adverse action and plaintiff's protected activities, and "are of no evidentiary value[.]" Id. at 6. In any event, Kowalowski contends that the Emerenciano case is factually distinguishable from the present matter, Emerenciano filed a grievance against Kowalowski before Kowalowski wrote a misbehavior report against that inmate; therefore, unlike plaintiff, Kowalowski avers, "Emerenciano had an actual, individualized conflict with Kowalowski before a misbehavior report [was] issued." Id. at 6.

Kowalowski also contends that plaintiff's allegation that Kowalowski was involved in the decision to instruct Sgt. King to file the January 2016 misbehavior report relating to plaintiff's use of letterhead based on his attendance at the meeting with Capt. Bishop and Deputy Supt. Bell is "wholly speculative" and "based on no competent evidence." Dkt. No. 196 at 6. Kowalowski avers that plaintiff's reliance on his January 11, 2016 letter to Assemblyman O'Donnell establishes only plaintiff's "ability to document the minute indignities he perceived and to speculate ... about malfeasance by DOCCS employees," but not Kowalowski's participation in the January 2016 misbehavior report. Id. at 7. Furthermore, as with his retaliation claims, Kowalowski argues that the "facts" plaintiff relies on in support of his conspiracy allegations against him are, in fact, plaintiff's "own conclusory statements about what he believes occurred." Id. at 8. In the alternative, Kowalowski avers that plaintiff's conspiracy claim against him "must fail under the intracorporate conspiracy doctrine." Id. at 9.

### III. Discussion [6]

[6] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Legal Standard

Summary judgment may be granted only if the submissions of the parties taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 190 of 306
Rucano v. Annucci, Not Reported in Fed. Supp. (2021)
2021 WL 3293504

exists." Price v. Oropallo, No. 9:13-CV-0563 (GTS/TWD), 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citing Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson, 477 U.S. at 248. A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (internal quotation marks omitted). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

**\*16** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. See Salahuddin, 467 F.3d at 273. The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. See Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (internal quotation marks and citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999). A plaintiff's verified complaint is to be treated as an affidavit. [7] See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ...."). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.' " Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

[7]     Plaintiff's Amended Complaint in this case was not properly verified. See Amen. Compl. at 80.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.

See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, ... a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

### B. First Amendment Retaliation

In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: that "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... *objectively*[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred;

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 191 of 306

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

that is, where he continued to file grievances and lawsuits." Id. With respect to the third element of the test, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (quoting Espinal, 558 F.3d at 129).

**\*17**  "Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at \*18 (N.D.N.Y. Mar. 28, 2014) (citation omitted); see Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." (italics omitted)).

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." Green v. Phillips, No. 04-CV-10202 (TPG), 2006 WL 846272, at \*3 (S.D.N.Y. Mar. 31, 2006) (citing Brown v. Middaugh, 41 F. Supp. 2d 172, 191 (N.D.N.Y. 1999)). Consequently, a plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. See Green, 2006 WL 846272, at \*3; see also Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial." (internal quotation marks and citation omitted)). Allegations, although specific, "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Smith v. Woods, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at \*3

(N.D.N.Y. Apr. 24, 2006) (internal quotation marks and citations omitted).

Here, it is undisputed that plaintiff's ILC activities constitute constitutionally protected activity. See Dolan v. Connolly, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC," constitutes constitutionally protected activity); Dkt. No. 178-2 at 17 (Defendants' memorandum of law in support of motion for summary judgment, acknowledging that plaintiff's "activities on the ILC meet the first prong of the [First Amendment] retaliation test."); Dkt. No. 179-4 at 5 (Kowalowski's memorandum of law in support of motion for summary judgment, acknowledging same). However, as defendants and Kowalowski have established through admissible evidence that no retaliatory motive or causal connection exists between plaintiff's protected activities on the ILC and the alleged adverse action, plaintiff's First Amendment retaliation claims must be dismissed.

### 1. February 2016 Disciplinary Proceeding

#### a. Sgt. King

Defendants have established entitlement to summary judgment dismissing plaintiff's First Amendment retaliation claim against Sgt. King based on the allegedly false January 2016 misbehavior report. As an initial matter, "[i]t is well settled that filing false or unfounded misbehavior charges against an inmate does not give rise to a per se constitutional violation actionable under section 1983." Burroughs v. Petrone, 138 F. Supp. 3d 182, 205 (N.D.N.Y. 2015) (internal quotation marks and citation omitted). Indeed, the Second Circuit has made clear that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. There must be more, such as retaliation against the prisoner for exercising a constitutional right." Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997).

**\*18**  It is well settled that "[a]llegations of adverse actions alone ... are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct." Baskerville v. Blott, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Factors indicating retaliatory motive include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) an inmate's prior good disciplinary record; (3) vindication

Case 9:23-cv-00098-MJK   Document 144   Filed 03/04/26   Page 192 of 306

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)
2021 WL 3293504

at a hearing on the matter; and (4) statements by the defendant concerning his motivation. See id. (citing Colon, 58 F.3d at 872-73). With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty, 252 F.3d 545, 554 (2d Cir. 2001).

However, as the Second Circuit explained:

> [P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. Accordingly, while we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations and quotation marks omitted).

Here, although the purported adverse action of Sgt. King's issuance of the allegedly false January 29, 2016 misbehavior report occurred within close temporal proximity to plaintiff's submissions of the December 9, 2015 memorandum and the December 16, 2015 proposed ILC agenda, it is well-settled that "temporal proximity without more is insufficient to survive summary judgment." Flynn v. Ward, No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *11 (N.D.N.Y. June 7, 2018) (internal quotation marks and citation omitted). Further, defendants have proffered admissible evidence establishing that plaintiff's submission of the December 2016 memorandum and proposed agenda was not "a substantial or motivating factor" in Sgt. King's decision to issue the January 29, 2016 misbehavior report. Burton, 664 F. Supp. 2d at 367. In his sworn affidavit, Sgt. King acknowledges that, although he was aware that plaintiff was a member of the Clinton C.F. ILC, he did not have knowledge of plaintiff's December 9, 2015 memorandum to Assemblyman

O'Donnell or the December 16, 2016 proposed ILC agenda, and that his issuance of the misbehavior report "was not motivated by a desire to retaliate against [plaintiff] for his activities on [the ILC], or for any other constitutionally protected activity." See Dkt. No. 178-8 at 1 ¶ 3, 2 ¶ 8; see also Van Dunk v. Brower, No. 11-CV-4564 (ER), 2013 WL 5970172, at *9 (S.D.N.Y. Nov. 7, 2013) ("To prove a causal connection, the plaintiff must demonstrate that the individuals who engaged in retaliation had knowledge of the protected conduct."); Henson v. Gagnon, No. 9:13-CV-0590 (GTS/TWD), 2015 WL 9809874, at *12-13 (N.D.N.Y. Dec. 10, 2015) (granting summary judgment and dismissing a pro se inmate's First Amendment retaliation claim against a correction officer for failure to establish causation where the correction officer submitted a sworn statement that he had no knowledge of the plaintiff's grievance against him at the time he conducted a cell search and issued the plaintiff a misbehavior report, and the plaintiff offered no evidence to refute the correction officer's sworn statement), report and recommendation adopted, No. 9:13-CV-0590 (GTS/TWD), 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016). Further, plaintiff does not aver, and the record does not indicate, that Sgt. King ever had any prior dealings with plaintiff, or made any statements evidencing that Sgt. King had any retaliatory animus against plaintiff. See Baskerville, 224 F. Supp. 2d at 732. Moreover, although the February 2016 Tier III disciplinary decision was ultimately reversed on plaintiff's administrative appeal, "no admissible record evidence exists indicating that the reversal was based on a finding that the misbehavior report in question was intentionally false or even unintentionally false." LeBron v. Selsky, No. 9:05-CV-0172 (GTS/DRH), 2010 WL 1235593, at *5 n.9 (N.D.N.Y. Mar. 31, 2010).

*19 In any event, the admissible evidence establishes that Sgt. King issued the January 2016 misbehavior report because he reasonably believed that plaintiff had abused his position as a law library clerk by using DOCCS letterhead for personal correspondence, in violation DOCCS Directive No. 0008, in order to obtain sexually explicit adult magazines—not for any retaliatory purpose. See Dkt. No. 178-8 at 2 ¶ 6. Defendants proffer, as an exhibit to Sgt. King's affidavit, a copy of DOCCS Directive No. 0008, which explicitly provides, in relevant part, that "Official Department stationary will only be used for the transaction of official governmental business." Id. at 6. Plaintiff's own documentary evidence—namely, the copy of his January 23, 2016 memorandum to Hollmen—demonstrates that he used DOCCS interdepartmental communication letterhead

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 193 of 306

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)
2021 WL 3293504

for his correspondence with the COMRC concerning the FMRC's decision to prohibit plaintiff from obtaining two issues of Cheri magazine. See Dkt. No. 25-1 at 149-52. Indeed, plaintiff does not deny that he used DOCCS letterhead for personal use, and contends only that he did so with the permission of his boss in the law library. See Amen. Compl. at 19 ¶ 70. However, plaintiff relies entirely on his own self-serving statements, and cites no evidence in support of his contention that his boss's alleged permission provided a valid exception to official DOCCS rules concerning the use of department letterhead. Consequently, defendants have established through admissible evidence that Sgt. King would have issued plaintiff the January 2016 misbehavior report regardless of whether he harbored retaliatory animus against plaintiff. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted). Plaintiff's shifting [8] and conclusory assertions to the contrary fail to raise a genuine issue of material fact as to his First Amendment retaliation claim against Sgt. King and are insufficient to overcome defendants' documentary case. Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983) ("[M]ere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case") (internal quotation marks and citation omitted), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); Zembko v. Northwestern Mut. Life Ins. Co., No. 3:05-CV-918 (AHN), 2007 WL 948323, at *4 n.1 (D. Conn. Mar. 26, 2007) ("[A] nonmovant's self-serving conclusory statements that dispute the movant's evidence cannot create material issues of fact to avoid summary judgment." (internal quotation marks and citation omitted)). Based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claim against Sgt. King be dismissed.

[8]    The undersigned declines to consider plaintiff's contention, for the first time in opposition to defendants' motion for summary judgment, that the stationary he used in correspondence with the FMRC was not official DOCCS letterhead because it did not contain a certain logo. See Dkt. No. 193 at 3 ¶ 12; Lyman v. CSX Transportation, Inc., 364 F. App'x 699, 701 (2d Cir. 2010) (summary order) (affirming the district court's determination that it should not consider claims raised for the first time in opposition to summary judgment); Auguste v. Department of Corrections, 424 F. Supp. 2d 363, 368 (D. Conn. 2006) (holding that a plaintiff "cannot amend his complaint in his memorandum in response to [the]

defendants' motion for summary judgment"). Nor is the undersigned inclined to recommend allowing plaintiff to further amend the complaint to add new allegations against the defendants at this late stage in the case. Regardless of whether plaintiff perfectly reproduced official DOCCS letterhead, the admissible evidence makes clear that plaintiff attempted to use official DOCCS letterhead for his personal correspondence—a violation of DOCCS rules. See Dkt. No. 178-8 at 6. Therefore, plaintiff's belated assertions in this regard do not impact the undersigned's analysis as to plaintiff's First Amendment retaliation claim against Sgt. King.

#### b. Capt. Bishop

Plaintiff's First Amendment retaliation claim against Capt. Bishop based on the January 2016 misbehavior report and resulting sanctions is premised exclusively on his speculative assertion that Capt. Bishop instructed Sgt. King to issue the misbehavior report after he allegedly consulted with Kowalowski. See Amen. Compl. at 16 ¶ 61.

Defendants' admissible documentary evidence establishes that Capt. Bishop, although aware that plaintiff was a member of the ILC, had no knowledge of the December 9, 2015 memorandum to Assemblyman O'Donnell or the December 16, 2015 proposed ILC agenda; had not read either document; never discussed either document with Kowalowski; and did not instruct Sgt. King to issue the January 2016 misbehavior report. See Dkt. No. 178-4 at 1 ¶ 4, 2-3 ¶¶ 5, 6, 10. Further, the record is devoid of facts or evidence indicating that Capt. Bishop made any statements to plaintiff or anyone else evidencing a retaliatory motive with respect to the January 2016 misbehavior report. See Baskerville, 224 F. Supp. 2d at 732. Moreover, plaintiff's conclusory and speculative assertion that Capt. Bishop directed Sgt. King to issue plaintiff the misbehavior report—a contention that both Capt. Bishop and Sgt. King deny—is insufficient to support a First Amendment retaliation claim against Capt. Bishop with respect to the January 2016 misbehavior report. See Dkt. No. 178-4 at 2-3 ¶ 10; Dkt. No. 178-8 at 2 ¶ 6 (Sgt. King's affidavit stating, "Capt[.] Bishop did not direct me to write the IMR and .... I did not discuss the 1st IMR with Capt[.] Bishop before I wrote it or thereafter."); see also Henson, 2015 WL 9809874, at *12 ("[C]onclusory statements are not sufficient to support causation on retaliation claims; the claims must be supported by specific facts."). In addition, Kowalowski's

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

declaration, in which he states that Capt. Bishop asked him to write plaintiff a misbehavior report based on plaintiff's use of DOCCS letterhead does not establish that Capt. Bishop instructed Sgt. King to issue the January 2016 misbehavior report, or that Capt. Bishop had retaliatory motive relating to plaintiff's December 2015 ILC activities. See Dkt. No. 179-3 at 6-7 ¶¶ 43-48. Rather, Kowalowski's declaration establishes, at most, that Capt. Bishop objected to plaintiff's use of official DOCCS letterhead, see id. at 7 ¶ 47, which, as explained above, defendants reasonably believed that plaintiff had used in violation of DOCCS rules for personal purposes. See Dkt. No. 178-8 at 2 ¶ 6.

**\*20** Plaintiff's contention in opposition that Capt. Bishop "conceded" that he was involved in the issuance of Sgt. King's January 2016 misbehavior report because Capt. Bishop stated in his affidavit that he "d[id] not believe [he] ever discussed [the proposed ILC agenda] with any other defendant in this case" fails to raise a genuine issue of material fact. Dkt. No. 193-2 at 12. This cherry-picked statement is taken out of context, and fails to account for Capt. Bishop's and Sgt. King's statements that Capt. Bishop did not instruct Sgt. King to issue plaintiff the January 2016 misbehavior report. See Dkt. No. 178-4 at 2-3 ¶ 10; Dkt. No. 178-8 at 2 ¶ 6. Plaintiff does not proffer any other evidence, admissible or otherwise, in opposition. See Riehl v. Martin, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at \*4 (N.D.N.Y. Mar. 31, 2014) ("The nonmovant must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."). Accordingly, it is recommended that plaintiff's First Amendment claim against Capt. Bishop based on the January 2016 misbehavior report and February 2016 disciplinary hearing be dismissed.

### c. Lt. Durkin

Defendants submit Lt. Durkin's sworn affidavit in which he states that his determination that plaintiff was guilty of using "DOCCS letterhead for a purpose that was unrelated to official government business" for "try[ing] to obtain adult magazines of a sexual nature" was based on his understanding of DOCCS regulations, and not to retaliate against plaintiff. Dkt. No. 178-7 at 3 ¶ 15. Further, Lt. Durkin's sworn affidavit explains that he "did not request to be appointed [as] the hearing officer" at the February 2016 disciplinary hearing or "discuss being appointed the hearing officer with any other [d]efendant." Id. at 2 ¶¶ 4, 9. Moreover, Lt. Durkin states that, contrary to plaintiff's contention, he was not "unfamiliar

with the hearing procedures, as [he] had previously served as a hearing officer on 22 occasions." Id. at 3 ¶ 11. In addition, Lt. Durkin denies stating off the record that "the [February 2016 misbehavior report] was 'problematic[,]' " or "inform[ing] Kowalowski that [plaintiff] had accused him of retaliation." Id. at 3 ¶¶ 12, 13. Plaintiff's conclusory allegation that Lt. Durkin "railroaded" him by finding him guilty in retaliation for his December 2015 ILC activities finds no support in the record and fails to establish that Lt. Durkin acted with a retaliatory animus against plaintiff. Amen. Compl. at 17 ¶ 64. Plaintiff's conclusory assertions in opposition are insufficient to raise a genuine issue of fact to defeat defendants' documentary case. See Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at \*4 n.1. Therefore, it is recommended that plaintiff's First Amendment retaliation claim against Lt. Durkin be dismissed.

### d. Supt. Kirkpatrick

Defendants submit Supt. Kirkpatrick's sworn affidavit, which explains that, contrary to plaintiff's contention, his decision to assign Lt. Durkin to preside over the February 2016 hearing was not unusual or inappropriate, as Lt. Durkin "had not taken part in investigating the incidents underlying the [January 2016 misbehavior report], ... he had served as hearing officer on 22 hearings," and was "not motivated by a desire to retaliate against [plaintiff] for his participation on the ILC, or for any other constitutionally protected activity." Dkt. No. 178-3 at 2 ¶ 8, 4 ¶ 19. Plaintiff's conclusory allegations to the contrary fails to rebut Supt. Kirkpatrick's sworn affidavit, which is corroborated by Lt. Durkin's sworn affidavit. See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998) ("Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact."). Consequently, it is recommended that plaintiff's First Amendment retaliation claim against Supt. Kirkpatrick based on his decision to assign Lt. Durkin as the hearing officer at the February 2016 disciplinary hearing be dismissed.

### e. Rodriguez

Defendants proffer Rodriguez's sworn affidavit, in which he states that "[n]one of [his] actions were motivated by an intent to retaliate against [plaintiff], nor did [he] retaliated against [plaintiff]. In fact, [he] was not aware that [plaintiff] had engaged in a constitutionally protected activity at the time the" misbehavior reports were issued, or the hearings

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

were held. Dkt. No. 178-9 at 2 ¶ 3. Thus, as defendants have submitted admissible documentary evidence that Rodriguez did not have knowledge of plaintiff's constitutionally protected activity at the time he made his determinations with respect to plaintiff's administrative appeal, defendants have demonstrated that no causal connection exists between the protected conduct and Rodriguez's actions. See Henson, 2015 WL 9809874, at *12-13; Van Dunk, 2013 WL 5970172, at *9. Moreover, the record is devoid of evidence, such as prior interactions or statements made by Rodriguez to plaintiff or other defendants to Rodriguez indicating that Rodriguez harbored any retaliatory animus against plaintiff. See Baskerville, 224 F. Supp. 2d at 732. As defendants contend, plaintiff's conclusory and speculative assertions to the contrary do not raise a genuine issue of material fact sufficient to defeat defendants' documentary case. See Dkt. No.178-2 at 17; Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1. Consequently, it is recommended that plaintiff's First Amendment retaliation claim against Rodriguez based on the February 2016 disciplinary hearing and subsequent administrative appeal, be dismissed.

### 2. March 2016 Disciplinary Proceeding

#### a. C.O. Breyette and C.O. Tucker

**\*21** The sworn affidavits of C.O. Breyette and C.O. Tucker constitute admissible documentary evidence that establishes that those defendants had no knowledge of plaintiff's involvement with the Clinton C.F. ILC or that he had engaged in constitutionally protected activity in his role as ILC secretary. See Dkt. No. 178-5 at 1 ¶ 3; Dkt. No. 178-10 at 1 ¶ 3. Therefore, defendants have established that neither C.O. Breyette nor C.O. Tucker had the requisite knowledge of plaintiff's constitutionally protected activities to sustain a First Amendment retaliation claim against them. See Henson, 2015 WL 9809874, at *12-13; Van Dunk, 2013 WL 5970172, at *9. Further, plaintiff does not allege that he had any prior interaction with C.O. Breyette or C.O. Tucker, or that either of those defendants made any statements or took any previous actions evidencing a retaliatory motive. See Baskerville, 224 F. Supp. 2d at 732. In addition, more than two months passed between plaintiff's constitutionally protected December 2015 ILC activities, C.O. Breyette's and C.O. Tucker's February 28, 2016 search of plaintiff's cell and resulting misbehavior report; thus, "[p]laintiff has not made a strong showing temporal proximity in support of his retaliation claim" against these defendants. Pierrot v. Hahn, No. 9:15-CV-1415

(DNH/CFH), 2017 WL 4221117, at *8 (N.D.N.Y. July 28, 2017), report and recommendation adopted, No. 9:15-CV-1415 (DNH/CFH), 2017 WL 4221072 (N.D.N.Y. Sept. 21, 2017); see Webster v. Fischer, 694 F. Supp. 2d 163, 183-84 (N.D.N.Y.) (holding that it was "questionable whether the disciplinary action followed [the] plaintiff's complaints close enough in time to raise an inference of retaliation" where "at least two months passed between plaintiff's complaints and the April 14, 2006 misbehavior reports and the resulting determination that [the] plaintiff was guilty of the charges, which was issued at the conclusion of disciplinary hearing on April 19, 2009"), aff'd, 398 F. App'x 683 (2d Cir. 2010).

Moreover, although Rodriguez reversed plaintiff's guilty determination on administrative appeal because he "believed, based upon the location of where the weapon was found, that it was possible that someone else had placed the weapon there, not [plaintiff]," Dkt. No. 178-9 at ¶ 29—"no admissible record evidence exists indicating that the reversal was based on a finding that the misbehavior report in question was intentionally false or even unintentionally false." LeBron, 2010 WL 1235593, at *5 n.9. Indeed, defendants have established that C.O. Breyette would have issued plaintiff the misbehavior report regardless of improper retaliatory motive. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted). C.O. Breyette and C.O. Tucker explain that they conducted a search of plaintiff's cell together on February 28, 2016 because plaintiff "was scheduled to be transferred to a different facility" and "[i]t is protocol to search [an] inmate's room when it is being packed." Dkt. No. 178-5 at 2 ¶¶ 5, 6; Dkt. No. 178-10 at 2 ¶¶ 4, 5. C.O. Breyette and C.O. Tucker both state that, during the cell search, they discovered "weapon on the ledge above the metal bars of the cell. It was a long, thin piece of metal, 7 inches long and 1/8 inches wide with a sharp point on one end and a handle on the other[, which] looked a bit like an ice pick." Dkt. No. 178-5 at 2 ¶ 8; Dkt. No. 178-10 at 2 ¶ 7. C.O. Breyette explains that he issued plaintiff the February 2016 misbehavior report because an inmate "possessing a weapon is a serious violation of the DOCCS policy that endangers officers and other inmates[,]" and both he and C.O. Tucker explain that they "were not motivated by a desire to retaliate against him for his activities on [the ILC], or for any other constitutionally protected activity[,]" but rather "to maintain a safe and secure environment at Clinton for both officers and inmates." Dkt. No. 178-5 at ¶ 13; Dkt. No. 178-10 at 2 ¶ 11. Thus, "[t]he record ... establishes that the misbehavior report was issued not with retaliatory intent, but simply because contraband ... was in fact recovered from [p]laintiff's

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

cell during that search." LeBron, 2010 WL 1235593, at *5. Aside from plaintiff's conclusory allegation in his unverified Amended Complaint that an unidentified person "planted" the ice pick in his cell, he advances no arguments and proffers no evidence, admissible or otherwise, in opposition to defendants' motion in this regard. Amen. Compl. at 20 ¶ 74; see Dkt. No. Dkt. No. 193-2 at 14-15. Accordingly, it is recommended that plaintiff's First Amendment retaliation claims against C.O. Breyette and C.O. Tucker be dismissed.

### b. Capt. Devlin

**\*22** As an initial matter, defendants have submitted Capt. Devlin's sworn affidavit in which he acknowledges that he was aware that plaintiff was a member of the Clinton C.F. ILC, but was unaware that plaintiff authored the December 9, 2015 memorandum to Assemblyman O'Donnell or the December 16, 2015 proposed ILC agenda. See Dkt. No. 178-6 at 2 ¶ 4. Further, Capt. Devlin denies banging on plaintiff's OMH cell; saying, 'What the [f]uck are you still doing here?" or "You'll see," in response to plaintiff's statement, "Why did I get 90 days, the maximum sentence for my first non-violent Tier III [misbehavior report]?" Id. at 2 ¶¶ 7-8; Amen. Compl. at 20 ¶ 75. Thus, defendants have established, through admissible evidence, that, "[a]t the time of the events in question," Dkt. No. 178-6 at 1 ¶ 2, 2 ¶ 4, Capt. Devlin lacked knowledge of plaintiff's constitutionally protected December 2015 ILC activities, such that he did not make the purported statements in retaliation for plaintiff's protected conduct. See Henson, 2015 WL 9809874, at *12-13; Van Dunk, 2013 WL 5970172, at *9. In any event, courts in this circuit have held that more explicit threats than the vague statements alleged here do not rise to the level of adverse action sufficient to support a First Amendment retaliation claim. See Kemp v. LeClaire, No. 03-CV-844S (WMS), 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (holding that threats from official that the plaintiff's "day [was] coming," that he would "be sent to [his] mother in a black box," and that he would "get [his] ass kicked" were insufficient to establish adverse action to support a First Amendment retaliation claim); Bartley v. Collins, No. 95-CIV-10616 (RJH), 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (holding that verbal threats such as "we going to get you, you better drop the suit" do not rise to level of adverse action).

Further, Capt. Devlin's lack of knowledge of plaintiff's constitutionally protected ILC activities undercuts plaintiff's allegation that Capt. Devlin did not remove the ice pick

from the evidence dropbox within 72 hours so that the February 2016 misbehavior report could be "fabricated" in retaliation for plaintiff's constitutionally protected ILC activities. Amen. Compl. at 23 ¶ 87; See Henson, 2015 WL 9809874, at *12-13Van Dunk, 2013 WL 5970172, at *9. Indeed, contrary to plaintiff's conclusory allegations, the record is devoid of facts or evidence supporting plaintiff's contention that Capt. Devlin's failure to remove the ice pick from the dropbox within the time period required pursuant to DOCCS Directive 4910A occurred for any reason aside from administrative oversight. See Amen. Compl. at 23 ¶ 87. Moreover, as Capt. Devlin explains in his sworn affidavit, the fact that the ice pick was not removed from the evidence dropbox within 72 hours had no impact on plaintiff's March 2016 disciplinary hearing because "no one accessed the dropbox during th[at] time." Dkt. No. 178-6 at 3 ¶ 10. Thus, the admissible evidence demonstrates that Capt. Devlin's failure to remove the icepick from the evidence drop box within the 72 hour-period contemplated under DOCCS's policy does not constitute adverse action and is not causally related to plaintiff's constitutionally protected activities. In opposition, plaintiff's speculative and conclusory allegations that the photograph of the weapon, along with Capt. Devlin's statements to him on February 29, 2016 "shows the big picture," and raises an inference that Capt. Devlin retaliated against him, Dkt. No. 193-2 at 21, fail to defeat defendants' documentary case. See Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1. Accordingly, it is recommended that plaintiff's First Amendment retaliation claim against Capt. Devlin be dismissed.

### c. Capt. Bishop

Plaintiff's First Amendment retaliation claims against Capt. Bishop relating to the March 2016 disciplinary hearing are conclusory and belied by defendants' admissible evidence. Capt. Bishop's sworn affidavit states that "[n]one of the actions that [he] took with regard to [plaintiff] had anything to do with his participation as a member of the ILC[,]" and "were not motivated by a desire to retaliate against him for his activities on [the ILC], or any other constitutionally protected activity." Dkt. No. 178-4 at 5 ¶ 27. Further, as discussed above, the March 2016 Tier III hearing and resulting sanctions occurred more than two months after plaintiff had engaged authored the December 9, 2015 memorandum to Assemblyman O'Donnell or drafted the proposed December 16, 2015 ILC memorandum and, therefore, the timeline does not raise a strong inference of retaliation. See Webster, 694

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

F. Supp. 2d at 183-84; Pierrot, 2017 WL 4221117, at *8. Further, the record is devoid of statements Capt. Bishop made to plaintiff that could evidence that Capt. Bishop found plaintiff guilty of weapons possession based on a retaliatory animus. See Baskerville, 224 F. Supp. 2d at 732. Moreover, although Capt. Bishop's March 2016 Tier III disciplinary decision was ultimately reversed on plaintiff's administrative appeal because Rodriguez "believed, based upon the location of where the weapon was found, that it was possible that someone else had placed the weapon there, not [plaintiff]," the record is devoid of evidence indicating that Rodriguez reversed that determination because a review of the proceeding evidenced that Capt. Bishop's determination was influenced by or premised on a retaliatory motive. Indeed, the sworn affidavits of C.O. Breyette and C.O. Tucker establish, the icepick was recovered from plaintiff's cell on February 28, 2016, see Dkt. No. 178-5 at 2 ¶ 8; Dkt. No. 178-10 at 2 ¶ 7, and, based on that evidence, Capt. Bishop concluded that plaintiff was guilty of possessing a weapon in violation of DOCCS rule 113. Dkt. No. 178-4 at 5 ¶ 27. Therefore, defendants have established that Capt. Bishop would have found plaintiff guilty of the charges in the February 2016 misbehavior report and imposed the resulting sanctions regardless of any retaliatory motive. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted). Thus, aside from plaintiff's conclusory allegations, nothing before the undersigned suggests that plaintiff's constitutionally protected ILC activities were "a substantial or motivating factor" in any of Capt. Bishop's actions relating to the March 2016 disciplinary hearing and resulting sanctions. Burton, 664 F. Supp. 2d at 367.

**\*23** Similarly, no inference of retaliation concerning Capt. Bishop may be inferred based on plaintiff's filing of Grievance CL-68902-16. Plaintiff's grievance challenged the guilty determination from his February 2016 Tier III disciplinary hearing relating to his use of DOCCS letterhead. See Dkt. No. 25-1 at 4-6. Plaintiff only mentions Capt. Bishop in this grievance for the proposition the January 2016 misbehavior report was issued in error, as purportedly evidenced by the fact that Capt. Bishop, along with other DOCCS personnel, had "received letters from [plaintiff] on various topics, on [DOCCS] letterhead" prior to plaintiff using that letterhead in his correspondence with Hollmen. Dkt. No. 25-1 at 5. Plaintiff does not allege any wrongdoing against Bishop in the grievance, which was lodged against Kowalowski for his alleged involvement with the first misbehavior report "in retaliation for [plaintiff] requesting the name of the ILC Advisor

in Albany Central Office while responding to [the] letter from ... Hollmen." Id. at 4. Indeed, the only relief sought through that grievance was reversal and expungement of his February 2016 disciplinary determination. Id. at 4. As the IGRC's decision denying the grievance made clear, plaintiff's grievance was not an appropriate "substitute appeal mechanism. An individual decision or disposition resulting from a disciplinary proceeding is not grievable." Id. at 7. Moreover, the record is devoid of facts that would allow the Court to draw the "legitimate inference" that Capt. Bishop retaliated against plaintiff based on his grievance filed against Kowalowski. Espinal, 558 F.3d at 130; see Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing a retaliation claim against a correction officer where the only alleged basis for retaliation was a complaint written against another officer); see also Burroughs v. Mitchell, 325 F. Supp. 3d 249, 282 (N.D.N.Y. 2018) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." (internal quotation marks and citation omitted)). In any event, plaintiff does not allege that Capt. Bishop was aware that he was mentioned in the grievance, or that he took adverse action based on that grievance, but instead, conclusorily alleges that "[j]ust two (2) days" after his grievance was filed by IGP Supervisor Gregory on February 26, 2016, some unidentified individual(s) "planted" the icepick in his cell. See Amen. Compl. at 20 ¶ 74. Accordingly, it is recommended that plaintiff's First Amendment retaliation claim against Capt. Bishop relating to the March 2016 disciplinary hearing be dismissed.

### d. Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez

Even affording the Amended Complaint the most liberal construction possible, plaintiff does not allege any specific claims of retaliation against Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez. See Amen. Compl. at 20-42. Rather, plaintiff's retaliation claims insofar as asserted against these defendants, are premised exclusively on their purported involvement in the alleged conspiracy against him based on his December 2015 ILC activities. See id. Thus, as plaintiff has only conclusorily alleged that Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez retaliated against him, he has failed to meet his "heightened burden" in establishing a First Amendment retaliation claim because has not pleaded his claim against these defendants "with particularity." Green, 2006 WL 846272, at *3 (citing Brown, 41 F. Supp. 2d at); Williams, 111 F. Supp. 2d at 290. Moreover, as

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 198 of 306

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)
2021 WL 3293504

discussed in detail below, plaintiff's Section 1983 conspiracy claims lack merit and are belied by defendants' admissible evidence. Consequently, it is recommended that plaintiff's First Amendment retaliation claims based on the March 2016 disciplinary hearing against Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez be dismissed.

### 3. Kowalowski

Kowalowski is entitled to summary judgment dismissing plaintiff's First Amendment retaliation claim. As to plaintiff's contention that Kowalowski retaliated against him through his comment that ILC inmates "all have a target on your back, be careful," Kowalowski has established through his sworn declaration that he made that comment to the entire ILC, as he did with each new ILC class, in order to give them awareness that their status could draw heightened attention from staff and other inmates. Amen. Compl. at 12 ¶ 44; see Dkt. No. 179-3 at 2 ¶ 7. Further, to sustain a First Amendment retaliation claim, a plaintiff's constitutionally protected conduct must be a "a substantial or motivating factor in the prison official's decision to take action against him." Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotations, brackets, and citations omitted). Here, however, Kowalowski's comment at the November 2015 ILC meeting was, "by definition—unconnected to" plaintiff's constitutionally protected ILC conduct that took place in December 2015—as Kowalowski made the comment before plaintiff had engaged in that conduct. Richard v. Fischer, 38 F. Supp. 3d 340, 357 (W.D.N.Y. 2014) (internal quotation marks and citation omitted); see Dkt. No. 179-4 at 8-9. Moreover, plaintiff's allegation that, on January 6, 2016, "Kowalowski violently snatched a piece of paper out of [plaintiff's] hand which listed ... new proposed TV channels," and stated, "I took it, so what. You are not as important as you think you are[,]" Amen. Compl. at 15 ¶ 56, fails to establish a claim of First Amendment retaliation. Even accepting plaintiff's allegations as true, Kowalowski's actions and comments in this regard amount to, at most, "harassing comments and hostile behavior [that] do not constitute adverse actions sufficient to state a retaliation claim." Quezada v. Roy, No. 14-CV-4056(CM), 2015 WL 5970355, at *21 (S.D.N.Y. Oct. 13, 2015) (citation and internal quotation marks omitted). In any event, plaintiff's own documentary evidence belies his assertion. Specifically, plaintiff submits the January 8, 2016 ILC's letter to Supt. Kirkpatrick, in which the ILC complains that Kowalowski would not show the ILC Clinton C.F.'s contract with Charter Cable, but does not raise any complaints concerning Kowalowski's purported threats and plaintiff does not contend that he ever filed a grievance or made any other complaint about this incident. See Dkt. No. 25-1 at 143.

**\*24** Further, Kowalowski denies threatening plaintiff with SHU confinement in retaliation for plaintiff including complaints about assault by staff in his proposed December 2015 ILC agenda. See Dkt. No. 179-4 at 9. Plaintiff's claim in this regard fails for several reasons. First, Kowalowski states, in his sworn affidavit, that he never read the contents of the proposed ILC agenda, and that when he instructed plaintiff not to submit the proposed agenda, he was simply relaying a directive from Supt. Kirkpatrick that the Clinton C.F. administration would no longer accept ILC agendas longer than one page or containing more than four or five individual items. See Dkt. No. 179-3 at 4 ¶ 21. He explains that he did not threaten plaintiff with 270 days in SHU, as he believed, at most, plaintiff's submission of a five-page ILC agenda would result in Clinton C.F. cancelling the ILC meeting. See id. at 5-6 ¶ 27. Next, plaintiff's own documentary evidence belies his claim. For instance, in his January 11, 2016 letter to Assemblyman O'Donnell, plaintiff stated only that Kowalowski objected to the proposed agenda's length and the highlighting of prison administrator's names, and indicated that "the real reason why [Kowalowski] was upset" was because the proposed agenda "talk[ed] about misrepresentation and/or misappropriation of $10,000 in ILC fundraiser money, violating [DOCCS] Directive 2771." Dkt. No. 25-1 at 124. Conspicuously missing from plaintiff's January 11, 2016 letter is any mention that Kowalowski objected to the contents of the proposed agenda, and makes no mention of Kowalowski taking issue with plaintiff's inclusion of complaints against staff or instructing plaintiff to "water down" the agenda. Dkt. No. 179-3 at 4-5 ¶¶ 26-28 (citing Amen. Compl. at 15 ¶ 55); see Dkt. No. 25-1 at 123-26.

Moreover, the evidence in the summary judgment record establishes that Kowalowski did not issue the January 2016 misbehavior report, was not involved with Sgt. King's decision to issue the misbehavior report relating to plaintiff's use of DOCCS letterhead, and did not participate in the February 2016 disciplinary hearing. See Dkt. No. 179-3 at 7 ¶¶ 47-48, 53, 54. Indeed, Kowalowski "did not personally review [plaintiff's] magazine[ ]" in his capacity as co-chair of the FMRC, and did not approve the FMRC's decision concerning plaintiff's magazine in retaliation for plaintiff's ILC activities, but rather, because the magazine at issue contained prohibited content. Id. at 6 ¶ 39; see id. at ¶¶ 36, 40.

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 199 of 306

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)
2021 WL 3293504

Plaintiff's conclusory assertions in opposition are insufficient to defeat Kowalowski's documentary case in support of summary judgment. Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1.

In addition, the undersigned concludes that plaintiff's reliance on inmate Emerenciano's SHU sentence and lawsuit against Kowalowski is unpersuasive. As Kowalowski avers, see Dkt. No. 196 at 5,6, plaintiff has not proffered any evidence to establish a causal connection between underlying facts of inmate Emercenciano's case and the present action. Indeed, Kowalowski's sworn declaration establishes that he did not threaten plaintiff with 270 days in SHU, see Dkt. No. 179-4 at 5-6 ¶ 27, and the uncontroverted evidence establishes that plaintiff never received a 270-day SHU sentence. Although plaintiff has sought to supplement his pleadings in his response in opposition, his speculative and conclusory assertions fail to rebut Kowalowski's admissible evidence. See Perez v. New York City Dep't of Corr., No. 10-CV-2697 (RRM/RML), 2012 WL 3704744, at *3 (E.D.N.Y. Aug. 27, 2012) (rejecting the plaintiff's reliance on incidents involving other inmates to support a constitutional claim against the New York City Dept. of Corrections, reasoning that the plaintiff had not "allege[d] anything other than his own conclusory statements to suggest that there [wa]s any causal connection between the alleged incidents and the alleged deprivation of [the] plaintiff's constitutional rights." (citation omitted)). Consequently, it is recommended that plaintiff's First Amendment retaliation claims against Kowalowski be dismissed.

### C. Section 1983 Conspiracy - February 2016 Disciplinary Proceeding

In order to support a claim for conspiracy pursuant to § 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002); Cusamano v. Sobek, 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009). "An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient." McRae v. Fischer, No. 9:17-CV-0146 (BKS/CFH), 2018 WL 3432743, at *6 (N.D.N.Y. June 6, 2018), report and recommendation adopted, No. 9:17-CV-00146 (BKS/CFH), 2018 WL 3432700 (N.D.N.Y. July 16, 2018). Although exact specifics are not required, "the pleadings must present facts

tending to show agreement and concerted action." Anilao v. Spota, 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. See Ciambriello, 292 F.3d at 325. Where "there is no underlying constitutional violation, there can be [no] § 1983 cause of action for conspiracy." Bibeau v. Soden, No. 8:08-CV-0671 (LEK/RFT), 2009 WL 701918, at *8 (N.D.N.Y. Mar. 13, 2009); see also Taylor v. New York Dep't of Corr. Servs., No. 9:10-CV-140 (MAD/RFT), 2012 WL 913678, at *9 (N.D.N.Y. Feb. 23, 2012) ("[T] he failure of a plaintiff to show an underlying constitutional violation on which to base a section 1983 conspiracy claim means the conspiracy claims fails as a matter of law."), report and recommendation adopted sub nom. Taylor v. New York Dep't of Corr., No. 9:10-CV-140 (MAD/RFT), 2012 WL 913564 (N.D.N.Y. Mar. 16, 2012).

**\*25** First, as plaintiff has failed to establish a First Amendment retaliation claim against any defendant based on the January 2016 misbehavior report and February 2016 disciplinary hearing, he has "failed to show an underlying constitutional violation on which to base his section 1983 conspiracy claim" and, therefore, his "conspiracy claim fails as a matter of law." Taylor, 2012 WL 913678, at *9; Bibeau, 2009 WL 701918, at *8. Alternatively, even assuming plaintiff could establish a retaliation claim, the Amended Complaint and supporting documentary evidence is bereft of "facts tending to show agreement and concerted action." Anilao, 774 F. Supp. 2d at 512-13. Indeed, as set forth in detail above, plaintiff's claims in this regard consist exclusively of "bare allegations of a conspiracy," McRae, 2018 WL 3432743, at *6, which he fails to support with any specific facts or evidence demonstrating that defendants engaged in a meeting of the minds, "such as time, place, or manner in which ... defendants conspired against plaintiff" to violate his rights with respect to the events surrounding the February 2016 disciplinary proceeding. Avent v. Reardon, No. 1:19-CV-1565 (GTS/CFH), 2020 WL 7705938, at *7 (N.D.N.Y. Dec. 28, 2020).

Capt. Bishop's, Sgt. King's, Lt. Durkin's, Supt. Kirkpatrick's, and Rodriguez's sworn affidavits, and Kowalowski's sworn declaration establish that those defendants did not enter into an agreement to act in concert to retaliate against plaintiff —which no evidence in the summary judgment record controverts. See Ciambriello, 292 F.3d 307, 324-25. Plaintiff's allegations that Capt. Bishop directed Sgt. King to issue the January 2016 misbehavior report is belied by defendants'

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

admissible evidence. In his sworn affidavit, Sgt. King states that

> Capt[.] Bishop did not direct me to write the IMR and I did not use a "false" [misbehavior report] because Capt[.] Bishop told me to. I authored a truthful [misbehavior report] because I believed (and still believe) that [plaintiff] violated DOCCS policy by attempting to use his status as a law library clerk to use DOCCS letterhead for personal correspondence.... I did not discuss the [January 2016 misbehavior report] with Capt[.] Bishop before I wrote it or thereafter.

Dkt. No. 178-8 at 2 ¶ 6. Capt. Bishop's sworn affidavit corroborates Sgt. King's sworn affidavit, as Capt. Bishop explains that he "did not direct Sgt. King to write this [misbehavior report]" and he "did not have any personal involvement in the issuance of th[is] misbehavior report or the [February 2016 disciplinary] hearing." Dkt. No. 178-4 at 2 ¶ 9.

Further, plaintiff's contention that Supt. Kirkpatrick conspired with Lt. Durkin to find plaintiff guilty of the charges in the January 2016 misbehavior report fails. Supt. Kirkpatrick's states in his sworn affidavit that his "decision to assign [Lt.] Durkin as the hearing officer on the [January 2016 misbehavior report] was not motivated by a desire to retaliate against [plaintiff] for his participation on the ILC," Dkt. No. 178-13 at 4 ¶ 19, and that his "assign[ment of] Lt.[ ] Durkin as the hearing officer .... was appropriate as [Lt. Durkin] had not taken part in investigating the incidents underlying the [first misbehavior report], and had served as hearing officer on 22 hearings." Id. at 2 ¶ 8. Lt. Durkin states that he never discussed plaintiff's involvement on the ILC with any other defendant in this action, and that he "did not request to be appointed [as] the hearing officer" or "discuss being appointed the hearing officer with any other [d]efendant." Dkt. No. 178-7 at 2 ¶¶ 4, 9.

Moreover, Rodriguez's sworn affidavit establishes that he "did not work at ... Clinton [C.F.] and was not personally involved with the issuance of either Inmate Misbehavior

Report ... in this case. Nor was [he] involved with the hearings, other than to review [plaintiff's] appeals from their decisions." Dkt. No. 178-9 at 1-2 ¶ 3. Rodriguez also denies discussing this case with any other defendant aside from Venettozzi, who worked in the same office, and posits that he has "no memory of speaking with ... Venettozzi about this case during the relevant time period." Id. at 4 ¶ 3. In addition, although Kowalowski states that Capt. Bishop discussed plaintiff's use of letterhead with him during a January 2016 meeting, Kowalowski states that, while he "subsequently learned that [Sgt.] King wrote a misbehavior report against [plaintiff] relating to the letterhead[,]" he did not encourage Sgt. King or any other DOCCS personnel to write a misbehavior report, did not participate in any way in the February 2016 Tier III disciplinary hearing, id. at ¶ 53, and was not referenced in the January 29, 2016 misbehavior report. See Dkt. No. 179-4 at 17.

*26 In opposition, to the extent plaintiff attempts to controvert defendants' admissible evidence concerning his conspiracy allegations relating to the February 2016 disciplinary hearing, plaintiff advances only conclusory assertions. Plaintiff's contention that "[t]he fact that Sgt. King conspired and retaliated against [him] is not defeated because Sgt. King did not know about the Dec. 9th letter or the Dec. 16th Agenda, as his lack of knowledge of this memo and agenda did not prevent him from conspiring and retaliating[,]" Dkt. No. 193-2 at 12, is wholly conclusory and unsupported by any admissible evidence. Thus, plaintiff has failed to raise a genuine issue of material fact sufficient to defeat defendants' documentary case. See Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1. Accordingly, it is recommended that plaintiff's Section 1983 conspiracy claim against Capt. Bishop, Sgt. King, Lt. Durkin, Supt. Kirkpatrick, and Rodriguez relating to the February 2016 disciplinary hearing be dismissed.

### D. Procedural Due Process Claims Against Capt. Bishop Relating to the March 2016 Disciplinary Hearing

"To state a claim for procedural due process, there must first be a liberty interest which requires protection." Lewis v. Murphy, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994)). To establish a procedural due process claim under § 1983, a plaintiff must show that he (1) possessed a liberty interest, and (2) was deprived of that interest without being afforded sufficient

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

process. See Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " Id. (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)). As to the first factor, "[t]he prevailing view in this [C]ircuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement." Liao v. Malik, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). As to the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. Vasquez v. Coughlin, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998). Although there are no bright-line rules for this inquiry, the Second Circuit has advised district courts that SHU confinements of fewer than 101 days, "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or [the] record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." Palmer v. Richards, 364 F.3d 60, 65 (2d Cir. 2004); see Ortiz, 380 F.3d at 654 ("To be sure, with respect to 'normal' SHU confinement, we have held that a 101–day confinement does not meet the *Sandin* standard of atypicality." (quoting Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir. 1999)).

Here, defendants aver—and plaintiff does not dispute—that plaintiff served a total of 92 days in SHU as a result of both the February and March 2016 disciplinary determinations. See Dkt. No. 178-2 at 26; Dkt. No. 178-12 at 2 ¶ 12; see id. at 7-8 (exhibit A to Supt. Kirkpatrick's, listing a chronological history of plaintiff's SHU confinement). Thus, plaintiff's SHU confinement, alone, is insufficient to establish atypicality. See Ortiz, 380 F.3d at 654. Where, as here, the SHU confinement "was not long enough to constitute an atypical and significant deprivation by itself," the undersigned must "look to the conditions of confinement" to determine whether a due process violation has occurred. Smith v. Hamilton, 9:15-CV-0496 (BKS/ATB), 2016 WL 3823395, at *3 (N.D.N.Y. July 12, 2016) (quoting Palmer, 364 F.3d at 66).

 **\*27** In opposition to defendants' motion for summary judgment—citing only to his unverified Amended Complaint—plaintiff contends that his 92-day stint in SHU constituted "atypical and significant hardship" because, for the first four days, he did not have his high blood pressure medicine or a change of clothes, and was "denied a time cut and PIMS

level 2." Dkt. No. 193-2 at 25. As defendants aver, see Dkt. No. 195 at 14, the portion of the Amended Complaint that plaintiff relies on in support of his contention that he was deprived his blood pressure medicine and a change of clothes, demonstrates that these alleged deprivations occurred prior to the February 2016 disciplinary hearing and relate, instead, to plaintiff's placement in a keep-lock cell on January 29, 2016—not as a result of the February 2016 misbehavior report or March 2016 disciplinary hearing. See Amen. Compl. at 16, 17 ¶¶ 61, 62. Therefore, plaintiff cannot establish a due process claim relating to his January 2016 keeplock confinement based on Capt. Bishop's guilty determination at the March 2016 disciplinary hearing. Further, insofar as plaintiff contends that he was denied a PIMS level two classification, his due process claim fails "[b]ecause the PIMS ..., like any security classification ... does not create a liberty interest protected by due process." Cicio v. Williams, No. 9:11-CV-1196 (TJM), 2013 WL 3101692, at *5 (N.D.N.Y. June 18, 2013). In any event, plaintiff has offered no evidence in support of these belated and conclusory allegations—made for the first time in opposition to defendants' motion for summary judgment; therefore, plaintiff has failed to establish that he experienced atypical and significant hardship during his 92-day confinement in SHU. See Palmer, 364 F.3d at 65; see also Kerzer, 156 F.3d at 400 ("Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact."); Cusamano v. Sobek, 604 F. Supp. 2d 416, 492 (N.D.N.Y. 2009) ("[W]hile special solicitude permits a *pro se* plaintiff to effectively amend the allegations of his complaint while responding to a motion to dismiss for failure to state a claim (which, typically, comes relatively early in an action), it does not permit him to do so while responding to a motion for summary judgment (which, typically, comes relatively late in an action, for example, where, as here, after the defendants have completed discovery based on the allegations contained in the plaintiff's complaint.").

In addition, it is well settled that the loss of packages, commissary, and phone privileges does not establish an atypical or significant hardship. See Vega v. Artus, 610 F. Supp. 2d 185, 200 (N.D.N.Y. 2009) (" '[T]he loss of phone, package, and commissary privileges does not give rise to a protected liberty interest under New York law.' " (internal quotation marks and citation omitted)); McEachin v. Selsky, No. 9:04-CV-0083 (FJS/RFT), 2010 WL 3259975, at *9 (N.D.N.Y. Mar. 30, 2010) ("It is expected that confinement in SHU will be accompanied by a loss of privileges that prisoners in the general population enjoy and such conditions

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504

fall 'within the expected parameters of the sentence imposed by a court of law.' ") (quoting Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996)); see also Borcsok v. Early, No. 9:03-CV-395 (GLS/RFT), 2007 WL 2454196, at *9 (N.D.N.Y. 2007) (holding that a 90–day confinement in SHU alone with 90–day loss of packages, commissary and telephone privileges was insufficient to raise a liberty interest where plaintiff made no showing that the conditions of confinement were atypical or constituted a significant hardship). Consequently, as plaintiff has failed to establish that the conditions of his confinement in SHU constituted an atypical and significant hardship, it is recommended that plaintiff's due process claims be dismissed on that basis alone.

Moreover, defendants are entitled to summary judgement dismissing plaintiff's specific procedural due process claims relating to Capt. Bishop's conduct as the hearing officer at the March 2016. The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or polices." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (internal citations omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

The constitutionally mandated due process requirements for prison disciplinary hearings include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. See Wolff v. McDonald, 418 U.S. 539, 564-70 (1974); Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004).

 *28  The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citing Wolff, 418 U.S. at 570-71). "Due process in this context requires

only that the hearing officer's decision not be 'arbitrary.' " Kimbrough v. Fischer, No. 9:13-CV-0100 (FJS/TWD), 2014 WL 12836864, at *4 (N.D.N.Y. Oct. 21, 2014) (quoting Wolff, 418 U.S. at 571), report and recommendation adopted, No. 9:13-CV-100 (FJS/TWD), 2016 WL 660919 (N.D.N.Y. Feb. 18, 2016). A decision is not "arbitrary" if it is supported by "some evidence." Superintendent v. Hill, 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied 'if there is any evidence in the record that supports' the disciplinary ruling." Sira, 380 F.3d at 69 (quoting Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000)). "[O]nly 'reliable' evidence can constitute 'some evidence.' " Id. at 76 (quoting Luna, 356 F.3d at 488). "The subsequent modification of [plaintiff's] determination during the administrative appeals process ... does not impact the due process analysis," and "[t]he outcome of an administrative appeal or a state court proceeding does not, by itself, resolve the question of whether a constitutional violation occurred." Alexander v. Fischer, No. 9:14-CV-548 (GLS/ATB), 2015 WL 10568892, at *4 (N.D.N.Y. Dec. 21, 2015) (citing Walker v. Bates, 23 F.3d 652, 657 (2d Cir. 1994) (additional citations omitted), report and recommendation adopted, No. 9:14-CV-548(GLS/ATB), 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016).

Here, plaintiff does not allege that he did not receive timely written notice of the charges against him; was not offered employee assistance to prepare for his Tier III disciplinary hearing; or that Capt. Bishop did not issue a written decision that included the evidence he relied on and his reasoning for his ultimate disposition. See Amen. Compl. at 22-23. Therefore, plaintiff's claims are limited to whether Capt. Bishop acted impartially; deprived plaintiff of certain evidence he requested at the March 2016 disciplinary hearing; erred in reaching certain conclusions based on the evidence elicited at the hearing. See id. at 22 ¶ 84, 23 ¶ 87.

Plaintiff's Amended Complaint, read liberally, contends that Capt. Bishop was not an impartial hearing officer because he was involved in the underlying incident giving rise to the March 2016 disciplinary hearing he presided over as hearing officer since his name appears on the UIR relating to the discovery of an icepick in plaintiff's cell on February 28, 2016. See Amen. Compl. 22 ¶ 84. Plaintiff also relies on his retaliation claim that Capt. Bishop "conspired with [Supt.] Ulher of [Upstate C.F.], a former [c]aptain of [s]ecurity at [Clinton C.F.] in 2008[,] to be assigned as the hearing officer at [Upstate C.F.] to hold [the] hearing, even though [Upstate C.F.] employs a full-time ... Hearing Officer ..." to establish

2021 WL 3293504

that Capt. Bishop was not a fair and impartial hearing officer. Id. However, defendants proffer Capt. Bishop's sworn affidavit in which he states that [he] did not draft [the] UIR or investigate the claims within it" and that his "name was listed on the UIR as the 'person reporting' because, as a matter of course, the Captain's name was listed on all UIRs." Dkt. No. 178-4 at 3 ¶ 14. Supt. Kirkpatrick's sworn affidavit further explains that "Bishop did not investigate the incident giving rise to the March 2016 misbehavior report,]" and that Capt. Bishop's "name is listed on the UIR simply because the [c]aptain's name is listed on the UIR as a matter of course." Dkt. No. 178-13 at 3 ¶ 16. Moreover, Supt. Kirkpatrick's sworn affidavit establishes the paperwork procedure for how UIRs are processed. See id. at ¶ 17. In particular, Supt. Kirkpatrick's sworn affidavit establishes that a captain reviews the UIR forms to make sure they are properly completed, but that the captain is not "considered to have 'investigated' the incident merely by being part of this chain of review." Id. Moreover, Supt. Kirkpatrick's and Capt. Bishop's sworn affidavits establishes that it was "common procedure and courtesy" for Capt. Bishop to preside over the March 2016 disciplinary hearing even though the hearing was held at Upstate C.F., because the incident giving rise to the proceeding—the discovery of the icepick in plaintiff's cell—occurred at Clinton C.F. Dkt. No. 178-13 at 3 ¶ 13; see Dkt. No. 178-4 at 3 ¶ 16. In addition, the sworn affidavits of Supt. Kirkpatrick, Capt. Bishop, and Supt. Uhler, establish that Supt. Kirkpatrick, as part of his duties as superintendent of Clinton C.F., independently assigned Capt. Bishop to serve as the hearing officer at the March 2016 disciplinary hearing—without engaging any prior discussions of the assignment with Capt. Bishop or Supt. Uhler. See id.; see Dkt. No. Dkt. No. 178-11 at 2 ¶ 6; Dkt. No. 178-4 at 13 ¶ 16. Thus, defendants have established through admissible evidence that Capt. Bishop was not appointed to serve as hearing officer for the purpose of ensuring a finding of guilt and that he was not involved in the investigation relating to the charges contained in the February 2016 misbehavior report. Plaintiff's conclusory arguments in opposition, which amount to only reassertions of the claims contained in his unverified Amended Complaint, see Amen. Compl. 22 ¶ 84; Dkt. No. 193-2 at 21, fail to raise a genuine issue of material fact.

 *29  Next, plaintiff alleges that Capt. Bishop violated his procedural due process rights by declining to grant him access to "requested ... E-Block (Unit) log book entries from 9:00 a.m. on February 28, 2016, until 5:00 p.m., on March 1, 2016," and provided him only with log book entries from February 28, 2016. Amen. Compl. at 23 ¶ 87; see id. at 24 ¶

89. Plaintiff notes that the handwritten date contained on the photograph of the icepick recovered from his cell on February 28, 2016, was dated February 29, 2016, and that non-party C.O. Stiles recorded the weapon "as being photographed on February 29[,] 2016." Id. at 23 ¶ 87. Plaintiff believes that the logbook entries for the days before and after February 28, 2016, were relevant to his defense at the hearing because "the evidence drop box log book [ ] [did not] have a date [ ] when the evidence was entered into the drop box," and he "feel[s] this evidence wasn't logged in on February 28, 2016, and [that] without seeing the previous ... and the forward pages, [he was not] able to identify whether or not it was logged in at the time." Id. at 24 ¶ 90. Plaintiff relies on the inconsistency between the date of the February 28, 2016 misbehavior report and the date on the photograph of the weapon in support of his contention that, on "February 29[ ], 2016, [ ]Capt[.] Devlin conspired with Capt. Bishop to fabricate the [February 28, 2016 misbehavior report]." Id. at 23 ¶ 87.

Capt. Bishop's sworn affidavit establishes that the handwritten date of February 29, 2016, contained under the photograph of the weapon, was due solely to a clerical error and is not relevant to the weapons charge that formed the basis of the February 2016 misbehavior report. See Dkt. No. 178-2 at 28; Dkt. No. 178-4 at 4 ¶ 22. As plaintiff acknowledges, he "questioned" the inconsistency at the hearing by asking Sgt. Baker, "[d]id you drop the ... weapon in the box the same date that you ... wrote the memo?" to which Sgt. Baker replied, " 'It was on the same day.' " Amen. Compl. at 24-25 ¶ 93 (quoting Dkt. No. 25-2 at 51). As Capt. Bishop explains, on March 29, 2016, the last day of the March 2016 disciplinary hearing, he questioned Sgt. Baker, who stated that the correct date on which the weapon was recovered and photographed was February 28, 2016, and that the handwritten date contained on the photograph was a "clerical error." Id. at 5 ¶ 23. Moreover, Capt. Bishop noted that, between the second and third days of the March 2016 disciplinary hearing, Sgt. Baker reviewed his attendance records, which indicated that he was not working on February 29, 2016, but was working on February 28, 2016, and that he had photographed the weapon; therefore, Capt. Bishop "concluded that the 28th" was the correct date, "and the handwritten date was an error." See id. at ¶ 24. Thus, as defendants aver, Capt. Bishop did not deprive plaintiff procedural due process based on his decision not to provide plaintiff with the additional log book dates because those pages were irrelevant, as it was established that the date contained on the photograph of the icepick was a mere scrivener's error that had no impact on the outcome of the hearing. See Torres v. Selsky, No. 9:02-

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 204 of 306
Rucano v. Annucci, Not Reported in Fed. Supp. (2021)
2021 WL 3293504

CV-0527 (DNH/DEP), 2005 WL 948816, at *7 (N.D.N.Y. Apr. 25, 2005) ("Evidence considered to be irrelevant or unnecessary to the issues truly in contention may, in a hearing officer's discretion, properly be excluded in such a proceeding." (citation omitted)).

Similarly, plaintiff's contention that Capt. Bishop violated his due process by preventing plaintiff from asking Sgt. Baker whether he had ever " 'secured evidence in the drop box in previous times[,]' " or if he " 'kn[e]w what [he was] supposed to do in the evidence drop box sign in sheet when [he] secure[d] evidence' " is meritless. Amen. Compl. at 26 ¶¶ 99, 100 (quoting Dkt. No. 25-2 73-74). As the record makes clear, Capt. Bishop asked Sgt. Baker if he had "secure[d]" the weapon "on [February 28,] 2016[,] in the evidence drop box[,]" to which Sgt. Baker replied, "Yes I did." Id. at ¶ 101 (quoting Dkt. No. 25-2 at 75). As discussed above, Sgt. Baker's testimony at the hearing established that the wrong date had been recorded on the photograph, but that he entered the weapon into evidence on February 28, 2016, the last day he worked before being off on February 29, 2016. Dkt. No. 178-4 at 5 ¶¶ 23, 24. Thus, the exclusion of plaintiff's proposed line of questioning was appropriate, as it was neither relevant nor necessary to plaintiff's defense at the hearing. See Tafari v. McCarthy, 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (" 'A hearing officer does not violate due process by excluding irrelevant or unnecessary testimony.' " (quoting Kalwasinski v. Morse, 201 F.3d 103, 109 (2d Cir. 1999)).

 *30  Further, plaintiff cannot establish a procedural due process claim based on Capt. Devlin's violation of DOCCS Directive 4910A by failing to remove the icepick from the evidence drop box within 72 hours. It is well established that "[v]iolations of state law do not give rise to claims under 42 U.S.C. § 1983 ...[, and, m]ore specifically, a violation of a DOCCS directive does not state a claim for a constitutional violation under § 1983." Tuitt v. Chase, No. 9:11-CV-0776 (DNH/TWD), 2013 WL 877439, at *10 (N.D.N.Y. Jan. 30, 2013) (internal citation omitted), report and recommendation adopted, No. 9:11-CV-0776 (DNH/TWD), 2013 WL 877617 (N.D.N.Y. Mar. 8, 2013). In any event, defendants have established that, although the weapon remained in the evidence dropbox longer than contemplated under DOCCS Directive 4910A, the evidence was not ultimately affected in any way, because "no one accessed the drop box during this time." Dkt. No. 178-6 at 3 ¶ 10. Thus, plaintiff's procedural due process claim in this regard fails. In addition, to the extent that plaintiff argues that the disciplinary hearing was the result of a false misbehavior report, see Amen. Compl.

at 24-27, 70, his conclusory assertion does not alter the foregoing analysis. It is well settled that prison inmates have no constitutionally guaranteed immunity from being falsely or wrongfully accused of conduct for which they are subjected to a deprivation of a protected liberty interest provided that, as plaintiff was here, the prisoner was afforded sufficient procedural due process. See Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986). Similarly, to the extent that plaintiff relies on the July 2017 administrative reversal of the March 2016 disciplinary decision to establish that Capt. Bishop violated his procedural due process rights, his claim fails. See Alexander, 2015 WL 10568892, at *4 (citing Walker, 23 F.3d at 657 (additional citations omitted)). Based on the foregoing, it is recommended that plaintiff's procedural due process claims against Capt. Bishop be dismissed.

### E. Section 1983 Conspiracy – March 2016 Disciplinary Proceeding

Plaintiff has failed to establish a First Amendment retaliation claim against any defendant based on the February 2016 misbehavior report and March 2016 disciplinary hearing, and failed to establish that Capt. Bishop violated his due process rights at the March 2016 disciplinary hearing; therefore, as plaintiff has "failed to show an underlying constitutional violation on which to base his section 1983 conspiracy claim," his "conspiracy claim fails as a matter of law." Taylor, 2012 WL 913678, at *9; Bibeau, 2009 WL 701918, at *8. In any event, plaintiff's Section 1983 conspiracy claims relating to the March 2016 disciplinary hearing are wholly conclusory and belied by defendants' admissible evidence. C.O. Breyette's and C.O. Tucker's sworn affidavits both state that they recovered a weapon from plaintiff's cell on February 28, 2016, which provided the basis for C.O. Breyette's misbehavior report. See Dkt. No. 178-5 at 2 ¶¶ 8, 10; Dkt. No. 178-10 at 2 ¶ 7. Both C.O. Breyette and C.O. Tucker state that he did not communicate about the incident with any other defendant in this action concerning the discovery of the weapon, and deny conspiring with anyone against plaintiff. See Dkt. No. 178-5 at 2 ¶ 11; Dkt. No. 178-10 at 2 ¶ 10. Further, Capt. Bishop's, Supt. Kirkpatrick's, and Supt. Uhler's sworn affidavits establish that Supt. Kirkpatrick appointed Capt. Bishop to preside over the March 2016 disciplinary hearing without consulting with Capt. Bishop or Supt. Uhler, and that he appointed Capt. Bishop to preside as the hearing officer even though the hearing took place at Upstate C.F. following plaintiff's transfer pursuant to "common procedure and courtesy" because the underlying incident had occurred

at Clinton C.F. Dkt. No. 178-13 at 3 ¶ 13; see Dkt. No. 178-11 at 1, 2 ¶¶ 2, 6; Dkt. No. 178-4 at 3 ¶ 16, 5 ¶ 27. Indeed, in his sworn affidavit, Supt. Kirkpatrick states that he "did not discuss the appointment with [Capt.] Bishop or [Supt.] Uhler." Dkt. No. 178-13 at 2 ¶ 11. Likewise, Capt. Devlin, Venettozzi, and Rodriguez all deny conspiring against plaintiff or discussing the February 2016 incident. See Dkt. No. 178-6 at 3 ¶¶ 12, 16; Dkt. No. 178-9 at 1-2 ¶ 3; Dkt. No. 178-12 at ¶ 4.

Plaintiff's contentions in opposition are devoid of any specific factual allegations, and plaintiff has not proffered any evidence to controvert defendants' sworn statements. See Dkt. No. 193 at 12, 13, 15, 16. Indeed, plaintiff has not advanced any specific facts or evidence demonstrating that defendants engaged in a meeting of the minds, "such as time, place, or manner in which ... defendants conspired against plaintiff" to violate his rights with respect to the events surrounding the March 2016 disciplinary proceeding. Avent, 2020 WL 7705938, at *7. Consequently, it is recommended that plaintiff's Section 1983 conspiracy claim against C.O. Breyette, C.O. Tucker, Capt. Bishop, Capt. Devlin, Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez based on the March 2016 disciplinary hearing be dismissed.

**\*31** In light of the foregoing recommendations that defendants are entitled to summary judgment dismissing plaintiff's First Amendment retaliation claims and Section 1983 conspiracy claims on the merits, the undersigned declines to address defendants' arguments regarding personal involvement [9] and qualified immunity.

[9]     The undersigned notes that defendants' arguments regarding personal involvement are based exclusively on their arguments concerning the merits of plaintiff's First Amendment retaliation and Section 1983 conspiracy claims, while conceding Capt. Bishop's personal involvement with the alleged due process violations at the March 2016 Tier III disciplinary hearing. See Dkt. No. 178-2 at 10-16.

### IV. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 178) be **GRANTED IN ITS ENTIRETY**, and it is further

**RECOMMENDED**, that Kowalowski's Motion for Summary Judgment (Dkt. No. 179) be **GRANTED IN ITS ENTIRETY**, and it is further

**RECOMMENDED**, plaintiff's Amended Complaint (Dkt. No. 25) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72. [10]

[10]     If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3293504

---

**End of Document**                © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:18-CV-00218**<br>Rucano v. Venettozzi et al | — | N.D.N.Y. | Feb. 20, 2018 | Docket |

**WESTLAW** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (10)**

**Direct History (2)**

1. Rucano v. Annucci
   2021 WL 3293504 , N.D.N.Y. , May 19, 2021

*Report and Recommendation Adopted by*

2. Rucano v. Venettozzi
   2021 WL 3292394 , N.D.N.Y. , Aug. 02, 2021

**Related References (8)**

3. Rucano v. Annucci
   2018 WL 11467222 , N.D.N.Y. , May 24, 2018

4. Rucano v. Venettozzi
   2018 WL 11467223 , N.D.N.Y. , Oct. 25, 2018

*Reconsideration Denied by*

5. Rucano v. Venettozzi
   2019 WL 140711 , N.D.N.Y. , Jan. 09, 2019

6. Rucano v. Venettozzi
   2019 WL 1306073 , N.D.N.Y. , Mar. 22, 2019

7. Rucano v. Venettozzi
   2019 WL 13247926 , N.D.N.Y. , Sep. 27, 2019

8. Rucano v. Venettozzi
   2019 WL 6317315 , N.D.N.Y. , Nov. 26, 2019

9. Rucano v. Venettozzi
   2020 WL 13599712 , N.D.N.Y. , Apr. 16, 2020

10. Rucano v. Annucci
    2020 WL 13599714 , N.D.N.Y. , Oct. 19, 2020

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag

Distinguished by Smith v. Collins, S.D.N.Y., October 1, 2015

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of New York, Kelly L. Munkwitz, Esq., Asst. Attorney General, of Counsel, Department of Law, Albany, NY, for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

 **\*1** Plaintiff, Jeff Smith, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated March 17, 2006, the Honorable George H. Lowe, United States Magistrate Judge, recommended that defendants' motion for summary judgment be granted, and that plaintiff's motion for partial summary judgment be denied. (Docket No. 51). The plaintiff has filed objections to the Report-Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of the report and recommendations to which the plaintiff has objected, the Report-Recommendation is accepted and adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly, it is ORDERED that
1. Defendants' motion for summary judgment is GRANTED;

Plaintiff's motion for partial summary judgment is DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Rules of Practice for this Court. In this *pro se* civil rights action brought under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges that five employees of Upstate Correctional Facility-Deputy Superintendent Robert K. Woods, Captain Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service Administrator Richard Antonelli, and Correction Officer Wayne Holt ("Defendants")-violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments by (1) retaliating against him for having previously filed a complaint, (2) subjecting him to an unreasonable search and seizure, (3) subjecting him to a damaged bunk bed while he was housed in the Upstate Correctional Facility Special Housing Unit, and (4) taking away his "good time" credits without affording him due process. (Dkt. No. 5 [Plf.'s Am. Compl.].) [1]

[1]     Given my duty to liberally construe a *pro se* plaintiff's civil rights complaint, I construe Plaintiff's Amended Complaint as including a claim that various Defendants violated Plaintiff's rights under the Fourth Amendment to be free from unreasonable searches and seizures. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, [the plaintiff] has raised. In so doing, the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. *(See also* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment[ ]

2006 WL 1133247

rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

 **\*2**  Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the ... responsibility of granting significant liberality in how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21

2006 WL 1133247

*(1972) (per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]      *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]      *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and*

that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]      Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

6    *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7    Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

8    *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649,

664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. [9] Of course, an affidavit may be conclusory because its assertions are too general. [10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

9    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10    *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging

remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by

admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a] [2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

12    (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13    *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other

2006 WL 1133247

two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"];* Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to **hold a copy of the complaint"** in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents *being in my possession ...* you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail."[14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters.[15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail.[16]

[14]    (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]    (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

[16]    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F.").[17]

[17]    (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F.[18]

[18]    (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ ¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198).[19]

[19]    (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37

2006 WL 1133247

[Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit.[20] At the time, Plaintiff was not an inmate law clerk.[21]

[20]     (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

[21]     (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer.[22]

[22]     (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action.[23] In pertinent part, the letter stated,

[23]     (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already told both of you that I am helping him with the filing of his motions, etc....

Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him.[24]

[24]     (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center.[25]

[25]     (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters.[26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on."[27] In addition, the last page of the letter states:

[26]    (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

[27]    (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original*.
It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession.[28]

[28]    (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters.[29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

[29]    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

   Plaintiff's Communications with Defendant Woods
   and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods.[30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request."[31]

[30]    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[31]    (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods.[32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention."[33]

[32]    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[33]    (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic."[34]

[34]    (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods.[35] The note stated, in pertinent part:

[35]    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration cannot take any action against the inmate's family nor myself.[36]

[36]    (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

 **\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff.[37] That memorandum stated, in pertinent part:

[37]    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately.[38]

[38]    (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum.[39]

[39]    (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents.[40] Plaintiff denied having such documents.[41]

[40]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note.[42]

[42]    (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers).[43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters).[44]

[43]    (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement];

Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44] (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping

an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods. [45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F. [46]

[45] (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46] (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

Plaintiff's Misbehavior Report,
Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002. [47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3)

soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20. [48]

[47]    (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48]    (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate family member without the consent or approval of the Superintendent or his designee. [51]

[49]    (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) See also 7 N.Y.C.R.R. § 270.02[B][26][vii].

[50]    (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) See also 7 N.Y.C.R.R. § 270.02[B][14][v].

[51]    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or

services" from Inmate Alcivar's daughters].) See also 7 N.Y.C.R.R. § 270.02[B][4][ii].

*8    22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

[52]    (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

[53]    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

[54]    (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

55    (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

56    (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence.[57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days.[58] However, Plaintiff's good time loss was unaffected by the discretionary review.[59]

57    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58    (Id.)

59    (Id.)

Meetings Between Defendants
Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff.[60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff.[61]

60    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1,

¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61    (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F.[62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules.[63]

62    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged

2006 WL 1133247

unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

[64]   (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

[65]   (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [68]

[66]   (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial

of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]   (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]   (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

III. ANALYSIS

A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

*9 In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d

**Smith v. Woods, Not Reported in F.Supp.2d (2006)**

2006 WL 1133247

---

379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have

been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]  *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at \*7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such

---

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

70    (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

71    (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

72    (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter"

with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74    *(See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. [75]

75    (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth

Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. [76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. [77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." [78]

[76]    *(See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

[77]    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am"

even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

[78]    (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11**  The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

[79]    *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

[80]    *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

[81]    (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

[82]    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

[83]    I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

[84]    See, e.g., DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12**  With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis" [85] in September of 2002 as a result of

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 226 of 306
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

sleeping on a defective bed.[86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

[85]   "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at *35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

[86]   (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

[87]   *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at *4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at *11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at *13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at *4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

[88]   (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard

conditions there, which included his allegedly defective bunk].)

[89]   (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective.[90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question.[91]

[90]   (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]   *(See, supra,* Statement of Fact No. 29.)

 **\*13**  More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed,[92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002.[93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002.[94]

[92]   (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93]   *(Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different

SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02]** *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02]** *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02,** or three days after his admission to SHU].)

[94] (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds.[95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95] *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it.[96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times.[97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96] (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97] *(See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints.[98] Any assertion by Plaintiff that Defendants

Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]    (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]    (*Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14**  In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October

24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]    (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

[101]    *(See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under §

1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations

omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]  (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]  *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding

that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable. [105]

[104] *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105] (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106] (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107] (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108] (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

### E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue.[109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated.[110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated.[111]

[109] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ...

upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110] *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at *7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at *7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111] *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

### F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group

2006 WL 1133247

of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have

personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant

official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992). [112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112]   See also *Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

[113]   See *Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the

sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

   H. Plaintiff's Motion for Partial Summary Judgment

Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the*

**Smith v. Woods, Not Reported in F.Supp.2d (2006)**

2006 WL 1133247

*moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*") [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (5)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Brief for Defendants-Appellees**<br>Jeff SMITH, Plaintiff-Appellant, v. Robert K. WOODS, Defendants-Appellees.<br>2006 WL 5101312 | PDF | C.A.2 | Oct. 23, 2006 | Brief |
| **2. Notice of Motion**<br>Jeff SMITH, Plaintiff, v. Robert K. WOODS, DepUty Superintendent; Joseph R. Belarge, Captain; G. J. O'Donnell, Sergeant; F.S.A. Antonelli; Wayne Holt, Officer, Defendants.<br>2004 WL 5538138 | PDF | N.D.N.Y. | June 30, 2004 | Motion |
| **3. Counter-Statement Pursuant to Rule 7.1(a)(3)**<br>Jeff SMITH, Plaintiff, v. Robert K. WOODS, Deputy Superintendent; Joseph R. Belarge, Captain; G.J. O'Donnell, Sergeant; F.S.A. Antonelli; Wayne Holt, Correction Officer, Defendants.<br>2005 WL 6063077 | PDF | N.D.N.Y. | Apr. 01, 2005 | Filing |
| **4. Docket 07-8792**<br>JEFF SMITH v. ROBERT K. WOODS | — | U.S. | Jan. 17, 2008 | Docket |
| **5. Docket 06-2370**<br>SMITH v. WOODS | — | C.A.2 | May 16, 2006 | Docket |

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (3)**

**Direct History (3)**

🚩 1.  Smith v. Woods
2006 WL 1133247 , N.D.N.Y. , Apr. 24, 2006

*Judgment Affirmed by*

2.  Smith v. Woods
219 Fed.Appx. 110 , 2nd Cir.(N.Y.) , Mar. 12, 2007

*Certiorari Denied by*

3.  Smith v. Woods
552 U.S. 1248 , U.S. , Mar. 03, 2008

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 7500501

2019 WL 7500501
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Richard H. LIVINGSTON, Plaintiff,
v.
William HOFFNAGLE, et al., Defendants.

No. 9:19-CV-0353 (GLS/CFH)
|
Signed 11/08/2019

**Attorneys and Law Firms**

Richard H. Livingston, 326 N. Beech Street, Syracuse, New York 13207, Plaintiff pro se.

OF COUNSEL: CHRISTOPHER J. HUMMEL, ESQ. [1] , Assistant Attorney General, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorney for Defendants.

[1]   The undersigned bears no relation to counsel for defendants.

**REPORT-RECOMMENDATION AND ORDER** [2]

[2]   This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Richard H. Livingston ("Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Correctional Sergeant ("Sgt.") William Hoffnagle, Correction Officer ("C.O.") Dustin Hollenbeck, and C.O. Chris King—who, at all relevant times were employed at Upstate Correctional Facility ("Upstate")—violated his constitutional rights under the First and Eight Amendments. See Dkt. No. 1 ("Compl."). [3]

[3]   Following initial review of plaintiff's complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), Senior

District Judge Gary L. Sharpe dismissed certain claims with and without prejudice. See Dkt. No. 4. The Court dismissed plaintiff's Fourteenth Amendment Due Process and Equal Protection Claims. See Dkt. Nos. 1, 4. Further, Judge Sharpe's Decision and Order dismissed plaintiff's claims insofar as plaintiff sought monetary damages against defendants in their official capacity pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915(A) as barred by the Eleventh Amendment. See Dkt. No. 4 at 8.

Presently pending before the Court is defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 12. Plaintiff did not file a response. [4] For the reasons that follow, it is recommended that defendants' motion be granted in part and denied in part.

[4]   In lieu of filing a response, plaintiff submitted a letter stating that he relied "solely" on a previous report and recommendation in a separate case arising out of largely the same facts and circumstances as alleged herein in which Magistrate Judge Peebles recommended granting defendants' motion to dismiss plaintiff's prior complaint on the basis that plaintiff failed to exhaust administrative remedies, but "note[d] that 'the outcome could very well have been different if plaintiff had, in fact, permitted the thirty-day period to elapse prior to commencing [that] suit." Dkt. No. 14 (quoting Livingston v Hoffnagle et al., 9:17-CV-1158 (MAD/DEP), Dkt. No. 28 at 18 n.11).

**I. Background**

**A. Plaintiff's Recitation of the Facts**

The facts are related herein in the light most favorable to plaintiff as the non-moving party. See section II.A. infra. At all times relevant to this complaint, plaintiff was incarcerated at Great Meadow Correctional Facility ("Great Meadow"). See generally Compl. On August 1, 2017, plaintiff was transferred from Clinton Correctional Facility ("Clinton") to Upstate, [5] where he was to be housed in solitary confinement for six months as a result of his involvement in an altercation with another inmate at Clinton. See Compl. at 5 ¶ 8; Dkt. No. 1-1 at 2. Upon his arrival to Upstate, plaintiff requested that

Sgt. Hoffnagle, the area supervisor, place him in protective custody because "he was in fear for his life and safety" as a result of the prior altercation, which he characterized as a "gang attack." Compl. at 5 ¶ 8. According to plaintiff, the inmate with whom he had engaged in an altercation at Clinton was a gang member and had initiated the fight with plaintiff. See id. However, plaintiff "had gotten the best of" him, which plaintiff believed became widely known throughout DOCCS. Id. Therefore, plaintiff asserts, he was worried that a gang member at Upstate would retaliate against him. See id. Plaintiff alleges that, in response to his request for protective custody, Sgt. Hoffnagle directed his two subordinates, C.O. Hollenbeck and C.O. King, "to dissuade" plaintiff from requesting protective custody. Id. at 12 ¶ 45.

[5]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. Samuels v. Selsky, No. 01-CV-8235 (AGS), 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

**\*2**  Plaintiff states that defendants "tortured" him by locking him in a holding cell, "chained and handcuffed tightly," with no food, water, or bathroom access between 1:00 P.M. and 6:30 P.M. Id. at 9 ¶ 39, 5 ¶ 12. He asked defendants "over 10 times" to loosen his chains and handcuffs, for water, and to use the bathroom "for relief," but defendants ignored his requests. Id. at 6 ¶ 13, 10 ¶ 40. Between 5:30 P.M. and 6:30 P.M., plaintiff "threaten[ed] to file grievances and lawsuits" against defendants based on "constitutional violations." Id. at 6 ¶ 15. In response, C.O. King told plaintiff that "the Sgt. wants to write plaintiff a ticket" and that "he was instructed to write a misbehavior report" based on plaintiff's "refus[al] of a direct order to lock into a cell," which plaintiff denies, stating that "this was not the case." Id. at 6 ¶¶ 17, 18. Sometime between 6:00 p.m. and 6:30 p.m., plaintiff was placed in a cell with a "violent gang banger," purportedly in contravention of DOCCS Directive No. 4003B, and given a tray of food that was "freezer cold." Id. at 6 ¶ 20. Plaintiff states that he was housed with this inmate as "punishment" for requesting protective custody. Id. at 6 ¶ 20, 7 ¶ 22. Plaintiff alleges that being housed with this "gang member" caused him "psychological pain" and loss of "sleep for days in fear of his life." Id. at 11 ¶ 43.

On August 3 and August 7, 2017, plaintiff filed two nearly identical grievances concerning the events that occurred on August 1, 2017. See id. at 7; Dkt. No. 1-1 at 4, 5.

On September 25, 2017, plaintiff's grievance was denied. See Dkt. No. 1-1 at 10-11. Plaintiff appealed the denial to Central Office Review Committee (CORC). See id. at 12. On December 12, 2018, CORC denied plaintiff's appeal as without merit. See id. at 16.

## II. Discussion [6]

[6]    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Legal Standard for Motions Pursuant to Fed. R. Civ. P. 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009)) (internal quotation marks omitted). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is " 'plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible....") (internal quotation marks and citation omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

2019 WL 7500501

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law....

 **\*3** Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, ... a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

### B. Eighth Amendment

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. Hudson v. McMillian, 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).

### 1. Excessive Force

Plaintiff alleges that defendants used excessive force in violation of his Eighth Amendment rights by applying his chains and handcuffs too tightly. Compl. at 10 ¶¶ 12, 41. Plaintiff states that the tightness of the chains and handcuffs caused "soreness." Id. at 10 ¶ 41. He further contends that he "asked over 10 times" for his handcuffs and chains to be loosened and "continued to complain about the tightness and soreness for [six] hours," but defendants refused to loosen the chains and handcuffs. See id. at 6 ¶ 14. He alleges that the chains and handcuffs were applied tightly in order to make him "break[ ] down and forget about wanting protective custody." Compl. at 9 ¶ 37. Defendants argue that plaintiff has failed to state a claim for excessive force because plaintiff's alleged injury is *de minimis* for constitutional purposes. See Dkt. No. 12-1 at 5.

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. See Davidson v. Flynn, 32 F.3d 27, 30 (2d Cir. 1994). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted [is] sufficiently serious to warrant Eighth Amendment protection." Hudson, 503 U.S. at 8 (internal quotation marks and citation omitted); Blyden, 186 F.3d at 262. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims, 230 F.3d at 22 (internal quotation marks, alteration, and citation omitted). However, "the malicious use of force to cause harm[ ] constitute[s] [an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (internal quotation marks and citations omitted). "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." Id. at 7.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions

characterized by wantonness." Sims, 230 F.3d at 21 (internal quotation marks and citations omitted). Thus, the key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically [to] cause[ ] harm." Hudson, 503 U.S. at 7 (internal quotation marks and citations omitted); see also Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (Observing that the Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—"not whether a certain quantum of injury was sustained.") (internal quotation marks and citation omitted). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:

> **\*4** the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response

Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

"While handcuffs must be reasonably tight to be effective, overly tight handcuffing may constitute excessive force." Burroughs v Petrone, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (internal quotation marks and citation omitted). For example, in Davidson, the plaintiff alleged that correction officers "placed ... handcuffs and leg irons and waist chain on [him] so tight as to cut into [his] flesh[,] reduce circulation[,] and cause swelling," which left a scar on his right ankle and numbness in the area, and caused his "wrists [to be] numb for several months afterwards." Davidson, 32 F.3d at 29. Further, the plaintiff alleged that the defendants purposefully placed the handcuffs and chains too tightly in retaliation for filing lawsuits, and that they refused his requests to loosen the restraints. See id. at 29, 30. The Second Circuit concluded that the plaintiff's complaint in Davidson

> plainly allege[d] both the objective and subjective components of a

cause of action for an Eighth Amendment violation: the handcuffs were allegedly placed on the plaintiff too tightly, leading to serious and permanent physical injury (the objective component), and such excessive force was applied to the plaintiff wantonly and maliciously in retaliation for being a litigious inmate (the subjective component).

Id. at 30 (internal quotation marks and brackets omitted).

By contrast, courts routinely dismiss claims of excessive force based on tight handcuffing where an inmate asserts only a *de minimis* injury without plausible allegations of wantonness or maliciousness.[7] For instance, in Burroughs v. Mitchell, the Court dismissed a *pro se* inmate's excessive force claim where he alleged only that the defendants "handcuffed him tightly, which caused cuts to his wrist." Burroughs v. Mitchell, 325 F. Supp.3d 249, 265 (N.D.N.Y. 2018) (internal quotation marks omitted). Similarly, in Burroughs v. Petrone, the Court dismissed the *pro se* inmate's excessive force claim based on tight handcuffing where the complaint alleged, without more, that the handcuffs caused "pain, swelling, and bruising." Burroughs v. Petrone, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (internal quotation marks and brackets omitted).

[7] As defendants observe, some relevant caselaw appears to suggest that, in order to state an Eighth Amendment excessive force claim based on tight restraints, a plaintiff must allege a permanent injury. See Dkt. No. 12-1 (citing, among other cases, Burroughs v. Petrone, 138. F. Supp. 3d 182, 213 (N.D.N.Y. 2015) ("In the absence of any facts alleging any permanent injury as a result of handcuffing, plaintiff's excessive force claims against Weeks, S. King, Melendez, and McKeown fail to state a cause of action under § 1983.")). However, many of those cases assess excessive force claims under the Fourth Amendment. See Bourdon v. Roney, No. 9:99-CV-0769 (LEK/ GLS), 2012 WL 21058177, at * 9-10 (N.D.N.Y. Mar. 6, 2003) (assessing an arestee's Fourth Amendment excessive force claim arising out of events that occurred during the course of the plaintiff's arrest); Jackson v. City of New York,

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 241 of 306

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

939 F. Supp. 2d 219, 231 (E.D.N.Y. 2013) (same); Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468–69 (S.D.N.Y. 2008) (same); Layou v. Crews, No. 9:11-CV-0114 (LEK/RFT), 2013 WL 5494062, at *7 (N.D.N.Y. Sept. 30, 2013) (same). It is well settled that Fourth Amendment excessive force claims are assessed under the objective reasonableness standard, which does not apply to post-conviction inmates and, unlike the Eighth Amendment standard that includes both objective and subjective elements, is an "exclusively objective analysis" under which the defendant's "intent is irrelevant." Franks v. New Rochelle Police Dep't, No. 13-CV-636 (ER), 2015 WL 4922906, at *10 (S.D.N.Y. Aug. 18, 2015). Further, the complaint in the Eighth Amendment excessive force case relied on by defendants, which cites to cases assessing Fourth Amendment excessive force claims, lacked allegations of wantonness, which allowed the court to bypass the subjective analysis and dismiss the Eighth Amendment excessive force claim on the objective prong alone. See Petron, 138 F. Supp. 3d at 213 (dismissing the plaintiff's Eighth Amendment excessive force claim where the complaint was devoid of allegations of malicious force and alleged only a de minimis injury). As discussed in section II.B.1., "[t]he appropriate test" for assessing an excessive force claim brought "under the Eighth Amendment involves both subjective and objective elements." Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). Accordingly, this Report-Recommendation & Order will apply the test articulated in Blyden.

**\*5** Further, where a pro se inmate's complaint alleged that overly tight handcuffing caused "pain in his wrists and pain, numbness[,] and swelling in his foot and ankle," the court concluded that the alleged injuries were "more than likely to prove de minimis." Warren v. Purcell, No. 03-CV-8736 (GEL), 2004 WL 1970642, at *8 (S.D.N.Y. Sept. 3, 2004). However, the court in Warren declined to determine whether such injuries were sufficiently serious for purposes of the Eighth Amendment because it concluded that the complaint failed to satisfy the subjective element, reasoning that the complaint did not "attribute[ ] any improper or retaliatory motive to the defendant officers, either in attaching the cuffs in ... the first instance, or in failing to loosen them once he complained." Id.

Moreover, in Wilson v. Woodbourne Corr. Facility, the pro se inmate alleged only that the defendants used excessive force by applying "handcuffs ... too tightly when escorting [him]." Wilson v. Woodbourne Corr. Facility, No. 9:11-CV-1088 (DNH/ATB), 2012 WL 1377615, at *4 (N.D.N.Y. Mar. 21, 2012), report and recommendation adopted sub nom. Wilson v. Depolo, No. 9:11-CV-1088, 2012 WL 1366590 (N.D.N.Y. Apr. 19, 2012). Noting the absence of any facts in the complaint alleging that the defendant correction officers were aware that the restrains were causing pain or that the plaintiff requested the restraints to be loosened, the Court concluded that the "[p]laintiff's allegation, without more, ... [wa]s clearly de minimis, and ... certainly not repugnant to the conscience of mankind." Id. (internal quotation marks omitted).

Here, the undersigned finds that plaintiff has sufficiently pleaded a per se claim for excessive force because he has alleged facts which plausibly suggest that the force asserted was done maliciously for the purpose of causing harm. See Hudson, 503 U.S. at 9-10. Although, as defendants correctly contend, plaintiff's alleged injury resulting from the "tight" handcuffs and chain—"soreness"—is de minimis, Compl. at 10 ¶¶ 12, 41; see Warren, 2004 WL 1970642, at *8 (holding that temporary pain, numbness and swelling as a result of tight handcuffing was "more than likely to prove de minimis"); Ruggiero v Fisher, No. 15-CV-00962 (RJA/JJM), 2018 WL 7892966, at *7 (W.D.N.Y. Sept. 27, 2018), report and recommendation adopted sub nom. Ruggiero v. Fisher, No. 15-CV-962-A, 2019 WL 1438810 (W.D.N.Y. Apr. 1, 2019 (temporary discomfort resulting from tight restraints held to be de minimis), "[t]he absence of serious injury [while] relevant to the Eighth Amendment inquiry, ... does not end it." Hudson, 503 U.S. at 7.

Plaintiff alleges that he asked defendants to "loosen the chains and [handcuffs] over ... 10 times," "complain[ed] about the tightness and soreness for [six] hours," that defendants ignored his "constant pleas and cries to loosen the chains and [hand]cuffs" and tightly chained and handcuffed him in order to make him "break[ ] down and forget about wanting protective custody." Compl. at 6 ¶ 13, 9 ¶ 37. Based on these allegations, the undersigned finds that the complaint sufficiently pleads facts plausibly suggesting that the use of force was malicious and done for the purpose to cause harm. See Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) ("[T]he malicious use of force to cause harm constitutes an 'Eighth Amendment violation per se ... whether or not significant injury is evident.' ") (quoting Blyden, 186 F.3d at

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 242 of 306

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)
2019 WL 7500501

263) (alteration omitted)). Thus, although plaintiff does not allege that he suffered any significant or permanent injury as a result of the tight handcuffs and chains, "any or even ... no injuries resulting from the events plaintiff described could amount to a *per se* constitutional violation." Brown v. Dubois, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at *9 (N.D.N.Y. June 16, 2017) (citing Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005)); Cf. Warren, 2004 WL 1970642, at *8 (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness, and swelling, and no improper or wanton motive was alleged for the officers' actions).

**\*6** Accordingly, it is recommended that defendants' motion to dismiss on this ground be denied.

### 2. Failure to Protect

Plaintiff next alleges that defendants failed to protect him in violation of his Eighth Amendment rights by placing him in a holding cell with a "violent gang member" despite his numerous requests to be placed in protective custody. Compl. at 11 ¶ 42. He further alleges that as a result of being housed with this other inmate, he was unable "to sleep for days in fear of his life" and experienced "psychological pain." Id. at 11 ¶ 43. Defendants argue that plaintiff's claim fails to state a cause of action for failure to protect because plaintiff "does not allege that the inmate he was housed with assaulted him[ ] or caused any other injury whatsoever." Dkt. No. 12-1 at 6.

"The Eighth Amendment requires prison officials to take 'reasonable measures to guarantee the safety of inmates' in their custody." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 832-33 (1994)). "[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983." Morales v. New York State Dep't of Corr., 842 F.2d 27, 30 (2d Cir. 1988). To state a claim for failure to protect under the Eighth Amendment, a plaintiff must demonstrate that (1) he or she was "incarcerated under conditions posing a substantial risk of serious harm" (objective prong); and (2) prison officials acted with deliberate indifference to that risk and the inmate's safety (subjective prong). Farmer, 511 U.S. at 834.

As to the objective prong, the deprivation must be "sufficiently serious," Hathaway v. Coughlin, 37 F.3d 63,

66 (2d Cir. 1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation marks omitted)), and "contemplate[ ] 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " Id. (quoting Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting)). "A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." Gilmore v. Rivera, No. 13-CV-6955 (RWS), 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014); see Rivers v. Spinnella, No. 9:09-CV-309 (FJS/RFT), 2010 WL 6428486, at *5 (N.D.N.Y. Nov. 4, 2010) (granting the defendants' motion for summary judgment where "there [were] no specific facts, nor even allegations, that indicate the [the d]efendant was aware that [the p]laintiff faced a substantial risk of serious harm until the altercation had already started.").

As to the subjective prong, the plaintiff must demonstrate that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. See Farmer, 511 U.S. at 837. The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. The plaintiff must "show that the defendants actually inferred from that disclosure that a substantial risk of serious harm existed." Murray v. Goord, 668 F. Supp. 2d 344, 359 (N.D.N.Y. 2009). Negligence by a prison official is insufficient to amount to a constitutional violation. See Hathaway, 37 F.3d at 66.

**\*7** As to the objective prong, plaintiff does not allege facts plausibly suggesting that he faced a substantial risk of serious harm from his cellmate. As urged by defendants, plaintiff does not claim that the inmate with whom he was housed on August 1, 2017, threatened or assaulted him in any way. Rather, plaintiff alleges only that he could not sleep for some uncertain amount of time and that he experienced unspecified "psychological pain" as a result of being housed with this inmate. Compl. at 11 ¶ 43. Such conclusory and speculative fears certainly do not " 'contemplate[ ] 'a condition of urgency, ... that may produce death, degeneration, or extreme pain.' " Hathaway, 37 F.3d at 66 (quoting Nance, 912 F.2d at 607). Further, given the absence of allegations of actual physical injury, plaintiff has failed to satisfy the objective element of the test. See Dzwonczyk v. Syracuse City Police Dep't, 710 F. Supp. 2d 248, 267 (N.D.N.Y. 2008) ("where, as here, the plaintiff does not allege that he was assaulted or

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 243 of 306

threatened by other inmates, or where plaintiff only alleges that he was in fear of an assault, a claim for failure to protect must be dismissed"); Johnson v. Lynn-Caron, No. 9:11-CV-386 (GLS/CFH), 2013 WL 5465594, *5 (N.D.N.Y. Sept. 30, 2013) (dismissing the plaintiff's failure to protect claim where the plaintiff did not demonstrate actual physical harm); Jamison v. Hayden, No. 9:03-CV9-13 (FJS/DRH), 2008 WL 907316, at *3 (N.D.N.Y. Mar. 31, 2008) (dismissing an inmate's failure to protect claim where the only injury alleged was "severe stress" in the absence of allegations of actual physical injury); Dolberry v. Levine, 567 F. Supp. 2d 413, 418 (W.D.N.Y. 2008) (dismissing a failure to protect claim where the plaintiff failed to proffer evidence showing he was subjected to any physical harm); see also Garcia v. Rodriguez, No. 05-CV-5915 (JSR), 2007 WL 2456631, at *2 (S.D.N.Y. Aug. 24, 2007) (holding that even an isolated threat from one inmate to another that an inmate would "get hurt," without any other present or past violent indications between the two inmates, does not demonstrate a substantial risk of serious harm).

As to the subjective prong, plaintiff fails to contend that defendants actually knew of and disregarded an excessive risk to his safety. Although plaintiff alleges that he explained to defendants "his reason for requesting [protective custody]"— that he had a general fear of retaliation for the altercation at Clinton—the complaint is devoid of any factual allegations that he informed defendants that the particular inmate with whom he was housed at Upstate had a connection to the inmate involved in the altercation at Clinton, knew of that incident, posed any specific risk to his safety as a result thereof, or engaged in any threatening or assaultive behavior toward plaintiff. Compl. at 11 ¶ 42. Therefore, the complaint fails to allege sufficient factual allegations that defendants could have "actually inferred from that disclosure that a substantial risk of serious harm existed" as a result of plaintiff's placement with his cellmate. Murray, 668 F. Supp. 2d at 359. Indeed, it is well settled that a defendant's knowledge of a plaintiff's generalized fear of harm is an insufficient basis upon which to establish a failure to protect claim. See Burns v. Martuscello, No. 9:13-CV-0486 (LEK/CFH), 2015 WL 541293, at *13 (N.D.N.Y. Feb. 10, 2015) (internal quotation marks omitted) ("Eighth Amendment failure to protect claims are not to be based on a defendant's knowledge of a general risk of harm to an inmate.") (internal quotation marks omitted); see also Hogan v. Fischer, No. 09-CV-6225, 2012 WL 4845609, at *6 (W.D.N.Y. Oct. 10, 2012) (holding the failure to protect the plaintiff against a general threat of harm is insufficient to raise a failure to protect

claim under the Eighth Amendment), vacated in part on other grounds, 738 F.3d 509 (2d Cir. 2013). Thus, the complaint does not sufficiently state a claim for failure to protect against defendants. [8]

[8]    In addition, to the extent that plaintiff also contends that defendants violated DOCCS Directive 4003B by housing him with the alleged gang member, it is well settled that "[f]ailure to follow a DOCCS Directive does not give rise to a § 1983 claim." Alicea v. Maly, No. 9:12-CV-203 (MAD/TWD), 2015 WL 4326114, at *14 n.8 (N.D.N.Y. July 14, 2015); see Cabassa v. Gummerson, No. 9:01-CV-1039 (DNH/GHL), 2008 WL 4416411, at *6 n.24 (N.D.N.Y. Sept. 24, 2008) (violation of a DOCCS Directive does not give the plaintiff a claim under 42 U.S.C. § 1983); see also Ahlers v. Nowicki, No. 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014) ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983.").

*8 Accordingly, it is recommended that plaintiff's failure to protect claim be dismissed.

### 3. Conditions of Confinement

Reading plaintiff's allegations to raise the strongest arguments they suggest, the complaint alleges that defendants subjected him to unconstitutional conditions of confinement in violation of his Eighth Amendment rights by placing him in a holding cell for a maximum period of five and one-half hours, during which time he was handcuffed, denied access to a bathroom, deprived of food and water, and housed with a "violent gang member." Compl. at 10 ¶ 40, 11 ¶ 43. Defendants argue that the alleged conditions of plaintiff's confinement do not rise to the level of an Eighth Amendment violation. See Dkt. No. 12-1 at 4-6.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer, 511 U.S. at 832 (internal quotation marks and citations omitted); see Blyden, 186 F.3d at 263 ("society does not expect or intend prison conditions

to be comfortable, [and] only extreme deprivations" of basic human needs "are sufficient to sustain a [conditions of confinement] claim.") (internal quotation marks omitted). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Objectively, the deprivation must be "sufficiently serious [such] that [the inmate] was denied the minimal civilized measure of life's necessities." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and citation omitted). The objective prong can be satisfied where the plaintiff pleads "conditions [that] either alone or in combination, pose an unreasonable risk of serious damage to [the inmate's] health." Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). There is no "static test" to determine whether or not an alleged deprivation is sufficiently serious to satisfy the objective prong. Id. (internal quotation marks omitted). Rather, courts must determine whether the conditions violate "contemporary standards of decency." Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)) (additional citation omitted). To satisfy the subjective test, the inmate must show that "the defendant official acted with a sufficiently culpable state of mind ... such as deliberate indifference to [the inmate's] health or safety." Id. (internal quotation marks and citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002).

Unconstitutional conditions of confinement have generally been found when the duration of the deprivation is sufficiently long, or when the deprivation is an ongoing condition of an inmate's confinement, rather than the result of a single, isolated incident. See Hutto v. Finney, 437 U.S. 678, 686-87 (1978) ("A filthy, overcrowded cell and a diet of grue might be tolerable for a few days and intolerably cruel for weeks or months.") (internal quotation marks omitted); Smith v. Copeland, 87 F.3d 265, 269 (8th Cir. 1996) ("[T]he length of time a prisoner is subjected to harsh conditions is a critical factor in [an Eighth Amendment] analysis. Conditions such as a filthy cell that may be tolerable for a few days are intolerably cruel for weeks or months." (citations omitted)); Walker v. Schriro, No. 11-CV-9299 (JPO), 2013 WL 1234930, at *13 (S.D.N.Y. 2013) (allegations that the plaintiff was temporarily deprived of food, shower, linens, running water or bathroom were insufficient to state a claim "[g]iven that none of the[ ] deprivations rose to an acute and conscience-shocking level, either alone or in combination, the relative brevity of the [p]laintiff's mistreatment precludes a finding that [the p]laintiff can satisfy the requirement of an objectively serious deprivation").

### i. Handcuffing/Denial of Bathroom Access

**\*9** "Individuals in custody do not have a constitutional right to use the bathroom ... whenever they please." Treat v. Cent. New York Psychiatric Ctr., No. 9:12-CV-602, 2013 WL 6169746, at *2 (N.D.N.Y. Nov. 20, 2013). It is well settled held that "[t]he temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation." Whitted v. Lazerson, No. 96-CV-2746 (AGS), 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998); see Odom v. Keane, No. 95-CV-9941 (SS), 1997 WL 576088, at *4-5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, J.) (concluding that, the absence of a working toilet in prison cell for approximately ten hours, without any allegation that the prisoner risked contamination by contact with human waste, did not rise to the level of cruel and unusual punishment). In the absence of allegations of serious physical harm or serious risk of contamination, courts have routinely rejected unconstitutional conditions of confinement claims where plaintiffs have alleged that they experienced pain or discomfort and were forced to relieve themselves in their clothing as a result of waiting to use a bathroom. See Whitted, 1998 WL 259929, at *2 (finding that the inmate failed to establish an objective injury where he was forced to wait one and a half hours to use the bathroom, during which time he "was forced to hold his bowel movement at painful levels, and at times partially urinated and defecated in his clothing."); Gill v Riddick, No. 9:03-CV-1456, 2005 WL 755745, at *16 (N.D.N.Y. Mar. 31, 2005) (concluding no Eighth Amendment violation in the absence of allegations of serious injury to the inmate's health as a result of being forced to hold his urine for approximately 70 minutes); Bourdon v. Roney, No. 9:99-CV-0769 (LEK/GLS), 2003 WL 21058177, at *30-31 (N.D.N.Y. Mar. 6, 2003) (observing that "[t]he standard for analyzing a pre[-]trial detainee's [conditions of confinement] claim is the same as the Eighth Amendment standard," and holding that the pre-trial detainee's allegations of being deprived of bathroom privileges for a maximum of three hours while locked in a hot police car without water "failed to adequately allege that he was denied minimal necessities of civilized life for a substantial period of time" in violation of his constitutional rights); see also Qawi v. Howard, No. Civ-A-98-220 (GMS), 2000 WL 1010281, at *3-4 (D. Del. July 7, 2000) (holding that the denial of the use of a bathroom for six hours during which the inmate was forced to urinate in drinking cup and bowl and defecate into

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

a paper bag did not constitute sufficiently serious deprivation because the duration of the condition was brief and the inmate suffered no significant health risk).

On the other hand, courts have, under certain circumstances, found that the denial of bathroom access may give rise to an Eighth Amendment violation. For example, in Hart v. City of New York, the Court refused to dismiss an inmate's Eighth Amendment claim where he alleged that the defendant correction officers ignored his repeated requests to use the bathroom for 12 hours, which forced plaintiff to "repeatedly soil himself and remain[ ] imprisoned in urine-soaked clothing," despite having been informed that the plaintiff suffered from multiple sclerosis which caused the need for frequent urination. Hart v. City of New York, No. 11-CV-4678 (RA), 2013 WL 6139648, at *7 (S.D.N.Y. Nov. 18, 2013). Further, in DeBlasio v. Rock, the Court denied the defendants' motion for summary judgment as to an inmate's Eighth Amendment claim of unconstitutional conditions of confinement where he alleged that the defendant correction officers handcuffed him behind his back and refused to "remove [his] handcuffs so that he could use the bathroom" for five hours, ultimately forcing the inmate to urinate and defecate on himself. DeBlasio v. Rock, No. 9:09-CV-1077 (TJM/GHL), 2011 WL 4478515, at *16 (N.D.N.Y. Sept. 26, 2011).

Here, plaintiff has not alleged any "serious physical harm or a serious risk of contamination" as a result the denial of bathroom access on August 1, 2017. Whitted, 1998 WL 259929, at *2. Rather, plaintiff contends only in conclusory terms that he requested "to use the restroom for relief." Compl. at 6 ¶ 13. The complaint does not allege that plaintiff experienced any pain or significant discomfort, that he was forced to urinate or defecate in his clothing, or that he has suffered any persisting physical injury as a result of his experience. Cf. Whitted, 1998 WL 259929, at *2. Further, unlike in Hart, plaintiff does not allege that he made defendants aware of any medical condition which would necessitate an exceptional need for bathroom access, or that this deprivation extended beyond the single, isolated incident on August 1, 2017. Cf. Hart, 2013 WL 6139648, at *7; accord Hutto, 437 U.S. at 686–87.

Moreover, although Rock involved a handcuffed inmate who was deprived bathroom access for a comparable period of time to plaintiff, that case appears distinguishable. The plaintiff in Rock specifically alleged that the defendants had applied handcuffs behind his back, which prevented him from

using the bathroom in his cell for approximately five hours until he was forced to urinate and defecate on himself. See id. Here, by contrast, plaintiff asserts only that his handcuffs and chains were applied "tight" and that he requested that the handcuffs and chain be loosened but does not state any facts from which the Court can infer that his handcuffs hindered him from relieving himself. Cf. Rock, 2011 WL 4478515, at *16. Thus, the present case appears more analogous to cases in which an inmate has alleged an Eighth Amendment violation based on temporary discomfort due to a fairly brief and isolated denial of bathroom access without any serious physical harm or serious risk of contamination. See Whitted, 1998 WL 259929, at *2.

**\*10** Similarly, concerning the application of "tight" handcuffs and chain, the complaint fails to allege facts demonstrating that the use of these restraints while plaintiff was confined in his cell was sufficiently serious such that it posed "an unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30 (quoting Walker, 717 F.3d at 125). As discussed in detail in part II.B.1 supra, plaintiff alleged only that he suffered temporary "soreness" as a result of the application of the chains and handcuffs and does not allege that he sought or required medical attention, or that he is currently suffering any injury as a result thereof. Compl. at 10 ¶ 41. Such minor discomfort cannot be said to pose an "unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30; see also Hudson, 503 U.S. at 9 ("routine discomfort is part of the penalty that criminal offenders pay for their offenses against society" (internal quotation marks and citation omitted)). Thus, plaintiff's Eighth Amendment claim for unconstitutional conditions of confinement insofar as premised upon the application of tight handcuffs and temporary denial of bathroom access fails to satisfy the objective prong of the Eighth Amendment test. Accordingly, it is unnecessary to reach the subjective prong because "without a constitutional violation, [d]efendants clearly could not have acted with 'deliberate indifference.' " Gill, 2005 WL 755745, at *16 (quoting Odom, 1997 WL 576088, at *5).

### ii. Denial of Food and Water

Plaintiff asserts that defendants subjected him to unconstitutional conditions of confinement in violation of his Eighth Amendment rights by depriving him of food and water between 1:00 P.M. and sometime between 6:00 P.M. and 6:30 P.M. on August 1, 2017, when he arrived at

Upstate. See Compl. at 6 ¶ 20, 11 ¶ 43. He concedes that, "[b]etween 6[:00] p.m. [and] 6:30 p.m., [he] was offered a hot tray of food, which was freezer cold." Id. at 6 ¶ 20. Defendants contend that plaintiff fails to state a claim because the temporary deprivation of food and water "has been routinely found insufficient to state a[n] [Eighth Amendment] conditions[ ]of[ ]confinement claim." Dkt. No. 12-1 at 5.

The deprivation of food, as any other deprivation, must be tested by the same Eighth Amendment analysis. In order to rise to the level of an Eighth Amendment claim, the deprivation must be sufficiently serious, and the defendant must have been deliberately indifferent to the inmate's health or safety. See Farmer, 511 U.S. at 834. As the Second Circuit has noted, courts have not explicitly held that the denial of food is a per se violation of a prisoner's Eighth Amendment rights. See Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (citing Moss v. Ward, 450 F. Supp. 591, 596 (W.D.N.Y. 1978)). However, "under certain circumstances[,] a substantial deprivation of food may well be recognized as being of constitutional dimension." Id. For example, depriving a prisoner of all food for four consecutive days was held to have violated the Eighth Amendment. Moss, 450 F. Supp. at 596-97.

On the other hand, "isolated" deprivations of food do not typically rise to the level of an Eighth Amendment violation. Reeder v. Hogan, No. 9:09-CV-520, 2012 WL 4107822, at *18 (N.D.N.Y. July 11, 2012), report and recommendation adopted 2012 WL 4106740 (N.D.N.Y. Sept. 19, 2012). For example, allegations of intermittent deprivations for periods of approximately eight- and one-half hours, twenty-three hours, and during periods of confinement, were held insufficient to state an Eighth Amendment conditions of confinement claim. See Little v. Mun. Corp., 51 F. Supp. 3d 473, 490 (S.D.N.Y. 2014); see also Konovalchuk v. Cerminaro, No. 9:11-CV-01344 (MAD/CFH), 2014 WL 272428, at *21 (N.D.N.Y. Jan. 24, 2014) (holding that an inmate's claim that he missed two consecutive meals while being transported to-and-from the courthouse was "not substantial and d[id] not amount to cruel and unusual punishment."); Zimmerman v. Seyfert, No. 9:03-CV-1389 (TJM), 2007 WL 2080517, at *27 (N.D.N.Y. July 19, 2007) (holding that requiring the plaintiff to go eleven hours without eating did not rise to the level of a constitutional claim). Moreover, courts in this Circuit have held that being denied a single meal does not give rise to a constitutional deprivation. See, e.g., Hankerson v. Nassau Cnty. Corr. Facility, No. 12-CV-5282 (SJF/WDW), 2012 WL 6055019, at *3 (E.D.N.Y.

Dec. 4, 2012) ("[The plaintiff's] allegation that he was denied a single meal while incarcerated ... does not give rise to a constitutional deprivation."); Scarbrough v. Evans, No. 11-CV-131 (NAM/DRH), 2012 WL 4364511, at *5 (N.D.N.Y. May 17, 2012) ("[T]he denial of a single meal is insufficient to state a claim for relief.") (citations omitted).

**\*11** Here, it is undisputed that plaintiff did not receive food from 1:00 P.M. until between 6:00 P.M. and 6:30 P.M. on August 1, 2017—a deprivation which lasted, at most, five and one-half hours. See Compl. at 11 ¶ 43. Thus, plaintiff's claim in this regard fails to satisfy the objective prong of the test, as he does not allege a deprivation of "the measure of food necessary to maintain health, but rather ha[s] described the sort of isolated withholding[ ] that do[es] not typically rise to [the] level of constitutional significance." Reeder, 2012 WL 4107822, at *18; see Zimmerman, 2007 WL 2080517, at *27.[9] Further, as defendants argue, the lack of a meal over the course of five and one-half hours is "not an atypical experience for most people over the course of an ordinary day, let alone those ... subjected to the more restrictive ... conditions of a prison setting." Dkt. No. 12-1 at 7. Indeed, this alleged deprivation is less significant than deprivations of food found to be insufficient to state a claim for cruel and unusual punishment. See Konovalchuk, 2014 WL 272428, at *21; Zimmerman, 2007 WL 2080517, at *27. Thus, even affording the complaint the most liberal construction possible, plaintiff does not even assert the denial of a single meal—a legally insufficient basis to support a constitutional claim. See Hankerson, 2012 WL 6055019, at *3; Scarbrough v. Evans, 2012 WL 4364511, at *5.

9    Insofar as the complaint may be construed as alleging an Eighth Amendment violation based on the provision of "freezer cold" food, plaintiff fails to state a claim. Compl. at 6 ¶ 20. It is well established that "[t]he provision of cold food, is not, by itself, a violation of the Eighth Amendment as long as it is nutritionally adequate and is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Martin v. Oey, No. 9:16-CV-00717 (TJM/TWD), 2017 WL 6614680, at *6 (N.D.N.Y. Nov. 28, 2017) (internal quotation marks and citation omitted). Here, the complaint is devoid of allegations that the food was prepared or served under conditions presenting an immediate danger to plaintiff's health or wellbeing; therefore, the alleged provision of

2019 WL 7500501

cold food, without more, fails to state a claim upon which relief may be granted. See id.; see also Brooks v. NYC DOC Comm'r, No. 14-CV-6283 (RRM/CLP), 2016 WL 4530456, at *4-5 (E.D.N.Y. Aug. 29, 2016) (*sua sponte* dismissing cause of action based on the failure to provide hot meals where there was no allegation that the inmate did not receive nutritionally adequate meals).

Plaintiff likewise fails to allege facts sufficient to state a claim for cruel and unusual punishment based on the temporary denial of drinking water. Liberally construing plaintiff's claim, his deprivation of drinking water coincided with his deprivation of food. See Compl. at 5 ¶ 12. Therefore, as plaintiff admits that he was provided a meal sometime between 6:00 P.M. and 6:30 P.M., this claim, too, amounts only to a short, isolated deprivation and, therefore, does not arise to the level of an Eighth Amendment violation. See Mortimer Excell v. Fischer, No. 9:08-CV-945, 2009 WL 3111711, at *5-6 (N.D.N.Y. Sept. 24, 2009) (holding that, to the extent the plaintiff alleged that he was denied water during the same 24-hour period he was denied a meal, he failed to state a constitutional claim); McGee v. Pallito, No. 10-CV-11, 2011 WL 6291954, at *13 (D. Vt. Aug. 3, 2011) ("temporary deprivations of drinking water are not unconstitutional"), report and recommendation adopted, 2011 WL 6294202 (D. Vt. 2011); see also Beckford v. Portuondo, 151 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."). Thus, plaintiff's Eighth Amendment claim premised on the denial of food and water fails to satisfy the objective element of the Eighth Amendment test. Therefore, as plaintiff has failed to adequately plead a constitutional violation, it is unnecessary to reach the subjective prong. See Gill, 2005 WL 755745, at *16 (quoting Odom, 1997 WL 576088, at *5).

### iii. Plaintiff's Cellmate

**\*12** Liberally construed, the complaint also alleges that plaintiff was subjected to unconstitutional conditions of confinement because he was housed with a "violent gang member." Compl. at 11 ¶ 43, 7 ¶ 22. Plaintiff contends that, as a result of being housed with this inmate, he was unable to "sleep for days" and experienced "psychological pain." Id. at 11 ¶43. Defendants posit that plaintiff fails to a claim in this regard because he "does not allege that he suffered any injury or harm as a result." Dkt. No. 12-1 at 8.

Despite plaintiff's conclusory assertion, he has failed to proffer sufficient factual allegations to establish an Eighth Amendment claim based on his placement with his cellmate at Upstate. Iqbal, 556 U.S. at 678. Even viewing the facts in the light most favorable to plaintiff, he does not allege how being placed in the cell with this inmate "pose[d] an unreasonable risk of serious damage to [his] health." Darnell, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). As discussed in section II.B.2. supra, the complaint does not state any factual allegations which could plausibly suggest that defendants' act of housing him with the purported gang member placed him at risk of harm. Indeed, plaintiff does not allege that his cellmate threatened or harmed him in any way, and plaintiff has not alleged any communication between him and defendants indicating that he informed defendants that his cellmate presented any specific risk to him, or that defendants were aware of, but disregarded, any such risk. See section II.B.2. supra.

Further, plaintiff's vague assertion that he lost sleep for an unspecified number of days as a result of being housed with this inmate fails to assert facts plausibly alleging an objectively serious injury. See generally Phelan v. Durniak, No. 9:10-CV-666 (FJS/RFT), 2014 WL 4759937, at *10 (N.D.N.Y. Sept. 24, 2014) (holding that the plaintiff's allegations that he was unable to sleep and suffered migraines because of the noise of the other inmates' televisions and radios late at night failed to satisfy the objective element of an Eighth Amendment claim); Cf. Mena v. City of New York, No. 13-CV-2430 (RJS), 2014 WL 4652570, at *4 (S.D.N.Y. Sept. 18, 2014) (concluding that the plaintiff plausibly alleged facts to support an inference that he was objectively prevented from sleeping at all for approximately two and one half days from being forced to lie on a cold, wet floor in a cell large enough for only one inmate as opposed to the three inmates who were housed there). Moreover, plaintiff's assertion that he suffered psychological pain is wholly conclusory and, as discussed in section II.B.2, the complaint contains no allegations that plaintiff ever sought therapy or other medical treatment following the alleged placement with his cellmate. See Iqbal, 556 U.S. at 664. Plaintiff has, therefore, failed to state an Eighth Amendment claim against defendants based on the alleged placement in the cell with a purported gang member.

In sum, the complaint fails to allege "conditions [that] either alone or in combination, pose[d] an unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30 (quoting Walker, 717 F.3d at 125). Accordingly, it is

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 248 of 306

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)
2019 WL 7500501

recommended plaintiff's Eighth Amendment conditions of confinement claim be dismissed.

### C. First Amendment Retaliation

Plaintiff alleges that defendants retaliated against him by placing him in a cell with a "violent gang member" for threatening to file grievances and a federal civil rights lawsuit based on their denial of plaintiff's requests for protective custody, to loosen his chains and handcuffs, food and water, and bathroom access, in violation of his First Amendment rights. Compl. at 9-10 ¶ 39. The complaint may also be construed as asserting a First Amendment retaliation claim based on C.O. King's alleged threat to file a false misbehavior report against plaintiff. See id. at 6 ¶¶ 17. Defendants contend that plaintiff fails to sufficiently plead a First Amendment retaliation claim because "[p]laintiff's verbal requests for protective custody ... do not constitute protected speech," and even if they did, "the alleged application of tight handcuffs and chains" and the temporary denial of food, water, and bathroom access does not constitute adverse action. Dkt. No. 12-1 at 10, 11.

**\*13** In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must allege the following: that "(1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). Because of the potential for abuse and the "ease with which claims of retaliation may be fabricated," courts must examine prisoner retaliation claims with "skepticism and particular care." Johnson v. Eggersdorf, 8 F. App'x 140, 144 (2d Cir. 2001) (summary order) (quoting Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)).

It is well settled that the filing of administrative grievances and lawsuits constitutes protected speech. See Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) ("the filing of prison grievances is a constitutionally protected activity"); Williams v. Ingraham, No. 04-CV-257 (GLS/DRH), 2005 WL 3746222, at *2 (N.D.N.Y. Feb. 3, 2005) ("The [inmate's] conduct at issue—complaints to judicial officials, filing a lawsuit, and grievances—are clearly constitutionally protected rights") (citing Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002)). Further, courts in this Circuit have routinely found that a prisoner's threat of filing a grievance

or lawsuit constitutes protected activity. See Flemming v. King, No. 14-CV-316 (DNH/CFH), 2016 WL 5219995, at *4 (N.D.N.Y. June 20, 2016) (concluding that inmate's threat to file lawsuit sufficient to establish protected activity), report and recommendation adopted, No. 9:14-CV-0316 (DNH/DEP), 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016); Gibson v. Fischer, No. 9:10-CV-0968 (LEK/TWD), 2014 WL 7178346, at *15 (N.D.N.Y. Dec. 15, 2014) (denying summary judgment as to retaliation claim where the plaintiff threatened to file a grievance); Sprau v. Coughlin, 997 F. Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's threat to file a complaint sufficient to establish protected activity). Here, plaintiff's threat to file grievances and a lawsuit constitutes protected activity; therefore, the complaint satisfies the first prong of the First Amendment retaliation test. See Flemming, 2016 WL 5219995, at *4; Gibson, 2014 WL 7178346, at *15; Sprau v. Coughlin, 997 F. Supp. at 393.

To adequately plead an "adverse action," a plaintiff must allege that he was subject to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Gill, 389 F.3d at 381 (internal quotation marks and citations omitted). Courts in this Circuit have found that a prison official defendant's "refusal of protective custody" can be an "adverse action" for the purposes of a First Amendment retaliation claim because it could cause a prisoner to "fear[ ] for his safety." Cruz v. Grosso, No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at *7 (N.D.N.Y. May 23, 2014); see also Cruz v. Lee, No. 14-CV-4870 (NSR/JCM), 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) ("[p]laintiff alleges that [the d]efendants' denial of protective custody ... constitutes an adverse action because [the p]laintiff feared for his safety without custodial protection. It cannot be said, as a matter of law, that this fear would not deter a similarly situated individual from filing further lawsuits or grievances. Therefore, [the p]laintiff has sufficiently alleged an adverse action.").

Here, plaintiff alleges that he requested protective custody out of fear that a gang member would retaliate against him for his altercation at Clinton and that defendants denied his request. See Compl. at 5 ¶ 8. Thus, accepting plaintiff's allegations as true, defendants' denial of protective custody could be considered adverse action. See Lee, 2016 WL 1060330, at *6; Grosso, 2014 WL 2176256, at *6.

**\*14** As for the third element,

"[p]roof of causal connection can be established indirectly by showing that the protected activity was followed closely

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 249 of 306
Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)
2019 WL 7500501

by discriminatory treatment ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant."

DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 116 (2d Cir. 1987) (internal citations omitted). With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001).

However, as the Second Circuit explained:

> [P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. Accordingly, while we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations and quotation marks omitted). For example, in Lee, the court concluded that an inmate sufficiently established a causal connection where he alleged facts demonstrating a "close temporal proximity" between the protected activity of filing a lawsuit and the adverse action of defendants denying his requests for protective custody "taken together with [the d]efendants' knowledge of the protected activity and statements tending to demonstrate a retaliatory motive." Lee, 2016 WL 1060330, at *7. Similarly, in Grosso, the inmate alleged that he informed the defendant of his pending lawsuit the same day that the defendant refused him protective custody status and that the defendant stated the reason for denying protective custody was because the inmate was "go[ing] against [prison] [a]dministration." Grosso, 2014 WL 2176256, at *7. Observing the temporal proximity of

the protected activity and adverse action, and noting that the defendant's statement "plausibly suggest[ed] a reason for the refusal of protective custody [that] related to retaliation," the Court concluded that the inmate established the causation prong for a First Amendment retaliation claim. Id.

Here, although close in temporal proximity, as the complaint makes clear, the adverse action of denying plaintiff's request for protective custody occurred prior to plaintiff threatening to file grievances and lawsuits, and well before plaintiff actually filed his two grievances or the present lawsuit. See Compl. at 6 ¶¶ 15, 20. Therefore, as the alleged adverse action preceded plaintiff's threat to file grievances and a lawsuit, plaintiff cannot show that defendants' denial of protective custody was motivated by this conduct. See, e.g., Gustafson v. Vill. of Fairport, 106 F. Supp. 3d 340, 353 (W.D.N.Y. 2015) (holding that the plaintiff failed to establish a causal link to support his First Amendment retaliation claim where the alleged adverse action of defendant police officers beating him preceded his constitutionally-protected expression of requesting an attorney).

*15 Additionally, insofar plaintiff's claim can be read to allege that defendants retaliated against him in violation of his First Amendment rights based on his repeated requests for protective custody, the complaint fails to state a claim because such requests do not appear to be constitutionally-protected speech. Rather, plaintiff's request for protective custody, in effect, constitutes a request for transfer to housing of his preference, which is not constitutionally protected speech. See Barrow v. Buren, No. 9:12-CV-01268 (MAD/CFH), 2015 WL 417084, at *13 (N.D.N.Y. Jan. 30, 2015) (concluding that an inmate's transfer requests were not constitutionally-protected speech); see generally McMahon v. Fischer, 446 F. App'x 354, 357 (2d Cir. 2011) (summary order) ("A prisoner has no right to housing in a particular facility"). Plaintiff's position would yield absurd results, as every denial of an oral request for protective custody status would give rise to a First Amendment retaliation claim. Therefore, the undersigned finds that the complaint fails to satisfy the first element for a First Amendment retaliation claim in this regard.

Moreover, to the extent that the complaint may be read as alleging that defendants retaliated against plaintiff for stating his intention to file grievances and lawsuits based on C.O. King's purported threat to file a false misbehavior report, even assuming arguendo that plaintiff's stated intention could be considered constitutionally-protected speech, plaintiff fails to state a First Amendment retaliation claim. See Compl. at 6 ¶

16, 17. As articulated in the complaint, C.O. King informed plaintiff that he had been instructed to file a misbehavior report and that "the Sgt. want[ed] to write [him] a ticket" based on plaintiff's refusal to follow a direct order to lock into a cell shortly after stating that he would file grievances and lawsuits. See Compl. at 6 ¶¶ 17, 19. Plaintiff denies that he refused to follow a direct order from defendants. See id. at 6 ¶¶ 18. Therefore, liberally construing the complaint, plaintiff appears to allege that C.O. King threatened to file a false misbehavior report.

As an initial matter, plaintiff does not allege that C.O. King actually wrote a misbehavior report, and no misbehavior report is contained in plaintiff's submissions; rather, plaintiff merely asserts that C.O. King threatened write a misbehavior report. In any event, it is well settled that a correction officer's filing of a false misbehavior report to prevent an inmate from seeking redress does not rise to the level of a constitutional violation in the absence of evidence that the filing of the false report actually hindered or prevented the inmate from exercising his constitutional right to seek redress through either the prison grievance procedure or by filing a lawsuit. See Nelson v. Michalko, 35 F. Supp. 2d 289, 294 (W.D.N.Y. 1999); Husbands v. McClellan, 957 F. Supp. 403, 407 (W.D.N.Y. 1997). Here, plaintiff does not allege that C.O. King's purported threat to file a false misbehavior report in any way hindered or prevented him from exercising his First Amendment right to file grievances and lawsuits. Indeed, it is undisputed that plaintiff, in fact, did file two grievances and this lawsuit subsequent to C.O. King's purported threat. Accordingly, based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claim be dismissed in its entirety and that defendants' motion be granted on this ground.

### D. Conspiracy

Plaintiff alleges that defendants "entered into an agreement that if [he] continue[d] to request protective custody status, and make their job extensive by filing extra paperwork[,] they ... [would] ... keep [him] locked in a holding cell, chained and tightly cuffed, without food, water or use of the bathroom, until [he] br[oke] down and forg[ot] about wanting protective custody." Compl. at 9 ¶ 37. Defendants argue that plaintiff's conspiracy claim must be dismissed because the underlying claims upon which it is based fail to state a claim for relief. See Dkt. No. 12-1 at 10.

**\*16** In order to support a claim for conspiracy pursuant to § 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002); Cusamano v. Sobek, 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009). "An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient." McRae v. Fischer, No. 9:17-CV-0146 (BKS/CFH), 2018 WL 3432743, at *6 (N.D.N.Y. June 6, 2018), report and recommendation adopted, No. 9:17-CV-00146 (BKS/CFH), 2018 WL 3432700 (N.D.N.Y. July 16, 2018). Although exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action." Anilao v. Spota, 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. See Ciambriello, 292 F.3d at 325.

Here, even construing the facts in the light most favorable to plaintiff, plaintiff has failed to advance anything more than conclusory allegations of a conspiracy. There are no allegations outlining with specificity when, why, or how an alleged conspiracy occurred or the existence of an explicit or implicit agreement between any or all of the defendants. Even though exacting specifics are unnecessary at the pleading stage, the complaint is devoid of factual allegations establishing that defendants had any meeting of the minds in which they contemplated "break[ing] plaintiff down" until he "forgot about wanting protective custody status." Compl. at 9 ¶ 37; see Anilao, 774 F. Supp. 2d at 512-13. Rather, plaintiff merely alleges, in conclusory fashion, that defendants "entered into an agreement" to do so. Compl. at 9 ¶ 37. Likewise, plaintiff conclusorily alleges that defendants wanted to curtail him from requesting protective custody status in order to avoid "filing extra paperwork," but fails to offer any indication as to when, where, or how defendants agreed to execute the purported conspiracy. Compl. at 9 ¶ 37. Beyond stating that C.O. King informed plaintiff that Sgt. Hoffnagle wanted to write him a misbehavior report for failing to follow a direct order to lock into a cell, which plaintiff does not allege was ever filed, the complaint fails to plead a "meeting of the minds between any of the[ ] [d]efendants to act in concert to inflict a constitutional injury on [p]laintiff." Cusamano, 604 F. Supp. 2d at 432.

In any event, although not addressed by the parties, plaintiff's claim also fails as it is likely barred by intracorporate

conspiracy doctrine. The intracorporate conspiracy doctrine provides that officers, employees, and agents of a single corporate entity are legally incapable of conspiring together. See Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008). Although the Second Circuit has recognized that the doctrine applies in the Section 1985 context, see id., it has not passed directly on the doctrine's applicability in the Section 1983 context. However, district courts within the Circuit have applied the doctrine to such claims. See Vega v. Artus, 610 F. Supp. 2d 185, 205-06 (N.D.N.Y. 2009) (dismissing conspiracy claim pursuant to intracorporate conspiracy doctrine where all of the defendants were DOCCS employees acting within the scope of their employment); see also Williams v. Korines, No. 9:16-CV-1157 (FJS/TWD), 2018 WL 4521204, at *5 n.1 (N.D.N.Y. Sept. 21, 2018) (concluding that the intracorporate conspiracy doctrine applied to an inmate's Section 1983 conspiracy claim); Richard v. Dignean, 126 F. Supp. 3d 334, 338-39 (W.D.N.Y. 2015) (finding intracorporate conspiracy doctrine applicable to claim by inmate against prison officials for discrimination against him based on race and religion); Toliver v. Fischer, No. 9:12-CV-00077 (MAD/ATB), 2015 WL 403133, at *22 (N.D.N.Y. Jan. 29, 2015) (dismissing conspiracy claim by inmate against DOCCS personnel under the intracorporate conspiracy doctrine).

 *17  An exception to the intracorporate conspiracy doctrine applies when the individuals are "pursuing personal interests wholly separate and apart from the entity." Ali v. Connick, 136 F. Supp. 3d 270, 282-83 (E.D.N.Y. 2015) (citation and internal quotation marks omitted). However, a plaintiff must show more "than simply alleging that the defendants were motivated by personal bias against the plaintiff." Medina v. Hunt, No. 9:05-CV-1460 (DNH), 2008 WL 4426748, at *8 (N.D.N.Y. Sept. 25, 2008); see also Vega, 610 F. Supp. 2d at 205 (holding that "in order to allege facts plausibly suggesting that individuals were pursuing personal interests wholly separate and apart from the entity" to overcome the intracorporate conspiracy doctrine "more is required of a plaintiff than simply alleging that the defendants were motivated by personal bias against plaintiff.").

Here, all defendants were DOCCS employees during the period set forth in the Complaint and all were acting within the scope of their employment. Therefore, the intracorporate conspiracy doctrine applies. See Vega, 610 F. Supp. 2d at 205-06. Additionally, plaintiff has not alleged facts to plausibly suggest that the exception to the intracorporate conspiracy doctrine applies. Plaintiff's conclusory allegation

that defendants conspired to violate his constitutional rights in retaliation for his repeated requests for protective custody, which would have "ma[de] their job extensive by" creating "extra paperwork" for them to file, Compl. at 9 ¶ 37, does not appear to establish that defendants acted out of personal interests wholly separate and apart from Upstate. See, e.g., Richard v. Leclaire, No. 9:15-CV-00006 (BKS/TWD), 2017 WL 9511181, at *13, (N.D.N.Y. July 10, 2017) (concluding that the pro se inmate failed to allege facts to establish the personal interest exception to the intracorporation conspiracy doctrine where he alleged that the defendants conspired to file a false misbehavior report and rig a disciplinary hearing so that he would be found guilty in retaliation for being found not guilty in a prior prison disciplinary proceeding). Indeed, the Complaint specifically alleges that, "[a]t all relevant times[,] defendants acted under color of law," Compl. at 5 ¶ 6, which contradicts any claim that defendants acted out of personal interest wholly distinct from those of Upstate. See Dowd v. DeMarco, 314 F. Supp. 3d 576, 588 (S.D.N.Y. 2018) (holding that the personal interest exception to the intracorporation conspiracy doctrine did not apply where the inmate's complaint alleged that the defendant correction officers' purported acts "were conducted within the scope of their official duties or employment." (internal quotation marks omitted)). Rather, plaintiff appears to allege that defendants acted out of personal bias against him, which is insufficient to defeat the application of the intracorporate conspiracy doctrine. See generally Medina, 2008 WL 4426748, at *8.

Accordingly, it is recommended that plaintiff's conspiracy claim be dismissed.

### E. Supervisory Liability

Plaintiff alleges that, after he informed Sgt. Hoffnagle that he desired to be placed on protective custody status, Sgt. Hoffnagle "sent his subordinates[,]" C.O. King and C.O. Hollenbeck, to "dissuade [him from] checking into [protective custody] by threatening to issue a misbehavior report," after which the alleged First and Eighth Amendment violations occurred. Compl. at 12 ¶ 45. Defendants argue that plaintiff's supervisory claims against Sgt. Hoffnagle must be dismissed because the underlying First and Eighth Amendment claims upon which they are based fail to state claims upon which relief can be granted. See Dkt. No. 12-1 at 8-9.

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 252 of 306

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

**\*18** Supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). In this Circuit, the " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (additional citations omitted)). However, supervisory personnel may be considered personally involved in their subordinate's conduct if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright, 21 F.3d at 501 (additional citation omitted)). [10] Absent a subordinate's underlying constitutional violation, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability.").

[10]     Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011) (recognizing that several District Courts in the Second Circuit have debated Iqbal's impact on the five Colon factors), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y.

2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

Construing the complaint liberally, plaintiff appears to allege supervisory liability under Colon factor one. See Colon, 58 F.3d at 873. As discussed in section II.B.1 supra, plaintiff has plausibly asserted a claim for excessive force. Therefore, it is recommended that defendants' motion to dismiss plaintiff's supervisory liability claim against Sgt. Haffnagle, insofar as it is based upon his excessive force claim, be denied. However, as discussed in sections II.B.2.-D supra, plaintiff has failed to adequately allege the remainder of his constitutional claims and, therefore, cannot state a claim for § 1983 supervisory liability based upon those allegations. See Elek, 815 F. Supp. 2d at 808.

Accordingly, it is recommended that defendants' motion be granted as to plaintiff's supervisory liability claim against Sgt. Hoffnagle insofar as it is based upon plaintiff's Eighth Amendment failure to protect and conditions of confinement claims and First Amendment retaliation claim. It is further recommended that defendants' motion to dismiss plaintiff's supervisory claim be denied insofar as it is based upon plaintiff's Eighth Amendment excessive force claim.

### III. Conclusion

**\*19 WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion to Dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 12) be **GRANTED IN PART** and the following of plaintiff's claims be **DISMISSED WITH PREJUDICE**:

(1) Eighth Amendment failure to protect claim;

(2) Eighth Amendment conditions of confinement claim;

(3) Conspiracy claim; and

(4) First Amendment retaliation claim;

(5) Supervisory claim against Sgt. Hoffnagle insofar as that claim is based upon plaintiff's Eighth Amendment failure to protect, conditions of confinement, and

conspiracy claims, and First Amendment retaliation claim, and it is further

**RECOMMENDED**, that defendants' motion to dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 12) be **DENIED** as to plaintiff's:

(1) Eighth Amendment excessive force claim;

(2) Supervisory claim against Sgt. Hoffnagle insofar as that claim is based upon plaintiff's Eighth Amendment excessive force claim; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72. [11]

[11]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7500501

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:19-CV-00353**<br>Livingston v. Hoffnagle et al | — | N.D.N.Y. | Mar. 21, 2019 | Docket |

**History (4)**

**Direct History (2)**

1. Livingston v. Hoffnagle 👓
   2019 WL 7500501 , N.D.N.Y. , Nov. 08, 2019

*Report and Recommendation Adopted by*

2. Livingston v. Hoffnagle
   2020 WL 95431 , N.D.N.Y. , Jan. 08, 2020

**Related References (2)**

3. Livingston v. Hoffnagle
   2021 WL 3888283 , N.D.N.Y. , Aug. 03, 2021

*Report and Recommendation Adopted by*

4. Livingston v. Hoffnagle
   2021 WL 3885247 , N.D.N.Y. , Aug. 31, 2021

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

2022 WL 991729

🚩 KeyCite Yellow Flag

Distinguished by [Gunn v. Milani,](#)   S.D.N.Y.,   September 9, 2024

2022 WL 991729
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond LEWIS, Plaintiff,
v.
Jason HANSON, et al., Defendants.

9:18-CV-0012 (LEK/DJS)
|
Signed 03/31/2022

**Attorneys and Law Firms**

[Theresa M. Trzaskoma](#), Allegra Noonan, Sher Tremonte LLP, [Yu Han](#), Morrison & Foerster LLP, New York, NY, for Plaintiff.

[Ryan T. Donovan](#), [Ryan E. Manley](#), Harris, Conway & Donovan, PLLC, Albany, NY, for Defendant [Jason Hanson](#).

[Andrew R. Safranko](#), Lamarche Safranko Law PLLC, Albany, NY, for Defendant Joseph Sharpe.

[Cynthia E. Neidl](#), [Katie Louise Birchenough](#), Greenberg Traurig, LLP, Albany, NY, for Defendant Scott Mere.

[Eric Michael Soehnlein](#), [Sean O'Brien](#), Lippes Mathias Wexler Friedman LLP, Buffalo, NY, [Lawrence H. Schaefer](#), Lippes Mathias Wexler Friedman LLP, Albany, NY, for Defendant [Zachary Peck](#).

[Barry Nelson Covert](#), [Diane M. Perri Roberts](#), Maxwell C. Radley, [Patrick Mackey](#), Lipsitz Green Scime Cambria LLP, Buffalo, NY, for Defendant Craig Robideau.

[Mark G. Mitchell](#), New York State Attorney General, Albany, NY, for Defendants [Jason Kearney](#), [John Kingston](#).

**MEMORANDUM-DECISION AND ORDER**

[LAWRENCE E. KAHN](#), United States District Judge

**I. INTRODUCTION**

**\*1** On April 11, 2019, Raymond Lewis filed his amended complaint against several corrections officers employed by the New York State Department of Corrections and Community Supervision ("DOCCS") at Bare Hill Correctional Facility in Malone, New York ("Bare Hill"), at all times relevant to this matter: Jason Hanson, Joseph Sharpe, Craig Robideau, Zachary Peck, Scott Mere, Jason Kearney and John Kingston.[1] Dkt. No. 61 ("Amended Complaint"). Plaintiff's claims arise from circumstances surrounding a use of force incident that occurred at Bare Hill on April 23, 2016, and Plaintiff's subsequent requests for medical aid on April 24, 2016. See Am. Compl. at 4. Now before the Court are motions for summary judgment filed by Robideau, Peck, Mere, Kearney, and Kingston (collectively, "Defendants"). Dkt. Nos. 136 ("Robideau Motion"), 136-5 ("Robideau Memorandum"), 136-4 ("Robideau Statement of Material Facts" or "Robideau SMF"), 136-1 ("Roberts Declaration"), 136-2 ("Exhibits A-L"), 136-3 ("Robideau Declaration"); 137 ("Peck Motion"), 137-1 ("Peck Memorandum"), 137-2 ("Peck Statement of Material Facts" or "Peck SMF"), 137-3 ("Soehnlein Declaration"); 138 ("Mere Motion"), 138-2 ("Mere Memorandum"), 138-1 ("Mere SMF"), 138-3 ("Birchenough Declaration"), 138-4 ("Mere Declaration"), Dkt. Nos 139; ("Kearney & Kingston Motion"), 139-16 ("Kearney & Kingston Memorandum"), 139-17 ("Kearney & Kingston Statement of Material Facts" or "Kearney & Kingston SMF"), 139-1 ("Kearney Declaration"), 139-2 ("Kingston Declaration"), 139-3 ("Mitchell Declaration"), 139-4 ("Plaintiff's Deposition"), 139-5 ("Kearney Deposition"), 139-6 ("Kingston Deposition").

[1]   The Amended Complaint also contained claims against Bruce Yelich, but all such claims were dismissed pursuant to the Court's order on the Motion to Dismiss filed by Kearney, Kingston, and Yelich. See Dkt. Nos. 79, 100.

Plaintiff has responded. Dkt. Nos. 149 ("Plaintiff's Response Memorandum"), 149-3 ("Plaintiff's Response to Defendants' Statements of Material Facts and Statement of Material Facts" or "Plaintiff's SMF")[2], 149-1 ("Plaintiff's Declaration"), 149-2 ("Noonan Declaration"). And all five defendants have replied. Dkt. Nos. 154-3 ("Robideau Reply Memorandum"), 154-2 ("Robideau Reply SMF"), 154 ("Roberts Reply Declaration"); 152 ("Peck Reply Memorandum"), 152-1 ("Peck Reply SMF"); 155 ("Mere Reply Memorandum"), 155-1 ("Mere Reply SMF"); 151 ("Kearney & Kingston Reply Memorandum").

[2]   Because Plaintiff has set forth his response to Defendants' statements of material facts in the

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 258 of 306

**Lewis v. Hanson, Not Reported in Fed. Supp. (2022)**
2022 WL 991729

same document as his own statement of material facts, the Court will cite to the sections responding to Defendants SMFs (pages 1–42) by their page number, but will cite to the sections setting forth Plaintiff's own material facts (pages 43–54) by their paragraph designation in order to most clearly designate which of Plaintiff's allegedly material facts are being referenced.

For the reasons set forth below, each of Defendants' motions for summary judgment is granted in part and denied in part.

## II. BACKGROUND

### A. Factual Background

#### 1. Plaintiff's Alleged Phone Violation and Transfer to the SHU

**\*2** The following facts are not in dispute except where noted.

In April of 2016, all Defendants were employed as corrections officers at Bare Hill where Plaintiff was incarcerated. Robideau SMF ¶ 2; Mere SMF ¶ 2; Peck SMF ¶ 10; Kearney & Kingston SMF ¶¶ 12, 20; Pl.'s SMF ¶ 1. At this time, Plaintiff had a lawsuit pending against Officer Brian Cowan, who Plaintiff alleged had assaulted him while he was incarcerated at the nearby Franklin Correctional Facility. Pl.'s SMF ¶ 3.

On April 22, 2016, Plaintiff was on "cube confinement" and was restricted from using the telephones. Pl.'s SMF ¶ 8; Kearney & Kingston SMF ¶ 2. That day, Kearney was assigned to the E-1 dorm where Plaintiff resided. Kearney & Kingston SMF ¶ 14. An inmate approached Kearney, asked to use the phone, and provided Plaintiff's ID number. Id. ¶ 15–16. When Kearney saw the ID number belonged to an inmate with restricted phone privileges, he refused the inmate's request and instructed him to return to his cube. Id. ¶ 18. Kearney and Kingston assert that Plaintiff was the inmate who requested to use the phone, id., while Plaintiff insists he never approached Kearney or asked to make a phone call that day, Pl.'s SMF at 4.

The next day, April 23, 2016, Defendant Kingston was on duty as a Watch Commander. Id. ¶¶ 20, 24. Part of his responsibilities as Watch Commander were to check phone logs to see if inmates who had phone restrictions had been using them improperly. Id. at 21. That day, Kingston claims he

reviewed the phone logs and found that Plaintiff's log showed significant usage in violation of his phone restriction. Id. at 24. Plaintiff questions the veracity of Kingston's claim that he did not notice the phone usage until that day, asserting that, since Kingston admitted to reviewing phone logs three out of every five days he worked, he would have noticed before April 23 if Plaintiff's log had indeed shown such significant, long-term usage over an 8-day period. Pl.'s SMF at 6.

When Defendant Hanson came on duty the day of April 23, 2016, Kingston claims he asked Hanson to take Plaintiff to the special housing unit ("SHU") for a phone violation. Kearney & Kingston SMF ¶ 25. Kearney claims that Hanson then approached him, showed him a picture of Plaintiff, and asked if he knew who Plaintiff was. Id. ¶ 26. Apparently recognizing Plaintiff as the inmate who had asked to use the phone the day prior, Kearney described the incident to Hanson and wrote a memorandum describing the alleged interaction. Id. ¶¶27–29. Plaintiff claims that Kearney could not have recognized him from the picture, because Plaintiff did not interact with Kearney on April 22, 2016, and was not the inmate who requested to use the phone that day. Pl.'s SMF at 6.

At some point later on April 23, 2016, Defendants Hanson and Robideau came to Plaintiff's dorm and instructed him to come with them. Pl.'s SMF ¶ 9. The two officers did not tell him why he was being transferred or where he was going, but handcuffed Plaintiff and placed him in a van. Id. ¶ 10. The ride in the van took between 5 and 7 minutes. Robideau SMF ¶ 6; Pl.'s SMF at 41.

**\*3** Plaintiff contends that during the ride in the van, Robideau began punching and kicking him while he was still handcuffed, saying "our buddy told us to give you the special treatment." Id. ¶ 11. Plaintiff further contends that upon arriving at the SHU, he was so severely injured that he could not walk on his own and had to be dragged out of the van and assisted into the building. Pl.'s SMF ¶ 12. Robideau denies that he assaulted Plaintiff in the van or that Plaintiff had to be helped into the SHU building. Robideau Reply SMF at 8–9.

#### 2. The Alleged Assault in the Special Housing Unit

The parties' accounts vary dramatically regarding what happened once Plaintiff entered the SHU.

Case 9:23-cv-00098-MJK Document 144 Filed 03/04/26 Page 259 of 306

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

2022 WL 991729

Plaintiff claims he was placed in the SHU strip-frisk room together with Defendants Hanson, Robideau, Sharpe, Mere, and another unidentified officer. Pl.'s SMF ¶¶ 13–14. Plaintiff claims Hanson said "this nigger gets special treatment because he filed a lawsuit against one of our brothers" before punching him in the head and taking him to the ground. Pl.'s SMF ¶¶ 15–16. Plaintiff then claims the other officers in the room joined in kicking and punching him. Id. ¶ 17. Plaintiff claims he heard one officer state "lets [sic] say he had a weapon" and another state "lets [sic] say he assaulted one of us." Id. ¶ 18. According to Plaintiff's account, Plaintiff was so severely injured he could not stand, and officers had to help him lean against a wall. Id. ¶ 20. Nurse Harmon then came to examine Plaintiff; Plaintiff asked for pain medication, but she told him to sign up for sick call. Id. ¶ 21; Mere SMF ¶ 17. Plaintiff alleges that Hanson then said Plaintiff looked like he wanted to hurt himself and needed to be placed on suicide watch. Pl.'s SMF ¶ 22. Once Plaintiff was escorted and placed in the suicide watch cell, Plaintiff alleges Hanson grabbed him by the neck and told him "if I hear anything about this, it can all happen again." Id. ¶ 23.

However, Robideau claims he did not enter the SHU with Plaintiff at all, but instead left once Plaintiff entered the SHU building. Robideau Reply SMF ¶ 13–14. Defendant Mere likewise claims that he was never in the SHU strip-frisk room with Plaintiff, but rather was on duty in the gym. Mere Reply SMF ¶ 14, Mere SMF ¶¶ 6, 13. Mere further claims he did not enter the SHU until after Plaintiff was already in the suicide watch cell, because Mere had been assigned to cover the 1:1 suicide watch over Plaintiff, Mere Reply SMF ¶¶ 21–22, and that he was never informed or aware of the use of force in the SHU strip-frisk room, Mere SMF ¶ 24.

Plaintiff claims the Defendants each know Brian Cowan, the officer at Franklin Correctional Facility against whom Plaintiff had a lawsuit pending (the "Cowan Suit"), and assaulted him in retaliation for filing the lawsuit. Pl.'s SMF at 14, 31, 35. Defendants each deny any association with or knowledge of Cowan or the lawsuit. Robideau Mem. at 17; Peck SMF ¶ 15; Mere SMF ¶ 55; Kearney & Kingston SMF ¶¶ 66, 67.

### 3. Plaintiff's Requests for Medical Aid

Plaintiff asserts that while in the 1:1 cell, he was in severe pain and was having difficulty breathing. Pl.'s SMF ¶ 24. He further claims that, although Mere was supposed to be watching him, he was not at his post. Id. ¶ 25. Plaintiff began kicking the door to get Mere's attention and request his asthma inhaler. Id. ¶ 26. Mere allegedly appeared after ten minutes and said he would "look into" it. Id. at 27. After over an hour with no word about his inhaler, Plaintiff again began kicking the door to get Mere's attention. Id. ¶¶ 27, 28. A different officer arrived, but refused to help. Id. ¶ 28. Plaintiff asserts he began kicking the door again. Id. ¶29. A third officer responded, and shortly after, returned with a nurse and Plaintiff's asthma medication. Id.

 *4 Mere contends that he began his 1:1 watch over Plaintiff on April 23, at 4:05 PM, did not leave his post until 10:20 PM, logged activity every 15 minutes, and that Plaintiff could see and communicate with him that entire time. Mere Reply SMF ¶¶ 25–26. Mere claims that Plaintiff was not only kicking the door, but yelling and slamming his body against it. Id. ¶ 26; Mere SMF ¶ 27. Mere claims Plaintiff engaged in this loud and disruptive behavior on at least 4 occasions, and disregarded his orders to stop. Mere SMF ¶¶ 39–44. Further, Mere asserts Plaintiff only asked for his inhaler one time, after which Mere responded he would "look into" getting it, and that a nurse arrived shortly after with the medication. Mere Reply SMF ¶ 30, Mere SMF ¶¶ 31–32. Mere claims that Plaintiff never complained of pain or requested medical aid. Mere SMF ¶ 37.

The next day, on April 24, 2016, Plaintiff contends he was still in severe pain, but was not given pain medication or breakfast. Pl.'s SMF ¶ 31–34. At 6:30 PM, Plaintiff asserts that he still felt unwell and kicked the cell door again when he could not see an officer outside his cell. Id. ¶ 35–36. When Defendant Peck arrived to start his duty on the 1:1 watch over Plaintiff, Plaintiff claims he told Peck he was having a hard time breathing and was having an asthma attack. Id. at 37. Peck allegedly stated he would call the medical department, but after an hour with no help, Plaintiff again asked Peck for the asthma spray. Id. at 38. Plaintiff claims that Peck responded that he would have to wait, at which time Plaintiff began kicking the door again to get the attention of a sergeant. Id. at 39. Non-party Sergeant Tamer arrived, whereupon Plaintiff explained he was having trouble breathing and Tamer said he would get the spray. Id. 40–41. After an additional one and a half hours with no response, Plaintiff went to his cell door again, but Peck was not there. Id. ¶ 42–43. Plaintiff began kicking his cell door again. Id. ¶ 46. Another officer arrived and provided the inhaler 15 minutes later. Id. ¶ 46.

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

2022 WL 991729

Peck claims that he did not know of the use of force incident that occurred the prior day. Peck SMF ¶ 13. Peck asserts that he visibly assessed Plaintiff, that everything seemed normal, and that Plaintiff did not ask for medical aid, but merely asked once when nurses would be making rounds. Peck SMF ¶ 16; Peck Dep. at 37. Afterward, Plaintiff began yelling, kicking, and hitting his body against the door. Id. at 38–39. Peck ordered Plaintiff to stop and requested that a roundsman inform a sergeant of the situation. Peck SMF ¶ 20–21. Peck claims that, at that point, Sergeant Tamer arrived and spoke with Plaintiff, after which Plaintiff calmed down. Id. ¶ 22–23. Around two hours later, Plaintiff resumed the same behavior. Id. ¶ 24. When Plaintiff did not comply with a direct order to stop, Peck issued a misbehavior ticket and Plaintiff stopped. Id. ¶ 25. Peck denies that Plaintiff ever said he was having chest pain or trouble breathing. Id. ¶¶ 27–28.

### 4. Plaintiff's Hospital Treatment

On April 25, two days after the alleged assault, Plaintiff claims he woke up with severe chest pain and trouble breathing. Pl.'s SMF ¶ 47. He informed officers he needed medical attention and was transferred to Alice Hyde Medical Center by ambulance. Id. ¶¶ 47–50. Plaintiff informed the medical staff he had been assaulted by corrections officers. Id. ¶ 54. Plaintiff was diagnosed with two fractured ribs and a collapsed lung caused by trauma which doctors stated "could have been fatal." Id. ¶¶ 53–56.

Plaintiff remained hospitalized until April 27, 2016, when he was released to the Upstate Correctional Facility ("Upstate") where he remained in the infirmary for another week. Id. ¶ 57.

### 5. Misbehavior Tickets and Investigations

After arriving at Upstate, Plaintiff was issued five misbehavior tickets. Pl.'s SMF ¶ 59. One ticket, issued by Hanson and co-signed by Kearney, alleged Plaintiff had made 18 phone calls from April 15, 2016 to April 22, 2016 in violation of his cube confinement status, and used the phones in violation of a direct order from Kearney. Id. ¶ 60. This ticket purported to justify Plaintiff's April 23, 2016, transfer to the SHU. Id. ¶ 59. Plaintiff denies making any phone calls or being ordered by Kearney not to use the phones, and was found not guilty at a hearing regarding this ticket. Id. ¶ 62.

*5 Another ticket was issued by Defendant Sharpe, alleging that during the strip frisk at the SHU, Plaintiff resisted and violently struggled. Id. ¶ 63. Plaintiff was found guilty of this conduct. Id. ¶ 65.

Plaintiff received two tickets written by Mere alleging he created a disturbance while in the SHU on suicide watch. Id. ¶ 66; Mere Reply SMF ¶ 68. Plaintiff was initially found guilty of creating a disturbance, but this finding was reversed on appeal. Pl.'s SMF ¶ 69; Mere Reply SMF ¶ 69.

The final ticket was written by Peck, alleging Plaintiff created a disturbance while in the SHU on suicide watch. Pl.'s SMF ¶ 70, Peck Reply SMF ¶ 70. Plaintiff was found guilty of this conduct. Pl.'s SMF ¶ 71.

### 6. Plaintiff's Grievance

On May 13, 2016, Plaintiff submitted a grievance regarding the alleged assaults, his struggle to obtain medical care, and the allegedly false tickets filed against him. Pl.'s SMF ¶ 72. Kingston was tasked with investigating the grievance. Id. ¶ 76. Kingston dismissed Plaintiff's allegations, and found the grievance was baseless and filed only to cause harm to the officers involved. Id. ¶ 77–80. On August 8, 2016, Plaintiff's grievance was denied by Superintendent Uhler. Kearney & Kingston SMF ¶ 41.

However, the DOCCS Office of Special Investigations ("OSI") opened an investigation into the use of force event and Plaintiff's subsequent stay in the SHU. Mere SMF ¶ 58; Pl.'s SMF ¶ 81. The OSI investigator, Michael Germano, issued his report on January 3, 2017. See Birchenough Decl. Exhibit T ("Germano Report"). The Germano Report questioned the narrative told by staff regarding the assault and denial of medical care, finding various inconsistencies in their accounts regarding the nature of Plaintiff's resistance, the Nurse's evaluation of Plaintiff, their responses to his request for medical attention, and Plaintiff's physical state after being put on the 1:1 watch. Pl.'s SMF ¶¶ 82–87. The Germano Report did not reach a conclusion regarding Plaintiff's assault allegations, but found that the involved staff failed to give Plaintiff proper medical care after the use of force incident in the SHU. Id. ¶ 81.

Defendant Mere asserts that any findings in the Germano Report are irrelevant as to him because the report did not identify him as "involved staff," he was not interviewed or

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 261 of 306

2022 WL 991729

questioned, and was not named in the final report. Mere SMF ¶¶ 58–61. Similarly, Robideau argues that the Germano Report supports his innocence because it found that he had "no valuable information to clarify the events documented in the use of force." Robideau Reply SMF ¶ 82.

**B. Procedural History**

Following Plaintiff's filing of his Amended Complaint, and the Court's partial grant of Defendant Kearney and Kingston's motions to dismiss, Dkt. No. 100, Plaintiff has the following claims remaining: excessive force claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston under the Eighth Amendment, Fourth Amendment, and Fourteenth Amendment; claims for deliberate indifference to a serious medical need against Hanson, Sharpe, Robideau, Mere, and Peck under the Eighth Amendment; and retaliation claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston in violation of the First and Fourteenth Amendments.

**\*6** Robideau, Mere, Peck, Kearney, and Kingston now move, respectively, for summary judgment arguing they are entitled to judgment as a matter of law on all claims against them. See Robideau Motion, Mere Motion, Peck Motion, Kearney Motion.

**III. LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."). The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary

judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), may not rely on mere conclusory allegations, speculation, or conjecture, Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" supporting its claims, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

**IV. DISCUSSION**

**A. Robideau Motion for Summary Judgment**

Robideau argues there is no material issue of fact regarding Plaintiff's (1) Eighth Amendment claim for use of excessive force, (2) Fourth and Fourteenth Amendment claims for use of excessive force, and (3) claim for retaliation, and asserts that all claims must be dismissed. See Robideau Mem.

*1. Eighth Amendment Excessive Force*

The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. Wilson v. Seiter, 501 U.S. 294, 296–97 (1991). To establish an Eighth Amendment claim, a plaintiff must show both an objective component, "a deprivation that is objectively, sufficiently serious ... [,]" and a subjective component requiring the defendant official have "a sufficiently culpable state of mind." Hayes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992).

**\*7** Plaintiff alleges that Robideau used excessive force against him by assaulting him in the back of the van while he was being transferred to the SHU and then by assaulting him again while in the SHU strip-frisk room. Pl.'s SMF ¶¶ 11,

14. Robideau argues there is significant evidence supporting his claim that he was the driver of the van and that he did not enter the SHU, and thus could not have assaulted Plaintiff. Robideau Mem. at 9–12. Robideau argues further that Plaintiff's self-serving testimony set forth on the record, absent other direct or circumstantial evidence, is insufficient to defeat summary judgment. Id.

#### a. Evidence Supporting Robideau's Version of Events

Robideau argues there is no dispute of material fact that, rather than being in the back of the van as Plaintiff claims, he was the driver of the van. He points to the DOCCS Escort Memorandum forms filled out by Robideau and Hanson that lists only two officers as having been involved in Plaintiff's transfer, Robideau SMF ¶ 10; Roberts Decl. Ex. H ("DOCCS Escort Memorandum"), and the deposition testimony of fellow defendant Sergeant Hanson, in which he stated that he (Hanson) was not driving the van, Robideau Reply at 7; Roberts Decl. Exhibit G ("Hanson Deposition") at 261. Further, Plaintiff has admitted that the driver of the van did not assault or speak to him. Pl.'s SMF at 41.

Robideau contends there is likewise significant evidence supporting his claim that he did not enter the SHU after dropping Plaintiff off. Robideau Mem. at 10. Robideau points to the SHU logbook which shows Robideau did not sign into the SHU building, but that Sergeant Hanson did upon arrival with Plaintiff, Roberts Decl. Exhibit I ("SHU Log Book"); the testimonies of Defendants Hanson and Sharpe that they were the only two officers in the strip-frisk room with Plaintiff that day, Hanson Dep. at 257, Roberts Decl. Exhibit J ("Sharpe Deposition") at 202; and the Germano Report, which found Robideau did not have any "valuable information to clarify the events" surrounding the use of force, Germano Report at 3.

Robideau argues that the only pieces of evidence on the record contradicting his account are Plaintiff's own self-serving statements made in his grievance, his deposition, and his declaration in opposition to summary judgment. Robideau Mem. at 7. Robideau argues his motion for summary judgment should be granted in spite of this contradictory evidence because "[i]t is clear in this Circuit that a nonmoving party's proffer of solely self-serving statements, 'without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment.' "

Robideau Reply at 7 (quoting J.F. v. Carmel Cent. Sch. Dist., 168 F.Supp.3d 609, 616 (S.D.N.Y. 2016)).

#### b. Sufficiency of Self-Serving Statements to Defeat Summary Judgment

The Court cannot agree that such clarity exists, and declines to adopt a blanket rule that a self-serving declarations or deposition testimony are per-se insufficient to defeat a motion for summary judgment, even without other evidence to support them.

Robideau is correct that there is a line of decisions from courts in the Southern District of New York that appears to adopt such a rule. See, e.g., Sec. & Exch. Comm'n v. Aly, 2018 WL 1581986, *9 (S.D.N.Y. 2018); J.F., 168 F.Supp.3d at 616; Fincher v. Depository Trust & Clearing Corp., No. 06-CV-9959, 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008). The provenance of the rule issued in these decisions can be traced back to the Second Circuit's opinion in Argus, Inc. v. Eastman Kodak Co., where the court held that, in the context of establishing a causal link between a breach of antitrust law and harm to a plaintiff-competitor, "when the fact of injury is in issue, the 'isolated self-serving statements' of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." 801 F.2d 38, 42 (2d Cir. 1986). However, in applying this standard to find no genuine issue of material fact regarding causation of injury, the Argus court refused to allow such statements to defeat summary judgment, not because of their nature as self-serving, but because the testimony was inherently "conclusory" and thus "[fell] woefully short of that necessary to outweigh the volume of contrary facts in the record." Id. at 45.

 **\*8** Robideau makes much of the Second Circuit's affirmation of one of the Southern District cases utilizing this rule: Fincher v. Depository Trust. However, even though the Second Circuit eventually affirmed the district court's ruling in Fincher, it disagreed with the district court's decision to use the above-described rule to discredit the plaintiff's testimony at the summary judgment stage because the plaintiff's statements were not conclusory or speculative. See Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) ("Fincher's testimony ... is not conclusory or speculative, as was the plaintiff's testimony in the case relied upon by the district court in disregarding the remarks, ... we decline to conclude at this stage of the proceedings that Fincher's testimony

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 263 of 306

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)
2022 WL 991729

may be deemed discredited."). The Fincher court eventually affirmed the grant of summary judgment, not because the plaintiff's testimony at issue was self-serving, but because it concerned statements made by a third-party who concluded the plaintiff had been discriminated against, and the alleged statements represented a mere "scintilla" of evidence "in light of their offhand, conclusory nature and the lack of further support in the record for Fincher's claim [of discrimination]." Id. at 727. However, the court stated that, if the plaintiff had testified that the third-party had made remarks that themselves were discriminatory, rather than merely conceding in conclusory fashion that plaintiff had been discriminated against, "[s]ummary judgment might not have been justified." Id. Heavily implying the Second Circuit would consider such self-serving testimony to be sufficient to defeat summary judgment.

In short, the Second Circuit—rather than holding that a self-serving statement is per se insufficient absent other supporting evidence—has reiterated the traditional standard that when ruling on summary judgment "[the] preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it," id. at 726 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)), and that "[m]ere conclusory allegations, speculation or conjecture" are insufficient to resist summary judgment, Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996). While it may be true that in some cases a party's self-serving affidavit or testimony, unsupported by other evidence on the record, will be insufficient to allow a reasonable jury to properly find a verdict in that party's favor, there are other circumstances where it may very well be sufficient.

### c. Plaintiff's Record Testimony and Statements are Sufficient to Defeat Summary Judgment

Plaintiff's allegations regarding the alleged assaults by Robideau are not conclusory or speculative, rather, they testify to events that allegedly happened in Plaintiff's presence that he observed directly. See Fincher, 604 F.3d at 726 ("Fincher's testimony ... is not conclusory or speculative ... because Fincher was testifying to the content of a conversation at which she was allegedly present."). Thus, the Court must determine if Plaintiff's repeated testimonial statements that Robideau assaulted him in the back of the van on the way to the SHU and assaulted him again in the

SHU strip-frisk room represent a mere "scintilla" of evidence, insufficient to create an issue of material fact.

The Court finds the weight of evidence is not so great that no rational jury could credit Plaintiff's testimony and find in his favor. Robideau contends that there is "extensive documentary and testimonial discovery establishing that Robideau was the driver of the van." Robideau Mem. at 10. The only documentary evidence Robideau points to is the Escort Memorandum listing Robideau and Hanson as having been in the van during the transport. Escort Memorandum at 1. However, this memorandum is not purely objective evidence, but rather was created and signed by Robideau and Hanson themselves. Hanson Dep. at 258. Robideau further relies on Hanson's testimony that Hanson was not the one driving the van, thus implying that since there were only two officers in the van according to the Escort Memorandum, the driver must have been Robideau. Robideau Mem. at 10. While Hanson did testify that he does not generally drive the vans, Hanson Dep. at 261, he explicitly stated that he did "not have an independent recollection" of transferring Plaintiff to the SHU, and when asked if he drove the van on that specific day, Hanson responded "not that I recall," id. at 259. Given the nature of this evidence, a reasonable jury could still choose to credit Plaintiff's account that Robideau was not the driver of the van, but was present in back of the van and assaulted him during the trip. [3]

[3]  Robideau also argues for the first time in his reply papers that "[d]riving the van is an exclusive duty of the Rounds 1 position, or of the Rounds 2 position if Rounds 1 is unavailable" and "Robideau without dispute was the only available Rounds person to drive the van at the time of Lewis' transfer because his partner, the Rounds 2, was not available." Robideau Reply Mem. at 3. The Court will disregard these arguments and alleged facts because, as they were not included in Robideau's initial motion, Plaintiff has not had a chance to appropriately respond. See In re Various Grand Jury Subpoenas, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered. Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

2022 WL 991729

party may not have an adequate opportunity to respond to it.") (citations omitted).

**\*9** Regarding the alleged assault in the SHU, Robideau asserts he did not enter the SHU at all and points to (1) the fact that he did not sign the SHU Logbook "when Sergeant Hanson did so upon arrival with Plaintiff," Robideau Mem. at 11 (citing SHU Logbook at 1), (2) Hanson and Sharpe's testimony that no other officers were present in the SHU strip-frisk room during the use of force event with Plaintiffs, id.; Hanson Dep. at 257; Sharpe Dep. at 201–02, and (3) the Germano Report's indication that "Robideau did not have any 'valuable information to clarify the events' documented in the use of force," id. (citing Germano Report at 3). [4]

[4]    For the first time in his reply, Robideau makes the argument that he has conclusively established he was not in the SHU strip-frisk room during the assault because Nurse Harmon testified there were only two officers present in the room, and that Robideau had to find his partner for their assignment at 3:30 P.M. Robideau Reply Mem. at 4, 7. Because these alleged facts and arguments are presented for the first time in Robideau's reply memorandum, and Plaintiff has not had an appropriate chance to respond, the Court will disregard them. See supra note 2.

This evidence is similarly not as conclusive as Robideau argues. The SHU Logbook entry for Plaintiff's admission has a designated place for the "escorting supervisor" to sign, but no obvious place where Robideau, who was indicated to be the "escorting officer" would have signed. See SHU Logbook at 1; Escort Memorandum. Robideau has not argued or established that it would have been improbable, or even difficult, for him to enter the SHU without having signed. Indeed, the record indicates other individuals were able to enter and leave the SHU multiple times without signing the logbook. Germano Report at 3. In short, a reasonable jury could find other explanations for Robideau's lack of signature. Further, the conclusion in the Germano report that Robideau did not have relevant information was based on Robideau's own testimony. Germano Report at 3. Given the repeated consistent statements Plaintiff has made regarding the assault in the SHU, Birchenough Decl. Ex. N ("Plaintiff's Grievance") at 3; Plaintiff's Dep. at 122:6–11, a reasonable jury could choose to credit Plaintiff's testimony over Robideau's, Sharpe's, and Hanson's.

Robideau argues that Plaintiff's testimony should be discredited because he claimed to see Robideau behind him in the strip-frisk room with his "peripheral visions" and one cannot see behind themself with peripheral vision. Robideau Mem. at 11. Robideau further argues that Sharpe and Hanson's statements "should be given significant weight" because they admit they were the only ones in the strip-frisk room during the use of force, "and there is no reason for them to be untruthful about who else was in the SHU frisk area." Id. Robideau's arguments may hold merit, however such weighing of testimony and determination of credibility is not within in the purview of a court on a motion for summary judgment. See Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."),

While the weight of evidence may favor Robideau, the evidence is not so conclusive that a reasonable jury could not believe Plaintiff's assertions that Robideau was in the back of the transfer van and in the SHU strip-frisk room and participated in the assaults. See Franklin v. Oneida Corr. Facility, No. 03-CV-1452, 2008 WL 2690243, at \*9 (N.D.N.Y. July 1, 2008) (Kahn, J) ("As tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants' invitation to make a credibility determination and reject plaintiff's version of the events on motion for summary judgment is plainly unwarranted"); Cicio v. Lamora, No. 08-CV-431, 2010 WL 1063875, at \*8 (N.D.N.Y. Feb. 24, 2010), report and recommendation adopted, No. 08-CV-431, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) ("Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact"); see also Harris v. Miller, 818 F.3d 49, 65 (2d Cir. 2016) (holding summary judgment is inappropriate where "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically ... [even where] the proof of excessive force [is] weak.").

**\*10** The Court thus declines to grant Robideau's motion for summary judgment regarding Plaintiff's Eighth Amendment claim of excessive force.

2022 WL 991729

### 2. Fourth and Fourteenth Amendment Excessive Force Claims Against Robideau

Plaintiff does not oppose Robideau's motion regarding his claims for excessive force under the Fourth and Fourteenth Amendments. See Pl.'s Resp. Mem. at 14. Thus, the Court grants Robideau's motion regarding these claims.

### 3. Eighth Amendment Deliberate Indifference to Serious Medical need Claim against Robideau

Plaintiff likewise does not oppose Robideau's motion regarding his claim for deliberate indifference to a serious medical need under the Eighth Amendment. Id. Thus, the Court grants Robideau's motion regarding this claim.

### 4. First Amendment Retaliation Claim Against Robideau

Robideau argues that Plaintiff's claims against him alleging retaliation should be dismissed, first, because Plaintiff did not appropriately exhaust his administrative remedies, and second, because there is no dispute as to material fact regarding whether Robideau engaged in retaliatory activities.

#### a. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). " 'Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules' as a precondition to filing a federal lawsuit." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009) (quoting Woodford v. Ngo, 548 U.S. 81, 90 (2006)). Likewise, "compliance with state procedural rules is necessary to achieve '[t]he benefits of exhaustion [that] can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.' " Id. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim,' because 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.' " Id. (quoting Jones v. Bock, 549 U.S. 199, 218 (2007)).

Robideau asserts that New York State grievance procedures require an inmate to "allege facts sufficient to put corrections officials on notice as 'to the nature of the claim,' and 'provide enough information about the conduct' at issue." Robideau Mem. at 14. Robideau argues that because "[Plaintiff] failed to file a grievance with particularity that implicated Robideau in any retaliatory acts towards Lewis" he has not sufficiently exhausted his administrative remedies as to the retaliation claim against Robideau. See id. at 15.

However, Plaintiff's Grievance alleges involvement of specific officers, including Robideau, Pl.'s Grievance at 2–3, and that he was beaten for retaliatory reasons, id. at 18 ("This is a case where I was severely beaten ... in retaliation for filing a lawsuit against correction officer B. Cowan."). Plaintiff's Grievance also provides a detailed account of the events, including a specific date, time, and location. Plaintiff's Grievance at 13–15.

**\*11** Thus, Plaintiff's Grievance provided prison officials with the "the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident" sufficient to advance the benefits of exhaustion, and the Court finds Plaintiff has exhausted his administrative remedies regarding the claim of retaliation against Robideau. See Espinal, 558 F.3d at 127 (finding administrative remedies properly exhausted where grievance alleged involvement of certain security officers and "included the specific date, time, and location of the incident about which he complained, and that he was beaten for retaliatory reasons.").

#### b. Robideau's Alleged Retaliatory Acts

In order to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 266 of 306

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)
2022 WL 991729

It is undisputed that filing a civil lawsuit is activity protected by the First Amendment. Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 152 (2d Cir. 2006) ("[L]awsuits are protected speech."); see also Houston v. Zen Zen, 388 F.Supp.2d 172, 174 (W.D.N.Y. 2005).

An action is considered to be adverse if it "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Tafari v. McCarthy, 714 F.Supp.2d 317, 348 (N.D.N.Y. 2010). Robideau argues that there is no material dispute of fact that he did not take any adverse action against Plaintiff because he was driving the van and did not enter the SHU. Robideau Mem. at 18. Robideau essentially reiterates his argument above, stating that documentary and testimonial evidence establishes his non-involvement, and the Court should disregard evidence to the contrary because it consists of "unsupported, self-serving statements that have not been corroborated." Id. However, as above, the Court finds that a reasonable jury could choose to credit Plaintiff's statements that Robideau assaulted him in the back of the transfer van and in the SHU. See supra Section IV(A)(1). It cannot be disputed that a physical assault on a handcuffed prisoner of the type alleged by Plaintiff would deter an individual of ordinary firmness from exercising constitutional rights. See Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) ("[Plaintiff's] claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights."); Flemming v. King, No. 14-CV-316, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) ("[A] physical assault constitutes adverse action."), report and recommendation adopted, No. 14-CV-0316, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016).

Thus, there is a material dispute of fact as to whether Robideau undertook an adverse action.

Robideau further argues that, even if it is accepted that he participated in the assaults, there is insufficient evidence on the record to establish a causal connection between Plaintiff's filing of the Cowan Suit and the assaults. Robideau Mem. at 16.

In determining whether a causal connection exists between a plaintiff's protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements

by the defendant concerning his motivation." [5] Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing Colon v. Coughlin, 58 F.3d 865, 872–73 (2d Cir. 1995)).

[5]   The court notes that factors (ii) and (iii) are generally employed when an inmate claims a prison disciplinary or administrative action is taken in retaliation, see, e.g., Faulk v. Fisher, 545 F. App'x 56, 59 (2d Cir. 2013); Morris v. Rabsatt, 2012 WL 976035, at *7 (N.D.N.Y. 2012), and are of dubious relevance when an inmate claims security officers have physically assaulted him.

*12 Notwithstanding the first three factors, the Court finds that alleged statements made by Robideau are sufficient for a reasonable jury to conclude the assaults were connected to the Cowan suit.

Plaintiff claims that while assaulting him in the back of the van, Robideau stated "our buddy wants us to give you the special treatment," Pl.'s Grievance at 13, and that during the alleged attack in the SHU, one officer stated "our buddy wants us to give a nigger like you the special treatment" and "this nigger gets the special treatment because he filed a lawsuit against one of our brothers," id. at 14. Robideau claims he does not know Officer Cowan and did not make these statements, and a jury could choose to disbelieve Plaintiff's claims, but they are sufficient to create a material issue of fact regarding Robideau's retaliatory motive. See Colon, 58 F.3d at 873 (reversing grant of summary judgment where prisoner presented direct evidence of causal connection in the form of an alleged admission of retaliatory motive by defendant prison official, despite defendant's denial on the record of ever making the statement.)

Therefore, the Court finds there are issues of material fact regarding whether Robideau retaliated against Plaintiff for exercising his First Amendment rights and denies Robideau's motion for summary judgment on this claim.

**B. Mere Motion for Summary Judgment**

Mere argues he is entitled to summary judgment on (1) Plaintiff's claim for use of excessive force, (2) Plaintiff's claim for deliberate indifference to a serious medical need in violation of the Eighth Amendment, and (3) Plaintiff's claim of retaliation in violation of the First Amendment. See Mere Mem. at 1. Mere also argues that he is entitled to qualified immunity. Id.

*1. Eighth Amendment Excessive Force
Under 42 U.S.C. § 1983 as to Mere*

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Brandon v. Kinter, 938 F.3d 21, 36 (2d Cir. 2019) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

Mere alleges it is "undisputed" that he was not personally involved in the assaults on Plaintiff, because the record establishes that he was in the gym when Plaintiff was allegedly assaulted in the SHU.[6] Mere Mem. at 7–9. To support this claim, Mere points to (1) his own deposition testimony as well as that of Defendants Hanson and Sharpe which each claim that only Hanson and Sharpe were in the SHU room when the use-of-force event occurred, id. at 8; Mere Dep. at 55; Hanson Dep. at 91–92; Sharpe Dep. at 122–123; (2) Birchenough Decl. Ex. I ("Use of Force Report"), Birchenough Decl. Ex. H ("Unusual Incident Memorandum"), Birchenough Decl. Ex. K ("Sharpe Inmate Misbehavior Report"), and the Germano Report, which each show that the use-of-force event occurred around 3:10 P.M. on April 23, 2016; (3) Mere's deposition testimony, declaration, and the DOCCS Staff Planning Grid from April 23, 2016 purportedly establishing that Mere was in the gym at 3:10 P.M. that day, Mere Dep. at 51, Mere Decl. Ex. A ("DOCCS Staff Planning Grid"); and (4) the fact that the Germano Report created after the OSI investigation did not identify Mere as "involved staff" or present during the use-of-force event. See Germano Report. Mere also contends that Plaintiff's Amended Complaint does not allege he was involved in the use-of-force event in the SHU, and that Plaintiff's Grievance likewise does not state Mere was in the SHU room during the assault and only mentions him for the first time after Plaintiff was placed in his SHU cell. Mere Mem. at 7–8.

[6]   It is undisputed that Mere was not present in the van during the alleged assault on Plaintiff during his transfer to the SHU. Pl.'s SMF at 18.

**\*13**  However, contrary to Mere's assertions, Mere's non-presence in the SHU during the assault is explicitly disputed on the record. Plaintiff testified several times during his deposition that Mere was present in the SHU strip-frisk room during the assault, along with Robideau, Sharpe, Hanson and another unidentified officer, and that all the officers present assaulted him:

Q. Okay. Was Officer Mere one of the individuals who assaulted you once you got to the SHU to the strip frisk room?

A. I believe he was.

Q. I'm sorry?

A. I believe he was because he was in the room with them.

Q. He was in the strip frisk room?

A. Yes.

...

Q. Okay. Was he one of the ones that assaulted you?

A. All of them assaulted me.

Pl. Dep. at 199–200; see also id. at 204, 223, 224. Likewise, in Plaintiff's Declaration, Plaintiff alleges that Mere assaulted him in the SHU. Pl.'s Decl. at 13–19.

The question then is whether this testimony is sufficient to create an issue of material fact, or whether it is nothing more than a mere scintilla of evidence. The Court find that Plaintiff's testimony is sufficient to withstand summary judgment.

Mere appears to argue that Plaintiff's Grievance contradicts his later statements that Mere participated in the SHU assault because the grievance does not name Mere specifically until Plaintiff describes events that occurred while he was in the SHU cell. Mere Mem. at 8.

Where a plaintiff "relies almost exclusively on his own testimony, much of which is contradictory and incomplete[,]" and the account is so contradictory that "no reasonable person could believe [it]," summary judgment may be appropriate. Jeffreys v. City of N.Y., 426 F.3d 549, 554–55 (2d Cir. 2005). It is true that Plaintiff's Grievance does not name Mere as one of the officers present in the SHU strip-frisk room and that Plaintiff relies almost exclusively on his own testimony to establish Mere's presence there. However, the Court does not find that the grievance inherently contradicts Plaintiff's later statements regarding Mere's participation. The grievance states there were several officers in the strip-frisk room during the assault and that "all the officers in the room started kicking

and punching." Pl.'s Grievance at 3. The Court does not find this statement, or the allegations in Plaintiff's Complaint, so contradictory that no reasonable person could believe Plaintiff's account.

Further, much of Mere's argument relies on the Staff Planning Grid to establish that it was "physically impossible" for him to be in the SHU at the time of the use-of-force event, as well as on the testimony of other officers and the Germano Report. Mere Mem. at 8. However, an assignment to a specific area does not conclusively establish that Mere was physically present in that area at the specified time. And a reasonable jury could choose to believe Plaintiff's account over the Staff Planning Grid, the defendant officers' testimonies, and the Germano Report, which was itself largely based on the parties' statements. Germano Report at 1–4.

While the weight of the evidence may favor Mere, a reasonable juror could credit Plaintiff's account, and the weighing of conflicting evidence is more properly left to the jury. Telesford v. Tamer, No. 14-CV-1209, 2016 WL 11480163, at *4 (N.D.N.Y. Aug. 31, 2016) ("Resolving the discrepancy between the parties' competing evidence would require the court to undertake a credibility determination that is not appropriate on summary judgment."). Thus, the Court denies Mere's request for summary judgment as to Plaintiff's Eighth Amendment excessive force claim.

### 2. Eighth Amendment Medical Indifference as to Mere

**\*14** To establish an Eighth Amendment violation due to medical indifference, an inmate must prove "deliberate indifference to [his] serious medical needs." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The deliberate indifference requirement has both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010). Mere only argues that Plaintiff has not satisfied the subjective prong. See Mere Mem. at 9–12.

The subjective prong requires that a defendant prison official act with a sufficiently culpable state of mind. They must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In other words, they must "act[ ] or fail[ ] to act 'while actually aware of a substantial risk that serious inmate harm will result.' " Acosta v. Thomas, 837 Fed. Appx. 32 (2d Cir.

2020) (quoting Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006)).

Mere argues that the record establishes he was not aware of the use-of-force event in the SHU, and thus had no knowledge of any excessive risk of injury, and that Plaintiff only requested his inhaler once, after which it was promptly provided to him—therefore, Mere did not act indifferently. Mere Mem. at 11–12.

However, as noted above, a reasonable jury could choose to credit Plaintiff's account of events, and that account relates a considerably different story. Plaintiff alleged on the record that Mere was not only aware of the use of force in the SHU, wherein five officer allegedly "beat[ ] up and kick[ed]" Plaintiff while on the ground, but participated as well. Pl.'s Dep. at 199:25–201:5. Shortly after the alleged attack, when Plaintiff had been placed in his SHU cell, Plaintiff claims he informed Mere that he could not breathe and feared he was having an asthma attack. Id. at 209:3–209:8; Pl.'s Decl. ¶ 28. A reasonable jury could conclude that knowledge of a brutal assault on Plaintiff combined with Plaintiff's statements shortly afterward that he couldn't breathe put Mere on notice of an excessive risk to Plaintiff's health. Baumann v. Walsh, 36 F. Supp. 2d 508, 513 (N.D.N.Y. 1999) ("[I]f [the defendants] were aware of [p]laintiff's injuries and subsequent pain at the time those injuries occurred, yet failed to provide access to necessary medical care or treatment, then an Eighth Amendment violation would be established despite the fact that medical treatment was later received.").

Likewise, a dispute as to material fact exists regarding whether Mere reacted with indifference to this excessive risk. While Mere claims Plaintiff was given his inhaler "within a reasonable time" after allegedly saying he couldn't breathe, Mere Mem. at 11–12, the record evidence Mere references to support his argument that this fact is undisputed instead shows the opposite. Mere cites to Plaintiff's deposition testimony, yet in that testimony, Plaintiff states that when he informed Mere he needed his inhaler, Mere said he would "look into it" but never provided assistance, and Plaintiff did not get his inhaler until hours after asking Mere (and then only when a different officer arrived). Pl.'s Dep. at 209:3–209:8, 215:9–215:16. Mere also cites the Germano Report, which states that Plaintiff attempted to gain the attention of "the officer assigned to the watch" but he was met with "negative results" and did not get his inhaler until "approximately one hour later." Germano Report at 1. The Germano Report also found that "[Plaintiff] made several complaints of rib pain and

Case 9:23-cv-00098-MJK   Document 144   Filed 03/04/26   Page 269 of 306

difficulty breathing immediately following the incident" and "involved staff failed to give [Plaintiff] proper medical care immediately after the Use of Force occurred and the following day." Id. at 1, 4.

**\*15** Indeed, Mere's alleged failure to provide assistance to an inmate struggling to breathe, shortly after participating in a violent assault on that inmate, could reasonably be inferred to be, not only indifference to a serious medical need, but an intentional delay in access to medical care. See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976) (finding deliberate indifference to serious medical need standard met where "prison guards ... intentionally deny[ ] or delay[ ] access to medical care."); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984) (denying summary judgment on claim for medical indifference where some evidence suggested defendants delayed emergency medical aid).

Because there are disputes as to material facts regarding whether Mere was aware of an excessive risk to Plaintiff's health, and whether Mere acted with deliberate indifference to that risk, the Court denies Mere's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a severe medical need.

### 3. Retaliation as to Mere

As stated above, to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

It is undisputed that the filing of a lawsuit constitutes protected conduct. See Mere Mem. at 16. Mere instead argues that his conduct does not constitute an adverse action and there was no causal connection between the alleged conduct and the protected activity. See id. at 16–18.

Plaintiff alleges three actions that could constitute retaliation by Mere: Mere's alleged participation in the assault in the SHU strip-frisk room, Mere's denial of adequate medical care, and Mere's issuance of misbehavior reports.

#### a. SHU Strip-Frisk Assault

The Court has already determined that issues of material fact exist regarding whether Mere participated in the alleged assault in the SHU strip-frisk room. See supra Section IV(B)(1). Similar to the assault allegedly perpetrated by Robideau, the physical assault allegedly perpetrated by Mere is sufficient to constitute an adverse action that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights. See Baskerville v, 224 F. Supp. 2d at 732.

Mere argues that Plaintiff "offers only conclusory evidence" to support his claim of a causal connection between Mere's alleged actions and the Cowan Suit. See Mere Mem. at 14. While much of the evidence presented by Plaintiff regarding Defendants' knowledge of the Cowan suit is indeed conclusory or speculative, Plaintiff has also provided direct evidence of a causal link. A reasonable factfinder could credit Plaintiff's account that an officer stated during the assault in the strip-frisk room that they wanted Plaintiff to receive "special treatment because he filed a lawsuit against one of our brothers," Pl.'s Dep at 187:24–188:5; 200:8–200:17, and that Mere participated in that assault. If believed, this is sufficient to create an inference of causation between the protected activity and the alleged assault, even if it is not conclusively established that Mere himself is the one who made the statement. See Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *5–6 (S.D.N.Y. Oct. 9, 2015) (finding summary judgment on retaliation claim unwarranted where evidence supported an "inference of causation" between filing of grievances and assault by multiple corrections officers because one had "mocked [plaintiff] for filing a grievance during the alleged attack").

#### b. Denial of Adequate Medical Care

**\*16** A denial of medical care in the face of great pain or need, as is alleged by Plaintiff and supported on the record, constitutes an adverse action sufficient to establish a claim for retaliation. See Abreu v. Lipka, 778 F. App'x 28, 33 (2d Cir. 2019) ("[W]ithholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights.").

As stated above, a reasonable factfinder could find that Mere's alleged assault was motivated by Plaintiff's filing of a suit against Cowan. Given that Plaintiff' Grievance states the denial of medical care initially occurred only thirty minutes to an hour after Mere supposedly took part in an assault on Plaintiff, Pl.'s Grievance at 6, which itself was allegedly explicitly undertaken in retaliation for the filing of the Cowan suit, see Pl.'s Dep at 187:24–188:5; 200:8–200:17, a factfinder could reasonably infer that this adverse-action was similarly motivated. Roland, 2015 WL 5918179, at *5–6 ("[S]ummary judgment is unwarranted if the evidence can support an inference of causation.").

c. Issuance of Misbehavior Tickets

However, the Court finds that Mere's issuance of misbehavior tickets does not constitute an adverse action sufficient to deter a person of ordinary firmness from exercising his rights because the tickets were eventually dismissed and Plaintiff never suffered adverse consequences or repercussions. See Birchenough Decl. Ex. O–Q; compare Berry v. Tremblay, No. 20-CV-177, 2021 WL 1575951, at *4 (N.D.N.Y. Apr. 22, 2021) ("Courts in this district have routinely found the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action.") (collecting cases), with Hayes v. Dahlke, 976 F.3d 259, 272–74 (2d Cir. 2020) (finding filing of false misbehavior report constituted adverse action where inmate-plaintiff spent time in keeplock as a result), and Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004) (finding adverse action where inmate-plaintiff spent three weeks in keeplock as a result of false misbehavior report.).

Plaintiff argues that he did suffer consequences because, while the misbehavior reports were eventually dismissed, he was initially found guilty and had to appeal the charges. See Pl.'s Resp. Mem. at 35. However, Plaintiff does not present any specific consequences or repercussions he faced as a result of the initial guilty finding or as a result of engaging in the appeals process. See id.

Therefore, the Court denies Mere's motion for summary judgment as to retaliation arising from Mere's alleged use of force in the SHU strip-search room and Mere's alleged denial of adequate medical care, but grants summary judgment as to retaliation arising from Mere's issuance of misbehavior reports.

*4. Qualified Immunity as to Mere*

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir. 2018); see also Green v. Montgomery, 219 F.3d 52, 59 (2d Cir. 2000). "The objective reasonableness test is met if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim v. Proulx, 93 F.3d 86, 91 (2d Cir. 1996)). Summary judgment should not be granted on the basis of qualified immunity due to objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain v. Springer, 494 F.3d 108, 131 (2d Cir. 2007).

**\*17** Mere does not argue that his actions did not violate clearly established law. See Mere Mem. at 18–20. He instead claims that his actions were objectively reasonable and he is thus entitled to qualified immunity as to the claims against him derived from his alleged use of excessive force and denial of adequate medical care. Id. [7]

[7] Mere also argues he is entitled to qualified immunity as to any claims arising from his issuance of misbehavior tickets. See Mere Mem. at 20. However, because the Court has already granted summary judgment for these claims, the Court will not address this argument.

Regarding the claims of excessive force and retaliation stemming from the alleged assault in the SHU strip-frisk room, Mere argues he is entitled to qualified immunity because he "was not present during the Use of Force Event ... and therefore it was objectively reasonable that Officer Mere did not intervene in a Use of Force Event of which he had no knowledge." Id. at 18. However, Mere's presence and participation in the strip-frisk room assault is a contested and material issue of fact. Construing the record in the light most favorable to Plaintiff, a jury could reasonably credit Plaintiff's testimony that Mere participated in the assault and thus reasonably find that it was not objectively reasonable for Mere to believe his actions did not violate Plaintiff's

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 271 of 306
Lewis v. Hanson, Not Reported in Fed. Supp. (2022)
2022 WL 991729

Eighth Amendment rights. See Jeanty v. Cty. of Orange, 379 F. Supp. 2d 533, 542 (S.D.N.Y. 2005) (denying summary judgment where plaintiff's testimony created factual dispute regarding defendants' use of excessive force, thus "jury could reasonably conclude that it was not objectively reasonable for the individual defendants to believe that their actions did not violate plaintiff's Eighth Amendment rights."); Brewer v. Kamas, 533 F. Supp. 2d 318, 331 (W.D.N.Y. 2008) (finding, where plaintiff alleged corrections officer used excessive force, that "if the facts as alleged by Plaintiff are established at trial, no reasonable corrections officer could reasonably believe he was not violating Plaintiff's constitutional rights.").

Mere also argues he is entitled to qualified immunity regarding claims of deliberate indifference to a serious medical need and retaliation stemming from his alleged failure to provide Plaintiff with his inhaler while on the 1:1 suicide watch. See Mere Mem. at 19. Mere asserts it was objectively reasonable for him to not leave his post to personally retrieve the inhaler and that "any reasonable officer similarly assigned to a one-on-one watch would engage the use of other DOCCS officers such as the SHU Roundsmen ... and would rely upon their assistance to alert medical staff." Id.

However, construing the evidence in the light most favorable to Plaintiff, Mere's assertions are heavily disputed. Plaintiff asserts that Mere participated in a vicious assault upon him in the SHU and thus knew he had been severely beaten. Pl.'s Dep at 200:8–200:17. Shortly after, Plaintiff claims he informed Mere he could not breathe, thought he was having an asthma attack, and needed his inhaler. Pl.'s Grievance at 6. Rather than contacting other officers to get medical aid, as Mere claims he did, Plaintiff asserts that Mere simply said he would "look into" it, walked away, and never provided any sort of assistance. Id. at 6–7; Germano Report at 1; Pl.'s Dep. at 209:3–209:8. Plaintiff claims he did not receive his inhaler until hours later, when he was able to contact another officer. Pl.'s Dep. at 215:11–215:16.

**\*18** Again, the test for objective reasonableness is met "if officers of reasonable competence could disagree on the legality of the defendant's actions." Green, 219 F.3d at 59 (quotation marks omitted). Tellingly, Mere states that "*any* reasonable officer" in his position would have engaged the use of other officers to alert medical staff. Mere Mem. at 19 (emphasis added). Thus, Mere implies that if an officer acted as Plaintiff asserts, and never alerted medical staff or sought assistance, no officer of reasonable competence would agree that it was legal or proper.

A reasonable jury could credit Plaintiff's account and find it was not objectively reasonable for Mere to believe denying an inhaler to an inmate who had stated he couldn't breathe, especially after participating in an assault on that inmate, did not violate Plaintiff's right to medical care. Thus, the objective reasonableness of Mere's actions depends on a determination of factual questions that cannot be answered at the summary judgment stage of litigation. See Ellington v. Whiting, 807 F. App'x 67, 69–70 (2d Cir. 2020) (denying summary judgment on qualified immunity grounds where material issues of fact existed regarding whether defendants were aware of plaintiff's condition); Robinson v. Taylor, No. 16-CV-0285, 2017 U.S. Dist. LEXIS 137233 (N.D.N.Y. Aug. 24, 2017) (denying summary judgment on qualified immunity grounds where "resolution of the objective reasonableness of Defendants' actions 'depends on the determination of certain factual questions that cannot be answered at this stage of the litigation.' ") (quoting Denton v. McKee, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004)).

**C. Peck Motion for Summary Judgment**

Peck moves for summary judgment on all claims against him, which include a claim of excessive force in violation of the Eighth Amendment, deliberate indifference to a serious medical need in violation of the Eight Amendment, and retaliation in violation of the First Amendment.

*1. Excessive Force as to Peck*

Plaintiff does not oppose Peck's motion regarding his claims for excessive force. See Pl.'s Resp. Mem. at 14. Thus, the Court grants Peck's motion for summary judgment regarding any claims of excessive force.

*2. Deliberate Indifference to a
Serious Medical Need as to Peck*

To establish an Eighth Amendment violation due to deliberate indifference to a serious medical need, an inmate must establish both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010).

Peck argues that he is entitled to judgment as a matter of law under both the objective and subjective prongs.

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 272 of 306

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

2022 WL 991729

a. Objective Prong

The objective prong of the deliberate indifference standard requires that "the alleged deprivation ... be sufficiently serious." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). This determination in turn requires two further inquiries. Salahuddin v. Goord, 467 F.3d 263, 280, 279 (2d Cir. 2006). The first inquiry is "whether the prisoner was actually deprived of adequate medical care." Id. This inquiry turns on whether the defendant acted "reasonably" in response to an inmate's health risk or whether he failed "to take reasonable measure in response to a medical condition." Id. at 279–80. The second inquiry is whether the inadequacy in medical care is sufficiently serious. Id. at 280. "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Id.

**\*19** Peck does not dispute that Plaintiff's injuries were sufficiently serious as required by the second inquiry of the objective prong. See Peck Reply. Mem. at 4. Peck instead argues that the record evidence is insufficient to meet the first inquiry of the objective prong because he reacted reasonably. Peck Mem. at 14. Instead, Peck argues he was not aware of the use of force against Plaintiff or Plaintiff's physical condition, or that Plaintiff was having trouble breathing. Peck Mem. at 14. Peck further argues that, on the one occasion Plaintiff asked if he could have his inhaler, Peck acted reasonably by informing medical staff and contacting a supervisor. Id. at 14–15.

Plaintiff contends Peck must have known of the use of force against him, and thus knew of his injuries, because that morning "another officer in the SHU told Lewis he would not receive breakfast because he assaulted another officer." Pl.'s Resp. Mem. at 31. The Court finds that the mere fact that a different officer in the SHU, on duty at a different time of day, knew of the use-of-force incident involving Plaintiff, is entirely too speculative and conclusory to create a triable issue of fact as to whether Peck himself knew of the incident. See Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."). Even if the other officer's knowledge were imputed to Peck, the other officer seemed to believe Plaintiff was the assailant, and would not necessarily have known of any injuries Plaintiff

had received. Plaintiff's Grievance at 7A (stating the officer said "no food for you because you assaulted a [sic] officer").

However, Plaintiff offers more than the speculative assertion above to support his claim that Peck knew of a serious risk to his health. Plaintiff testified that he informed Peck he was having a hard time breathing and was having an asthma attack, but Peck did not do anything to help. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–2. Plaintiff further alleged that he requested his inhaler from Peck again, after an hour with no assistance, and Peck told him he would "just have to wait." Pl.'s Grievance at 7B; Pl.'s Decl. ¶¶43–44 [8] . According to Plaintiff, he did not receive medical aid until an additional hour and a half had passed. Pl.'s Grievance at 7C. Additionally, a reasonable jury could take into account the Germano Report, which found Peck exhibited "a lack of care custody and control by departmental standards," to find Peck did not act reasonably.

[8]    Peck argues that Plaintiff has relied "almost exclusively on his Declaration to invent questions of fact" in response to Peck's motion. Peck Reply Mem. at 5. Peck further argues that the Court should disregard the assertions Plaintiff makes in his declaration because they contradict Plaintiff's deposition testimony and are "replete with inconsistencies." Id. at 2. The Court disagrees on both counts. Plaintiff's material assertions that he informed Peck he was having trouble breathing and requested his inhaler multiple times find support, not only in Plaintiff's Declaration, but in both his deposition testimony and the Germano Report. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B. Further, while it is true that a declaration made in response to a motion for summary judgment may be disregarded to the extent it contradicts past deposition testimony, the two must be "actually contradictory." Palazzo v. Corio, 232 F.3d 38, 43 (2d Cir. 2000). The Court does not agree that Plaintiff's Declaration is inconsistent with his deposition. Peck claims that Plaintiff states Peck was not at his post in his declaration, but in the deposition, stated that it was Mere who was not at his post. Peck Reply Mem. at 2. While Plaintiff does state that Mere was not at his post in his deposition, Pl.'s Dep. at 208, he also states later that Peck was not at his post the next day, id. at 265:6–8. Similarly, Peck argues it is inconsistent for Plaintiff to claim in his later declaration that he did not

receive his inhaler until after Peck did not respond, when he admitted in his previous deposition that he received an inhaler before Peck even began his shift. Peck Reply Mem. at 3. However, Plaintiff makes clear that, while he did receive his inhaler the day before while Mere was on watch, he was still short of breath the next day, and thus requested the inhaler again from Peck. Pl.'s Grievance at 7B; Pl.'s Decl. ¶¶ 31, 38.

**\*20** Further, the record belies Peck's assertion that he acted reasonably because he contacted a supervisor in response to Plaintiff's request. Notably, Peck does not cite to any record material to support this factual assertion. See Peck Mem. at 14. Indeed, Peck denied during his deposition that he ever requested medical attention for Plaintiff, Peck Dep. at 43:2–43:8, Peck testified that when he contacted a roundsmen about getting a supervisor, he did not recall mentioning any need for medical attention and "[t]he only thing [he] wanted to have the roundsman do was to have a sergeant come down," id. at 46:14–47:2, Peck also testified he did not recall ever telling Sergeant Tamer that Plaintiff had requested medical attention and did not contact medical directly at any point, id. at 57:5–57:23.

Construing the evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find Peck knew Plaintiff was in severe medical need due to his inability to breathe, but did not act to obtain aid, and thus did not act reasonably in response to Plaintiff's requests. Therefore, Peck is not entitled to summary judgment under the objective prong of the deliberate indifference standard.

#### b. Subjective Prong

The subjective prong of the deliberate indifference standard requires that a defendant prison official act with a sufficiently culpable state of mind. They must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." Hill, 657 F.3d at 122 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In other words, they must "act[ ] or fail[ ] to act 'while actually aware of a substantial risk that serious inmate harm will result.' " Acosta v. Thomas, 837 Fed. Appx. 32 (2d Cir. 2020) (quoting Salahuddin, 467 F.3d at 280).

Peck argues he did not know of and disregard an excessive risk to inmate health or safety because he was not informed of Plaintiff's physical condition, he did not notice any injuries upon beginning his assignment, and that Plaintiff testified that

the extent of his medical request was for an inhaler because he was having an asthma attack. See Peck Mem. at 15–16.

However, as stated above, a reasonable jury could credit Plaintiff's account and find that he informed Peck he was having an asthma attack and was unable to breathe. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–2. Given Peck's deposition testimony, a reasonable factfinder could likewise find that Peck did not undertake any action to provide medical aid in response to Plaintiff's reports that he could not breathe. Peck Dep. at 43:2–8; 46:14–47:2; 57:5–23.

Thus, a factfinder could find Peck was aware of an excessive risk to Plaintiff's health, and that Peck disregarded it by failing to take any action to provide aid. [9] See Warren v. City of New York Dep't of Corr. Med. Staff, No. 17-CV-1125, 2021 WL 1163105, at *11 (E.D.N.Y. Mar. 26, 2021) (denying summary judgment where material dispute of fact existed regarding whether defendant provided plaintiff medical attention in response to asthma attack); Ennis v. Davies, No. 87-CV-1465, 1990 WL 121527, at *3 (S.D.N.Y. Aug. 14, 1990) (holding that a jury could reasonably find that inmate's request for his asthma medication was sufficient to make the defendants aware of a serious medical need and failure to provide medication constituted deliberate indifference).

[9]    Peck argues that, to meet the subjective prong of the deliberate indifference claim against a non-medical official, "the plaintiff must establish that the official 'intentionally delayed access to medical care' " after the plaintiff made the problem known. Peck Mem. at 13. However, an examination of the higher court decisions from which this doctrine springs indicates that, while they consider showing intentional delay to be *sufficient* to establish deliberate indifference, they do not state that such a showing is *necessary* to establish deliberate indifference. See Estelle v. Gamble, 429 U.S. 97, 104–105 (1976) ("[D]eliberate indifference to serious medical needs of prisoners ... [is manifested] by prison guards in intentionally denying or delaying access to medical care."); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984) ("[I]f defendants did decide to delay emergency medical aid ... in order to make Archer suffer, surely a claim would be stated under Estelle."). However, to the extent such a showing is necessary, the Court finds that a reasonable jury could find intentional delay here due to Peck's alleged complete inaction

in the face of Plaintiff's statements he was having an asthma attack and could not breathe. See Baumann v. Walsh, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (finding dispute of material fact regarding whether defendants intentionally delayed care where evidence showed they ignored plaintiff's complaints and refused medical care).

**\*21** Thus, because there are disputes as to material facts regarding whether Peck acted reasonably and whether he knew of and acted with reckless disregard regarding an excessive risk to Plaintiff's health, the Court denies Peck's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a serious medical need.

### 3. Retaliation as to Peck

Plaintiff alleges Peck withheld proper medical treatment and filed a false misbehavior report against him as retaliation for his filing of the lawsuit against Cowan. Pl.'s Resp. Mem. at 36.

To succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis, 320 F.3d at 325; see also Pidlypchak, 389 F.3d at 380. In determining whether a causal connection exists between a protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." Baskerville, 224 F. Supp. 2d at 732 (citing Colon, 58 F.3d at 872–73 (2d Cir. 1995)).

Peck argues there is insufficient evidence on the record to establish a causal connection between his alleged actions and any retaliatory animus. See Peck Mem. at 22. In response, Plaintiff asserts that there is sufficient circumstantial evidence to infer a causal connection due to the temporal proximity between the protected conduct and Peck's alleged retaliatory conduct and the due to fact that Bare Hill is close geographically to Franklin, the facility where Cowan worked. See Pl.'s Resp. Mem. at 38–39.

Regarding temporal proximity, the Court cannot agree that this factor meaningfully supports a causal connection in this case. Peck's alleged actions took place around ten months after Plaintiff filed the Cowan Suit. Noonan Decl. Ex. 13. While the Second Circuit "has not drawn a bright line to define the outer limits" of temporal proximity in retaliation cases, Gorman–Bakos v. Cornell Co-op Ext. of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001), a gap of ten months is somewhat longer than most that are found to support a causal connection. See, e.g., Gorman-Bakos, 252 F.3d at 554 (finding five-month gap sufficiently short to support inference of causal connection); Espinal, 558 F.3d at 129 (finding six-month gap sufficiently short). However, it is relevant that the Cowan Suit was ongoing at the time of Peck's alleged retaliatory actions. See Cruz v. Lee, No. 14-CV-4870, 2016 WL 1060330, at \*7 (S.D.N.Y. Mar. 15, 2016) (finding temporal proximity sufficient to support retaliation for filing lawsuit where lawsuit was ongoing). Given that the Cowan Suit was ongoing, but nothing occurred in the lawsuit near in time to the alleged retaliatory acts, [10] and the suit was filed ten months prior to the alleged acts, the Court finds this factor does not strongly favor, nor disfavor, an inference of causation.

[10]    The only event Plaintiff points to in the Cowan Suit that happened near in time to these events is the denial of pro bono counsel in November 2016, five months after the alleged retaliatory events. Pl.'s Resp. Mem. at 38.

**\*22** Militating against a finding of causal connection, Plaintiff's prior disciplinary record could not be categorized as "good." It contains multiple infractions for violating direct orders and harassment, amongst others. See Mitchell Decl. Ex. D. Also, Plaintiff was eventually found guilty of the misbehavior ticket issued by Peck. Pl.'s SMF at 71.

However, most significantly, Plaintiff's grounds for alleging a causal connection are too conclusory and speculative to create a triable issue of fact regarding Peck's alleged retaliatory motive. Plaintiff's main argument is that "there is ample evidence to conclude that Moving Defendants knew other officers at Franklin – a facility located in the same small town." Pl.'s Resp. Mem. at 39. Namely, Plaintiff references Peck's deposition testimony that when he goes to trainings, there would be officers from Franklin and Upstate Correctional there as well, Peck Dep. at 115:12–115:22, and that Defendants Kingston and Mere stated they would run

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 275 of 306

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

2022 WL 991729

into officers from Franklin at times, Kingston Dep. at 92:10–92:21, Mere Dep. 18:16–19:2.

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are " 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.' " Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003). Plaintiff did not file a suit or complaint against Peck himself. The mere fact that Peck works in the same general area as an officer against whom Plaintiff filed a lawsuit, and thus conceivably could have met that officer or others who know him, and in turn could have potentially acted in retaliation for a suit against that officer, is entirely too speculative and conclusory to create an issue of material fact. Even where officers have worked together in the same facility, allegations that one retaliated on behalf of another have generally been found conclusory and insufficient to withstand summary judgment absent other evidence of retaliatory motive. See Faulk, 545 F. App'x at 59 (finding allegations too conclusory to withstand summary judgment because "no evidence suggest[ed] that they were motivated by, or even aware of, [the] grievance," because defendants were not themselves named in the grievance and allegations they had retaliated on behalf of another officer in the same facility were merely "conclusory"); Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (upholding summary judgment where plaintiff alleged retaliation for filing complaint regarding acts of other inmates and officials at same facility, but did not name defendant). This contrasts with cases where courts have found disputes of material fact to exist, even though a defendant was not directly named in a grievance or suit, because a direct connection was established between the defendant and the officer who was the target of the suit, or the defendant was alleged to have made statements referencing the grievance or suit. See Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995) ("If this circumstantial evidence represented the sum total of Colon's proof, we might be inclined to affirm the grant of summary judgment ... [but Colon] also presents direct evidence of retaliation, namely, defendant Bezio's alleged admission of the existence of a retaliatory scheme."); Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *5 (S.D.N.Y. Oct. 9, 2015) (finding evidence sufficient to support inference of retaliatory motive where one defendant lived with the two officers who were the subject of the past grievance and "most significantly, [plaintiff] testified that a Defendant mocked him for filing grievances during the alleged attack"); Farid v. Goord, 200 F. Supp. 2d 220, 237 (W.D.N.Y. 2002) (finding issue of triable fact existed as to whether false misbehavior report was motivated by complaint against other officer where defendant knew of the complaint "well before the filing of the Misbehavior Report").

**\*23** Because Plaintiff's allegations that Peck knew of and was motivated by the Cowan Suit are entirely conclusory and speculative, the Court grant's Peck motion for summary judgment as to Plaintiff's claims of retaliation.

### D. Kearney and Kingston Motion for Summary Judgment

Defendants Kearney and Kingston argue they are entitled to summary judgment as to Plaintiff's claims for excessive force in violation of the Eighth Amendment, Retaliation in violation of the First Amendment, and are entitled to qualified immunity. See Kearney & Kingston Mem. at 7.

*1. Excessive Force and Personal
Involvement as to Kearney and Kingston*

Defendants Kearney and Kingston argue that they are entitled to summary judgment as to Plaintiff's claim of excessive force because the record fails to establish that they were personally involved in the constitutional violation. Id. at 8–13. Plaintiff responds by arguing that personal involvement may be established by showing a defendant facilitated or attempted to cover up a constitutional violation. Pl.'s Resp. Mem. at 21–22.

"Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662 (2009) "To hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." Tangreti v. Bachmann, 983 F.3d 609, 620 (2d Cir. 2020).

Plaintiff cites several cases holding that if a defendant attempts to facilitate or cover up a constitutional violation, that is sufficient to find that defendant personally participated in the violation. See, e.g., Edwards v. Annucci, No. 17-CV-5018, 2019 WL 1284295, at *7 (S.D.N.Y. Mar. 20, 2019) ("A prisoner's well-pleaded allegation that a defendant 'fil[ed] a false report to his supervisors in order to cover

up' constitutional violations will 'give rise to a plausible inference' that the defendant 'was personally involved in the purported constitutional violations.' ") (quoting Randle v. Alexander, 960 F. Supp. 2d 457, 478 (S.D.N.Y. 2013)). Additionally, this Court held in response to Kearney and Kingston's Motion to Dismiss, Dkt. No 79, that these allegations of facilitation and cover-up were sufficient to establish personal involvement, See Dkt. No. 100 ("Order on Motion to Dismiss") at 8–9. This would imply that if the record now presented sufficient evidence that Defendants facilitated or attempted to cover up the use of excessive force, a reasonable jury could find they personally participated in the Eighth Amendment violation.

However, subsequent to the decisions Plaintiff cites and this Court's Order on Motion to Dismiss, the Second Circuit clarified the requirements for personal involvement in Tangreti.

In Tangreti, an inmate filed suit under 42 U.S.C. § 1983 alleging a prison supervisor displayed deliberate indifference to a risk of sexual abuse because the supervisor was grossly negligent in supervising the abusing officers. Id. at 616. The Second Circuit found that supervisory liability of this type violated the standard set forth in Iqbal, and that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. at 616. Further, " '[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." Id. at 618 (quoting Iqbal, 556 U.S. at 676).

**\*24** Thus, while previously many court's only required a § 1983 Plaintiff to establish a "tangible connection" between a defendant's acts and injuries suffered, see Miller v. Annucci, No. 919-CV-0030, 2019 WL 2370295 (N.D.N.Y. June 5, 2019) (Kahn, J.); Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008); in Tangreti, the court required the plaintiff to show "that [defendant] violated the Eighth Amendment by [defendant's] own conduct" and establish the elements of her Eighth Amendment claim directly against the defendant. Tangreti, 983 F.3d at 619.

While Plaintiff's allegations regarding excessive force against Kearney and Kingston do not allege supervisory liability, the reasoning in Tangreti applies with equal force here: Plaintiff must show that Defendants violated the Eighth Amendment by their own conduct, and establish the elements of his Eighth

Amendment claim for excessive force [11] directly against Kearney and Kingston rather than relying on the conduct of other officers. See Quintin v. Cty. of Nassau, No. 18-CV-5852, 2022 WL 888950, at \*3 (E.D.N.Y. Mar. 25, 2022) (applying Tangreti outside of the supervisory context and stating that "it is well-settled that to establish liability under Section 1983, a plaintiff must 'plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution' " (quoting Tangreti, 983 F.3d at 618)); Karelefsky v. Brann, No. 20-cv-9485, 2022 WL 624424, at \*2 (S.D.N.Y. Mar. 1, 2022) (observing that to find personal involvement and "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official." (citing Tangreti, 983 F.3d at 620)).

11    While Plaintiff made allegations in his Amended Complaint that "none of the [Defendants] took reasonable steps to protect [Plaintiff] from the objectively unreasonable and conscience shocking excessive force of the others, despite being in a position to do so," Plaintiff seems to have abandoned this argument regarding Kingston and Kearney and thus the Court will not address it. Kingston and Kearney specifically state in their motion for summary judgment that they are moving to dismiss all claims against them, Kearney & Kingston Mem. at 1, but Plaintiff did not argue in his response that they were liable due to a failure to protect. See generally Pl.'s Resp. Mem.; Pukhovich v. City of N.Y., No. 16-CV-1474, 2018 WL 4688943 at \*8 (E.D.N.Y. Sep. 27, 2018) (finding claims abandoned where complaint contained certain claim and defendants moved for summary judgment on "all" claims and neither party mentioned the cause of action in briefing); Singleton v. City of Newburgh, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (finding claim abandoned on summary judgment because it was not raised in the record after being asserted in the complaint).

As stated above, to establish an Eighth Amendment claim of excessive force, a plaintiff must show both an objective and subjective component. "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency ... when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated.' "

Wright v. Goord, 554 F.3d 255, 268–69 (2d Cir. 2009). The subjective component requires a plaintiff to show a defendant official had "a sufficiently culpable state of mind." Hayes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992).

**\*25** A corrections officer who knowingly facilitates an assault on an inmate could be found to have directly, through their own actions, deprived an inmate of his right to be free from cruel and unusual punishment by causing physical bodily harm in the same way an officer who directly participates in the assault deprives an inmate of such rights, and thus the facilitating officer has "used force" to cause harm maliciously. C.f. Smith v. Levine, 510 F. App'x 17, 20 (2d Cir. 2013) (finding complaint to have sufficiently alleged defendant's personal participation in constitutional violation where allegations created "obvious inference" that defendant's action was a "precursor" to the violative act). However, an officer who attempts to cover up an assault after the fact, while potentially committing other violations, may not have personally participated in cruel and unusual punishment in the same way such that a plaintiff could establish the elements of an excessive force claim against them directly.

Thus, because it is admitted neither Kearney nor Kingston participated directly in the alleged assaults on Plaintiff, the question before the Court is whether there is sufficient evidence on the record for a reasonable jury to conclude that Defendants knowingly facilitated the assault.

Plaintiff argues there is evidence showing Kearney made up the phone infraction and Plaintiff's request to use the phones out of whole cloth, thus facilitating the assault by establishing a pretext to transfer Plaintiff to the SHU. Pl.'s Resp. Mem. at 23. After being shown a picture of Plaintiff, Kearney informed Hanson that Plaintiff had asked to use the phone the day before in violation of his cube confinement restrictions. Pl.'s Resp. Mem. at 23; Kearney & Kingston SMF ¶ 15–16. Plaintiff disputes that he was the inmate who approached Kearney to make the call, Pl.'s SMF at 4; Pl.'s Resp. Mem. at 22, and there is evidence on the record that could allow a reasonable factfinder to credit Plaintiff's account. Hanson did not remember ever showing Kearney a picture of Plaintiff. Pl.'s Resp. Mem. at 22. Additionally, evidence on the record indicates that another inmate was using Plaintiff's ID to make phone calls during the relevant time, Mitchell Decl. Ex. O ("Germano Deposition") at 76, and Plaintiff was found not guilty of the misbehavior ticket accusing him of making

phone calls in violation of cube restrictions, Mitchell Decl. Ex. K at 59.

Making all reasonable inferences in Plaintiff's favor, a factfinder could reasonably credit his account and conclude that he did not ask Kearney for permission to use the phone on April 22, 2016. A reasonable factfinder could thus conclude Kearney was lying when, after seeing a picture of Plaintiff, he told Hanson Plaintiff was the one who asked to use the phone, and could infer from this dishonesty that Kearney did so to facilitate, or aid in the facilitation of, Plaintiff's transfer to the SHU.

Plaintiff alleges Kingston facilitated the excessive use of force by initiating Plaintiff's transfer knowing and intending that Plaintiff be assaulted. See Pl.'s Resp. Mem. at 24. The alleged basis for the initial transfer of Plaintiff to the SHU was Kingston's review of Plaintiff's phone log that showed significant usage while Plaintiff was on cube confinement. Kingston SMF ¶ 24. It is undisputed that Plaintiff's phone log did indeed show significant usage while Plaintiff was restricted from using the phone. See Mitchell Decl. Ex M ("Phone Log"). However, the record establishes that Kingston reviewed the phone logs 3 out of 5 days every week he worked, Kingston Dep. at 38:9–16, would write a misbehavior report "as soon as he knew" of multiple improper calls made over more than one day, id., at 49:16–50:12, and would typically find out about such a violation within a day or two of it occurring, 50:13–50:18. However, despite this regular review and usual habit of writing misbehavior reports immediately, Kingston did not write a misbehavior report for Plaintiff until after 18 calls had accrued over the course of 8 days. Pl.'s SMF ¶ 60.

**\*26** A reasonable jury could conclude that Kingston did indeed notice the phone infraction prior to April 23, 2016, as he testified he generally would have, but did not write a misbehavior ticket immediately as was his usual practice. A reasonable jury could further infer the reason for delay was to facilitate Plaintiff's transfer to the SHU as a specific time on a specific day. Further, if a jury were to believe Plaintiff's account that he was assaulted on April 26 during and immediately after his transfer, it would not be unreasonable to infer that Kingston initiated the transfer on that day in order to facilitate the assault.

*2. Retaliation as to Kearney and Kingston*

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 278 of 306
Lewis v. Hanson, Not Reported in Fed. Supp. (2022)
2022 WL 991729

Defendants argue that there is insufficient evidence on the record to establish that their actions were sufficiently adverse or that they were motivated by retaliation for Plaintiff's filing of the Cowan Suit. Kearney & Kingston Mem. at 13. Defendants also argue they would have undertaken the actions even in the absence of the protected conduct. Id.

#### a. Adverse Action

Plaintiff alleges that Kearney retaliated against him by supplying false allegations that supported a false misbehavior ticket and co-signing that ticket, and that both Kearney and Kingston retaliated by facilitating a retaliatory transfer knowing and intending that Plaintiff be assaulted. Pl.'s Resp. Mem. at 35.

The Court holds that, because Plaintiff was found innocent of the allegations in Kearney's allegedly false ticket, Pl.'s SMF ¶ 62, and thus suffered no adverse effects due to its issuance, this does not constitute an adverse action. See Tremblay, 2021 WL 1575951, at *4.

However, a retaliatory transfer to a facility with more restrictions constitutes an adverse action sufficient to discourage other inmates form exercising their rights, see Miller, 2019 WL 2370295, at *10, especially if that transfer is undertaken with the purpose of facilitating an assault upon an inmate, Abreu, 778 F. App'x at 33 ("[A] severe beating, false misbehavior reports, or the withholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights.").

Thus, if a factfinder finds Defendant's facilitated Plaintiff's transfer to the SHU, intending that he be assaulted during said transfer, a reasonable jury could conclude they had undertaken adverse actions sufficient to support a claim of retaliation.

#### b. Causal Connection

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are " 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.' " Bennett, 343 F.3d at 137. Plaintiff's main basis for asserting a retaliatory motive is that Defendants work in the same general area as an officer against whom Plaintiff filed a lawsuit, Cowan, and thus conceivably could have met him or others who know him. See Pl.'s Resp. Mem. at 39.

While the Court found this was insufficient to create an issue of material fact regarding retaliatory motive as to Defendant Peck, the Court finds differently with regard to Defendants Kearney and Kingston. This is so because, on summary judgment, the Court must review the record as a whole and make all favorable inferences in favor of the nonmoving party. See Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) (stating that a court considering a summary judgment motion must view the record as a whole and "disregard all evidence favorable to the moving party that the jury is not required to believe" (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 135 (2000))); Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000) ("In determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion ... for a jury ... would be entitled to view the evidence as a whole.").

**\*27** On the record before the Court, it has already been determined that a reasonable factfinder could conclude that Kearney and Kingston acted to facilitate Plaintiff's transfer to the SHU for the purpose of his assault and that during and immediately after that transfer Plaintiff was indeed assaulted by other Corrections Officers who specifically stated they were doing so in retaliation for his filing of the Cowan Suit. Thus, a reasonable jury could infer that Defendants acted with a similar retaliatory motive.

#### c. Action Undertaken in Absence of Protected Conduct

Even if a Plaintiff establishes that he engaged in protected activity, the defendant undertook an adverse action, and that there is a causal relationship, a defendant may still defeat liability if they can show by preponderance of the evidence that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." McRae v. Fischer, No. 9:17-CV-00146, 2017 WL 3535298, at *7 (N.D.N.Y. July 14, 2017) (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

2022 WL 991729

Defendants argue that, because it is undisputed the phone log for Plaintiff's PIN showed numerous calls were made in violation of his cube restriction, there was an undisputed legitimate basis for their transfer of Plaintiff to the SHU, and thus there is no dispute as to any material fact regarding whether they would have undertaken the same action regardless of Plaintiff filing the Cowan Suit. Kearney & Kingston Mem. at 18. However, Plaintiff's claim is not merely that Defendants transferred him, but that they did so at a specific time and date in order to facilitate his assault at the hands of other officers. See Pl.'s Resp. Mem. at 35, 40. Despite the phone logs, a reasonable jury could find that Defendants undertook their retaliatory actions on April 23, 2016 to facilitate an assault, and would not have done so absent a retaliatory motive. Indeed, Kingston's testimony indicates that, under most circumstances, an inmate who had made calls like Plaintiff was accused of doing would have been transferred much sooner. See Kingston Dep. 49:16–50:12.

### 3. Supervisory Liability Claims as to Kearney and Kingston

Kearney and Kingston argue that Plaintiff's claims for supervisory liability should be dismissed because they are no longer viable following the Second Circuit's decision in Tangreti. Kearney & Kingston Mem. at 20. Plaintiff does not contest this assertion, see Pl.'s Mem, and the Court agrees. Therefore, Kearney and Kingston [12] are granted summary judgment on any claims pressed against them based on supervisory liability.

[12]    Supervisory liability claims will be dismissed against all other Defendants for the same reason and on the same grounds.

### 4. Qualified Immunity as to Kearney and Kingston

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir. 2018); see also Green, 219 F.3d at 59. A public official's actions are objectively reasonable if " 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim,

93 F.3d at 91). Summary judgment should not be granted on basis of qualified immunity due to objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain, 494 F.3d at 131.

**\*28**  To establish qualified immunity, Kearney and Kingston rely on their previous arguments that their conduct did not, as a matter of law, violate Plaintiff's rights, asserting that therefore their actions were objectively reasonable and they are entitled to qualified immunity. See Kearney & Kingston Mem. at 22. However, the Court has found that a reasonable jury could conclude that both or either Defendant facilitated Plaintiff's transfer for the purposes of Plaintiff being assaulted, in violation of his Eighth Amendment right to be free of cruel and unusual punishment and in retaliation for his filing of the Cowan suit. See supra Sections IV(D)(1)–(2). Because inmates have a clearly established right not to be retaliated against for exercise of First Amendment rights, Burton v. Lynch, 664 F. Supp. 2d 349, 368-69 (S.D.N.Y. 2009) ("[A] claim of government retaliation for the exercise of First Amendment rights ... alleges the violation of a clearly established right."), and have a clearly established right to be free from cruel and unusual punishment, and excessive, malicious use of force, Green, 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established."), a reasonable be jury could likewise conclude that Defendants' actions, allegedly facilitating these violations, were objectively unreasonable in light of clearly established law.

Thus, the Court finds Defendants Kearney and Kingston are not entitled to qualified immunity regarding Plaintiff's claims of excessive force and retaliation against them.

### V. CONCLUSION
Accordingly, it is hereby:

**ORDERED**, that Defendant Robideau's Motion for Summary Judgment, Dkt. No. 136, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Robideau for excessive force under the Fourth and Fourteenth Amendments, deliberate indifference to serious medical need under the Eighth Amendment, and any claims alleging supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Robideau for excessive

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 280 of 306

**Lewis v. Hanson, Not Reported in Fed. Supp. (2022)**
2022 WL 991729

force under the Eighth Amendment and retaliation survive Defendant Robideau's Motion; and it is further

**ORDERED**, that Defendant Mere's Motion for Summary Judgment, Dkt. No. 138, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Mere for excessive force under the Fourth and Fourteenth Amendments, retaliation in so far as it relates to issuance of misbehavior tickets, and supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Mere for excessive force under the Eighth Amendment, medical indifference under the Eighth Amendment, and retaliation related to use of force in the strip-frisk room and denial of adequate medical care survive Defendant Mere's Motion; and it is further

**ORDERED**, that Defendant Peck's Motion for Summary Judgment, Dkt. No. 137, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Peck for excessive force under the Fourth, Fourteenth, and Eighth Amendments, retaliation, and supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Peck for medical indifference under the Eighth Amendment survive Defendant Peck's Motion; and it is further

**ORDERED**, that Defendant Kearney's Motion for Summary Judgment, Dkt. No. 139, is hereby **GRANTED in part**

and **DENIED in part**; Plaintiff's claims against Kearney for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Kearney for excessive force under the Eighth Amendment and for retaliation survive Defendant Kearney's Motion; and it is further

**ORDERED**, that Defendant Kingston's Motion for Summary Judgment, Dkt. No. 139, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Kingston for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Kingston for excessive force under the Eighth Amendment and for retaliation survive Defendant Kingston's Motion; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 991729

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:18-CV-00012**<br>Lewis v. Hanson et al | — | N.D.N.Y. | Jan. 03, 2018 | Docket |

**WESTLAW**   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (1)**

⚑ 1.  Lewis v. Hanson
2022 WL 991729 , N.D.N.Y. , Mar. 31, 2022

**Related References (1)**

⚑ 2.  Lewis v. Hanson
2020 WL 1812556 , N.D.N.Y. , Apr. 09, 2020

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 969932

2009 WL 969932
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Vincent BOUKNIGHT, Plaintiff,
v.
Warden Robert SHAW, Officer
Rivera, Captain Matthew, Defendants.

No. 08 Civ. 5187(PKC).
|
April 6, 2009.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.

 **\*1** Plaintiff Vincent Bouknight brings this action *pro se* under 42 U.S.C. § 1983, seeking monetary damages for violations of his constitutional rights. Defendants move to dismiss under Rule 12(b) (6), Fed.R.Civ.P., for failure to state a claim. For the reasons explained below, the motion is granted.

BACKGROUND

A. *Facts*
The following facts, taken from plaintiff's Amended Complaint ("A.C."), are accepted as true for the purposes of this motion. [1]

[1]  Because the pages of plaintiff's Amended Complaint are not numbered, the Court will refer to the page numbers inserted on the copy submitted by defendants. *See* Chestnov Decl. ex. A.

At the time of the events at issue here, plaintiff was a pre-trial detainee at Riker's Island. (A.C. at 1.) On April 7, 2007, at or about 10:50 p.m., defendant Officer Rivera began spreading rumors to inmates who were "active gang members of the Latin Kings and Bloods." (*Id.*) Officer Rivera told these inmates that plaintiff was "a rat, snitch and a homosexual." (*Id.*) Officer Rivera allegedly intended to "incite[ ] such gang members to get [plaintiff] out of the housing area, because of [Officer Rivera's] personal dislike[ ]

of homosexuals, and snitches." (*Id.*) That night, plaintiff endured about three and a half hours of inmates calling him a snitch and a homosexual. (*Id.*) During the remainder of the week, inmates continued to "tortur[e] [plaintiff] with such abusive words, stating and calling [him] a snitch." (*Id.*) This incident led plaintiff to write to defendant Warden Shaw and to file a grievance. (*Id.* at 1–2.) Neither Mr. Shaw nor the grievance committee responded. (*Id.* at 2.)

In May, plaintiff was moved to a different housing unit and was "hired as house gang." (*Id.*) On or about July 14, 2007, Officer Rivera remarked that she "can't have snitches and homosexuals working in my house." (*Id.*) About two days later, plaintiff was fired by Officer Rivera from his working assignment. (*Id.*) During these two days and for the remainder of the week, Officer Rivera "prolonged the torture and told inmates[ ] that she didn't like me being in her house because I was a homosexual and a snitch." (*Id.*) On or about July 30, 2007, plaintiff filed a grievance. (*Id.*) The grievance committee responded that Mr. Shaw would review plaintiff's grievance "because of the lack of jurisdiction regarding a harassment issue." (*Id.*) Also on July 30, Officer Rivera wrote plaintiff up for an infraction. (*Id* .) As she was writing plaintiff up, she was saying, "If the inmates didn't get you out of the house, I will get you out, you snitch gay, homosexual." (*Id.*) Officer Rivera "guarantee[d] ... that [plaintiff] will be going to the box (lock up)." (*Id.*) Plaintiff was found guilty of the infraction and was sentenced to twenty days in lock up. (*Id.*) Defendant Captain Matthew threatened to tamper with plaintiff's food when plaintiff entered lock up. (*Id.* at 3.)

On August 2, 2007, plaintiff wrote to Warden Shaw regarding Officer Rivera. (*Id.* at 2.) Plaintiff received no response. (*Id.*) When plaintiff attempted to speak to Mr. Shaw upon seeing him at plaintiff's housing area, Mr. Shaw did not make himself available. (*Id.*) On August 30, 2007, Officer Rivera locked plaintiff in his cell for the day and did not let him out. (*Id.* at 2–3.)

B. *Procedural History*
 **\*2** Plaintiff filed his complaint on June 6, 2008. In an Order dated the same day ("June 6 Order"), Chief Judge Kimba M. Wood granted plaintiff's request to proceed *in forma pauperis* and directed plaintiff to submit an amended complaint within sixty days to cure several defects in his original pleading. The court held that "[p]laintiff's present allegations of harassment, threats and the spreading of rumors regarding his sexuality and snitching are insufficient to sustain a claim under § 1983" because "threats or profanity alone do not constitute

2009 WL 969932

a violation of any federally protected right." June 6 Order at 2. The court explained that "in order to state a claim for incitement in violation of his rights, [plaintiff] must allege facts showing that prison officials were deliberately indifferent because they knew and disregarded an excessive risk to his safety or created an environment that subjected him to a significant risk of injury." *Id.* at 2–3. The court also held that plaintiff's allegation of retaliation was "conclusory" and that "the issuance of the misbehavior report, without more, fails to state a retaliation claim." *Id.* at 3. Rather, "[i]n order to establish a retaliation claim," the court instructed that "plaintiff must show that prison officials retaliated against him for engaging in protected conduct." *Id.* at 4. The court explained that "[t]he amended complaint must be specific and must provide a nexus between each named defendant, plaintiff's exercising of his [constitutional] right and the resulting retaliation." *Id.*

Plaintiff filed an Amended Complaint on July 2, 2008 and defendants thereafter moved to dismiss. In an order dated February 18, 2009, the Court extended plaintiff's time to respond to March 31, 2009. (Doc. # 20.) To date, the Court has received no response from plaintiff.

DISCUSSION

A. *Rule 12(b)(6)*
A *pro se* complaint is reviewed under a more lenient standard than that applied to "formal pleadings drafted by lawyers." *Haines v. Kerner.* 404 U.S. 519, 520 (1972) (per curiam). Plaintiffs' *pro se* pleadings "must be read liberally and should be interpreted 'to raise the strongest arguments that they suggest.' " *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

Rule 8(a) (2), Fed.R.Civ.P., requires only "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, ____, 127 S.Ct. 1955, 1964 (2007) (quotation omitted) (alteration in original). When a defendant tests the sufficiency of a complaint by a motion under Rule 12(b)(6), "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly,* 127

S.Ct. at 1965) (footnote omitted). The complaint is measured against a "flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (emphasis in original), *cert. granted,* 128 S.Ct. 2931 (2008). This "does not require heightened fact pleading of specifics, [but] it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig .,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974) (footnote omitted); *see also Erickson v. Pardus.* 551 U .S. 89, ____, 127 S.Ct. 2197, 2200 (2007) (per curiam).

B. *Section 1983*
 **\*3** To state a claim for the violation of civil rights under 42 U.S.C. § 1983, plaintiff must allege "that state officials, acting under color of state law, deprived [him] of a right guaranteed [to him] by the Constitution or laws of the United States. Moreover, defendants' actions at that time must have been objectively unreasonable in light of clearly established federal law; otherwise, those actors are entitled to qualified immunity." *Rodriguez v. Phillips,* 66 F.3d 470, 473 (2d Cir.1995). For the reasons explained below, plaintiff's Amended Complaint, construed liberally to raise the strongest arguments it suggests, fails to state a claim under § 1983. Thus, the Court need not address qualified immunity.

   1. *Verbal Harassment*
Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under § 1983. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam); *Aziz Zarif Shabazz v. Pico.* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983") (quotation omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000) (collecting cases). Plaintiff alleges that Officer Rivera verbally harassed him by calling him "a rat, snitch and a homosexual." (A.C. at 1.) Plaintiff also alleges that Captain Matthew threatened to tamper with plaintiff's food while plaintiff was in lock up. (*Id* at 3.) These instances of verbal harassment, standing alone, are insufficient as a matter of law to state a claim for relief under § 1983.

2009 WL 969932

### 2. Failure to Protect / Excessive Force

Construing the Amended Complaint liberally, it can also be read to allege an infliction of cruel and unusual punishment. Where, as here, the prisoner was a pre-trial detainee, "the relevant constitutional provision is not the Eighth Amendment but is, instead, the Due Process Clause" because the Eighth Amendment only applies where there has been a "formal adjudication of guilt." *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983). The Second Circuit has held that an "unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant v. Okst.* 101 F.3d 845, 856 (2d Cir.1996). Thus, the analysis is the same under the Due Process Clause as it would be under the Eighth Amendment. *See Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000); *Brewster v. Nassau County,* 349 F.Supp.2d 540, 552 (E .D.N. Y.2004).

The Eighth Amendment imposes duties on prison officials, who must provide "humane conditions of confinement," including taking "reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quotation omitted). Not "every injury suffered by one prisoner at the hands of another," however, "translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. A prisoner establishes a violation of the Eighth Amendment only if he satisfies two requirements. First, the plaintiff must establish that his injury has been "objectively, sufficiently serious" to have denied him "the minimal civilized measure of life's necessities." *Id.* (quotation omitted). Second, the prison official must have had " 'a sufficiently culpable state of mind' amounting to at least deliberate indifference." *Dawes v. Walker,* 239 F.3d 489, 494 (2d Cir.2001) (quoting *Farmer,* 511 U.S. at 834), *overruled on other grounds, Swierkiewicz v. Sorema N .A.,* 534 U.S. 506 (2002). Deliberate indifference exists when the prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837.

**\*4** "[T]he spreading of rumors [by a corrections officer] alone does not amount to a constitutional violation." *Williams v. Mullen* 98 Civ. 5204(BSJ), 2001 WL 936297, at \*4 (S.D.N.Y. Aug. 17, 2001). But a prisoner can state a claim under the Eighth Amendment against a corrections officer who spreads malicious rumors about him if the rumors "incited other inmates to assault [the plaintiff] ..., thereby placing him at grave risk of physical harm." *Young v. Coughlin,* 93 Civ. 262(DLC), 1998 WL 32518, at \*7 (S.D.N.Y. Jan. 29, 1998). However, if the plaintiff fails to allege—with concrete facts, not conclusory assertions—that

he has suffered an objectively "sufficiently serious" injury or that the corrections officer acted with a "sufficiently culpable state of mind," then the claim must be dismissed. *See, e.g., Dawes,* 239 F.3d at 493 ("[Plaintiff] does nothing more than state in conclusory terms that the references to him as an 'informant' and a 'rat' ... opened him up to assault from his fellow inmates .... Absent some factual showing that the comments by the prison officials actually risked inciting other inmates against [plaintiff], we are unwilling simply to assume that prison inmates would be incited ... to attack 'one of their own' who was labeled an 'informant' and a 'rat' "); *Young,* 1998 WL 32518, at \*6–\*8 (dismissing claim that corrections officer "directed other inmates to sexually harass and 'jump' [plaintiff]" because the officer's "comments were not 'objectively, sufficiently serious' to state an Eighth Amendment violation" and plaintiff had failed to "allege harm of federal constitutional magnitude"); *Brewster,* 349 F.Supp.2d at 552–53 (dismissing for failure to state a claim complaint alleging that corrections officers "subjected [plaintiff] to 'abusive language, gestures, taunts, jeers, laughter, and harassment,' and spread false rumors among other inmates that [plaintiff] is a homosexual, thief, or rapist"); *Walsh v. Goord,* 07 Civ. 0246(CGS), 2007 WL 1572146, at \* 10 (W.D.N.Y. May 23, 2007) (holding that prisoner failed to state a claim where he "allege[d] that he was identified [by corrections officers] as a snitch and a child molester and that, as a result, he was subjected to assaults and rape at the hands of other inmates"; but granting leave to replead).

Plaintiff's allegations fail to meet either the objective or subjective standards necessary to state a claim under the Eighth Amendment against Officer Rivera. To satisfy the objective prong, plaintiff must "establish the deprivation of a basic human need such as reasonable safety," *Benjamin v. Fraser,* 343 F.3d 35, 51 n. 17 (2d Cir.2003) (quoting *Lewis v. Casey,* 518 U.S. 343, 350 (1996)), due to Officer Rivera's creation of "a substantial risk of serious harm." *Farmer,* 511 U.S. at 834. Here, plaintiff has alleged only that, one night, he endured about three and a half hours of inmates calling him a snitch and a homosexual, and that during the remainder of the week, inmates continued to "tortur[e] [plaintiff] with such abusive words, stating and calling [him] a snitch." (A.C. at 1.) Plaintiff has not alleged any facts that, if proven, would establish that he ever faced actual or imminent harm. The Court is "unwilling simply to assume" that such a risk existed merely because Officer Rivera spread rumors about him. *Dawes,* 239 F.3d at 493. Thus, plaintiff has failed to allege an injury that was sufficiently serious by objective standards.

**\*5** To satisfy the subjective prong, plaintiff must allege that Officer Rivera acted "maliciously and sadistically to cause harm" or, at least, was deliberately indifferent to "an excessive risk to inmate health or safety." *See Trammell v. Keane,* 338 F.3d 155, 162–63 (2d Cir.2003); *Phelps v. Kapnolas,* 308 F.3d 180, 185–86 (2d Cir.2002). As Chief Judge Wood explained, plaintiff's mere allegation that Officer Rivera spread rumors about him was insufficient to show that she had the requisite culpable state of mind. *See* June 6 Order at 2–3. Plaintiff's Amended Complaint is similarly insufficient because he has not "ampli[fied] [his] claim with some factual allegations ... needed to render the claim *plausible.*" *Iqbal,* 490 F.3d at 157–58 (emphasis in original). Plaintiff alleges that "Officer Rivera incited such gang members to get me out of the housing area, because of her personal dislike[ ] of homosexuals, and snitches." (A.C. at 1.) But none of plaintiff's allegations, if proven, would establish that Officer Rivera intended to incite inmates to harm plaintiff physically. Nor has plaintiff alleged that Officer Rivera knew and disregarded the fact that her comments had created an environment that subjected plaintiff to a significant risk of injury. Thus, plaintiff has failed to allege that Officer Rivera acted with the requisite culpable state of mind.

To the extent that the Amended Complaint can be construed liberally to allege claims under the Eighth Amendment against Warden Shaw and Captain Matthew, these claims must also be dismissed. Plaintiff has failed to allege any objectively "sufficiently serious" injury that resulted from Captain Matthew's threat that he would tamper with plaintiff's food (A.C. at 3) or Warden Shaw's refusal to speak with plaintiff (*id.* at 2). Plaintiff also has not alleged sufficient facts to make out a plausible claim that Warden Shaw was deliberately indifferent to an excessive risk of harm faced by plaintiff. Plaintiff alleges that after he wrote to Warden Shaw regarding Officer Rivera's verbal harassment, plaintiff was transferred to a different housing unit. (*Id.*) This indicates that Warden Shaw responded to his grievance. Thus, the allegations in the Amended Complaint fail to state a claim under the Eighth Amendment.

### 3. *Retaliation*

The Amended Complaint may be construed liberally to allege that Officer Rivera retaliated against plaintiff in violation of his rights under the First Amendment. After plaintiff filed a grievance against Officer Rivera, she wrote up plaintiff for an infraction. (*Id.* at 2.) Plaintiff alleges that "she wrote me up for revenge." (*Id.* at 16.) A "prison inmate has no constitutionally

guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997). In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). Thus, there must be "a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quotation omitted). Prisoners' claims of retaliation must be examined with "skepticism and particular care," *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), because they are " 'Prone to abuse' since prisoners can claim retaliation for every decision they dislike." *Graham,* 89 F.3d at 79 (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*6** Plaintiff has failed to allege the requisite causal connection between his filing of a grievance and Officer Rivera's writing him up for an infraction. As Chief Judge Wood explained, plaintiff's assertion that Officer Rivera "wrote me up for revenge" (A.C. at 16) is conclusory. June 16 Order at 3. Plaintiff has not alleged any facts that would establish that Officer Rivera was motivated by plaintiff's filing of a grievance against her. Plaintiff's mere speculation is insufficient. In fact, plaintiff alleges that as Officer Rivera was writing him up, she was saying, "If the inmates didn't get you out of the house, I will get you out, you snitch gay, homosexual." (*Id.* at 2.) This tends to show that Officer Rivera was motivated by her personal dislike of plaintiff, not that she was reacting to his filing of a grievance. Indeed, Officer Rivera had exhibited verbal hostility toward plaintiff since April 2007, before he ever filed a grievance. (*Id.* at 1.) Thus, plaintiff has failed to allege facts sufficient to state a plausible claim of retaliation in violation of his rights under the First Amendment.

### C. *PLRA*

There is an independent basis for dismissing plaintiff's claims seeking compensatory damages for mental and emotional injuries. The Prison Litigation Reform Act of 1995 ("PLRA") states in relevant part: "No Federal civil action may be brought by a prisoner ... for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). In the section of his

2009 WL 969932

Amended Complaint titled "Injuries," plaintiff states: "she infliction [sic] of emotional distress and pain and suffering compensatory damages punitive damages." (A.C. at 16.) And in the section seeking relief, plaintiff "request[s] ... as follows[:] mental damages, compensatory damages, punitive damages, emotional distress, award me in the amount of $1,000,000.00 dollars." (*Id.* at 18.) Because plaintiff has not alleged that he suffered any physical injury in connection with defendants' alleged infliction of emotional distress, his claims seeking compensatory damages for mental or emotional injuries must be dismissed under the PLRA,

CONCLUSION

For the foregoing reasons, defendants' motion to dismiss for failure to state a claim is granted. To the extent the Amended Complaint raises state law claims, the Court declines to exercise supplemental jurisdiction over them. 28 U.S.C. § 1367(c)(3). The Clerk shall enter judgment for defendants. Defendants are directed to provide plaintiff with copies of all unpublished opinions cited herein.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 969932

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| 1.  **Docket 1:08cv05187**<br>BOUKNIGHT v. SHAW ET AL | — | S.D.N.Y. | June 06, 2008 | Docket |

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4174795

2017 WL 4174795
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rendell ROBINSON, Plaintiff,
v.
James TAYLOR, et al., Defendants.

Civ. No. 9:16-CV-0285 (BKS/DJS)
|
Signed 08/24/2017

**Attorneys and Law Firms**

RENDELL ROBINSON, 07-A-6175, Five Points Correctional Facility, Caller Box 119, Romulus, New York 14541, Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL: RICHARD LOMBARDO, ESQ., Assistant Attorney General, The Capitol Albany, New York 12224, Attorney General of the State of New York, Attorney for Defendant.

### REPORT-RECOMMENDATION and ORDER

Daniel J. Stewart, U.S. Magistrate Judge

**\*1** *Pro se* Plaintiff Rendell Robinson commenced this civil rights action, pursuant to 42 U.S.C. § 1983, asserting claims arising from his incarceration at Great Meadow Correctional Facility ("Great Meadow") in the custody of the Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1, Compl. Presently before the Court is Defendants' Motion, brought pursuant to FED. R. CIV. P. 12(c), to dismiss Plaintiff's Eighth Amendment medical indifference claims against Defendants Kimberly Lipka, Ted Nesmith, David Karandy, Raymond Maddocks, Kalyana Battu, and Leon Renaud.[1] Dkt. No. 37, Defs.' Mot. Dismiss. Plaintiff elected not to respond to Defendants' Motion. Dkt. No. 40. For the reasons that follow, the Court recommends that Defendants' Motion be **granted in part and denied in part**.

[1]   Defendants Ted Nesmith, Raymond Maddocks, and Kalyana Battu are listed on the docket as "Fischer Nesmith," "Haddocks," and "K. Rattu." Based upon Defendants' Answer, however, these Defendants correct names are Ted Nesmith, Maddocks, and Battu, and they will be referred to

as such. *See* Dkt. No. 36. The Clerk of the Court is directed to amend the caption accordingly.

### I. STANDARD OF REVIEW

"The standard for granting a [FED. R. CIV. P.] 12(c) motion for judgment on the pleadings is identical to that of a [FED. R. CIV. P.] 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001).

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (*overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, 754 (1963). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. at 697 (citing *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp.*

Robinson v. Taylor, Not Reported in Fed. Supp. (2017)

2017 WL 4174795

*v. Twombly*, 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. at 679-80.

 **\*2**  Where, as here, the complaint was filed *pro se*, it must be construed liberally with "special solicitude" and interpreted to raise the strongest claims that it suggests. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011). Nonetheless, a *pro se* complaint must state a plausible claim for relief. *See Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, ... matters to which the court may take judicial notice[,]" as well as documents incorporated by reference in the complaint. *Spence v. Senkowski*, 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (citing FED. R. CIV. P. 10(c)).

## II. SUMMARY OF THE COMPLAINT

The Court here summarizes, and in accordance with the applicable standard accepts as true, only those allegations contained in the Complaint that are relevant to the determination of Defendants' Motion. For a more complete summary of Plaintiff's factual allegations, the Court refers to the Complaint, as well as the initial screening in this action, conducted pursuant to 28 U.S.C. §§ 1915(e) and 1915A by the Honorable Gary L. Sharpe, Senior United States District Judge. Compl.; Dkt. No. 7, Dec. & Order, dated May 20, 2016, at pp. 4-10.

Plaintiff has been diagnosed with post-traumatic stress disorder, depression, and anti-social personality disorder, and receives psychotropic drugs. Compl. at ¶ 36. [2] On March 12, 2013, Plaintiff was housed in the long-term keeplock unit at Great Meadow. *Id.* at ¶¶ 25-27. When the mental health nurse came to his cell to give him his daily medication, Plaintiff told her that "he felt like killing himself." *Id.* at ¶ 38. Defendant Correction Officer ("C.O.") St. John, who was escorting the nurse, told Plaintiff that he was going to be moved to an observation ("OBS") cell for suicide watch. *Id.* Plaintiff then explained that he was only playing and that he did not want to kill himself. *Id.* at ¶ 39.

[2]    Plaintiff's Complaint is filed on the Court's Case Management Electronic Case Files ("CM/ECF") System in two parts at Dkt. No. 1 and Dkt. No. 1-1. The Court will cite to the Complaint's paragraph numbers, which continue consecutively throughout the two parts.

Shortly thereafter, a number of correction officers arrived at Plaintiff's cell to escort him to an OBS cell. *Id.* at ¶¶ 45-46. While he was being escorted to the OBS cell, the correction officers assaulted Plaintiff by dragging and slamming him on the ground, striking him with closed fists, slamming his face into a fence, choking him, and twisting his hands and feet. *Id.* at ¶¶ 53-54, 59-60, & 63-65.

Following the assault, Plaintiff was taken to the facility infirmary, where he was examined by Defendant Nesmith, a physician's assistant ("P.A."). *Id.* at ¶¶ 66-67. Plaintiff sustained the following injuries in the assault: head trauma, including contusions and chronic migraines; a "closed left eye" and "chronic eyeball pain"; pain and loss of hearing in his left ear; neck pain and cramps; right shoulder and arm pain; back pain and muscle spasms; lacerations and bruise marks; left leg pain; and a swollen left ankle and foot. *Id.* at ¶ 68. Nesmith failed to document any of Plaintiff's injuries in his medical records and failed to provide any treatment. *Id.* at ¶ 67.

 **\*3**  Plaintiff was taken from the infirmary to the Special Housing Unit ("SHU"), where he again indicated that he was feeling suicidal. *Id.* at ¶ 69. Plaintiff was then taken to an OBS cell, where he stayed for the next eight days until March 20, 2013. *Id.* at ¶¶ 70 & 105. During that period, Defendants C.O. Therrian and C.O. Renaud denied Plaintiff any food, as well as access to showers and mental health treatment. *See id.* at ¶¶ 81 & 105. Therrian and Renaud also made false log book entries indicating that Plaintiff was refusing meals and mental health treatment. *Id.* at ¶ 91.

On March 13 or 14, 2013, Plaintiff spoke with Defendant Battu, a psychiatrist, *id.* at ¶ 21, regarding the assault by correctional staff and the emotional distress he was

2017 WL 4174795

experiencing. *Id.* at ¶ 82. Plaintiff told Dr. Battu that he would attempt suicide if he was returned to SHU. *Id.* at ¶ 84. Dr. Battu told Plaintiff to file a grievance complaint on his allegations against correctional staff and ordered him to be discharged from the Mental Health Unit for suicide watch and returned to SHU. *Id.* at ¶ 87. Plaintiff was escorted to SHU, but was returned to the Mental Health Unit when he indicated signs of suicidal behavior on the SHU screening questionnaire. *Id.* at ¶ 89.

On March 13, 2014, Plaintiff was seen by Defendants Nurse Lipka and P.A. Nesmith for pain in his head, ear, eye, face, neck, legs, and foot. *Id.* at ¶ 158-59. Lipka and Nesmith refused to give Plaintiff ice or ibuprofen, or to have x-rays taken. *Id.* at ¶ 159-60. On March 15, 2013, Plaintiff was seen by Defendant Dr. Maddocks, who also refused to provide pain medication or order x-rays, in spite of Plaintiff's complaints of pain. *Id.* at ¶¶ 160-61.

On March 19, 2013, Dr. Battu again discharged Plaintiff from the Mental Health Unit, although he did not even meet with Plaintiff. *Id.* at ¶ 95. Plaintiff, however, again did not pass the SHU suicide prevention screening and was returned to the Mental Health Unit. *Id.* at ¶ 96. The evening of March 19, Plaintiff began to feel weak from not having eaten for seven days, and his legs buckled and he fell to the floor. *Id.* at ¶ 98. Plaintiff's legs and arms felt numb and he was lightheaded. *Id.* at ¶¶ 99 & 101. Defendants Renaud and Sergeant W. observed Plaintiff lying on floor and asked him what happened. *Id.* at ¶¶ 100-01. Plaintiff requested medical attention, but the Defendants ignored his request. *Id.* at ¶ 102.

On March 20, 2013, Plaintiff was seen by Dr. Battu, and he continued to express that he was experiencing suicidal thoughts. *Id.* at ¶¶ 106 & 115. Plaintiff requested that he be placed in mental health program where he would receive mental health treatment, and Dr. Battu said that he would discuss that request with Plaintiff's treatment team. *Id.* at ¶¶ 116-17. As Plaintiff was walking back to his OBS cell, his legs again buckled and he fell to the floor. *Id.* at ¶ 118. Defendants Lieutenant John Doe and Sergeant W., who were escorting Plaintiff, did not notify medical staff that Plaintiff had fallen, but instead dragged him on the floor back to his OBS cell, causing injuries to his head, legs, feet, and shoulder. *Id.* at ¶¶ 121-22.

On March 20, 2013, Dr. Battu ordered Plaintiff to be discharged from the Mental Health Unit. *Id.* at ¶ 125. Plaintiff was escorted in a wheelchair to the SHU intake room,

where he again indicated during the screening process that he would kill himself if he was admitted to SHU. *Id.* at ¶¶ 127-28. A nurse then conducted a medical examination. *Id.* at ¶ 129. Despite being notified that Plaintiff was suffering from numerous injuries, had not had any food for eight days straight, and was unable to ambulate, Defendant Dr. Karanady, the Health Services Director at Great Meadow, *id.* at ¶ 133, cleared Plaintiff to be admitted to the SHU instead of ordering Plaintiff to be brought to the infirmary. *Id.* at ¶¶ 134-35.

**\*4** Plaintiff was taken from the intake room to a SHU cell. *Id.* at ¶ 139. Approximately ten minutes later, Plaintiff attempted suicide and was found hanging from a sheet in his cell. *Id.* at ¶ 146. Plaintiff was cut down and taken on a stretcher to the infirmary emergency room where he was seen by Defendants Dr. Karandy and Nurse Lipka. *Id.* at ¶¶ 140-42. Plaintiff repeated his complaints of neck, eye, facial, back, and foot pain, and reported the two incidents where his legs had given out. *Id.* at ¶¶ 143-44. Dr. Karandy directed Plaintiff to walk to the x-ray room, but Plaintiff explained that he was unable to walk due to numbness in his legs and requested a wheel chair. *Id.* at ¶¶ 145-46. Dr. Karandy responded that Plaintiff would only get x-rays if he walked to the x-ray room, despite Plaintiff's complaints of leg numbness and the fact that Plaintiff's legs were shackled. *Id.* at ¶¶ 147-48. Plaintiff attempted to walk to the x-ray room, but Dr. Karandy falsely recorded that Plaintiff was being uncooperative and had refused x-rays. *Id.* at ¶¶ 152-53. Plaintiff also requested ibuprofen and ice, but the Defendants denied that request. *Id.* at ¶¶ 150-51. Plaintiff was discharged from the infirmary without receiving any medical treatment. *Id.* at ¶ 154.

Plaintiff was admitted to the Mental Health Unit for five more days. *Id.* at ¶¶ 155-56. He did not see Dr. Battu during this period because Defendant Therrian falsely reported that he would not come out of his cell. *Id.* at ¶ 156.

On March 27, 2013, Plaintiff received an inmate misbehavior report, charging Plaintiff with multiple counts of misconduct during the March 12, 2013 incident. *Id.* at ¶ 162. Following a Tier III Disciplinary Hearing, *id.* at ¶ 163, Plaintiff was found guilty of certain of the charges and sentenced to six months confinement in SHU, six months loss of privileges, six months loss of good time credits. *Id.* at ¶ 174.

The following claims survived the initial screening conducted by Judge Sharpe: (1) Eighth Amendment excessive force and/or failure to protect claims against Defendants Taylor,

2017 WL 4174795

St. John, Prieur, Lashinsky, and Goodman;[3] (2) Eighth Amendment medical indifference claims against Defendants Lipka, Nesmith, Karandy, Maddocks, Battu, and Renaud;[4] (3) Fourteenth Amendment due process claim against Defendant Quinn; and (4) Eighth Amendment conditions-of-confinement claims against Defendants Therrian and Renaud. Dec. & Order, dated May 20, 2016, at p. 22.

[3]     Plaintiff's Eighth Amendment excessive force claims against Defendants Lieutenant John Doe and Sergeant W. also survived initial review. Dec. & Order, dated May 20, 2016, at p. 22.

[4]     Plaintiff's Eighth Amendment medical indifference claims against Defendants Lieutenant John Doe, Sergeant W., and John Doe (Area Supervisor for Great Meadow SHU) also survived initial review. Dec. & Order, dated May 20, 2016, at p. 22.

### III. DISCUSSION

Defendants Lipka, Nesmith, Karandy, Maddocks, Battu, and Renaud move to dismiss Plaintiff's Eighth Amendment medical indifference claims for failure to state a claim upon which relief can be granted. Alternatively, Defendants argue that they are entitled to qualified immunity from Plaintiff's medical indifference claims.

### A. Legal Standard

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). A court must consider two inquiries in determining whether a deprivation of care is sufficiently serious. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). First, the court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is adequate where the care provided is a "reasonable" response to the inmate's medical condition. *Id.* The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where there is a failure to provide any treatment, the court examines whether the inmate's medical condition is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). In cases where medical treatment is given, but is inadequate, "the seriousness inquiry is narrower." *Salahuddin v. Goord*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Smith v. Carpenter*, 316 F.3d at 185).

**\*5** The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 295 of 306
Robinson v. Taylor, Not Reported in Fed. Supp. (2017)
2017 WL 4174795

involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

### B. Analysis

#### 1. Defendants Lipka, Nesmith, Karandy, and Maddocks

Liberally construing the Complaint, Plaintiff asserts that Defendants Lipka, Nesmith, Karandy, and Maddocks violated his Eighth Amendment rights by denying him any medical treatment for the injuries he incurred in the March 12, 2013 incident. The Defendants argue that Plaintiff has failed to allege an objectively serious condition or that any of them failed to act with sufficiently culpable state of mind. Dkt. No. 37-1, Defs.' Mem. of Law at pp. 6-9.

At the objective prong, Plaintiff alleges a number of injuries that he suffered during the alleged March 12 assault. *See* Compl. at ¶ 68. These include migraines; pain in his eyes, neck, shoulder, back, arm, and leg; a closed left eye; pain and loss of hearing in his left ear; lacerations, bruising, and contusions. *Id.* Defendants argue that even if Plaintiff did suffer from these conditions, they would not amount to an objectively serious medical condition. Defs.' Mem. of Law at pp. 6-7. While Defendants are correct that courts have found that conditions such as cuts, bruises, and scrapes do not constitute a sufficiently serious medical condition, *see, e.g.*, *Dallio v. Herbert*, 678 F. Supp. 2d 35, 44-45 (N.D.N.Y. July 28, 2009), construing Plaintiff's allegations liberally, he suffered more than cuts and bruises in the assault. Among his allegations, Plaintiff alleges that his left eye was swollen closed, and that he had ringing and loss of hearing in his left ear. Compl. at ¶ 68. Plaintiff further alleges that he had "chronic" pain in his eye, neck, shoulder, back, arm, and leg. *Id.* Although Plaintiff's allegations are vague and lack detail, viewing them in the most favorable light, the combination of Plaintiff's alleged symptoms is sufficient at this stage to plead the objective prong of an Eighth Amendment claim. *See, e.g.*, *Ellis v. Guarino*, 2004 WL 1879834, at *11 (S.D.N.Y. Aug. 24, 2004) (finding that allegations of, *inter alia*, blurred vision and dizziness and ringing in ears were sufficient to plead a serious medical condition).

Next, under the subjective prong, Defendants argue that Plaintiff has failed to allege that Defendants Lipka, Nesmith, Karandy, or Maddocks acted with a sufficiently culpable state of mind. Defs.' Mem. of Law at pp. 7-9. As to each of these Defendants, however, Plaintiff has alleged that they refused to provide him with any medical treatment after he informed them of his injuries. *See* Compl. at ¶¶ 134-35, 144-47, 151, & 159-61. "Deliberate indifference ... is properly pleaded by allegations ... of 'complete denial' of medical treatment." *Harding v. Kuhlmann*, 588 F. Supp. 1315, 1316 (S.D.N.Y. 1984).

**\*6** As stated above, Defendants also argue that they are entitled to qualified immunity from Plaintiff's medical indifference claims. Defs.' Mem. of Law at pp. 13-15. The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity analysis involves a three step inquiry:

> First, we must determine whether plaintiff has alleged a violation of a constitutional right. Then, we must consider if the violated right was clearly established at the time of the conduct. Finally, if plaintiff had a clearly established, constitutionally protected right that was violated ..., he or she must demonstrate that defendants' actions were not objectively reasonable.

*Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211 (2d Cir. 2003) (citations omitted). As the Court has already discussed, Plaintiff has sufficiently alleged his medical indifference claim against Defendants Lipka, Nesmith, Karandy, and Maddocks. Furthermore, "the right to be free from deliberate indifference to serious medical needs" was clearly established at the time of the events of this action.[5] *See LaBounty v. Coughlin*, 137 F.3d 68, 74 (2d Cir. 1998) (citing *Estelle v. Gamble*, 429 U.S. at 104). Thus, Defendants' entitlement to qualified immunity turns on whether it was objectively reasonable for them to believe that their actions did not violate Plaintiff's constitutional rights. However, resolution of the objective reasonableness of

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 296 of 306

Robinson v. Taylor, Not Reported in Fed. Supp. (2017)
2017 WL 4174795

Defendants' actions "depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee*, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004).

[5]     Defendants argue that it was neither clearly established that the conditions Plaintiff alleges he suffered from constituted a serious medical need, nor that the acts Defendants allegedly engaged in could constitute deliberate indifference. *See* Defs.' Mem. of Law at pp. 14-15. However, while the contours of the right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right[,] [t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.' " *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations omitted). The right Plaintiff is alleging was violated is his "right to be free from deliberate indifference to serious medical needs." *LaBounty v. Coughlin*, 137 F.3d at 74 (explaining that the district court took an overly "restricted view of the right" and "conflate[d] the specific conduct at issue with the defined right"); *see also Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996) ("A court need not have passed on the identical course of conduct in order for its illegality to be 'clearly established' ....").

Accordingly, the Court recommends that Defendants' Motion be **denied** as to Plaintiff's claims against Defendants Lipka, Nesmith, Karanady, and Maddocks.

### 2. Defendant Battu

The basis of Plaintiff's claim against Defendant Battu is that Battu violated Plaintiff's Eighth Amendment rights by ordering him to be discharged from the Mental Health Unit when Plaintiff was suffering from emotional distress and told Battu that he would commit suicide if returned to SHU. *See* Dkt. No. 1-1 at pp. 26-28. [6]

[6]     Citation is to the pagination assigned by the Court's CM/ECF System.

**\*7** Defendants first argue that Plaintiff's allegations are insufficient to meet the objective prong because emotional and mental stress do not constitute a serious medical condition. Defs.' Mem. of Law at p. 9. Although generalized claims of stress may be insufficient to establish a serious medical condition, *see Blackson v. City of New York*, 2014 WL 6772256, at *4 (S.D.N.Y. Dec. 2, 2014), Plaintiff alleges that he suffers from a number of mental disorders and that he reported feeling suicidal to Battu, *see* Compl. at ¶¶ 36, 84, & 114. Plaintiff further clams that he attempted suicide after Battu discharged him to SHU. Compl. at ¶ 146. District courts in this Circuit have recognized that "depression combined with severe anxiety attacks or suicide attempts is a serious medical need." *Young v. Choinski*, 15 F. Supp. 3d 172, 184 (D. Conn. 2014) (quoting *Zimmerman v. Burge*, 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009)). Therefore, Plaintiff has adequately alleged that he suffered from a serious mental health need for the purposes of his Eighth Amendment claim against Defendant Battu.

Defendants also argue that Plaintiff's allegations are insufficient to establish that Defendant Battu acted with deliberate indifference towards Plaintiff's complaints of mental distress. Plaintiff, however, asserts that he repeatedly expressed suicidal thoughts to Defendant Battu, and that Battu disregarded Plaintiff's statements by discharging him from the Mental Health Unit. Shortly after being discharged from the Mental Health Unit, Plaintiff claims that he attempted suicide. Plaintiff's allegations suggest that Battu recklessly disregarded a substantial risk of harm to Plaintiff and are sufficient to satisfy the subjective prong of his Eighth Amendment claim.

Accordingly, the Court recommends that Defendants' Motion be **denied** as to Plaintiff's Eighth Amendment claim against Defendant Battu. [7]

[7]     For the same reasons set forth above in connection with Plaintiff's claims against Defendants Lipka, Nesmith, Karandy, and Maddocks, the Court finds that Defendant Battu's entitlement to qualified immunity is not appropriately resolved at this stage of the proceedings.

### 3. Defendant Renaud

With respect to Defendant Renaud, Plaintiff alleges that on the evening of March 19, 2013, he collapsed on account of not

Case 9:23-cv-00098-MJK    Document 144    Filed 03/04/26    Page 297 of 306

Robinson v. Taylor, Not Reported in Fed. Supp. (2017)

2017 WL 4174795

having received meals for seven straight days. Compl. at ¶ 98. Plaintiff states that his legs and arms were numb and that he felt lightheaded. *Id.* at ¶ 101. Plaintiff claims that Defendant Renaud saw him lying on the floor, and asked him what happened, but when Plaintiff requested medical assistance, Renaud refused to notify medical staff. *Id.* at ¶¶ 100 & 102. Plaintiff claims that he was lying on the floor of his cell all night with aches and pain, and unable to walk. *Id.* at ¶¶ 103 & 119.

"Non-medical prison personnel engage in deliberate indifference when they 'intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel.' " *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (quoting *Hodge v. Coughlin*, 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994)). For the purposes of his medical indifference claim against Defendant Renaud, however, Plaintiff has not alleged a sufficiently serious medical condition. Plaintiff claims that his legs "buckled," and that he felt "weak," "lightheaded," and "numb" in his arms and legs. Compl. at ¶¶ 98 & 101. None of these symptoms, which were due to not having eaten, suggest "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d at 702. Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's Eighth Amendment medical indifference claim against Defendant Renaud.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion to Dismiss (Dkt. No. 37) be **GRANTED** as to Plaintiff's Eighth Amendment medical indifference claim against Defendant

C.O. Leon Renaud and **DENIED** in all other respects; and it is further

**\*8 ORDERED**, that the Clerk of the Court amend the caption of this case to reflect the correct spelling of Defendant "Haddocks" as Maddocks, Defendant "K. Rattu" as K. Battu, and Defendant "Fischer Nesmith" as Ted Nesmith; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14)[8] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[8]    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4174795

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:16-CV-00285**<br>Robinson v. Taylor et al | — | N.D.N.Y. | Mar. 10, 2016 | Docket |

**History (3)**

**Direct History (2)**

1.  Robinson v. Taylor
2017 WL 4174795 , N.D.N.Y. , Aug. 24, 2017

*Report and Recommendation Adopted by*

2.  Robinson v. Taylor
2017 WL 4174792 , N.D.N.Y. , Sep. 19, 2017

**Related References (1)**
3.  Robinson v. Taylor
2019 WL 1429529 , N.D.N.Y. , Mar. 29, 2019

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.



**User Name:** Chaim Jaffe

**Date and Time:** Wednesday, March 4, 2026 9:44 AM EST

**Job Number:** 277417744

## Document (1)

1. *Phipps v. Gillani, 2013 U.S. Dist. LEXIS 132088*
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**

About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2026 LexisNexis

 Positive

As of: March 4, 2026 2:44 PM Z

# *Phipps v. Gillani*

United States District Court for the Northern District of New York

July 23, 2013, Decided; September 16, 2013, Filed

Civil Action No. 9:10-CV-1588 (TJM/DEP)

**Reporter**

2013 U.S. Dist. LEXIS 132088 *

RONALD PHIPPS, Plaintiff, v. DR. SOHAIL A. GILLANI, Defendant.

**Subsequent History:** Adopted by, Summary judgment granted by, Dismissed by *Phipps v. Gillani, 2013 U.S. Dist. LEXIS 132086 (N.D.N.Y, Sept. 16, 2013)*

**Prior History:** *Phipps v. Gillani, 2012 U.S. Dist. LEXIS 10875 (N.D.N.Y, Jan. 30, 2012)*

**Counsel: [*1]** RONALD PHIPPS, PLAINTIFF, Pro se, Dannemora, NY.

FOR DEFENDANTS: KEITH A. MUSE, ESQ., Assistant Attorney General, OF COUNSEL, HON. ERIC T. SCHNEIDERMAN, Office of the Attorney General, State of New York, Albany, New York.

**Judges:** David E. Peebles, U.S. Magistrate Judge.

**Opinion by:** David E. Peebles

# Opinion

DAVID E. PEEBLES

U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

*Pro se* plaintiff Ronald Phipps, a New York State prison inmate, has commenced this action pursuant to *42 U.S.C. § 1983* alleging the deprivation of his rights under the United States Constitution. Construed liberally, plaintiff's complaint alleges that defendant Dr. Sohail Gillani, a psychiatrist at the prison facility in which plaintiff was housed at the relevant times, injected him on multiple occasions with Risperdal over his objection, in violation of his constitutional rights.

Currently pending before the court is defendant Gillani's motion seeking the entry of summary judgment dismissing plaintiff's claims against him, both on the procedural basis that he failed to exhaust available administrative remedies before commencing suit, and on the merits. Because the record firmly establishes, and plaintiff has admitted, that he did not file a grievance **[*2]** raising the issues advanced in this action prior to its commencement, I recommend that defendant's motion be granted, and plaintiff's complaint be dismissed.

I. BACKGROUND[1]

It appears from the scant allegations set forth in his complaint that plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), and is, and was at the relevant times, confined in the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *See generally* Complaint (Dkt. No. 5); Muse Decl. Exh. 1 (Dkt. No. 36-4); Gillani Affd. (Dkt.

---

[1] In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)*.

Chaim Jaffe

No. 36-10) at ¶ 6. Plaintiff alleges that, while at Clinton, defendant Dr. Sohail Gillani, a psychiatrist working at Clinton, administered to Phipps over 200 bi-weekly medical injections of Risperdal, over plaintiff's objection, despite a court order directing such involuntary injections cease in October 2007. Complaint (Dkt. No. 5) at **[*3]** 4. The injections have allegedly "caused [plaintiff] to feel weak and dizzy and sick." *Id*. at 2.

In response, defendant has submitted an affidavit to the effect that he "had contact with [plaintiff]" on only nine occasions beginning on June 11, 2010, and ending on December 23, 2011. Gillani Affd. (Dkt. No. 36-10) at ¶ 7. In addition, defendant Gillani states that, although he prescribed bi-weekly injections of Risperdal for plaintiff, he never administered the injections, nor was he aware of "any instance that [plaintiff] refused an injection during the time period in which [defendant] treated [plaintiff]." *Id*. at ¶¶ 12, 13, 15. According to defendant Gillani, "[a]t no time while [plaintiff] was under [his] direct care did [he] ever order an injection to be given to [plaintiff] over his objection or against his will." *Id*. at ¶ 17.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on December 30, 2010, with the filing of a pleading styled as an order to show cause for a temporary restraining order and seeking preliminary injunctive relief.[2] Dkt. No. 1. In that initial pleading, plaintiff named as defendants Dr. Gillani and the State of New York. *Id*. On January 12, 2011, Senior District **[*4]** Judge Thomas J. McAvoy issued an order directing the filing of this original submission as a complaint, granting plaintiff's application for *in forma pauperis* status, denying his motion for a temporary restraining order, and ordering a response by the named defendants to plaintiff's request for injunctive relief. Dkt. No. 4. Subsequently, following defendants' filing of response in opposition, Judge McAvoy denied

---

[2] That filing was followed by the submission of a virtually identical document on January 12, 2011. Dkt. No. 5.

plaintiff's motion for injunctive relief. Dkt. No. 19.

On March 28, 2011, defendant Gillani moved for dismissal of plaintiff's complaint against him for failure to state a claim upon which relief may be granted, and additionally on the basis of qualified immunity. Dkt. No. 16. Defendant State of New York later moved, on June 28, 2011, seeking dismissal of plaintiff's claims against that defendant upon the basis of the *Eleventh Amendment*. Dkt. No. 23. Those motions were addressed in a report issued by me on January 5, 2011, in which I recommended that plaintiff's claims against defendant State of New York be dismissed, but that defendant Gillani's motion to dismiss be **[*5]** denied. Dkt. No. 28. That report and recommendation was adopted by decision and order issued by Judge McAvoy on January 30, 2012. Dkt. No. 29.

Now that discovery in the action has closed, defendant has moved, by motion filed on October 12, 2012, for summary judgment dismissing plaintiff's claims against him. In his motion, defendant Gillani argues that (1) plaintiff has failed to exhaust his available administrative remedies, (2) no reasonable factfinder would conclude that he administered Risperdal injections to the plaintiff over his objection, and (3) in any event, he is entitled to qualified immunity from suit. Dkt. No. 36. Plaintiff has not responded in opposition to defendant's motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to *28 U.S.C. § 636(b)(1)(B)* and *Northern District of New York Local Rule 72.3(c)*. *Fed. R. Civ. P. 72(b)*.

## III. DISCUSSION

### A. Plaintiff's Failure to Oppose Defendant's Motion

The court's local rules require that a party seeking the entry of summary judgment must submit a statement of material facts that it contends are undisputed by the record evidence. *N.D.N.Y. L.R. 7.1(a)(3)*. In **[*6]** opposition to that motion, the

local rules instruct the non-moving party to respond to the moving party's statement of material facts by specifically admitting or denying each of the facts listed in the moving party's statement. *Id.* The purpose underlying this rule is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N.Y., Nos. 09-CV-0360, 09-CV-0363, 2011 U.S. Dist. LEXIS 49658, 2011 WL 1770301, at *1 n.2 (N.D.N.Y. May 9, 2011)* (Sharpe, J.).[3] To meaningfully fulfill this purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement from the non-moving party.

In this instance, defendant Gillani has complied with *local rule 7.1(a)(3)*, providing a statement setting forth ten facts as to which, he contends, there is no genuine triable issue. Dkt. No. 36-11. Plaintiff has failed to respond to that statement. *See generally* Docket Sheet.

By its terms, *local rule 7.1* provides, in part, that "[t]he Court shall **[*7]** deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *N.D.N.Y. L.R. 7.1(a)(3)* (emphasis in original). Courts in this district have routinely enforced this provision in cases where a non-movant fails to properly respond. *See, e.g., Elgamil v. Syracuse Univ., No. 99-CV-0611, 2000 U.S. Dist. LEXIS 12598, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000)* (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n, 961 F. Supp. 406, 415 (N.D.N.Y. 1997)* (McAvoy, C.J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado, No. 96-CV-0169, 1998*

---

[3] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

*U.S. Dist. LEXIS 7903, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998)* (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a *pro se* litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins, No. 09-CV-0308, 2011 U.S. Dist. LEXIS 29743, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011)* **[*8]** (Mordue, C.J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendants' rule 7.1(a)(3) statement, Dkt. No. 36-1, and he has failed to do so, I have construed defendant's facts contained therein as true to the extent they are supported by accurate record citations. *See, e.g., Latouche, 2011 U.S. Dist. LEXIS 29743, 2011 WL 1103045, at *1*; *see also Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996)*. As to any facts not contained in defendant's rule 7.1(a)(3) statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry, 336 F.3d at 137*.

B. Failure to Exhaust

In his motion, defendant first argues that, because plaintiff did not file a grievance addressing the issues now raised in this action before commencing suit and pursue that grievance through the administrative grievance procedure available at Clinton, he is procedurally barred from pursuing this action. Def.'s Memo of Law (Dkt. No. 36-2) at 6-9.

The Prison Litigation Reform Act of 1996 ("PLRA"), *Pub. L. No. 104-134, 110 Stat. 1321 (1996)*, which imposes several restrictions on the ability of prisoners **[*9]** to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under *section 1983* of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *42 U.S.C.*

*§ 1997e(a)*; *see also Woodford v. Ngo, 548 U.S. 81, 84, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)* ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley, No. 04-CV-4587, 2007 U.S. Dist. LEXIS 6899, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007)* ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under *Section 1983*."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002)*.

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord, 347 F.3d 431, 434 (2d Cir. 2003)*. Instead, failure to exhaust **[*10]** is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints."[4] *Jones v. Bock, 549 U.S. 199, 216, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)*. In the event a defendant establishes that the inmate-plaintiff failed to complete the administrative review process prior to commencing the action, the plaintiff's complaint is subject to dismissal. *See Woodford, 548 U.S. at 93* ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford, 548 U.S. at 95*; *see also Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007)* (citing *Woodford*).[5]

In New York, prisons inmates are subject to a three-step Inmate Grievance Program ("IGP") established by the DOCCS and recognized as an "available" remedy for purposes of the PLRA. *Mingues v. Nelson, No. 96-CV-5396, 2004 U.S. Dist. LEXIS 2492, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004)* (citing *N.Y. Corrs. Law § 139* (McKinney's 2003); *7 N.Y.C.C.R. § 701.7*; *Rodriguez v. Hahn, 209 F. Supp. 2d 344, 347 (S.D.N.Y. 2002)*; *Mendoza v. Goord, No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, 2002 WL 31654855, at *2 (S.D.N.Y. Nov. 21, 2002))*. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident at issue.[6] *7 N.Y.C.R.R. § 701.5(a)*. The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id*. *§§ 701.4(b)*, *701.5(b)*. If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id*. *§ 701.5(c)*. The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), **[*12]** which makes the final administrative decision. *Id*. *§ 701.5(d)*. Ordinarily, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to *section 1983* in a federal court. *Reyes v. Punzal, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002)* (citing, *inter alia, Sulton v. Greiner, No. 00-CV-0727, 2000 U.S. Dist. LEXIS 17887, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000))*.

Defendant's rule 7.1(a)(3) statement asserts, and by his failure to respond, plaintiff admits, that plaintiff "never filed a grievance at Clinton Correctional Facility alleging that Dr. Gillani was prescribing medication that was being administered over his objection," and that he "never filed an appeal to the [CORC] involving the injections of medications

---

[4] In this case, defendant Gillani raised failure to exhaust administrative remedies as a defense in his answer to plaintiff's complaint. Dkt. No. 30 at ¶ 6.

[5] While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct **[*11]** in order to satisfy the PLRA. *Macias, 495 F.3d at 43* (quoting *Johnson v. Testman, 380*

---

*F.3d 691, 697-98 (2d Cir. 2004)* (emphasis omitted)).

[6] The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." *7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b)*.

being administered by Dr. Gillani or his staff over his objection." Def.'s L.R. 7.1(a)(3) Statement (Dkt. No. 36-11) at ¶¶ 1, 2. These assertions are supported by record evidence including an affidavit from Christine Gregory, the IGP Supervisor at Clinton, and Karen R. Bellamy, the Director of the DOCCS IGP. Gregory Affd. (Dkt. No. 36-8) [*13] at ¶¶ 5-8; Bellamy Affd. (Dkt. No. 36-9) at ¶¶ 6-7; Bellamy Affd. Exh. A (Dkt. No. 36-9) at 3-4. In addition, at his deposition plaintiff acknowledged his failure to exhaust during the following exchange:

Q. When you were receiving the shots from 2007 until 2010, did you ever go through the grievance process?

A. No; I'm not a firm believer in the grievance process, no.

Q. You never field any grievances about the shots and you didn't want to take them or you were receiving them involuntarily?

A. No, I filed the lawsuit.

Q. So besides filing the lawsuit, have you filed anything else in the State prison system regarding either Dr. Gillani or the shots.

A. No.

Muse Decl. Exh. 4 (Dkt. No. 36-7) at 33.

Although it is clear from the record that plaintiff failed to avail himself of the administrative remedies available to him through the IGP, his failure to do so does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g.,* [*14] *Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)*; *see also Macias, 495 F.3d at 41*. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias, 495 F.3d at 41*; *Hemphill, 380 F.3d at 686*. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id*. In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id*.

In this instance, there is no record evidence to suggest that the IGP was not fully available to the plaintiff in this matter. In addition, plaintiff admitted at his deposition that the failure [*15] to exhaust remedies was his decision, and not the product of any interference or special circumstances that would justify excusing him from the PLRA's exhaustion requirement. *See* Muse Decl. Exh. 4 (Dkt. No. 36-7) at 33 (testifying that he did not use the grievance procedure to complain about receiving shots between 2007 and 2010 because he is "not a firm believer in the grievance process"). Based upon this evidence, which Phipps has not disputed, I conclude that this action is subject to dismissal based on plaintiff's failure to exhaust his available administrative remedies before commencing this suit.

IV. SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action alleges that defendant Gillani, the sole remaining defendant in the action, involuntarily subjected him to injections of Risperdal in violation of his substantive due process rights under the *Fourteenth Amendment*. The record firmly discloses, however, that the plaintiff did not file a grievance and pursue that grievance to completion, pursuant to the established DOCCS IGP prior to commencing this action, as required under *42 U.S.C. § 1997e(a)*. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for [*16] summary judgment (Dkt. No. 36) be

2013 U.S. Dist. LEXIS 132088, *16

GRANTED, and that plaintiff's complaint in this action be DISMISSED for failure to exhaust available administrative remedies before commencing suit.

NOTICE: Pursuant to *28 U.S.C. § 636(b)(1)*, the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 6(a)*, *6(d)*, *72*; *Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: July 23, 2013

Syracuse, New York

/s/ David E. Peebles

David E. Peebles

U.S. Magistrate Judge

**End of Document**